IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

**ORIGINAL**
**FILED IN CLERK'S OFFICE**
U.S.D.C.

JAN 3 0 2003

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

| | | |
|---|---|---|
| WILLIAM WORTHEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action File No. |
| v. | ) | 1-00-CV-1717 (CC) |
| | ) | |
| WORLD CHAMPIONSHIP | ) | |
| WRESTLING, INC. and | ) | **JURY TRIAL DEMANDED** |
| TURNER SPORTS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF'S NOTICE OF FILING APPENDIX

Plaintiff, WILLIAM WORTHEN, hereby serves notice that he is filing herewith in the above-styled case an Appendix containing copies of relevant deposition testimony and exhibit documents in support of his Response To Defendants' Motion For Summary Judgment filed with this Court.

This __30th__ day of __January__, 2003.

_____
Cary Ichter
Georgia Bar No. 382515
Charles J. Gernazian
Georgia Bar No. 291703
Michelle M. Rothenberg-Williams
Georgia Bar No. 615680

**MEADOWS, ICHTER & BOWERS, P.C.**
Fourteen Piedmont Center, Suite 1100
3535 Piedmont Road
Atlanta, GA 30305
Telephone:   (404) 261-6020
Telecopy:    (404) 261-3656

108

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| WILLIAM WORTHEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action File No.: |
| v. | ) | 1-00-CV-1717 (CC) |
| | ) | |
| WORLD CHAMPIONSHIP | ) | |
| WRESTLING, INC. and | ) | **JURY TRIAL DEMANDED** |
| TURNER SPORTS, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## APPENDIX OF EXHIBITS AND DEPOSITION EXCERPTS

A.   Affidavit of William Worthen

B.   Plaintiffs' Exhibit No. 11

C.   Plaintiffs' Exhibit No. 12

D.   Plaintiffs' Exhibit No. 13

E.   Defendant's Exhibit No. 6

F.   List of Heavyweight Champions

G.   EEOC Charge Against WCW

H.   Excerpts of Deposition Transcript of William Boulware

I.   Excerpts of Deposition Transcript of Tony Carr

J.   Declaration of J.P. Snakovsky

K.   Declaration of George Grace

L.   Carr Memorandum of Law In Support of Defendants' Motion
     for Summary Judgment

M.   Ross Memorandum of Law In Support of Defendants' Motion
     for Summary Judgment

N.   Supplemental Report of Dr. David Rasmussen

O.   Plaintiffs' Exhibit No. 26A

P.   Plaintiffs' Exhibit No. 75

Q.   Plaintiffs' Exhibit No. 76

R.   Plaintiffs' Exhibit No. 64

S.   Plaintiffs' Exhibit No. 44

T.   Norris Memorandum of Law In Support of Defendants' Motion
     for Summary Judgment

U.   Plaintiffs' Rule 26(a)(2) Disclosures of Expert J. Steve
     Hicks

V.   Plaintiffs' Exhibit No. 72

W.   Plaintiffs' Exhibit No. 18

X.   Affidavit of Moses Williams

Y.   Excerpts of Deposition Transcript of Pez Whatley

Z.   Interview of Olie Anderson

AA.  Affidavit of Pamela Collins

BB.  Walker Memorandum of Law In Support of Defendants' Motion
     for Summary Judgment

CC.  Plaintiffs' Exhibit No. 5

DD.  Plaintiffs' Exhibit No. 10

EE.  Plaintiffs' Exhibit No. 15

FF.  Plaintiffs' Exhibit No. 2

GG.  Plaintiffs' Exhibit No. 49

HH.  Affidavit of Bobby Walker

II.  Affidavit of J. Steve Hicks

JJ.  Plaintiff's Rule 26 Expert Report of Dr. David Rasmussen

KK.  Affidavit of Brenda Smith

LL.  Affidavit of Catherine Neal

MM.  Defendants' Supplemental Responses to Plaintiffs'

Interrogatories

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all parties in the foregoing matter with the foregoing **Plaintiff's Notice of Filing Appendix** by depositing a copy of same in the United States Mail, postage prepaid and properly addressed as follows:

> Eric Richardson
> Evan Pontz
> Troutman Sanders LLP
> Suite 5200, Bank of America Plaza
> 600 Peachtree Street, N.E.
> Atlanta, Georgia  30308-22165

This _30th_ day of January, 2003.

Michelle M. Rothenberg-Williams



# EXHIBIT / ATTACHMENT

## A

(To be scanned in place of tab)

## DECLARATION OF WILLY WORTHEN

STATE OF GEORGIA
COUNTY OF FULTON

Before the undersigned officer appeared Willy Worthen, who,
after being placed under oath, says and deposes as follows:

1.

My name is Willy Worthen.  I am over eighteen (18) years of
age, and I am otherwise competent to make this affidavit.

2.

I have been involved in bodybuilding since the time I was
eighteen years old and won several bodybuilding titles during my
early years of competition.

3.

I became interested in training to become a professional
wrestler and contacted the Power Plant to inquire about the
process.  I was informed that I needed to pay $250 to "try out,"
and that if I made it through the tryout and WCW thought I was
good enough to be a WCW superstar, I would be invited back to
train for approximately six months for a fee of $5,000.

4.

I attended a try-out and, at the conclusion of the tryout,
I was invited to join WCW's training program.

5.

I was excited about the prospect of becoming a "WCW superstar," and made a $1,000 down-payment to begin training at the Power Plant. I paid the remaining fees in $400 monthly installments.

6.

To satisfy WCW's request that I train "full time," I quit my job at the Department of Corrections and began attending the Power Plant on a full-time basis.

7.

For over two years, I traveled approximately 214 miles round-trip each day to attend training at the Power Plant.

8.

On many "training" days, I received no wrestling training at all. Instead, WCW required me to perform labor at the facility, including cleaning, sweeping the mats, putting up and taking down the wrestling rings, and loading/unloading trucks. I was not compensated for any of this work.

9.

During the time I was at the Power Plant, I worked at least thirty-five (35) hours per week for two years. WCW did not compensate me for any of this work.

2

10.

When WCW moved the Power Plant from Carol Drive to Log
Cabin Drive, I helped load trucks to assist with the move.  I
received no compensation for any of this work.  WCW simply used
me for free labor.

11.

WCW's Caucasian trainees did not perform janitorial tasks
and menial labor and were not required to attend the Power Plant
"full time."  In fact, many of the Caucasian "trainees" did not
show up to the Power Plant at all.  During this time, I
continued to train "full time" at WCW's direction without
receiving a contract.

12.

In spite of the fact that they refused or were not required
to train, WCW offered contracts to many Caucasian "trainees" who
did not have prior wrestling experience and who began at the
Power Plant at the same time as or after I did, including the
following: "Horshoe," Joseph Bradley Kane pka "Lodi," Evan
Karagias pka "Evan Courageous," "Spiderman", John Greene pka
"Johnny Attitude," Dale Torberg pka "The Daemon," Scott Chasser
pka "Lorenzo," Brett Hammer, Robert Vick pka "Sickboy," William
Tatum pka "Chase Tatum," Sammy Roman pka "Kid Romeo," Mark
LeRoux pka "Lash LaRue," Mike Sanders, "Kiwi," Chuck Palumbo,
Luther "Big Sexy" Biggs, Mark Jindrek pka "Mark Millennium,"

5

Rick Cornell pka "Reno," Jacobus Strauss pka "Jake," Joan Hugger pka "Johnny the Bull," Craig O'Malley pka "Irish Invasion," and Bill Goldberg.

13.

At the same time as WCW offered contracts to Caucasian wrestlers with less training experience, WCW trainer, Whatley, explicitly told me that because I am black, I would have to work "even harder" than Caucasians trainees to succeed at WCW.

14.

While at the Power Plant, I experienced the negative racial attitudes exhibited by WCW's management. During one match, a WCW announcer referred to me as "Willie B," which was the name of the famous gorilla at the Atlanta zoo. WCW chose not to edit the reference and allowed it to air unaltered. When I complained about this incident to the WCW trainers, they simply laughed.

15.

On another occasion, I witnessed Marcus Bagwell's performance in "black face." I again complained about this incident to the WCW trainers, who again laughed.

16.

Terry Taylor refused to give me a contract and did nothing to "push" me or to provide me with opportunities to succeed despite the repeated recommendations of the WCW trainers, who

4

told me that they had tried to tell WCW management that I was qualified but that management would not listen.

17.

After two years of "training" that included performing janitorial services for WCW without receiving any compensation, I had completely depleted my life savings and needed an income to support myself, my family and my efforts to continue "training" at the Power Plant. I sought out part-time employment as a security guard but continued to travel the 214 miles required to train at the Power Plant. Although I was attending the Power Plant part-time, WCW still required me to spend some part of every day, and in some instances, my entire training day, performing janitorial work and other menial tasks.

18.

Eventually, I stopped working as a security guard and obtained employment with Federal Express. Around this time, WCW was in the process of moving the Power Plant from its location at Caroll Drive to a new location at Log Cabin Drive. I learned that only wrestlers who were under contract for WCW would be allowed to train at the Power Plant once WCW completed the move. After I learned that WCW would not allow me to continue to train at the Power Plant, I discontinued my training altogether. By this time, I had spent three (3) years traveling to and from the Power Plant without any reimbursement, performing janitorial

FROM : MORE THAN MAIL
PHONE NO. : 19124521846
Jan. 27 2003 03:33PM P7
01/27/2003 15:12 FAX 404 261 5838
MEADORS ICHTER&BOWERS
007/009

Case 1:00-cv-01767-CC   Document 108   Filed 01/30/03   Page 12 of 530

work without being compensated, watching less experienced
Caucasian wrestlers receive contracts, depleting my savings, and
spending money on "training fees," wrestling equipment and
medical bills without receiving a contract

19.

Even after I stopped training at the Power Plant, I
remained ready, willing and able to wrestle for WCW and would
have signed a contract with WCW had WCW ever offered me one.

20.

During the time I was at WCW, I regarded the work
environment as being hostile to blacks.  The use of racial
slurs, the unequal treatment of blacks in their work
opportunities, the fact that black wrestlers were called upon to
do work that white wrestlers were not required to do all made
blacks feel they were unwelcome and wanted only for the purpose
of temporary exploitation at WCW.  This hostile work environment
discouraged me and made me worry that I would never be given a
chance to succeed at WCW.  I believe that, while I always did my
best at WCW, the environment there had a negative effect upon my
performance over time.

21.

There were many Caucasian trainees from the Power Plant
with equal or less training experience than me who WCW scripted
to win multiple matches.  For example, the following wrestlers

6

FROM : MORE THAN MAIL          PHONE NO. 108 1942451046         Jan. 27 2003 03:33PM P8
01/27/2003 15:12 FAX 404 281 3658          MEADOWS, ICHTER&BOWERS          Ⓩ008/009

Case 1:00-cv-0177-CC   Document 108   Filed 01/30/08   Page 13 of 530

with similar or less training experience as me won multiple wrestling matches: "Horeshoe, Dale Torberg pka "The Daemon," Scott Chasser pka "Lorenzo," Robert Vick pka "Sickboy," Mark LeRoux pka "Lash LaRue," Rick Cornell pka "Reno," Bill Goldberg and Evan Koragias pka "Evan Courageous."

22.

During my entire tenure at the Power Plant, WCW scripted me to win only one match. Although WCW told me that the match was taped to be aired on television at a later date, WCW never aired that match.

23.

Although I wrestled in a few wrestling matches, my experience consisted of wrestling as a "jobber" or "enhancement talent," someone who is used to enhance the career of another wrestler, typically a Caucasian.

24.

WCW utilized, pushed and offered contracts to many Caucasian wrestlers that had less or similar experience as me.

25.

During my tenure at the Power Plant, I observed Terry Taylor routinely come to the Power Plant to help Caucasian trainees. He helped the Caucasian trainees to develop their characters and gimmicks and gave them pointers as to how to improve their stage persona. He also helped them improve their

7

physical wrestling skills by wrestling against them and working with them in the ring. I personally observed Terry Taylor work with the following Caucasian trainees in this manner: Chad Fortune, Chip Minton, Peter Gruner pka "Billy Kidman," Joseph Dorgan pka "Johnny Swinger," Mark Jindrek pka "Mark Millennium," Robert Vick pka "Sickboy," Rob Knapik and Kenneth Stasiowski of "High Voltage," "Horeshoe," and Bill Goldberg.

26.

I never observed Terry Taylor similarly work with any African-American trainee.

27.

During the time that I attended the Power Plant, I learned that African-Amerian Rocky King had complained to WCW that the head of WCW's security department, Doug Dillinger, had called Rocky King a "nigger" and that WCW did not respond to King's complaint in any way.

28.

I declare under penalty of perjury that the foregoing is true and correct.

Willy Northen

Executed on (Date)

6



# EXHIBIT / ATTACHMENT

## B

(To be scanned in place of tab)

FULL LEGAL NAME: *Willie Worthen*

RING NAME: _____

D.O.B. _____

CURRENT ADDRESS _____

PHONE: _____

SS#: _____

EMERGENCY CONTACT: _____


TRY OUT DATE: _____

STARTING DATE: *9/20/97*

COMMENTS: WILLIE HAS DONE TV WORK FOR WCW, AND IS STILL DOING TV WHENEVER WCW NEEDS HIM. WILLIE LOOKS GOOD, HAS A GREAT ATTITUDE, WORKS VERY WELL IN THE RING. IS AN EXCELLENT ENHANCEMENT TALENT.



PLAINTIFF'S EXHIBIT

WCW 002554
CONFIDENTIAL



# EXHIBIT / ATTACHMENT

## _____C_____

(To be scanned in place of tab)

ME  William Worthen

RING NAME  Same

HEIGHT  6'1"

WEIGHT  251

TIME IN POWER PLANT  1 year

HOMETOWN  Milledgeville,GA

BACKGROUND INFORMATION: Athlete and Personal trainer;Trained at the Power Plant and has been successfully used on the WCW wrestling program;

TYPE OF CHARACTER PORTRAYED:Fast moving,charismatic,agressive-comes to the ring to look good as well to win every match;Powerful and graceful at the same time.



PLAINTIFF'S EXHIBIT

WCW 002748

CONFIDENTIAL



# EXHIBIT / ATTACHMENT

## D

(To be scanned in place of tab)

TALENT EVALUATIONS FOR THE POWER PLANT, JANUARY, 1999:

"HEAVYWEIGHT DIVISION

WILLIE WORTHEN:          $500.00

GOOD SOLID WORKER THAT TAKES GOOD BUMPS, CAN WORK AS A HEEL OR A
BABYFACE.

"LOOK FOR TV."

WILLIE LOOKS LIKE AN ATHELETE,  HIS "GIMMICK" IS HIS SOLID CONVINCING WORK IN
THE RING.





WCW 002749

**CONFIDENTIAL**



# EXHIBIT / ATTACHMENT

_____ E _____

(To be scanned in place of tab)

☐ VOID    ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|
| WORLD CHAMPIONSHIP WRESTLING | $ | | |
| CNN CENTER | 2 Royalties | **1997** | Miscellaneous |
| ATLANTA                        GA | $ | | Income |
| 30348          PH: 404-827-1142 | 3 Other income | Form 1099-MISC | |
| | $ | | Copy |

| PAYER'S Federal identification number | RECIPIENT'S identification number | 4 Federal income tax withheld | 5 Fishing boat proceeds | For Payer |
|---|---|---|---|---|
| 58-1811414 | 260230171 | $ | $ | or State Copy |

| RECIPIENT'S name, address, and ZIP code | 6 Medical and health care payments | 7 Nonemployee compensation | For Paperwork |
|---|---|---|---|
| WORTHEN, WILLIE | $ | 1800.00 | Reduction Act |
| 110 MAPLEWOOD AVE | 8 Substitute payments in lieu of dividends or interest | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | Notice and Instructions for completing this |
| MILLEDGEVILLE        GA 31061 | 10 Crop insurance proceeds | 11 State income tax withheld | form, see Instructions for |

| Account number (optional) | | 2nd TIN Not. | 12 State/Payer's state number | 13 | Forms 1099, |
|---|---|---|---|---|---|
| 97006 | | ☐ | $ | | 1098, 5498, and W-2G |

1099 MISC                                                    Department of the Treasury - Internal Revenue Service

**DEFENDANT'S EXHIBIT**

6

**CONFIDENTIAL**

WCW 002533

PAYER'S name, street address, city, state, ZIP code, and telephone no.

WORLD CHAMPIONSHIP WRESTLING
CNN CENTER
ATLANTA                              GA
30348

☐ VOID   ☐ CORRECTED

| | OMB No. 1545-0115 | |
|---|---|---|
| 1 Rents $ | **1998** | Miscellaneous Income |
| 2 Royalties $ | Form 1099-MISC | |
| 3 Other income $ | | |

PAYER'S Federal identification number | RECIPIENT'S identification number

58-1831414

| 4 Federal income tax withheld $ | 5 Fishing boat proceeds $ |
|---|---|

RECIPIENT'S name, address, and ZIP code

WORTHEN, WILLIE
110, MAPLEWOOD AVE
MILLEDGEVILLE          GA 31061

| 6 Medical and health care payments $ | 7 Nonemployee compensation $ |
|---|---|
| 8 Substitute payments in lieu of dividends or interest $ | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ |
| 10 Crop insurance proceeds $ | 11 State income tax withheld $ |

Account number (optional)        2nd TIN Not.

97006        ☐

| 12 State/Payer's state number | 13 $ |
|---|---|

Form 1099-MISC        Department of the Treasury - Internal Revenue Service

CONFIDENTIAL

WCW 002534



# EXHIBIT / ATTACHMENT

## F

(To be scanned in place of tab)

As per your request.:

In March of 2001 is the time when Booker T won back the title back from Steiner.   This was the last TV under Russo and Taylor's control and believe this was the time that Moses and Johnny is talking about.  Russo and Taylor wanted to put the belt back on Booker in order to make it appear that they were not being discriminating against the minority talent in WCW.

### WCW World Heavyweight Title History

| Name | Date | Location | Notes |
|------|------|----------|-------|
| Ric Flair | January 11, 1991 | East Rutherford, New Jersey | 1 |
| Lex Luger | July 14, 1991 | Baltimore, Maryland | 2 |
| Sting | February 29, 1992 | Milwaukee, Winsconsin | |
| Big Van Vader | July 12, 1992 | Albany, Georgia | |
| Ron Simmons | August 2, 1992 | Baltimore, Maryland | |
| Big Van Vader (2) | December 20, 1992 | Baltimore, Maryland | |
| Sting (2) | March 11, 1993 | London, England | |
| Big Van Vader (3) | March 17, 1993 | Dublin, Ireland | |
| Ric Flair (2) | December 27, 1993 | Charlotte, North Carolina | 3 |
| Ric Flair (3) | April 24, 1994 | Atlanta, Georgia | 4 |
| Hulk Hogan | July 17, 1994 | Orlando, Florida | |
| The Giant | October 29, 1995 | Detroit, Michigan | 5 |
| Randy Savage | November 26, 1995 | Norfolk, Virginia | 6 |
| Ric Flair (4) | December 27, 1995 | Nashville, Tennessee | |
| Randy Savage (2) | January 22, 1996 | Las Vegas, Nevada | |
| Ric Flair (5) | February 11, 1996 | Saint Petersburg, Florida | |
| The Giant (2) | April 22, 1996 | Albany, Georgia | |
| Hulk Hogan (2) | August 10, 1996 | Sturgis, South Dakota | |
| Lex Luger (2) | August 4, 1997 | Auburn Hills, Michigan | |
| Hulk Hogan (3) | August 9, 1997 | Sturgis, South Dakota | |
| Sting (3) | December 28, 1997 | Washington, D.C. | 7 |
| Sting (4) | February 22, 1998 | San Francisco, California | 8 |
| Randy Savage (3) | April 19, 1998 | Denver, Colorado | |
| Hulk Hogan (4) | April 20, 1998 | Colorado Springs, Colorado | |

| | | | |
|---|---|---|---|
| Bill Goldberg | July 6, 1998 | Atlanta, Georgia | |
| Kevin Nash | December 27, 1998 | Washington, D.C. | |
| Hulk Hogan (5) | January 4, 1999 | Atlanta, Georgia | |
| Ric Flair (6) | March 14, 1999 | Louisville, Kentucky | |
| Diamond Dallas Page | April 11, 1999 | Tacoma, Washington | 9 |
| Sting (5) | April 26, 1999 | Fargo, North Dakota | |
| Diamond Dallas Page (2) | April 26, 1999 | Fargo, North Dakota | 10 |
| Kevin Nash (2) | May 9, 1999 | Saint Louis, Missouri | |
| Randy Savage (4) | July 11, 1999 | Fort Lauderdale, Florida | 11 |
| Hulk Hogan (6) | July 12, 1999 | Jacksonville, Florida | |
| Sting (7) | September 12, 1999 | Winston-Salem, North Carolina | |
| Bret Hart | November 21, 1999 | Toronto, Ontario, Canada | 12 |
| Bret Hart (2) | December 20, 1999 | Baltimore, Maryland | 13 |
| Chris Benoit | January 16, 2000 | Cincinatti, Ohio | 14 |
| Sid Vicious | January 24, 2000 | Los Angeles, California | 15 |
| Kevin Nash (3) | January 25, 2000 | Las Vegas, Nevada | 16 |
| Sid Vicious (2) | January 25, 2000 | Las Vegas, Nevada | 17 |
| Jeff Jarrett | April 16, 2000 | Chicago, Illinois | 18 |
| Diamond Dallas Page (3) | April 24, 2000 | Rochester, New York | |
| David Arquette | April 25, 2000 | Syracuse, New York | 19 |
| Jeff Jarrett (2) | May 7, 2000 | Kansas City, Missouri | 20 |
| Ric Flair (7) | May 15, 2000 | Biloxi, Mississippi | |
| Jeff Jarrett (3) | May 22, 2000 | Grand Rapids, Michigan | 21 |
| Kevin Nash (4) | May 23, 2000 | Saginaw, Michigan | 22 |
| Ric Flair (8) | May 29, 2000 | Salt Lake City, Utah | 23 |
| Jeff Jarrett (4) | May 29, 2000 | Salt Lake City, Utah | |
| Booker T. | July 9, 2000 | Daytona Beach, Florida | 24 |
| Kevin Nash (5) | August 28, 2000 | Las Cruces, New Mexico | |
| Booker T. (2) | September 17, 2000 | Buffalo, New York | |
| Vince Russo | September 25, 2000 | Uniondale, New York | 25 |
| Booker T. (3) | October 2, 2000 | San Francisco, California | 26 |

12. Bret Hart defeated Chris Benoit in a 32-man tournament final to win the title.

13. Bret Hart vacated the title on "NITRO" in the show and defeated Bill Goldberg for the title in the main event.

14. Title was vacated on January 15, 2000 due to Bret Hart's injury. Chris Benoit defeated Sid Vicious for the title. Title was then vacated on January 17, 2000 due to a dispute with WCW.

15. Sid Vicious defeated Kevin Nash for the title. Was stripped of the title a day later by "commissioner" Nash.

16. Kevin Nash awards himself the title after stripping it from Sid Vicious.

17. Sid Vicious defeated Kevin Nash and Ron Harris to win the title.

18. Vince Russo vacated the title on April 10, 2000 in Denver, Colorado. Jeff Jarrett defeated Diamond Dallas Page in a tournament final.

19. David Arquette pins Eric Bischoff in a tag team match to win the title in a stipulation tag team match between Diamond Dallas Page and David Arquette vs. Jeff Jarrett and Eric Bischoff. Vacated the title on May 1, 2000.

20. Jeff Jarrett defeated David Arquette and Diamond Dallas Page in a triple cage match to win the title.

21. Ric Flair was stripped of the title, the title was then awarded by Vince Russo.

22. Kevin Nash defeated Jeff Jarrett and Scott Steiner in a three way to win the title.

23. Kevin Nash hands the title over to Ric Flair.

24. Hulk Hogan pinned Jeff Jarrett to win the World Heavyweight Title. But, Vince Russo comes back out and explains to the crowd that he has been dealing with Hogan's politics all day and gives Hogan "his" WCW World title belt as the Hulk Hogan Memorial Belt because it doesn't mean squat anymore; Russo claims Jarrett is still the WCW Champion but with a new belt and will defend his title against Booker T, a man who has been "held back by Hogan for 14 years". Booker then pinned Jarrett to win the title.

25. This was a steel cage match. Title vacated by Russo on October 2, 2000.

26. Booker T. defeated Jeff Jarrett in a "San Francisco 49er box" match.

27. This is the first time the WCW World Heavyweight Title changed hands on WWF television.

28. Chris Jericho unifies the WCW World Heavyweight Title with the WWF World Heavyweight Title on December 9, 2001 when he defeated Steve Austin.

---

Get your FREE download of MSN Explorer at http://explorer.msn.com.



# EXHIBIT / ATTACHMENT

## G

(To be scanned in place of tab)

# CHARGE OF DISCRIMINATION

| | | | CHARGE NUMBER |
|---|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | | ☐ FEPA<br>☒ EEOC | 110920735 |

_____ _____ and EEOC

State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mr. Robert L. Ross, Jr. | (404) 974-8145 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 6309 PICKETTS WAY, ACWORTH, GA 30101 | | 07/15/59 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| WCW WORLD CHAMPIONSHIP WRESTLING | Cat A (15-100) | (404) 827-2066 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1 CNN CENTER, ATLANTA, GA 30303 | | 121 |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN<br>☐ RETALIATION ☐ AGE ☐ DISABILITY ☐ OTHER (Specify) | EARLIEST (ADEA/EPA)   LATEST (ALL)<br>/ /       07/14/91<br>☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

I.  On 7-14-91 I was discharged from my position as a professional wrestler.  I had been employed since 1-15-91.

II.  Mr. Jim Heard, executive vice-president, Dusty Rhodes, booker and T. A. Magnum, assistant booker, stated that my contract was not being renewed because of budgetary reasons.

III.  I believe that I have been discriminated against because of my race/black in violation of Title VII of the Civil Rights Act of 1964, as amended.

"This perfects my original correspondence that was timely filed with the Commission on 01-10-92."

| ☐ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| Date  2/14/92    Robert L Ross Jr<br>Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |

EEOC TEST FORM 5 (09/01/91)

**FILE COPY**

WCW 102034

# CHARGE OF DISCRIMINATION

| | | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA  ☒ EEOC | 110 820735  AMENDED |

_____ and EEOC

_State or local Agency, if any_

| NAME _(Indicate Mr., Ms., Mrs.)_ | HOME TELEPHONE _(Include Area Code)_ |
|---|---|
| Mr. Robert L. Ross | (404) 974-8145 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 6309 PICKETT WAY, ACWORTH, GA 30101 | | 07/15/59 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME _(If more than one list below.)_

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE _(Include Area Code)_ |
|---|---|---|
| WCW WORLD CHAMPIONSHIP WRESTLING | Cat C (201-500) | (404) 827-2066 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1 CNN CTR., STE. 1280, SOUTH TOWER, ATLANTA, GA 30303 | | 121 |

| NAME | TELEPHONE NUMBER _(Include Area Code)_ |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

| CAUSE OF DISCRIMINATION BASED ON _(Check appropriate box(es))_ | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN  ☐ RETALIATION ☐ AGE ☐ DISABILITY ☐ OTHER _(Specify)_ | EARLIEST _(ADEA/EPA)_  07/14/91  LATEST _(ALL)_  07/14/91  ☐ CONTINUING ACTION |

THE PARTICULARS ARE _(If additional space is needed, attach extra sheet(s)):_

(AMENDED CHARGE)

I. On 7-14-91 I was discharged from my position as a professional wrestler. I had been employed since 1-15-91. During my tenure I was paid less wages than similarly situated White wrestlers.

II. Mr. Jim Heard, executive vice-president, Dusty Rhodes, booker and T. A. Magnum, assistant booker, stated that my contract was not being renewed because of budgetary reasons. When I inquired about the difference in wages, Jim Heard told me that I should just be glad that I had a job.

III. I believe that I have been discriminated against because of my race/Black in violation of Title VII of the Civil Rights Act of 1964, as amended.

"This perfects my original correspondence that was timely with the Commission on 01-10-92."

RECEIVED EEOC 92 MAR 27 A II: 12

| ☐ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - _(When necessary for State and Local Requirements)_ |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| _Robert L. Ross Jr._  27 mar 92 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE _(Day, month, and year)_ |
| Date   Charging Party _(Signature)_ | |

EEOC TEST FORM 5 (09/01/91)

**FILE COPY**

WCW 102035

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

PERSON FILING CHARGE

Mr. Jack Petrik, General Mgr.
CEO
WCW World Championship
Wrestling
1 CNN Center
Atlanta, GA. 30303

| THIS PERSON *(Check One)* |
|---|
| CLAIMS TO BE AGGRIEVED |
| IS FILING ON BEHALF OF OTHER PERSON(S) |

DATE OF ALLEGED VIOLATION
7-14-91

PLACE OF ALLEGED VIOLATION
Atlanta

CHARGE NUMBER
110920735

## NOTICE OF CHARGE OF DISCRIMINATION
*(See reverse side of this notice for additional information)*

You are hereby notified that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act of 1964.

[ ] The Age Discrimination in Employment Act of 1967.

[ ] An Equal Pay Act (29 USC, §206(d)) investigation will be conducted concurrently with our investigation of this charge.

The boxes checked below apply to your organization:

1. [X] No action is required on your part at this time.

2. [ ] Please submit by_____ a statement of your position with respect to the allegation(s) contained in this charge, with copies of any supporting documentation. This material will be made a part of the file and will be considered at the time that we investigate this charge. Your prompt response to this request will make it easier to conduct and conclude our investigation of this charge.

3. [ ] Please respond fully by _____ to the attached request for information which pertains to the allegations contained in this charge. Such information will be made a part of the file and will be considered by the Commission during the course of its investigation of the charge.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

Ms. Carolyn Daniel  Supervisor
*(Commission Representative)*

(404) 331 0632
*(Telephone Number)*

[ ] Enclosure: Copy of Charge

BASIS OF DISCRIMINATION

[X] RACE  [ ] COLOR  [ ] SEX  [ ] RETALIATION  [ ] AGE  [ ] RELIGION  [ ] NATIONAL ORIGIN

CIRCUMSTANCES OF ALLEGED VIOLATION:

| DATE | TYPED NAME/TITLE OF AUTHORIZED EEOC OFFICIAL | SIGNATURE |
|---|---|---|
| 1-17-92 | CHRIS ROGGERSON, DISTRICT DIRECTOR | |

EEOC FORM 131 (REV 2/89)   PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

WCW 102033

# CHARGE OF DISCRIMINATION

|  | AGENCY | CHARGE NUMBER |
|---|---|---|
| ☐ FEPA | | |
| ☒ EEOC | 110920735 | |

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

_____ and EEOC

*State or local Agency, if any*

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Mr. Robert L. Ross, Jr. | (404) 974-8145 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 6309 PICKETTS WAY, ACWORTH, GA 30101 | | 07/15/59 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| WCW WORLD CHAMPIONSHIP WRESTLING | Cat A (15-100) | (404) 827-2066 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1 CNN CENTER, ATLANTA, GA 30303 | | 121 |

| NAME | | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|---|
| | | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER *(Specify)*

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST(ADEA/EPA) | LATEST(ALL) |
| / / | 07/14/91 |
| ☐ CONTINUING ACTION | |

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

I.  On 7-14-91 I was discharged from my position as a professional wrestler.  I had been employed since 1-15-91.

II.  Mr. Jim Heard, executive vice-president, Dusty Rhodes, booker and T. A. Magnum, assistant booker, stated that my contract was not being renewed because of budgetary reasons.

III.  I believe that I have been discriminated against because of my race/black in violation of Title VII of the Civil Rights Act of 1964, as amended.

"This perfects my original correspondence that was timely filed with the Commission on 01-10-92."

| ☐ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - *(When necessary for State and Local Requirements)* |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| | SIGNATURE OF COMPLAINANT |
| 2/14/92                *Robert L Ross* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(Day, month, and year)* |
| Date            Charging Party *(Signature)* | |

EEOC TEST FORM 5 (09/01/91)

**FILE COPY**

WCW 102034

Case 1:00-cv-01471-CC Document 108 Filed 01/30/03 Page 33 of 530

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

|  | AGENCY | CHARGE NUMBER |
|---|---|---|
| ☐ FEPA | | 110 920735 |
| ☒ EEOC | | AMENDED |

_____     ___ ___
State or local Agency, if any

and EEOC

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mr. Robert L. Ross | (404) 974-8145 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 6309 PICKETT WAY, ACWORTH, GA 30101 | | 07/15/59 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| WCW WORLD CHAMPIONSHIP WRESTLING | Cat C (201-500) | (404) 827-2066 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1 CNN CTR., STE. 1280, SOUTH TOWER, ATLANTA, GA 30303 | | 121 |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☐ RETALIATION ☐ AGE ☐ DISABILITY ☐ OTHER (Specify)

| DATE DISCRIMINATION TOOK PLACE |  |
|---|---|
| EARLIEST (ADEA/EPA) | LATEST (ALL) |
| 07/14/91 | 07/14/91 |

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

(AMENDED CHARGE)

I.   On 7-14-91 I was discharged from my position as a professional wrestler. I had been employed since 1-15-91. During my tenure I was paid less wages than similarly situated White wrestlers.

II.  Mr. Jim Heard, executive vice-president, Dusty Rhodes, booker and T. A. Magnum, assistant booker, stated that my contract was not being renewed because of budgetary reasons. When I inquired about the difference in wages, Jim Heard told me that I should just be glad that I had a job.

III. I believe that I have been discriminated against because of my race/Black in violation of Title VII of the Civil Rights Act of 1964, as amended.

"This perfects my original correspondence that was timely with the Commission on 01-10-92."

| ☐ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| Robert L. Ross Jr. 27 mar 97 | |
| Date   Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |

EEOC TEST FORM 5 (09/01/91)

**FILE COPY**

WCW 102035

| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION | PERSON FILING CHARGE |
|---|---|
| Mr. Jack Petrik, General Mgr.<br>CEO<br>WCW World Championship<br>Wrestling<br>1 CNN Center<br>Atlanta, GA.   30303 | **THIS PERSON (Check One)**<br>CLAIMS TO BE AGGRIEVED<br>IS FILING ON BEHALF OF OTHER PERSON(S)<br><br>**DATE OF ALLEGED VIOLATION**<br>7-14-91<br><br>**PLACE OF ALLEGED VIOLATION**<br>Atlanta<br><br>**CHARGE NUMBER**<br>110920735 |

## NOTICE OF CHARGE OF DISCRIMINATION
*(See reverse side of this notice for additional information)*

You are hereby notified that a charge of employment discrimination has been filed against your organization under:

[X] **Title VII of the Civil Rights Act of 1964.**

[ ] **The Age Discrimination in Employment Act of 1967.**

[ ] **An Equal Pay Act (29 USC. §206(d)) investigation will be conducted concurrently with our investigation of this charge.**

The boxes checked below apply to your organization:

1. [X] No action is required on your part at this time.

2. [ ] Please submit by _____ a statement of your position with respect to the allegation(s) contained in this charge, with copies of any supporting documentation. This material will be made a part of the file and will be considered at the time that we investigate this charge. Your prompt response to this request will make it easier to conduct and conclude our investigation of this charge.

3. [ ] Please respond fully by _____ to the attached request for information which pertains to the allegations contained in this charge. Such information will be made a part of the file and will be considered by the Commission during the course of its investigation of the charge.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

Ms. Carolyn Daniel  Supervisor
—————————————————————————————
*(Commission Representative)*

(404) 331 0632
—————————————————————————————
*(Telephone Number)*

[ ] Enclosure: Copy of Charge

**BASIS OF DISCRIMINATION**

| [X] RACE | [ ] COLOR | [ ] SEX | [ ] RETALIATION | [ ] AGE | [ ] RELIGION | [ ] NATIONAL ORIGIN |
|---|---|---|---|---|---|---|

CIRCUMSTANCES OF ALLEGED VIOLATION:

| DATE | TYPED NAME/TITLE OF AUTHORIZED EEOC OFFICIAL | SIGNATURE |
|---|---|---|
| 1-17-92 | CHRIS ROGGERSON, DISTRICT DIRECTOR | |

EEOC FORM 131 (REV.2/89)   PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

**WCW 102033**

# CHARGE · DISCRIMINATION

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA ☒ EEOC | 110920735 |

_____ and EEOC

State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mr. Robert L. Ross, Jr. | (404) 974-8145 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 6309 PICKETTS WAY, ACWORTH, GA 30101 | | 07/15/59 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| WCW WORLD CHAMPIONSHIP WRESTLING | Cat A (15-100) | (404) 827-2066 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1 CNN CENTER, ATLANTA, GA 30303 | | 121 |

| NAME | | TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| | | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☒ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☐ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER (Specify)

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST (ADEA/EPA) | LATEST (ALL) |
| / / | 07/14/91 |
| ☐ CONTINUING ACTION | |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

I.  On 7-14-91 I was discharged from my position as a professional wrestler.   I had been employed since 1-15-91.

II.  Mr. Jim Heard, executive vice-president, Dusty Rhodes, booker and T. A. Magnum, assistant booker,  stated that my contract was not being renewed because of budgetary reasons.

III.  I believe that I have been discriminated against because of my race/black in violation of Title VII of the Civil Rights Act of 1964, as amended.

"This perfects my original correspondence that was timely filed with the Commission on 01-10-92."

| | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| ☐ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| 2/14/92  *Robert L. Ross Jr.*  Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |

Date

EEOC TEST FORM 5 (09/01/91)

**FILE COPY**

WCW 102034

# CHARGE OF DISCRIMINATION

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA ☒ EEOC | 110 920735 AMENDED |

_____ and EEOC

*State or local Agency, if any*

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Mr. Robert L. Ross | (404) 974-8145 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 6309 PICKETT WAY, ACWORTH, GA 30101 | | 07/15/59 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| WCW WORLD CHAMPIONSHIP WRESTLING | Cat C (201-500) | (404) 827-2066 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1 CNN CTR., STE. 1280, SOUTH TOWER, ATLANTA, GA 30303 | | 121 |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

| CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))* | DATE DISCRIMINATION TOOK PLACE |
|---|---|

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER *(Specify)*

| EARLIEST *(ADEA/EPA)* | LATEST *(ALL)* |
|---|---|
| 07/14/91 | 07/14/91 |

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

(AMENDED CHARGE)

I.  On 7-14-91 I was discharged from my position as a professional wrestler. I had been employed since 1-15-91. During my tenure I was paid less wages than similarly situated White wrestlers.

II.  Mr. Jim Heard, executive vice-president, Dusty Rhodes, booker and T. A. Magnum, assistant booker, stated that my contract was not being renewed because of budgetary reasons. When I inquired about the difference in wages, Jim Heard told me that I should just be glad that I had a job.

III.  I believe that I have been discriminated against because of my race/Black in violation of Title VII of the Civil Rights Act of 1964, as amended.

"This perfects my original correspondence that was timely with the Commission on 01-10-92."

RECEIVED-EEOC
MAR 27 AM 11: 12

| ☐ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - *(When necessary for State and Local Requirements)* |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| *Robert L. Ross Jr.* 27 mar 92 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(Day, month, and year)* |
| Date          Charging Party *(Signature)* | |

EEOC TEST FORM 5 (09/01/91)

FILE COPY

WCW 102035

| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION | PERSON FILING CHARGE |
|---|---|

Mr. Jack Petrik, General Mgr.
CEO
WCW World Championship
Wrestling
1 CNN Center
Atlanta, GA.   30303

**THIS PERSON (Check One)**

CLAIMS TO BE AGGRIEVED

IS FILING ON BEHALF OF OTHER PERSON(S)

**DATE OF ALLEGED VIOLATION**
7-14-91

**PLACE OF ALLEGED VIOLATION**
Atlanta

**CHARGE NUMBER**
110920735

## NOTICE OF CHARGE OF DISCRIMINATION
*(See reverse side of this notice for additional information)*

You are hereby notified that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act of 1964.

[ ] The Age Discrimination in Employment Act of 1967.

[ ] An Equal Pay Act (29 USC, §206(d)) investigation will be conducted concurrently with our investigation of this charge.

The boxes checked below apply to your organization:

1. [X] No action is required on your part at this time.

2. [ ] Please submit by _____ a statement of your position with respect to the allegation(s) contained in this charge, with copies of any supporting documentation. This material will be made a part of the file and will be considered at the time that we investigate this charge. Your prompt response to this request will make it easier to conduct and conclude our investigation of this charge.

3. [ ] Please respond fully by _____ to the attached request for information which pertains to the allegations contained in this charge. Such information will be made a part of the file and will be considered by the Commission during the course of its investigation of the charge.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

Ms. Carolyn Daniel  Supervisor
*(Commission Representative)*

(404) 331 0632
*(Telephone Number)*

[ ] Enclosure:  Copy of Charge

**BASIS OF DISCRIMINATION**

[X] RACE    [ ] COLOR  [ ] SEX    [ ] RETALIATION    [ ] AGE    [ ] RELIGION    [ ] NATIONAL ORIGIN

**CIRCUMSTANCES OF ALLEGED VIOLATION:**

| DATE | TYPED NAME/TITLE OF AUTHORIZED EEOC OFFICIAL | SIGNATURE |
|---|---|---|
| 1-17-92 | CHRIS ROGGERSON, DISTRICT DIRECTOR | |

EEOC FORM 131 (REV.2/89)    PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

**WCW 102033**

# CHARGE OF DISCRIMINATION

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA ☒ EEOC | 110930735 |

_____ and EEOC

_State or local Agency, if any_

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mr. Robert L. Ross, Jr. | (404) 974-8145 |

| STREET ADDRESS    CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|
| 6309 PICKETTS WAY, ACWORTH, GA 30101 | 07/15/59 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| WCW WORLD CHAMPIONSHIP WRESTLING | Cat A (15-100) | (404) 827-2066 |

| STREET ADDRESS    CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| 1 CNN CENTER, ATLANTA, GA 30303 | 121 |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|

| STREET ADDRESS    CITY, STATE AND ZIP CODE | COUNTY |
|---|---|

**CAUSE OF DISCRIMINATION BASED ON** (Check appropriate box(es))

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify)

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST (ADEA/EPA) | LATEST (ALL) |
| / / | 07/14/91 |
| ☐ CONTINUING ACTION | |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

I. On 7-14-91 I was discharged from my position as a professional wrestler.   I had been employed since 1-15-91.

II. Mr. Jim Heard, executive vice-president, Dusty Rhodes, booker and T. A. Magnum, assistant booker,  stated that my contract was not being renewed because of budgetary reasons.

III. I believe that I have been discriminated against because of my race/black in violation of Title VII of the Civil Rights Act of 1964, as amended.

"This perfects my original correspondence that was timely filed with the Commission on 01-10-92."

| ☐ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |
| 2/14/92                 _Robert L. Ross Jr._ | |
| Date              Charging Party (Signature) | |

EEOC TEST FORM 5 (09/01/91)

**FILE COPY**

WCW 102034

# CHARGE OF DISCRIMINATION

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA<br>☒ EEOC | 110820735<br>AMENDED |

_____ and EEOC

*State or local Agency, if any*

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mr. Robert L. Ross | (404) 974-8145 |

| STREET ADDRESS    CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|
| 6309 PICKETT WAY, ACWORTH, GA 30101 | 07/15/59 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| WCW WORLD CHAMPIONSHIP WRESTLING | Cat C (201-500) | (404) 827-2066 |

| STREET ADDRESS    CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| 1 CNN CTR., STE. 1280, SOUTH TOWER, ATLANTA, GA 30303 | 121 |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS    CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| | |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN<br>☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify) | EARLIEST (ADEA/EPA)  LATEST (ALL)<br>07/14/91    07/14/91<br>☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

(AMENDED CHARGE)

I.   On 7-14-91 I was discharged from my position as a professional wrestler. I had been employed since 1-15-91. During my tenure I was paid less wages than similarly situated White wrestlers.

II.  Mr. Jim Heard, executive vice-president, Dusty Rhodes, booker and T. A. Magnum, assistant booker, stated that my contract was not being renewed because of budgetary reasons. When I inquired about the difference in wages, Jim Heard told me that I should just be glad that I had a job.

III. I believe that I have been discriminated against because of my race/Black in violation of Title VII of the Civil Rights Act of 1964, as amended.

"This perfects my original correspondence that was timely with the Commission on 01-10-92."

RECEIVED-G-EEOC
92 MAR 27 AM 11: 12

| ☐ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>*Robert L. Ross Jr.*   27 mar 92<br>Date    Charging Party (Signature) | SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |

EEOC TEST FORM 5 (09/01/81)

FILE COPY

WCW 102035

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

```
┌                              ┐
  Mr. Jack Petrik, General Mgr.
  CEO
  WCW World Championship
  Wrestling
  1 CNN Center
  Atlanta, GA.   30303

└                              ┘
```

| PERSON FILING CHARGE |
| --- |
| THIS PERSON *(Check One)* |
| CLAIMS TO BE AGGRIEVED |
| IS FILING ON BEHALF OF OTHER PERSON(S) |
| DATE OF ALLEGED VIOLATION |
| 7-14-91 |
| PLACE OF ALLEGED VIOLATION |
| Atlanta |
| CHARGE NUMBER |
| 110920735 |

## NOTICE OF CHARGE OF DISCRIMINATION
*(See reverse side of this notice for additional information)*

You are hereby notified that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act of 1964.

[ ] The Age Discrimination in Employment Act of 1967.

[ ] An Equal Pay Act (29 USC, §206(d)) investigation will be conducted concurrently with our investigation of this charge.

The boxes checked below apply to your organization:

1. [X] No action is required on your part at this time.

2. [ ] Please submit by_____ a statement of your position with respect to the allegation(s) contained in this charge, with copies of any supporting documentation. This material will be made a part of the file and will be considered at the time that we investigate this charge. Your prompt response to this request will make it easier to conduct and conclude our investigation of this charge.

3. [ ] Please respond fully by _____ to the attached request for information which pertains to the allegations contained in this charge. Such information will be made a part of the file and will be considered by the Commission during the course of its investigation of the charge.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

Ms. Carolyn Daniel  Supervisor
_____
*(Commission Representative)*

(404) 331-0632
_____
*(Telephone Number)*

[ ] Enclosure: Copy of Charge

BASIS OF DISCRIMINATION

[X] RACE   [ ] COLOR   [ ] SEX   [ ] RETALIATION   [ ] AGE   [ ] RELIGION   [ ] NATIONAL ORIGIN

CIRCUMSTANCES OF ALLEGED VIOLATION:

| DATE | TYPED NAME/TITLE OF AUTHORIZED EEOC OFFICIAL | SIGNATURE |
| --- | --- | --- |
| 1-17-92 | CHRIS ROGGERSON, DISTRICT DIRECTOR | |

EEOC FORM 131 (REV 2/80)   PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

WCW 102033



# EXHIBIT / ATTACHMENT

## _____H_____

(To be scanned in place of tab)

1            IN THE UNITED STATES DISTRICT COURT

          FOR THE NORTHERN DISTRICT OF GEORGIA

2                 ATLANTA DIVISION

3

WILLIAM BOULWARE, JR.,      )

4  et al.,                )

                     )

5       Plaintiffs,     )

                     )

6    vs.              )  CIVIL ACTION FILE

                     )  NO. 1:01-CV-0915-CC

7  WORLD CHAMPIONSHIP WRESTLING, )

  INC.,                )

8                     )

       Defendant.      )

9                     )

10

11

12

          DEPOSITION OF WILLIAM BOULWARE, JR.

13            NOVEMBER 16, 2001

              10:09 A.M.

14

15

16

17

18

19

20

21

22

23

24

25        CERTIFIED COURT REPORTERS

The Pinnacle, Suite 500 • 3455 Peachtree Road, N.E. • Atlanta, Georgia  30326 • www.premierrptg.com

404-237-1990

800-317-5773

Page 22

1  wrestlers.
2      Q    Do they tape it, or do they broadcast it
3  live?
4      A    Tape it.  And then I get it -- I pay to get
5  it put on TV.
6      Q    Well, let me go back.  Can you tell me the
7  name of some of the production companies, the
8  television companies you've used?
9      A    I use who I named.  Lot of people I know
10 directly.  I use a guy out of -- out of Griffin,
11 Georgia.  His name is Murrill.  I can't think of
12 Murrill's last name, but most of the people own a
13 little small company.  You probably know --
14     Q    Do they provide all the equipment and all
15 the people to help?
16     A    Yes.  No.  No.  They just come in and film
17 the show.  I have most of my guys helping with setup,
18 and, you know, I could tape the show.
19     Q    Now, when you pay all these individuals do
20 you withhold Social Security and employment taxes on
21 them, or do you pay them as independent contractors?
22     A    I pay them independent contractors, but I
23 also -- I mean, I pay all -- I pay tax on them.
24     Q    So you withhold taxes on them?
25     A    No.  I don't withhold taxes on them.

Page 23

1      Q    So they're responsible for paying their own
2  tax?
3      A    Right.
4      Q    Is that true for everybody that you pay?
5      A    Oh, yes.  Yes.  They sign a waiver saying
6  that they responsible for their own taxes.
7      Q    So everybody you hire through Boulware
8  Enterprises is an independent contractor --
9      A    Yes.
10     Q    -- of Boulware Enterprises?
11     A    Yes.
12     Q    Do you keep records on the different people
13 you hire?
14     A    Oh, yes.
15     Q    So you have all the pay records of everyone
16 you pay?
17     A    I got everything.
18     Q    Every -- every event you've ever had?
19 Everybody --
20          (Whereupon, a discussion ensued off the
21 record.)
22 BY MR. PONTZ:
23     Q    It's hard, Mr. Boulware.  If you will just
24 -- and it's my fault as bad as you, when we got into
25 kind of a conversational back and forth.  Normal

Page 24

1  people talk over each other a little bit because we
2  can hear fine, but when he's trying to write, I'll try
3  to pause after your answers, and if you try to just
4  pause after my question and make sure I'm done.
5      A    Yes.
6      Q    Let me go back.  So you think you have all
7  the records on all the shows that Boulware Enterprises
8  has ever put on?
9      A    Yes.  I know between my wife and my
10 accountant, yes, they have them.
11     Q    What is your accountant's name?
12     A    James Brown.
13     Q    The same gentleman?
14     A    Yes.
15     Q    Do you know if he's a certified public
16 accountant?
17     A    Yes, he is.
18     Q    And does your wife work for Boulware
19 Enterprises, Inc.?
20     A    Yes.  I guess.
21     Q    Does she get paid?
22     A    No.
23     Q    So she helps you, but she's not getting
24 paid?
25     A    I mean, we both don't get paid.  We just run

Page 25

1  the company.
2      Q    You say you put the television shows that
3  you tape, the wrestling shows, on television?
4      A    Yes.
5      Q    Where have you had those put on television?
6      A    I just basically, I been running a little
7  small -- like in Columbus, Georgia, basically a little
8  cable station that I -- anywhere that I could get it
9  on.
10     Q    Do you know what cable station in Columbus,
11 Georgia?
12     A    Channel 16.  I run that for two years.
13     Q    Do they pay you for that?
14     A    No, no.  Pay them for that.
15     Q    Do you know where the Channel 16 -- is that
16 on cable?
17     A    It's -- it's on cable.
18     Q    Is it a public access station?
19     A    It's a little small station.
20     Q    Do you know the call letters or anything
21 like that?
22     A    No.  I have to look it up.
23     Q    Who do you deal with when you deal with the
24 Channel 16?
25     A    Where I previously took my show off there,

Page 46

1   A   Yes.
2   Q   And how long were you with that group?
3   A   About six months.
4   Q   And did you continue wrestling through the
5   '80s?
6   A   Yes. All through the '80s.
7   Q   Were you just wrestling at that time, or
8   were you doing anything else in the wrestling
9   business?
10   A   Basically I was doing wrestling.
11   Q   When did you first make contact with WCW?
12   A   WCW -- it was not WCW then. It was -- I was
13   with NWA. When they -- when Turner Broadcasting
14   bought WCW from the Crockett family out of Charlotte,
15   North Carolina, I was already working with the
16   Crockett family. So when they bought them, I was one
17   of the first people that came over.
18   Q   What were you doing with the Crocketts?
19   A   Wrestling.
20   Q   So you were wrestler when then it was NWA?
21   A   I was. Yes. I was on one of the first
22   pay-per-view TV that they had.
23   Q   Did you wrestle under the name Rocky King?
24   A   Yes. I wrestled under the name Rocky King,
25   and I also wrestled under the name Little Richard

Page 47

1   Marley.
2   Q   M-A-R-L-E-Y?
3   A   Yes. Richard Marley. Yes. Marley, yes.
4   Q   And so were you still wrestling when the
5   company became WCW?
6   A   Yes.
7   Q   How many years did you -- well, let me,
8   back up from that. Do you remember what year that
9   was?
10   A   If it was, like, the -- if I'm not
11   mistaken, it was, like, the first of the '90s.
12   When -- 1990s.
13   Q   First couple years in the '90s?
14   A   Yes. Like '91, if I'm not mistaken.
15   Q   And did you continue wrestling with WCW?
16   A   Yes.
17   Q   Were you ever signed to a contract?
18   A   No.
19   Q   You got paid each time you appeared?
20   A   Yes.
21   Q   Was it a set fee?
22   A   Well, in some cases. Back then, the thing
23   what they call they pay you by the match. Like, for
24   example, you get some money for your first match,
25   depending on where you wrestling. If I'm wrestling in

Page 48

1   the Omni, where you're going to have probably 18,000
2   people, your pay will go up. You wrestle in a little
3   place, say like a club in Georgia and you got 4,000
4   people, you get a little percentage of that.
5   Q   And this is the way most of the wrestlers
6   were paid?
7   A   Yes.
8   Q   They would be paid for each match?
9   A   Lot of white guys under contract at the
10   time. I remember they first started giving contracts
11   out when I was there. I remember some guys when they
12   first walked in the door.
13   Q   But there were a lot of white guys also like
14   you just getting paid by appearances?
15   A   Well, nothing but white guys.
16   Q   So most of the -- most of the white guys
17   were getting paid by appearances like you; right?
18   A   Yes. Some of them were, yes. Some of them
19   were.
20   Q   Do you know how much were you making at the
21   time for the different appearances? Do you recall?
22   A   It varied. Anywhere from like we would do
23   TV, morning TV at Turner Broadcasting, Channel 17 back
24   then. And you'd get like $75. 65, $75 and you would
25   go to a house show. It would be a place people pay to

Page 49

1   get in. It would go anywhere from $100 to, I'd make
2   up to $500 a night.
3   Q   And that's what a lot of the wrestlers were
4   making? Same amount of money?
5   A   Yes.
6   Q   And this was the early '90s?
7   A   Yes. Real early '90s, yes.
8   Q   And did you continue wrestling with WCW as
9   the years went on into the mid-'90s?
10   A   Yes.
11   Q   Were you still just wrestling in, let's say,
12   1994, 1995?
13   A   No. A couple of times I got -- I had a
14   couple altercations, and basically they just quit
15   using me.
16   Q   You had altercations?
17   A   Yes.
18   Q   Who did you have altercations with?
19   A   Well, a guy -- I was -- one time they call
20   -- they changed my name to Little Richard Marley,
21   painted me up, put paint on my face.
22   Q   What kind of paint?
23   A   Wall paint. There was a joke going around.
24   You know, they painted me up, like they say the nigger
25   that was standing out in the yard. And, you know, for

Page 50

```
1    me it hurt me, but I needed to work. There was only
2    -- it was only -- only player in town, so you had to
3    put up with it, so Michael one time called me nigger
4    in front of the boys.
5    Q    Who?
6    A    Michael Hayes.
7    Q    Is that another wrestler?
8    A    Yes. He's still working. Now he's working
9    for the Federation now.
10   Q    Mr. Boulware, hang on a second. Do you know
11   his real name?
12   A    Michael Hayes. Half of them I didn't deal
13   with them on, you know, personal.
14   Q    When was this?
15   A    It was, like, 1991 or '92.
16   Q    Whose idea was it to put paint on your face?
17   A    Arn Anderson. I never forget that. They
18   was setting in the office, and that they talking about
19   paint the nigger up, and it was a joke.
20   Q    Did you hear them say --
21   A    Yes.
22   Q    This was back in '90, '91?
23   A    Yes.
24   Q    Let's move forward then into the mid-'90s.
25   In '94, '95 were you still wrestling with WCW, or had
```

Page 51

```
1    you stopped wrestling by then?
2    A    I was in and out, because we had territory
3    back then. You had places like Florida Championship
4    Wrestling. You had Kansas City Champion where NWA and
5    World Championship Wrestling kind of like a
6    partnership because NWA was the signal name before WCW
7    came in, so they had all these places you could go
8    wrestle back then, so they might -- you know, I'd
9    get -- like I find the time, I think I went to Kansas
10   City and wrestled for a while.
11   Q    Was it a different organization?
12   A    Well, they still NWA. They was still NWA
13   partnership.
14   Q    But that wasn't WCW? You wrestled with NWA?
15   A    It was NWA was there before -- it was NWA
16   before it was WCW.
17   Q    I understand. But were you wrestling for
18   WCW, or were you wrestling for some other
19   organization?
20   A    I worked for a different organization also.
21   That's the question you asked.
22   Q    Other than wrestling services, did you ever
23   provide other services to WCW?
24   A    Yes, I did.
25   Q    What other services did you provide?
```

Page 52

```
1    A    I was -- I was in production.
2    Q    Let's go one at a time. Tell me when you
3    were in production with WCW?
4    A    I was in production from '90 -- I think
5    last of '96 until -- until -- until -- basically
6    until I left.
7    Q    When did you leave?
8    A    I really didn't -- never did leave. Never
9    left. I had a contract until the time they was
10   closed.
11   Q    What kind of work -- when you say you were
12   in production, what were you doing?
13   A    Ring crew. You know, ring.
14   Q    What were you doing on the ring crew?
15   A    Driving the ring back and forth to a city.
16   Q    Did you do that in 1996?
17   A    During '97-'98.
18   Q    Did you do it after 1998?
19   A    No.
20   Q    When you drove the truck, who did you drive
21   it with?
22   A    Oh, God.
23   Q    Do you remember any of the names of the
24   people?
25   A    Gordon Nelson.
```

Page 53

```
1    Q    Just Gordon Nelson?
2    A    Yes.
3    Q    And were you paid for each time you drove
4    the truck?
5    A    Yes. All -- well, I was an independent
6    contractor.
7    Q    Each time you drove the truck and provided
8    services, you'd receive a set amount of pay?
9    A    Yes. I was independent contractor, and the
10   white guy with me was an employee.
11   Q    Did you work every day doing truck driving?
12   A    Yes. I was home three or four times a
13   month.
14   Q    Three or four times a month you were home?
15   A    Yes.
16   Q    So the rest of the time you were on the
17   road?
18   A    Home.
19   Q    Did you sign a contract to do these
20   services?
21   A    No.
22   Q    But you were an independent contractor?
23   A    Yes. At that time.
24   Q    And you didn't drive the truck anytime after
25   '98?
```

Page 58

1   A   Every day. Well, once they let me become a
2   referee that I begged for so long. I did it every
3   night that I was at the show. They would let me --
4   they made a joke. They give me the dog matches.
5   Q   Let me back up. Who let you become a
6   referee?
7   A   Who let me become a referee? Well, it
8   started with, I asked Eric Bischoff, the president,
9   and he told me I wasn't qualified, and I told him I
10  was -- I was wrestling before he got in the business.
11  How could he tell me that I wasn't qualified?
12  Q   But you'd never refereed before?
13  A   Yes. I'd referee plenty of times.
14  Q   With WCW?
15  A   No.
16  Q   Where did you referee?
17  A   Just different shows.
18  Q   Little small, local shows?
19  A   Yes. But it's the same thing. Once you
20  know how to do it, just like minor league baseball.
21  Play pros.
22  Q   Were those on live television?
23  A   Some of them was on TV.
24  Q   Were they on live TV?
25  A   No. Not live TV.

Page 59

1   Q   Were some of the WCW matches on live TV?
2   A   Yes.
3   Q   So Eric said he didn't think you were
4   qualified?
5   A   And I told him I thought he was being
6   racist, and he finally said, no.
7        I said, well, if you say no, you ain't
8   racist, they got shows in Disney.
9        He'd say, fine. Go stay away from me.
10  Q   So he let you go referee down there?
11  A   Yes.
12  Q   At the tapings in Universal Studios?
13  A   Yes.
14  Q   Did you ask anybody else to be a referee?
15  A   Yes. I begged Jody Hamilton.
16  Q   Did Jody select referees?
17  A   Jody was head of the referees.
18  Q   When was this?
19  A   The whole time until, basically, they --
20  about a year before they left.
21  Q   How do you know he was head of referees?
22  A   He wrote the schedule. You go in the
23  office, he hired referees. He told you who he's going
24  to hire and who going to work here and there.
25  Q   So you're saying he scheduled where the

Page 60

1   referee goes. How do you know he hired referees?
2   A   I know. I can tell.
3   Q   Did you see him hire referees?
4   A   He hired his son.
5   Q   Mr. Boulware, how do you know he made the
6   decision to hire the referees?
7   A   I seen him hire people.
8   Q   Did you see him hire people?
9   A   Like, for example, everyone that was
10  refereeing from where I left, came in after I started
11  wrestling. I saw guys, I could think, like, Nick
12  Patrick one of them, his son. I know all of them
13  names. I can't think of them now.
14  Q   Who else were the referees that were there
15  at the time?
16  A   Nick Patrick. I can't think of their names.
17  I can't think of the name, but I got picture with all
18  of them.
19  Q   You think Jody Hamilton hired them?
20  A   I know Jody Hamilton hired them.
21  Q   How do you know that?
22  A   Because I seen -- I mean --
23  Q   Did Jody ever say, I hired the referees?
24  A   Yes.
25  Q   When did he say that?

Page 61

1   A   He told me that several times. As a matter
2   of fact, he got mad when I -- he saw me refereeing on
3   TV, and he got mad, and I came to his school. He say,
4   you know that no black person go over me and become no
5   referee.
6        I told him what Eric Bischoff said. He
7   said, I don't give a hoot who told you. Then he cut
8   my booking down -- I had four booking a month that
9   time -- because Jody didn't like the -- the fact that
10  I became a referee.
11  Q   This was back in 1996?
12  A   No. This was 1997; '96-'97. I can't recall
13  the exact year.
14  Q   It was still in the '96, '98 time?
15  A   Yes.
16  Q   So you got opportunities to referee, and we
17  were trying to figure out how many times you think you
18  refereed in '96 or '97 or '98. Do you have some
19  estimate of how many times that was?
20  A   Well, I was at three to four shows a week,
21  and I referee all the dog matches.
22  Q   What do you mean by dog matches?
23  A   The dog matches, it's a match that they film
24  but they don't put on TV. And, quote, from Doug
25  Dellenger, who was the security guard, that is the job

Page 62

1  the nigger do.  He said that to me.
2  Q   When did he say that to you?
3  A   He said that to me, I can't remember the
4  exact date, but I report -- I got it all written
5  down.  I got a document all of it.
6  Q   Do you have those documents?
7  A   I got them.  My mother got them.  Yes.  I
8  got a document.  As a matter of fact, he stopped me
9  one time.  I was out putting up the ring, and
10 Dellenger is head of security.  I was putting up the
11 ring and stuff.  We was coming in.  He told people,
12 cut the music.  I saw him walk to me.  He said, you
13 know, he ain't having that nigger stuff around here.
14      I lay my head, and I said, Doug, I know
15 you a long time.  Why would you say that in front of
16 white people?  He just walked off.
17 Q   When was this?
18 A   I can't remember the year.  It had to be
19 about '98.
20 Q   Where was it?
21 A   I can't remember the time.  I got a
22 document.
23 Q   Was it in the arena?
24 A   It was in the arena, because as a matter of
25 fact, I called Time Warner at the time and told them

Page 63

1  exactly what he said to me.
2  Q   What arena was it?
3  A   I can't remember exactly.  I got the
4  document.
5      MR. PONTZ:  Mr. Breedlove, if I may, has
6  Mr. Boulware provided you with these document?
7      MR. BREEDLOVE:  It's his deposition.
8      MR. PONTZ:  I understand.  I'd like to
9  ask you, if I could, has he provided you with the
10 documents he's talking about?
11     MR. BREEDLOVE:  You've asked him about a
12 number of documents.  I'll be more than happy to
13 discuss what he has provided me with if it's
14 properly --
15     MR. PONTZ:  You filed some initial
16 disclosures in this case, and those require you to
17 provide at least a listing, if not a copy, of the
18 documents you think are relevant to your client's
19 claims.
20     MR. BREEDLOVE:  Right.
21     MR. PONTZ:  Do you think those documents
22 are relevant to your client's claims?
23     MR. BREEDLOVE:  They're post -- they're
24 prediscovery, and the things that I have to supplement
25 the initial disclosures with versus the things that

Page 64

1  we've come up with subsequent to that submission of
2  those.  Based upon what questions were asked in the
3  initial disclosures, I'm not sure they're covered by
4  what we have or what he gave me, but I'll check.
5      MR. PONTZ:  Are --
6      MR. BREEDLOVE:  We're not withholding
7  anything, is what I'm saying.
8      MR. PONTZ:  I understand.
9      MR. BREEDLOVE:  I've just never been
10 asked for all them.
11     MR. PONTZ:  Are all your claims from
12 1990 forward?  Excuse me, '99 forward?
13     MR. BREEDLOVE:  Yes.
14     MR. PONTZ:  He's not pursuing any claims
15 from pre1990?
16     MR. BREEDLOVE:  No.
17 BY MR. PONTZ:
18 Q   Mr. Boulware, do you understand you're not
19 pursuing any claims pre1999?
20 A   No.
21 Q   You're not?
22 A   Wait a minute.
23 Q   You're not pursuing any claims for anything
24 that happened before 1999?
25 A   No.  No.  Everything happened --

Page 65

1  Q   Everything after '99?
2  A   Right.  You asked me questions about stuff
3  that happened before.
4  Q   I'm just trying to make it clear.  That's
5  fine.  Okay.  So we talked a little bit about
6  referees?
7  A   Yes.
8  Q   And you refereed, you said, in 1996 and 1997
9  and a little bit in 1998?
10 A   Yes, sir.
11 Q   What other services did you provide to WCW?
12 You talked about wrestling with them in the '90s for a
13 period of time.  You talked about working on the ring
14 crew.  You talked about refereeing with them.  Did you
15 provide any other services to WCW?
16 A   Yes, I did.
17 Q   What else did you provide?
18 A   One of them was, I was involved in an
19 investigation.
20 Q   Other than that, did you provide any other
21 services to WCW?  Is that a no?
22 A   A no.  Not as far as I remember.  But I
23 dealt with a lot of people through WCW since then.
24 Q   But you didn't provide any services to WCW?
25 A   They told me, don't do nothing.

Page 70

1 18 years in the career. You got to understand, most
2 of these guys we used to have a circle, and you see
3 these guys all the time. And like you might -- you
4 -- well, you at arena or not, you see them. You-all
5 go to the same places. I go to places looking for
6 talent. I see Nick Patrick. I'd see JJ Dillon. I'd
7 see Arn Anderson. I'd maybe see them once or twice a
8 week.
9    Q    My question, though, about the referees.
10   A    Yes.
11   Q    You'd remembered Nick Patrick's name, but
12 you said you couldn't remember the names of other
13 referees?
14   A    The name Nick Patrick -- give me a minute.
15   Q    Please?
16   A    I'll give it to you. Nick Patrick? It's
17 just too far. I mean, I know -- they right in front
18 of me, but I can't --
19   Q    Well, if you do remember, if you will just
20 let me know, or let your lawyer know if it's not
21 during the course of the day.
22   A    Okay.
23   Q    How do you know that -- you said a minute
24 ago that you thought they were employees. How do you
25 know they were employees?

Page 71

1    A    Well, Terry Taylor told me.
2    Q    What did Terry tell you?
3    A    Well, it was a guy came in by the name of
4 Chip Crockett. His family used to own the wrestling,
5 and we all -- Pez, myself, everybody was sitting there
6 and he became an employee.
7    Q    Was he a referee?
8    A    No. He was an employee. So I went to Terry
9 and, I'm saying, how did this guy, white, come on and
10 ain't had no experience in the business and become an
11 employee?
12        He said, to me, this is the way we
13 operate. Turner told us we don't need to use you-all
14 niggers. Just like that. Something about survey or
15 whatever.
16        And I kept saying, why?
17        He said, we got it from the big office.
18 They told us we don't have to use you-all.
19        And I asked Terry. I said, well, why?
20        He said, we make employee to people, white
21 people, not black people.
22   Q    When did he say this to you?
23   A    Terry told me this in -- I had this
24 conversation with a few of them in the last few months
25 before they closed.

Page 72

1    Q    Well, back up for a second. You had that
2 conversation with --
3    A    Terry Taylor --
4    Q    -- Terry Taylor. When was that?
5    A    That was, like, it had to have been in '98
6 or '99.
7    Q    Where did that happen?
8    A    At one of the arena.
9    Q    Was anybody else around?
10   A    No. Not at the time.
11   Q    And you said you've had a similar
12 conversation with other people?
13   A    Yes, I have.
14   Q    Who have you had that conversation with?
15   A    Well, I had a conversation with Arn
16 Anderson.
17   Q    When was this?
18   A    Shoot, probably -- about a month or two
19 months before you-all closed, before Turner closed. I
20 guess most of the guys was -- I thought they was
21 coming down off their bigotry they had been with us,
22 but they were mad at Turner because they figured they
23 had no job no more. I don't know what it was.
24        I run into JJ. I run into Paul Orndorff.
25 Paul called me about using the kid in my wrestling

Page 73

1 organization, and I replied to Paul, I said, why now
2 you-all want to work with me when I been trying to be
3 a referee, I been trying to put my company out there?
4        And Paul basically told me that they had
5 got some word from Turner Sports that black people
6 don't buy tickets; they don't use no niggers.
7    Q    Paul said that to you?
8    A    Yes. Paul said that to me. I was Paul
9 partner one time, so I been knowing him for over the
10 period of time, and the word nigger, buckwheat,
11 crackhead, you got to understand, was something they
12 used. I mean, it wasn't --
13   Q    When you say they, who are they?
14   A    Well, Jody Hamilton, JJ Dillon, Paul
15 Orndorff, Mike Wenners. All employees. Doug
16 Dellenger.
17   Q    Let me get back to your point. We'll talk
18 about that a little more, but let me get back to your
19 point. You said that you believed referees were
20 employees, and what I want to know is, what evidence
21 do you have --
22   A    Nick told me.
23   Q    -- that they were employees?
24   A    Me and Nick was going down the road one day,
25 and Nick, I would say, about, I need some insurance

Page 74

1  for my daughter.
2      And Nick said, you don't have no
3  insurance?
4      I said, well, could I have insurance?
5      He said, well, you know, we all employee.
6  We got insurance.
7      Q   Who?
8      A   Nick Patrick. That was Jody Hamilton's
9  son.
10     Q   Did he say who the "we" was?
11     A   The "we," that's the referees. That's what
12  he was saying to me.
13     Q   Did he say referees?
14     A   He said referees, we have insurance.
15     Q   Did he say the referees have insurance?
16     A   Yes. He said he had insurance, and we all
17  have insurance. I took that to be that he was talking
18  about the referees.
19     Q   That's what you believed he was talking
20  about?
21     A   Right.
22     Q   But he didn't specifically say --
23     A   He said he had insurance.
24     Q   But he didn't say the referees have
25  insurance?

Page 75

1      A   He said, I got insurance, and we have
2  insurance. So the we, I took --
3      Q   Is that all the evidence that supports your
4  belief that they were employees?
5      A   Well, like I say, Chip Crockett, he was on
6  the production crew, and he had never did no
7  production, and he came right in and made insurance.
8      Q   My question, though, Mr. Boulware, has to do
9  with referees, and you said Chip Crockett was not a
10  referee?
11     A   No. He wasn't.
12     Q   So is the evidence that you believe the
13  referees were employees, that conversation you just
14  mentioned with Nick Patrick?
15     A   Yes. And lot more stuff that was going on
16  around the time.
17     Q   What else?
18     A   Like I just said, the Crockett, those
19  events. Guy would sit at home and wouldn't get -- I
20  mean, didn't come to work and was getting paid. I
21  mean, it was just -- it was a racist atmosphere. You
22  got to be there to know about it.
23     Q   Again, Mr. Boulware, you need to listen to
24  my question carefully. What I'm asking you for is all
25  the evidence that you believe supports the statement

Page 76

1  that you made that the referees were employees? And
2  you told me about Nick Patrick. You told me about
3  Chip Crockett. Is there any other evidence that you
4  have that you believe supports your statement --
5      A   Yes.
6      Q   -- that the referees were employees?
7      A   Some of the conversation I had with guys
8  like Kevin Sullivan.
9      Q   What conversation did you have with Kevin?
10     A   Kevin basically told me that -- you want to
11  know what he told me, or just about the employee?
12     Q   I want to know what he told you.
13     A   Well, he told me basically I was getting
14  screwed. He told me that I put in for the minor
15  league program, that they had two more white groups,
16  out of -- one out Nashville, one out of Ohio. Gave
17  them $100,000 apiece and the truck and gave them rings
18  and stuff like that.
19     Q   Why does that make you believe that the
20  referees were employees?
21     A   Because they did everything else like that.
22  I mean, that was -- that was their policy, treating
23  blacks bad and whites -- I mean the good old boy
24  system.
25     Q   So are you basically telling me the reason

Page 77

1  you feel like the other referees were employees was
2  because there was discrimination going on?
3      A   And Nick told me. Yes. And then Arn
4  admitted -- well, Terry admitted to me that they was,
5  like, employees around there that had came on, white
6  guys, since I'd been there all them years and wasn't
7  no employee.
8      Q   Not specifically referees? Just other
9  people?
10     A   Referee and other people. Nick Patrick, for
11  example. Because I asked him about -- I was a
12  production and referee, so the job was basically about
13  the same. I mean, it was different, but everybody was
14  on that same -- it was employees, and, you know, you
15  be independent contractor.
16     Q   Was Nick -- do you know, was he providing
17  any other services?
18     A   No. He didn't have to. His daddy was boss.
19     Q   Do you know what Nick Patrick did for WCW?
20     A   Referee.
21     Q   Do you know if he did anything else?
22     A   Well, they made him -- also later on they
23  made him road agent.
24     Q   So he was providing road agent services?
25     A   Yes. But wasn't no black road agent either.

Page 94

1    Q    Let me finish, please. I know it's hard. I
2    know it's hard. Did you approach WCW and say to the
3    WCW folks, I have a wrestling promotion, and I'd like
4    you to send your talent to wrestle with my promotion?
5    A    Yes.
6    Q    Who did you talk to about that?
7    A    Down the line --
8    Q    Give me one at a time?
9    A    You want Time Warner?
10   Q    At WCW?
11   A    JJ. I --
12   Q    When did you talk to JJ about it?
13   A    I talked to JJ on several occasions.
14   Q    Do you remember what years these were?
15   A    It was the last few months of the thing I
16   kept, because I just didn't want to sue this. I
17   wanted to come back to work and, you know --
18   Q    What did JJ say?
19   A    Well, he basically told me -- a couple times
20   he gave me the -- he'd talked to the big people, and
21   then he kind of, like he said to me a couple time that
22   they just -- they didn't want to fool with me.
23   Q    So JJ said that wasn't his decision to make?
24   A    Well, he said that he had to talk to the
25   other people at Turner. But he was in charge.

Page 95

1    Q    Who is the next person other than JJ that
2    you talked to?
3    A    Talked to Terry Taylor.
4    Q    What did you ask Terry about?
5    A    I asked -- I showed Terry what I had. We
6    sat down and ate lunch. I showed him about, you know,
7    the group of guys I'd put together. My ring. I was
8    insured. I show him my charity groups that I was
9    doing right here in Atlanta.
10   Q    And what did he indicate about --
11   A    He told me it was real good. He told me it
12   was real good.
13   Q    Did he say he was in a position to hire --
14   A    Yes.
15   Q    -- your company?
16   A    He told me yes, he was going to go to JJ.
17   He thought this was a great idea. Give it a little
18   time. I kept calling him back.
19   Q    Was this during the few months before WCW
20   closed down?
21   A    I talked to him, yes.
22   Q    Is that when you talked to him? That period
23   of time?
24   A    Yes. I talked to him over the period of
25   time for two years, the last one from '99 to probably

Page 96

1    I have records most of them, records of calling and
2    talking to him. Yes. I run into him all the time,
3    like we go to -- I go places and scout for talent,
4    and I would see Terry. I'd see Arn and guys like
5    that, and we knew each other.
6         We was sitting there talking, and at the
7    end they just basically -- would most of them
8    basically told me the truth. That they wouldn't --
9    when they call, that Turner told them they did a
10   survey, whatever, and black people weren't coming to
11   the matches, and they weren't using all the blacks.
12   Q    But you weren't talking about wrestling now.
13   You're talking about using wrestlers from WCW to --
14   A    I talked to all of them. All the wrestling
15   too. I still could wrestle.
16   Q    Is your claim on behalf of Boulware
17   Enterprises, just the claim that they didn't use you
18   and sign a contract with you to provide training and
19   wrestling opportunities?
20   A    Not only that. I was shut out. I was shut
21   out of the arena. I went to Channel 34 one time. I
22   got pay-per-view there too also, and a few small
23   wrestling organizations. I tried to get -- to buy a
24   spot on TV. They looked at my tape, and they came
25   back -- basically I sit there and told them that we

Page 97

1    got Turner stuff coming out here, legal problem with
2    Turner, like I haven't sued nobody. We can't deal
3    with you.
4    Q    Who told you that?
5    A    There are people at Hot Atlanta. That was,
6    like, a year, year and a half ago. I went to, like,
7    for example, Jody Hamilton to sell a lot of rings that
8    he got from WCW, and I try to buy rings and stuff, but
9    they triple the price on me.
10   Q    How do you know that?
11   A    Because I get people that bought rings.
12   Q    Like who?
13   A    I got a list of them. I got of list of
14   people that Jody had sold rings they had made, and if
15   you want to know the truth, they overcharged WCW for
16   the charge of the ring. They had to get the ring, and
17   they'll sell it to -- I mean, I had people -- several
18   people approach me about rings. I had went to shows
19   and seen people with WCW logos on the ring, and I
20   went, like, where you-all get that from?
21        Jody Hamilton.
22   Q    You have this list in your possession?
23   A    I got it somewhere. I don't know where. I
24   kept a lot of documents on all the stuff that went on.
25   Q    We need you to find that documentation.

Page 98

1  We're going to make a request of your attorney for the
2  appropriate documentation.
3     A   I got enough of it.
4     Q   Anything else that you believe that we
5  haven't talked about that you were discriminated
6  against on the basis of your race in placement with
7  WCW?
8     A   Yes. Oh, yes. Few things. You showed me
9  that policy there. I think if you look under there,
10 that they have a policy, no touch. You put your hands
11 on someone, you get fired. I had a guy by the name of
12 Steve Barry, who was the head of the production crew
13 for all the setup, walked up one day mad and pushed
14 me. I had four different witnesses. Nobody --
15 people that seen it. They walked to me and said, why
16 did he do that to you? And I called Turner. I called
17 Time Warner, everybody.
18    Q   When was this, Mr. Boulware?
19    A   It was, like, it was -- it was '90 -- it
20 was actually before '99, but I'm going to continue the
21 story. He pushed me, and I called everybody and made
22 a complaint about it. He was still working there to
23 the day they closed, but I saw this gentleman in the
24 year of -- I saw him a couple of times, but I saw him
25 one time at the Good Old Day. Good Old Day was a

Page 99

1  place we go, all WCW, talented young guy would go and
2  wrestle outside. They do it on Friday night.
3        So I run into Steve one time. I was
4  really mad at him. He called me to the side. He
5  apologized to me about it, and he said to me -- and I
6  asked him, I said, well, you know, my whole thing is,
7  why would they do that? They know this is against the
8  law.
9        He said, you know Buff slap the cameraman.
10 They don't do nothing to us for doing that to you-all.
11 He just walked off.
12    Q   And you said this incident with Mr. Barry
13 was before 1999?
14    A   No. No. He slapped me. He pushed me
15 before '99, but he told me in 2001 why he did it, and
16 wasn't nobody going to bother him about it.
17    Q   Why did he push you?
18    A   He said because nobody going to do nothing.
19 He was upset. Something happened to his family life,
20 and he just at the time, anybody ran into him, he
21 didn't care. He pushed me. I had evidence he did it,
22 and he made the statement to me about Buff slapping
23 the cameraman. He said, you see what they did to
24 Buff? They didn't do nothing to Buff. He slapped the
25 guy. Steve Barry said this.

Page 100

1  I went, like, what? It was unbelievable.
2     Q   Now I'm asking you -- again, I appreciate
3  you telling me about that, but again, what I was
4  asking you about is opportunities in placement that
5  you didn't get with WCW. Okay. You've told me about
6  a few of them. Are there any other opportunities for
7  placement that you believe you didn't get with WCW?
8     A   Yes. Yes.
9     Q   What would that be?
10    A   I still wrestle on a regular basis. I could
11 have wrestled. I apply for that job, but like I say,
12 referee; thousand dollar  made in referee. Promotion.
13 The minor league program, the way I understood from
14 three of the bookers, that they pay three
15 organizations, miles away, $100,000 apiece, and that
16 100,000, I probably could have made a lot of money on
17 that. And I was ready in Atlanta, and I was an
18 employee.
19    Q   Mr. Boulware, let me ask you about that.
20 How do you know that? Who told you that?
21    A   I got it from the bookers.
22    Q   Who?
23    A   Terry told me. Kevin Sullivan told me. I
24 can name the list.
25    Q   Well, I'd ask you, if you would, Mr.

Page 101

1  Boulware, tell me who told you that, and I'm going to
2  ask you what they told you.
3     A   Okay. I will.
4     Q   Terry -- you said Terry Taylor?
5     A   Yes.
6     Q   What did Terry tell you?
7     A   Terry told me finally, after they gave one
8  of the guys, Birch Prentice -- I think he was in
9  Nashville.
10    Q   What was his name?
11    A   Birch Prentice.
12    Q   And who was Mr. Prentice?
13    A   Prentice was a guy that run organization
14 like I was running.
15    Q   Out of where?
16    A   Nashville.
17    Q   What did Terry tell you about Mr. Prentice?
18    A   He told me that Mr. Prentice was a friend of
19 his, and he said, I got to get a contract to him. No.
20 He talked to -- after he'd gave a contract. When I
21 called him up, I said, Terry, why? I said, I'm here.
22 Turner don't have to pay no money to fly nobody out.
23       And they always said, it's not our money;
24 it's their money. We don't care.
25       I asked him, I said, because I'm black?

Page 102

1    He asked me, what do you think? What do
2  you think? Yes, it's because you're black.
3    Q    So he didn't say that? You asked him if it
4  was because of your race, and he said, what do you
5  think?
6    A    Yes. Because you're black; what do you
7  think?
8    Q    Did Mr. Taylor say it was because you were
9  black?
10   A    Yes.
11   Q    When did he say that?
12   A    When did Terry tell me this? It was after
13  Birch got the minor league program.
14   Q    Do you remember when that was?
15   A    I can't tell you the exact date, but I can
16  look it up.
17   Q    You don't know whether Mr. Taylor made the
18  decision to sign that contract with Birch Prentice, do
19  you?
20   A    He said he did.
21   Q    But you don't actually know whether or not
22  he did?
23   A    I'm telling you what he said.
24   Q    I understand you say Mr. Taylor said he did,
25  but you don't actually know that? You weren't in the

Page 103

1  room? You didn't see him sign the contract?
2    A    Because more people told me.
3    Q    Who else told you that?
4    A    Kevin Sullivan.
5    Q    Told you what?
6    A    That Terry Taylor, they was discussing who
7  to give the minor league program to? And Birch
8  Prentice was an old friend of Terry Taylor, and Terry
9  stood up and say he'll say he'll vouch for him and,
10  you know, they should give him the money and the ring.
11   Q    Do you know how long Mr. Prentice had this
12  program?
13   A    I know a lot about Prentice, though.
14   Q    Answer my question. That's fine. Do you
15  know how long Mr. Prentice had this program?
16   A    No.
17   Q    Do you know how many people he'd trained in
18  this program or how many opportunities or how many
19  shows he had each year?
20   A    I know that a lot of stuff that he had
21  claimed that he did, he hadn't did.
22   Q    Do you know what he told WCW about his
23  qualifications and his experiences and his background
24  and his skills? You don't know that, do you?
25   A    No. I know what I told him about mine. He

Page 104

1  didn't call me back and say yes or no or nothing.
2    Q    So you don't know what went into the
3  decision WCW made to give Mr. Prentice this contract?
4    A    No. But --
5    Q    That's fine. Now, was there another
6  organization besides Mr. Prentice's organization?
7    A    Yes. There was a guy in Cleveland, Ohio.
8  Cincinnati, Ohio.
9    Q    Where in Ohio?
10   A    Cincinnati, Ohio. And this guy name -- he
11  used to wrestle with me. His name is -- I can't think
12  of his name right now, but you have it on your record.
13  I'm pretty sure you do.
14   Q    You don't remember the name?
15   A    I got his name in my file, but I can't
16  remember right offhand.
17   Q    Do you know how long he'd had this wrestling
18  business?
19   A    No, I don't.
20   Q    And do you know anything about the wrestling
21   -- that business in terms of what his qualifications
22  were to run it or what he told WCW he was capable of
23  doing?
24   A    No. I have no --
25   Q    And you don't know exactly how much they

Page 105

1  paid him, do you?
2    A    I know what they told me.
3    Q    What did they tell you?
4    A    They give him $100,000.
5    Q    This was -- Terry told you that?
6    A    Terry told me that, and Kevin Sullivan told
7  me. It was a known fact when they put everything on
8  the Internet, once they do it.
9    Q    And other than what Terry Taylor told you
10  about who made the decisions, you don't have any other
11  evidence about who made these decisions to hire these
12  companies or do contracts with these companies, do
13  you?
14   A    No.
15   Q    Did anybody else besides Terry Taylor and
16  Kevin Sullivan tell you anything about these minor
17  league contract deals?
18   A    Yes. Paul Orndorff.
19   Q    What did Paul tell you?
20   A    Paul basically told me they gave Birch, I
21  think $100,000. They gave him a truck. And he was
22  kind of mad at him because he figured that they were
23  throwing away a lot of money because you got -- after
24  all, you got to fly guys up there. You got to get
25  guys there to the show where we had -- knowing that I

Page 118

1  make -- he would take his place, but the other guy
2  would come back and work again.
3  Q   Do you know what qualifications this company
4  here in Atlanta that was doing work with WCW had to
5  provide those services?
6  A   It wasn't better than mine, I guarantee you
7  that.
8  Q   Do you know what their qualifications were?
9  A   Just a little wrestling organization that --
10 just like mine, out there working, and it was white
11 also.
12 Q   Do you know what services they provided to
13 WCW?
14 A   All I know is that they took guys from the
15 training power plant and they used them on live shows,
16 same show -- type of show that I had.
17 Q   Do you know what else they might have done
18 with WCW?
19 A   No. I have no idea.
20 Q   And you don't know how much they got paid to
21 do that, do you?
22 A   No.
23 Q   And you don't know what the terms and
24 conditions of the deal was, do you?
25 A   I'm pretty sure the record would tell it,

Page 119

1  though.
2  Q   But you don't know that?
3  A   I don't know.
4  Q   And you don't know who made the decision to
5  pick them?
6  A   I just know what I was told. I have no way
7  of knowing -- I wasn't there when they say, here is
8  the job. I know they hired these people, and they
9  overlooked my company and my skills, over 20 years in
10 the business.
11 Q   As to this third company, you don't know
12 what that company's skills or background was in the
13 business, do you?
14 A   No.
15 Q   And you don't know what criteria they
16 weighed or considered in deciding to choose that
17 company, do you?
18 A   No. But what I do know is in all the past
19 stuff they went, picked their buddies and their white
20 counterparts and didn't hire anyone that was black. I
21 mean, it wasn't no black in the whole management for
22 WCW, period.
23 Q   And you don't know what other companies
24 sought to provide those kind of skills and training
25 for programs and live opportunities? You don't know

Page 120

1  what other companies provided those kinds of things to
2  WCW, or -- let me rephrase that. Let me take that
3  back. Do you know if there were other companies
4  besides those three who sought to work with WCW and
5  provide the same kind of programs?
6  A   I have no idea what record they would have
7  of who applied for a job.
8  Q   I'm not asking what records they have. You
9  don't know anybody else who might have applied for
10 those opportunities, do you?
11 A   I just know what they might have said. I
12 mean -- I don't know, no.
13 Q   There might have been other folks that were
14 turned down for those opportunities? There might have
15 been other companies that came and said, I want to
16 provide you minor league wrestling services and WCW
17 said no?
18 A   There ain't that many. You talk like it's a
19 thousand of them out there. It ain't that many. It's
20 very few. It's only two large wrestling company in
21 the country, and only a handful of wrestling minor
22 companies in the country that legitimate, people that
23 been in the business, that know the business. You
24 might have somebody just like, a paralegal, your
25 lawyers, that are different, you know. Just -- it

Page 121

1  just ain't that many people.
2  Q   Well, how many are there? Do you know?
3  A   I'd say ten at the most, probably.
4  Q   And so you know about ten or so?
5  A   I been in the business 21 years.
6  Q   You don't know if any of those other ten
7  that we haven't talked about came to WCW and said, I
8  want to provide services and WCW said, no thanks?
9  A   Well, they didn't tell me no thanks. They
10 just didn't call me.
11 Q   So you don't know?
12 A   I don't know.
13 Q   Talking about your claims of compensation
14 discrimination, pay discrimination, tell me what you
15 believe -- what evidence you have that you were paid
16 differently than others because of your race?
17 A   Okay. For example -- I'll use Terry Taylor,
18 for example. Me and Terry Taylor basically broke into
19 the business at the same time. He had no more
20 knowledge of the business than what I have. He
21 probably made 200, $300,000 for the last four or five
22 years, or more.
23      I could name a guy like Jimmy Hart, for
24 example. These guys I broke in the business with. I
25 wrestled with. When I refereed with, they just passed

Page 122

1  them over. They had young guys come like i mentioned
2  the guy, a distant friend. This kid come in, white
3  guy. I mean, basically couldn't even wrestle. They
4  made -- from wrestle, they know he was a booker. He
5  had no prior qualifications of that. I mean, I'd been
6  wrestling ten years before he even got in the
7  business.
8     Q    So, Mr. Boulware, is it your complaint that
9  you didn't get these job opportunities? It's not
10  really that you didn't get paid the same as them?
11  It's --
12    A    I didn't get the paid the same also.
13    Q    Because you weren't doing the job; right?
14  You said you couldn't get the job?
15    A    Well, for example, when I was ring -- the
16  ring guy, where they call ring boy, or ring guy, they
17  have a guy that was over here making $50,000.
18    Q    Who?
19    A    Gordon Nelson.
20    Q    Was Pez Whatley making $50,000?
21    A    Not at that time. Not at that time.
22    Q    Did he make $50,000 on the ring crew? Do
23  you know?
24    A    I don't know exactly what he made, but he
25  got a raise after I complained so much to Time Warner

Page 123

1  and the Turner people, then they gave him --
2     Q    How do you know how much Mr. Nelson was
3  making?
4     A    He told me several times. We rode the truck
5  together. He laughed about it. He laughed about it.
6  He made a joke about it. It was out in your face. It
7  wasn't like they here behind your back and you hear
8  them whispering. They would say it to your face.
9  They have no problem with saying it.
10    Q    Other than Mr. Nelson telling you what he
11  made, do you have any other evidence as to what he --
12    A    Him, Klondike -- Bill Klondike, Chip
13  Crockett. I mean, the list go on.
14    Q    I need you to listen to my question, Mr.
15  Boulware. My question was, other than Mr. Nelson
16  telling you how much Mr. Nelson made, do you have any
17  other evidence how much Mr. Nelson was paid?
18    A    Yes.
19    Q    What's your evidence?
20    A    I have -- Terry told me. We talk about it
21  all the time.
22    Q    What did Terry tell you?
23    A    Terry basically told me -- I asked why my
24  pay different from theirs, and it always basically
25  come back, the color of your skin, and you're not in

Page 124

1  the clique.
2     Q    Did Terry Taylor say the reason you were
3  paid differently than Mr. Nelson was the color of your
4  skin?
5     A    Yes. He said that.
6     Q    Did he say those words?
7     A    He said that, oh, yes.
8     Q    What words did he use?
9     A    He use several different -- I talked to him
10  several different times.
11    Q    What do you remember him saying?
12    A    I remember him basically telling me -- do
13  you want me to use a good example?
14    Q    What I'd like you to do is tell me what he
15  said. Not basically what he said, but --
16    A    I can't remember the exact words he said.
17    Q    Tell me what you remember him saying.
18    A    I remember him telling me about that I knew
19  how -- what was going on. Why would I keep bothering
20  him, because things wasn't going to change. And I
21  asked him a couple times, why? And that when I --
22  finally everybody started telling me -- everybody,
23  meaning JJ, Dusty -- I even talked to Dusty about it
24  also. He was in management. That the Turner people
25  basically told them, when no black people come to the

Page 125

1  show, then they didn't have to use no black, period.
2  I don't know if it was true. I know they told me.
3     Q    This is Terry Taylor?
4     A    Terry. JJ told me the same thing. Arn
5  Anderson. The list go on. Each one of them sit down
6  basically when we was away from all the record and
7  stuff going on and look me in the eye and told me that
8  was the reason I wasn't getting no promotion and why I
9  wasn't going to be nothing but the worst job that they
10  could give me. And they basically told me that.
11    Q    What other evidence do you have that
12  supports your claim that you were paid differently
13  because of your race?
14    A    Well, okay. Chip Crockett back again. We
15  was in Philadelphia, and I had just received my
16  paycheck, and I had my check, and Chip telling me, he
17  said, well, I got direct deposit. Well, how you get
18  direct deposit? You're not no employee.
19          He said, oh, you didn't know? I'm an
20  employee, and I can get paid more than you. And even
21  I showed him my check. He said no, I got a guaranteed
22  salary. I don't get paid by the low end.
23          I'm, like, how can you do that and you
24  came here probably 16 years after I been in the
25  business?

Page 126

1   Q   What kind of job was Chip Crockett doing?
2   A   Ring crew.
3   Q   Was he driving the truck?
4   A   Yes.
5   Q   What else was he doing?
6   A   That's it.
7   Q   Do you know if he was doing anything else,
8   or that's all you saw him do?
9   A   That's all he was doing.
10  Q   Did you see him do anything else?
11  A   That's all he was doing.
12  Q   How do you know he wasn't doing anything
13  else?
14  A   Wasn't doing anything else.  I hung around
15  with him.
16  Q   Every day?
17  A   Basically, every day.  Because we was on the
18  road together most of the time.
19  Q   But he wasn't in your truck with you?
20  A   No, but we was all the time.  He live at the
21  Ramada.  I live in Riverdale.  He call me for favors,
22  like pick him up -- he didn't have a car -- from the
23  airport.
24  Q   When you were on the road for three or four
25  days driving the truck, you wouldn't be around Chip

Page 127

1   Crockett?
2   A   Somehow, the crew always hook together.
3   Sometimes we do two shows.  We do shows together,
4   like, for example, one show might be in some one part
5   of the Pennsylvania.  We'd be in Pittsburgh.  So when
6   they get through there, they come there.  Now, and we
7   all meet there.  I've seen them about -- I would say
8   once to three times a month, four times a month.
9   Q   Other than what you now told me about Chip
10  Crockett and what you told me about Gordon Nelson and
11  the statements that other people made about them, what
12  else do you believe supports your claim that you were
13  paid differently because of your race?
14  A   Because I was told by the management, Terry
15  Taylor, JJ Dillon, all of them, they told me.
16  Q   What role were you in when you were talking
17  with them about your pay?  Was this when you were on
18  the ring crew?
19  A   That was on the ring crew.  When I got off
20  the ring crew, I talked to them about coming back to
21  work.
22  Q   So that's not really a claim that you
23  weren't paid?  That's a claim that they wouldn't bring
24  you back to work?
25  A   That was two claims, though.  You asked me.

Page 128

1   Q   But you're not saying you were paid less
2   than somebody because you weren't actually working to
3   get paid; right?
4   A   Which time are you talking about?
5   Q   Well, you tell me.
6   A   I don't know.  You ask me the question.
7   Q   It's your claim, Mr. Boulware.  What I'm
8   asking you to tell me is why you believe you were paid
9   less because of your race?  Tell me all the instances,
10  all the situations in which you believe you were paid
11  less because of your race and why you believe that?
12  A   Well, I believe that because I got it from
13  people that were credibility people, I assume at the
14  time, and they was in charge of WCW.
15  Q   And I'm asking you, Mr. Boulware, give me --
16  I'll give you an example.  Okay?  If I'm working and I
17  have a lawyer working next to me --
18  A   Yes.
19  Q   -- and I feel like we're doing the same work
20  and I feel like he's making a different amount of
21  money than me, then maybe I wonder why.  Okay?  Does
22  that make some sense to you?
23  A   Yes.
24  Q   Are there similar situations that you have
25  like that?

Page 129

1   A   I can't remember right now.
2   Q   You can't remember at all?
3   A   I can't remember right now.
4   Q   So is there anything else besides what we've
5   talked about already that supports your claims of
6   being paid differently?
7   A   I can't remember right now.  It's a whole
8   bunch of stuff you asked me.
9   Q   I mean, that's what you're here for.
10  A   I'm sorry.  I can't make my mind remember
11  stuff I can't.
12  Q   That's fine.  And that's all I'm asking you
13  is everything you can tell me sitting here today.
14  A   I tell you the truth what I know, and if I
15  can't remember, I say I don't remember.
16  Q   So we've talked about everything that you
17  can remember that supports your claim for compensation
18  discrimination, pay discrimination?
19  A   Have we talked about everything?
20  Q   Is there anything you can think of that we
21  haven't talked about that supports your claim of --
22  A   Pay discrimination?  Oh, yes.  That I can
23  remember.
24  Q   That's a yes?
25  A   Yes.  That I can remember.

1   crew?
2   A   Well, I was — Terry Taylor. I'm sorry.
3   Terry Taylor.
4   Q   How do you know Terry made that decision?
5   A   He told me.
6   Q   Did he tell you why he made that decision?
7   A   He just told me that the only job they'd let
8   me have.
9   Q   When did he tell you this?
10  A   That was '96, '97.
11  Q   Did you think about going to try to wrestle
12  someplace else?
13  A   Ain't nowhere to go.
14  Q   Did you call WWF?
15  A   WCW and WWF is — is competitive.
16  Q   Right.
17  A   If they don't give you a chance to do
18  nothing here, ain't nobody else going to give you a
19  chance.
20  Q   Did you call WWF to ask?
21  A   No, not really.
22  Q   You didn't say, hey, I'm a wrestler here at
23  WCW; they're not letting me wrestle anymore; let me go
24  talk to somebody else about wrestling?
25  A   No. I kept staying where I was here. I

1   been here all the time.
2   Q   But you could have left Atlanta or could
3   have left WCW and tried to get a job with WWF, right,
4   and you didn't?
5   A   No, I didn't.
6   Q   And then you talked about — well, let me
7   make sure I got it right. Referee contract, who
8   denied you a contract as a referee?
9   A   Well, basically the whole wrestling office
10  people that were in promotion.
11  Q   Do you know who made the decision not to
12  make you a referee?
13  A   Well, I became a referee, but I didn't get
14  the pay, and the last time I talked to JJ about it,
15  and JJ — actually I asked him about a contract. I
16  kept asking him every week about a contract. He
17  finally pulled me off and he told me, Eric Bischoff
18  wasn't going to give me a contract. I asked him why.
19      He said, because I'm black, but he told me
20  what he would do for me was give me $200 a night just
21  to keep quiet and stay out of his way.
22      And I told him, that still ain't fair.
23      He said, that's the only thing I can do
24  for you. Take it or leave it.
25  Q   Do you know how much the other referees were

1   making a night?
2   A   A lot of them make a thousand dollars,
3   $1,500 a week.
4   Q   How do you know that?
5   A   I seen some of the checks.
6   Q   And they were making $1,000 a week?
7   A   A week. Right.
8   Q   How many nights a week were they working?
9   A   Three, four.
10  Q   And —
11  A   But they had a contract, and that's what was
12  different.
13  Q   Did you see any of the contracts?
14  A   I seen guys with contracts. Never did sit
15  down and read their contract.
16  Q   How do you know they had a contract?
17  A   I mean, I seen them. I mean, they would be
18  sitting around reading the contract before they sign
19  them. We'd be on the plane or something, or I'm in a
20  Marriott or something. You sit there like Nick. I
21  knew Nick 15, 18 years.
22  Q   Did Nick have a contract?
23  A   Yes. Nick had a contract.
24  Q   Did you see Nick's contract?
25  A   Yes.

1   Q   Anybody else's contract you saw?
2   A   No. Just what guy told me they had, either
3   contract or a deal. Lot of times the deal was that
4   you guaranteed a certain amount of money, every week.
5   Q   Who told you that they had a deal? Anybody
6   else besides Nick or — that you can remember?
7   A   Basically, everyone that was in the
8   business.
9   Q   And you can't remember who those folks were?
10  A   I mean, I can start naming peoples. I mean,
11  Terry. I saw him when he left and went to New York,
12  and he came back after all the racist stuff that was
13  made. He got a job there. I saw him there tell me
14  about contract. He told me he had a 90-day probation
15  period on it.
16  Q   But he wasn't a referee?
17  A   No.
18  Q   He was a booker. Are there any referees
19  that you can think of who had a contract?
20  A   Well, all of them had a contract.
21  Q   Can you tell me any of their names?
22  A   I can't remember the guy's name. I just
23  can't remember the name. I remember their faces.
24  Q   This was back in '96, '97 '98?
25  A   Yes. And if I'm not mistaken, what I was

Page 138

1  told by Terry Taylor and JJ, everybody there had a
2  contract, or agreement they'll make so much money each
3  week, and they all were white.
4      Q   This is what Terry Taylor told you?
5      A   Terry, JJ.
6      Q   Anybody else besides JJ or Terry tell you
7  this?
8      A   It was basically a known fact because we all
9  basically ate and slept together. I mean, you at the
10 same place. You're at the same time. You be there
11 all day long when you have a show, so you'd sit down
12 and talk to people.
13     Q   Is there anything else that you think was
14 discipline that was taken against you or discipline
15 that was done in discrimination because of your race?
16 Other than what we've already talked about?
17     A   Yes. Lots of stuff. Like, for example, my
18 wives are white. It was known fact, and they told
19 you, don't bring no white woman around the matches.
20     Q   Who told you that?
21     A   Terry Taylor told me that. JJ done told me
22 that. I mean, several people told me that.
23     Q   When was this?
24     A   I mean, told me my whole career.
25     Q   So this was all the way through 1998?

Page 139

1      A   Yes. All the way up. My wife and I are
2  married three years. We been together 18 years.
3  She's never been to a wrestling match, because she
4  knew if she goes to that match, I would have no job.
5  And I have had white female come up and talk to me,
6  and they'll call you off to the side and tell you, no.
7      Q   This was during the time you were at WCW?
8      A   Yes. Yes.
9      Q   Anything else that you believe was
10 discriminatory discipline? What else is there? Is
11 there anything else?
12     A   Well, by not even considering me for a job.
13 I mean, I got all the qualifications. I had never did
14 nothing. I have never, like I say, no discipline or
15 none of that. I had a clean record with them, and I
16 applied for a job through every phase of it, and then
17 you got -- I'm qualified for five or six different
18 things, and I've got 20 years' experience, and you
19 can't find nothing for me to do? That's hard to
20 believe.
21     Q   Anything else, Mr. Boulware, other than what
22 we've already talked about?
23     A   Not that I can -- not that I can think of
24 right now.
25     Q   You have a claim in your complaint that you

Page 140

1  were discriminated against in training. Is there
2  training that you believe you were supposed to receive
3  or should have received that you didn't get?
4      A   Training where? In what?
5      Q   Well, that's what I'm asking you. Is it --
6      A   You got to tell me what training you're
7  talking about. Training in wrestling?
8      Q   It's your complaint, Mr. Boulware. I'm
9  asking you, is there training you believe that you
10 didn't receive from WCW because of your race?
11     A   Training? Training I received? Training
12 that I received? I can't remember.
13     Q   You can't think of any instance where there
14 was some training that you think you should have
15 received but you didn't receive it because of your
16 race?
17     A   I don't remember.
18     Q   Now, you also have a complaint saying that
19 you were subjected to a hostile work environment at
20 WCW, and do you know what that means? What do you
21 think it means to be subjected to a hostile work
22 environment?
23     A   Well, you can't go to work and perform your
24 job the way you should be able to without someone
25 making racist crack about you. And I will use a

Page 141

1  couple example.
2      Q   Hang on a second. So this is the time
3  period when you were on the ring crew, as a referee,
4  or a wrestler with WCW? Is that what we're talking
5  about here?
6      A   Well, but that was the one time -- that was
7  the time when they did it to me in my face.
8      Q   When did somebody do it to you in your face?
9  Tell me about the instances. Give me one at a time if
10 there were more than one?
11     A   Well, I got a record of them.
12     Q   Tell me what you remember.
13     A   I remember standing in the parking lot in
14 1998. A lady just come in. She was a truck driver.
15 I had to buy new tennis shoes, and she walked up to me
16 in front of a bunch of people, fans, and I'll just
17 tell you, Turner employees. Bunch of Turner employee.
18 She said, what nigger did you chase down to get them
19 tennis shoes? I reported it, wrote it down, got a
20 record of it.
21     Q   Who was she?
22     A   Just -- it got so bad that people that were
23 just employed outside the wrestling thing would do it.
24 She was this truck driver employed by Turner Sports.
25     Q   Do you know her name?

36 (Pages 138 to 141)



# EXHIBIT / ATTACHMENT

## I

(To be scanned in place of tab)

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF GEORGIA

3                    ATLANTA DIVISION

4

5   TONY BYRON CARR,              )
                                  )
6            Plaintiff,           )  Civil Action File No.
    vs.                           )  1-00-CV-1721  (CC)
7                                 )
    WORLD CHAMPIONSHIP WRESTLING, )
8   INC., and TURNER SPORTS, INC.,)
                                  )         ORIGINAL
9            Defendants.          )

10  ─────────────────────────────────────────────────────
              DEPOSITION OF TONY BYRON CARR
11                 JANUARY 28, 2002
                     10:00 a.m.
12  ─────────────────────────────────────────────────────

13

14

15

16

17

18

19

20

21

22

23

24

25         CERTIFIED COURT REPORTERS

800-317-5773

1          And I said, well, let me go put my outfit on, so I

2    put it on, and he looked at it and he shook his head.  He

3    was like, I hope you didn't spend too much money on that.  I

4    was like, what do you mean?  He's like, we can't use that.

5    And I was like, why not?

6          He said, well, it's not realistic, you know, and

7    like I said, that kind of hit me for a blow because also

8    they look for realistic characters now, but yet, you've got

9    this guy Glacier, he comes in the building and makes it

10   snow.

11          So I'm like, well, that's not very realistic, you

12   know.  That's what he told me.  And then later on Rocky King

13   told me that, you know, they weren't looking for no blacks.

14   That's what he said.

15    Q.   We'll get to that in a little bit.  So you tried a

16   genie outfit?

17    A.   Right.

18    Q.   And you said Terry didn't like it because he said

19   it was unrealistic?

20    A.   Right.  Jimmy Hart loved it, though.  Jimmy Hart

21   said, oh, that's good.  We can use that.  We can do that,

22   but Terry was the head booker and he shot it down.

23    Q.   Okay.  When was this?  Do you recall?

24    A.   I don't remember.

25    Q.   Do you remember it was early?

Page 55

1     a truck driver.  First time he said, I don't know who's

2     blowing smoke up your ass, kid, but they ain't hiring no

3     niggers.

4         Q.   This is what Jody Hamilton said?

5         A.   This is what Jody Hamilton said.

6         Q.   When did he say that?

7         A.   He said it right before we left Carol Drive.  Then

8     we got up here, when he hired me back as a truck driver, you

9     know, I told him I still want to wrestle.  I still brought

10    my wrestling gear.  I still talked to the bookers.  Hey, you

11    know, if you all need somebody, I want to wrestle.  I didn't

12    come here to be a truck driver.  I want to wrestle.  So I

13    was trying to network any way I could to get back in, you

14    know, so --

15        Q.   Okay.  And how did that conversation go when you

16    talked to him about that?

17        A.   Well, that's when he said, he said -- this time he

18    cleaned up.  He said, we're not hiring any blacks, you know.

19        Q.   Did he refer to anyone in particular.

20        A.   No, he just said --

21        Q.   Did he give you a name as to who's making this

22    decision?

23        A.   He just said the higher-ups.

24        Q.   Okay.  But you don't know who actually made the

25    decision not to give you a wrestling contract?

1     A.   Well, I had been hearing the whole time that Jody

2  Hamilton was a racist.  His brother was in the Ku Klux Klan,

3  all this stuff here.  Jody would say certain things but I

4  didn't hear that stuff.  All I know, I wanted to be a

5  wrestler, you know.  I heard the stuff.  I didn't hear it.

6  I heard the jokes.  I heard the comments.

7     Q.   What kind of jokes or comments did you hear

8  personally?

9     A.   Okay.  Well, Sarge, if we call people -- he

10  referred to this Asian guy as -- who was in the ring,

11  playing the ring, wrestling around, he's like, there's soul

12  food and oriental food in the ring or something like that,

13  you know, stuff like that.

14     Q.   Okay.  What else do you remember hearing that you

15  thought was a racial comment?

16     A.   Taylor Terry would come by and say stuff like

17  there was a time when the air conditioner broke and he said,

18  well, you'd better turn the air conditioner on because you

19  know, these niggers, they can't take this cold weather.

20     Q.   Did you hear that?

21     A.   Yes.

22     Q.   When was this?

23     A.   This was -- can't remember the dates on it.

24     Q.   How long had you been at the Power Plant when that

25  occurred?

Page 93

1    A.   I'd been there for a long time.

2    Q.   Okay.  Can you give me an idea of when you thought

3    it was year-wise, what time of year it was?  Was it

4    summertime?

5    A.   It was cold, because it was real cold and nobody

6    wanted to do anything because it was cold down there.

7    Q.   So you think it was wintertime?

8    A.   I'm pretty sure it was wintertime.

9    Q.   You don't remember which year?

10   A.   I don't remember what year.

11   Q.   Okay.  You said some comments about Sarge and a

12   comment about Terry Taylor.  What else do you recall

13   occurring down at the Power Plant that you think was a

14   racial comment?

15   A.   Like I said, the comments were all, the whole --

16   even when I came back people were making comments.

17   Q.   Well, I need to know, Mr. Carr, what those

18   comments were, who said them.  I can't just have --

19   A.   Pick a time.  Pick a time.

20   Q.   You tell me.  I need to know everything that you

21   recall --

22   A.   Okay.

23   Q.   -- about comments and who said them and what they

24   said.

25   A.   Okay.  I'll get a little bit recent on you then.

1     A.   Paul said they're not hiring any blacks.  This was

2  down at the new school, because what happened, went through

3  tryouts and Jody told me that -- made the comment or

4  whatever, but I hadn't talked to Paul Orndorff yet.

5     Q.   Okay.  So when was this conversation with Paul?

6     A.   This was sometime late '99.

7     Q.   Okay.  And what did he say to you?

8     A.   He said they ain't hiring no niggers.

9     Q.   And did he use the word "nigger"?

10    A.   Yes, he did.

11    Q.   Okay.  And do you know who he was referring to?

12    A.   Well, I was the only one in the room and I was

13  trying to get a job.

14    Q.   No, no.  When he said "they", do you know who he

15  meant by "they"?

16    A.   I assume he meant WCW.

17    Q.   But you don't know in particular who he --

18    A.   No.

19    Q.   Did Paul Orndorff ever say anything else that you

20  thought was racially discriminatory?

21    A.   No, I didn't see Paul a whole lot after that.

22    Q.   Tell me someone else that you believe down at the

23  Power Plant, said something that you believe was racially

24  discriminatory.

25    A.   Okay.  At the Power Plant.  Like I said, Jody

1      Q.    Okay.

2      A.    You know, and then I didn't hear from him for a

3  while, and then about a month later he called me and asked

4  me if I wanted to get back on the ring truck, and I said

5  yes.

6      Q.    So he offered you a job on the ring crew?

7      A.    Yeah, you know.

8      Q.    Any other conversations with Jody Hamilton you

9  think were discriminatory?

10     A.    Okay.  All right.  What happened, on the days

11  where I was off, Jody would have me come down there and move

12  a lot of stuff, you know, rings, you know, just shift stuff

13  around in the new building here on Log Cabin.

14          I'd unload trucks by myself, move rails, and then

15  I come back and sit down, I take a lunch break or whatever,

16  and he had these stories and they start talking about the

17  problems with the black community.

18          He made this thing about Martin Luther King.  He

19  was like, well, Martin Luther King started all this problem

20  and that's why black people are having so much trouble now.

21  He started segregation and a lot of black people got, you

22  know, sucked up in it because they weren't smart enough to

23  keep up with the white people, so it's bringing down the

24  society.

25          That's the kind of comments he was making, you

1      Well, David Crockett, he was Jody's boss, he came

2  out there and he said, tape those ropes up.  We've got to

3  get it ready.  And I told him, it's going to take 45 minutes

4  to tape those ropes.

5      And he said, get your black ass in there and tape

6  those ropes, and there was people around, too.  Steve Smalls

7  was one of them.  He said, get your black ass back in there

8  and tape those ropes.

9      And I left after that and I went in the back.  I

10 mean, I was hot.  I was really hot after that.  This is in

11 front of -- you know, the whole crowd was there.  It was

12 right by the ringside.

13     Q.   Okay.

14     A.   You know, I mean, like I say, he just treated me

15 bad the whole time after that.

16     We had a show out in California, and the way they

17 did things, I mean, everybody walking around back stage.  If

18 you knew somebody, everybody came around back stage.  Just

19 if you know somebody.  I mean, it was ridiculous.  All the

20 people back stage shouldn't have been back there.

21     Well, I've got a friend that's a cop out in

22 California now and we was going out there and I wanted to

23 get him, you know, back stage to come back there while I was

24 working there, you know.

25     Now, just the night before everybody was back

1     on the basis of your race and comments or jokes or things

2     like that?

3          A.   I mean, Terry Taylor would say stuff so much, I

4     just disregarded him.

5          Q.   What do you remember Terry saying?

6          A.   Well, he was referring to something about -- I had

7     a BWA shirt on right there at one of the shows.  That's

8     Rocky's company.

9          Q.   Okay.

10         A.   All right.  And I'm wearing the BWA shirt.  I

11    didn't even think about it.  I just had a T-shirt over it

12    because you wear anything when you get on the ring stuff,

13    and he said something about, wrestling for the Black

14    Wrestling Association.  That was the big joke.  He's like,

15    oh, you're working for the nigger company, you know.

16         Q.   Did he say those words?

17         A.   Yes.

18         Q.   How did you respond?

19         A.   Nothing.  I mean, Terry was the boss at the time.

20    You know, I could have went off, but I'm still, even though

21    I see the environment is messed up, I'm like, well, maybe if

22    I can get a foothold in there I can, like, get by.  I tried

23    to work around this.  I mean, I heard it a lot.

24         Q.   Okay.  Who else did you hear use words that you

25    found discriminatory?

1        A.    Jamaica.  They could be to Canada, you know.

2        Q.    Okay.  And you said -- were there some weeks you

3    didn't work at all and then you said you were very busy in

4    the beginning, but did it get to the point where there were

5    some weeks --

6        A.    Well, towards the end when the company was

7    shutting down, like the last few months, you know, we didn't

8    work a whole lot then.  Like the last couple of months

9    there.

10            But at the same time, when I went back to work on

11    the ring, I even tried to work with security because

12    security was getting a lot of time on TV, too, and you know,

13    I approached Doug Dillinger several times and first he kept

14    giving me the runaround that -- first he'd say, well, you've

15    got to be a police officer or you've got to, you know, have

16    had some law enforcement experience.

17            I was like, well, I used to be in the Marine

18    Corps.  I had top secret clearance or whatever.  That

19    doesn't count, you know.  And I keep -- I said, Doug, let me

20    get out there.  Let me get some TV time.  You guys are

21    getting all the TV time and you're not even wrestlers, you

22    know, and at the end he said, you know, same thing, you

23    know, he'd say, you know we don't hire no blacks, just like

24    that.

25        Q.    Doug Dillinger said that?

1          They wanted me to put a shirt -- Terry Taylor came

2     up with this idea, put a shirt on and put like, you know,

3     "Tank Abbott Sucks" or something like that on the shirt and

4     start something out of it.  I would sit in the audience like

5     a fan.

6          Well, that was earlier that day.  Later on that

7     day Terry came by and said, they ain't going to believe no

8     niggers are in Montana.  It's going to look like a plant.

9     He said, I'll pay, you know, but we're not going to use it.

10     Q.   Did he pay you for it?

11     A.   He paid me for it, but he said, you know, it was

12     because they ain't going to believe no nigger's in Montana.

13     Q.   Did he use those words?

14     A.   Yes.

15     Q.   You remember him saying that?

16     A.   Yes.  Like I said, Terry used it a lot.  It was

17     open forum, you know.

18     Q.   Did you ever say to him, Terry, don't use that

19     word?

20     A.   I mean, what are you going to tell him?  You see

21     how things work.  I mean, these guys can make you or break

22     you, you know.  What are you going to tell them, you know.

23     Q.   You never said Terry, look, I wish you wouldn't

24     call me that?

25     A.   No.  I just said, Terry, that was messed up and,





# EXHIBIT / ATTACHMENT

## J

(To be scanned in place of tab)

## DECLARATION OF JOHN SNAKOVSKY

STATE OF GEORGIA
COUNTY OF _____

    John Snakovsky gives the following declaration under
penalty of perjury and states as follows:

### 1. J.S.

    I became a wrestler WCW in 1994.  My wrestling name and
professional name is Johnny Boone.

### 2. J.S.

    In 1999, I became a referee.  In my capacity as a wrestler,
and then as a referee, I was in a position to personally observe
many of the WCW officials, especially those who worked in the
Booking Department.

### 3. J.S.

    On numerous occasions, I heard Terry Taylor use offensive
and negative words in describing minorities.  I heard him call
Sonny Onoo a "Jap" on several occasions.  I also heard him refer
to Sonny Onoo as a "Gook."

### 4. J.S.

    I also heard Terry Taylor use the word "nigger" on many
occasions.  In fact, he constantly used that word when referring
to African-American wrestlers.

### 5. J.S.

    I heard Terry Taylor call Ernest Miller ("The Cat") a
"nigger."

### 6. J.S.

    I also heard Terry Taylor call Harrison Norris ("Hard
Body") a "nigger."

7. J.S.

On one occasion, I heard Terry Taylor state that neither Bobby Walker nor Hard Body Norris would make it in the wrestling profession because they were "black."

8. J.S.

Based on my observations of Mr. Taylor, including his use of the words "nigger" and "gook" I believe that Taylor was discriminating against non-Caucasians.

9. J.S.

For example, I recall that Terry Taylor often "pushed" a Caucasian wrestler by the name of Joey Mags.  Upon information and belief, Mr. Mags had many personal problems.  Joey Mags did not possess many skills and abilities as a wrestling performer. Nevertheless, I am personally aware that Terry Taylor "pushed" Joey Mags over Ernest Miller.  Although Ernest Miller was a much better athlete, better wrestler, and better performer, Terry Taylor "pushed" Joey Mags over Ernest Miller.

10. J.S.

I also am aware that Terry Taylor pushed Joey Mags, but did not push Hard Body Norris or Bobby Walker.

11. J.S.

I personally observed Terry Taylor treat Sonny Onoo horribly.  Terry Taylor always referred to Sonny in a negative and/or racist manner, and never provided Sonny with an opportunity fully use his talents.

12. J.S

Sonny played a very unique role at WCW.  Sonny was neither a wrestler nor a referee, but worked as a manager/entertainer. Sonny was extremely professional, very diligent, and always demonstrated a thorough understanding and knowledge of the wrestling industry.

13. J.S

Based on my observations and experience, Sonny Onoo was a much better entertainer and/or manager than Sherry Martil.

Similarly, he was much better than Tori Wilson. As to each of these individuals, Sonny demonstrated much better role-playing and more professionalism. He also demonstrated a greater degree of wrestling expertise in his approach to wrestling events.

14.

Sonny Onoo was also a better manager/entertainer than Colonel Parker. I believe that Sony was better at involving the crowd, and getting a crowd reaction to various staged events than was Colonel Parker. He also was more knowledgeable about wrestling, and was a much harder worker than Colonel Parker.

15.

In addition to Terry Taylor, I heard many other WCW officials use racist and/or negative words such as "nigger." I cannot recall with certainty the identity of the other individuals, but I am confident that I heard these words from WCW officials in addition to Terry Taylor.

16.

In the summer of 2000, I was working as a referee. That night, the WCW held a World Championship wrestling match. The match was scheduled between Booker T and Jeff Jarrett. Based on my recollection, Booker T was not "pencilled in" to win the fight. As those of us in the industry know, a particular wrestler is scripted to prevail in a fight. I believe that Jeff Jarrett was scripted to win the world championship over Booker T on that particular date.

17.

Before the actual wrestling match, I had heard Vince Russo and Terry Taylor discussing a lawsuit filed by Hard Body Norris and Bobby Walker. I believe I also heard them refer to a wrestler named Ice Train during this conversation. All of these individuals are African-American.

18.

During the conversation, I heard Terry Taylor and Vince Russo state that these African-American wrestlers had sued WCW for racial discrimination. I recall Taylor saying, in reference to Hard Body Norris, "that nigger Hard Body is no good."

19. J. S.

During the same conversation, I heard Vince Russo and Terry Taylor state that they would have to do something about the racial allegations against WCW.

20. J S.

Each of them indicated that they would have to do something to deflect racial allegations brought against WCW. During the conversation, they made it clear that they were going to make an African-American the champion in order to make it appear that they were not discriminating against African-Americans. Terry Taylor indicated that by making Booker T, an African-American, the champion, it would "get them off of our backs." In sum, they made it clear that they were concerned about racial allegations brought by Bobby Walker, Hard Body Norris, and other African-American wrestlers. In order to make themselves appear not to be racist, they scripted Booker T, an African-American, to become the WCW champion in response to the lawsuit alleging racial discrimination.

I declare under penalty of perjury that the foregoing is true and correct.

_John Snakovsky_
John Snakovsky

_April 5, 2002_
Executed on (Date)



# EXHIBIT / ATTACHMENT

## K

(To be scanned in place of tab)

## DECLARATION OF GEORGE GRACE

STATE OF GEORGIA
COUNTY OF _ _____

George Grace gives the following declaration under penalty of perjury and states as follows:

1.

I am over eighteen years of age and competent to give this testimony, which is based upon my personal knowledge.

2.

I am the President of Grace Market Research, Inc. ("Grace Market") and served in this position in March, 2000.

3.

In March, 2000, Grace Market conducted an online survey for World Championship Wrestling, Inc.

4.

In this survey, respondents were asked to rate a number of wrestling performers on a number of factors, including the familiarity and likeability. A true and correct copy of this survey is attached hereto as Exhibit "A."

5.

Respondents were also asked to provide some information about themselves, including their ethnicity. Specifically, Question No. 152 asked each respondent to provide his or her ethnicity. The survey provided the following options as possible responses to this question: (1) African/American/Black; (2) Asian; (3) Caucasian/White; (4) Hispanic/Latino; and (5) Other.

6.

According to the information provided by the respondents, the ethic make-up of the respondent group was as follows (percentages rounded to the nearest whole number):

| | |
|---|---|
| Base/ Total Number of Respondents | 1379 |
| Percentage of Total | 100% |
| | |
| African/American/Black: Total Number | 51 |
| Percentage of Total | 4% |
| | |
| Asian: Total Number | 32 |
| Percentage of Total | 2% |
| | |
| Caucasian/White: Total Number | 1173 |
| Percentage of Total | 85% |
| | |
| Hispanic/Latino: Total Number | 66 |
| Percentage of Total | 5% |
| | |
| Other: Total Number | 57 |
| Percentage of Total | 4% |

7.

This information was provided to WCW at some point during the spring or summer of 2000.

8.

Grace Market maintains this information on a database in electronic format.  The information is no longer maintained by Grace Market in hard-copy form.

I declare under penalty of perjury that the foregoing is true and correct.

_George Grace_
George Grace

_12 - 18 - 2002_
Executed on (Date)



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

FILED IN CHAMBERS
U.S.D.C. ——

MAR -8 2002

LUTHER D. THOMAS, Cle
[signature]

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TONY BYRON CARR,                    )
                                    )
           Plaintiff,               )
v.                                  )    CIVIL ACTION FILE
                                    )    NO. 1:00-CV-1721-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
and TURNER SPORTS, INC.,            )
                                    )
           Defendants.              )

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

### I.   INTRODUCTION

Defendants Universal Wrestling Corporation (f/k/a World Championship Wrestling, Inc.) ("WCW") and Turner Sports, Inc. ("TSI") submit this memorandum in support of their Motion for Summary Judgment on all claims brought by Plaintiff Tony Carr. Mr. Carr filed this action on July 10, 2000, alleging race discrimination under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Mr. Carr alleges that WCW (i) discriminated against him due to his race (black) with regard to wrestling opportunities and compensation, (ii) retaliated against him for filing this lawsuit, and (iii) subjected him to a racially hostile work environment. In addition, Mr. Carr claims that this same alleged conduct constituted intentional infliction of emotional distress ("IIED") under state law. Finally, Mr. Carr asserts that

WCW owes him unpaid minimum wages and overtime under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (the "FLSA").

As shown below, these claims are without merit. Mr. Carr was never treated differently due to his race, and was given opportunities and paid like other similarly situated whites at WCW. Likewise, Mr. Carr was not subjected to any retaliation for filing this lawsuit, nor was he subjected to a racially hostile work environment. All actions taken regarding Mr. Carr were based on legitimate, non-discriminatory business reasons that had nothing to do with his race. Mr. Carr offers no evidence of race discrimination, and accordingly, summary judgment should be entered on all of his discrimination claims.

Similarly, summary judgment should be granted on Mr. Carr's IIED claim because this claim is based on nothing other than his allegations of race discrimination, which cannot, under Georgia law, constitute IIED. Finally, summary judgment must be granted on Mr. Carr's FLSA claims because he was not an employee under the FLSA and he never worked any unpaid overtime hours for WCW.

## II.   STATEMENT OF FACTS

### A.   WCW's Business

WCW created, produced, and marketed professional wrestling programs during the 1990s through March 2001. (Affidavit of Diana Myers ("Myers Aff.") ¶ 3 (copy attached as Exh. A)). WCW's

wrestling programs were seen by live audiences and/or aired on various television networks and pay-per-view systems. Id. Wrestlers in WCW's programs provided their services as independent contractors, either under formal Independent Contractor Agreements or without written contracts. (Id. at ¶ 4). WCW's programs were created by writers and producers, with the goal of entertaining wrestling fans and general audiences nationwide. (Id. at ¶ 3).

After having much commercial and financial success in the mid to late 1990s, WCW's business suffered a sharp downturn. (Myers Aff. ¶ 5). In 1999, WCW was losing significant sums of money, and so it began reducing the number of talent it contracted with and the compensation of existing talent, and began producing fewer and fewer wrestling programs. Id. WCW even terminated some of its wrestling programs in early 2000. Id. Accordingly, in 1999 and over the next two years, WCW had less and less need for wrestling services. (Id. at ¶ 6). Despite WCW's efforts, the business downturn did not stop, and in March 2001, WCW sold its principal assets and closed its operations. (Id. at ¶ 7). After this sale was completed, WCW changed its name to Universal Wrestling Corporation to close up remaining corporate operations. Id.

**B.   Mr. Carr's Background And Relationship With WCW.**

Mr. Carr first came to WCW in 1995 for a try out to train as a professional wrestler. (Deposition of Tony Carr (hereinafter

"Carr Dep.") at 25).   Mr. Carr tried out and was invited to train at WCW's training facility, known as the Power Plant.   (Id. at 28).   Mr. Carr, like other trainees, paid WCW to train at the Power Plant.   (Id. at 28, 33, 43).   After completing his initial training period, Mr. Carr continued to work out at the Power Plant through 1999 while holding jobs with other employers.   (Id. at 11-12, 34, 43, 62, 87).   During this time, Mr. Carr provided occasional, infrequent wrestling services to WCW, receiving a flat fee each time he wrestled with WCW.   (Id. at 45-46, 50, 89).

In 1998 and 1999, Mr. Carr also provided services to WCW's ring crew as an independent contractor.   (Id. at 62-64).   The ring crew consisted of individuals who, working in teams of two, were responsible for the wrestling rings used for the matches.   (Id. at 107; Affidavit of Joseph Hamilton ("Hamilton Aff.") ¶ 6 (copy attached as Exh. B)).   The ring crew transported the ring to each match; set up the ring; maintained and cleaned it before, during and after the matches; and broke down the ring and hauled it to the next match.   (Carr Dep. at 63, 109-110; Hamilton Aff. ¶ 6).   Mr. Carr was paid a flat fee each time he provided these ring transport services.   (Carr Dep. at 45-46, 50, 89).

In 1998, WCW decided to move the Power Plant from its previous location on Carroll Drive in Smyrna, Georgia to a new location on Log Cabin Drive, also in Smyrna.   (Id. at 87; Myers

Aff. ¶ 9; Hamilton Aff. ¶ 4).  This new Power Plant facility was established specifically to work with a smaller group of wrestler trainees rather than the large, undefined number that had been working out at the previous location.   (Myers Aff. ¶ 9; Hamilton Aff. ¶ 4; Affidavit of James Morrison ("Morrison Aff.") ¶ 5 (copy attached as Exh. C)).  This smaller group of wrestlers training at the new facility were signed to Independent Contractor Agreements with WCW.   (Myers Aff. ¶ 10; Morrison Aff. ¶ 6).  Previously, Mr. Carr and other individuals working out at the Power Plant were non-contract independent contractors paid a flat fee each time they participated in a WCW event.  (Myers Aff. ¶ 10).

After evaluating the individuals who were then training at the Power Plant, including Mr. Carr, WCW selected approximately twelve trainees to continue training at the new facility and to be offered Independent Contractor Agreements.   (Morrison Aff. ¶ 8). This selection process involved the evaluation of these individuals' wrestling skills, physique, and demeanor and their drive, ambition, and raw potential to become successful professional wrestlers. Id.  Mr. Carr was not among the roughly twelve individuals selected to train at the new facility because he lacked unique wrestling skills, physique, demeanor, and the raw potential to become a successful professional wrestler worthy of

being compensated to train or having his professional services contracted to WCW. (Id.; Carr Dep. at 87).

In 1999, after the move to the new location, Joseph Hamilton, who was responsible for WCW's ring crew, offered Mr. Carr a position as a ring crew employee. (Carr Dep. at 97, 104; Hamilton Aff. ¶ 7). Unlike wrestling on a non-contract basis, the ring crew job provided steady work as an employee of WCW, with better compensation. (Hamilton Aff. ¶ 7; Carr Dep. at 105). Mr. Carr accepted the job and remained a ring crew employee until WCW ceased its operations in March 2001 and discharged its employees. (Myers Aff. ¶ 12; Carr Dep. at 107, 114).

III. ARGUMENT AND CITATION OF AUTHORITY

    A.    **Defendant TSI Is Entitled To Summary Judgment On All Of Plaintiff's Claims Because There Is No Basis For Vicarious Liability Of TSI.**

All of Mr. Carr's claims involve allegations against WCW. WCW, not TSI, is the entity for whom Mr. Carr performed services as an independent contractor; WCW is the entity that employed him from 1999 to 2001 on its ring crew; and WCW is the entity that paid Mr. Carr for these services. (Carr Dep. at 45-46, 50, 62-64, 89, Exh. 4). As Mr. Carr admits, he never had any interaction with anyone at TSI. (Id. at 154-55).

Mr. Carr wants to "pierce the corporate veil" and assert liability against TSI under agency, alter ego, or joint venture

theories.  (See Second Amended Complaint, ¶¶ 37-40).  Despite the sweeping allegations of his Complaint, Mr. Carr can offer no evidence of any agency, alter ego, or joint venturer relationship between TSI and WCW.  (Carr Dep. at 154-57).  While WCW and TSI are sister subsidiaries of a common parent, there is no evidence that WCW acted as the agent or alter ego of TSI or as a joint venturer with TSI.  Id.  Mere allegations that two corporations are related, even as parent and subsidiary, are insufficient to create vicarious liability between the corporations.  Soerries v. Dancause, 546 S.E.2d 356, 358 (Ga. App. 2001).  Corporations normally use their subsidiaries to promote their own purposes, but this does not lead to piercing the corporate veil or vicarious liability, absent evidence of fraud or a sham corporation. Florida Shade Tobacco Growers, Inc. v. Duncan, 256 S.E.2d 645 (Ga. App. 1979); Boafa v. Hosp. Corp. of America, 338 S.E.2d 477, 479 (Ga. App. 1985).  Mr. Carr can offer no evidence of any relationship between TSI and WCW that would support any theory for vicarious liability against TSI.  Therefore, TSI is entitled to summary judgment on all of Mr. Carr's claims.  See, e.g., Williams Plaza, Inc. v. Sedgefield Sportswear Div. of Blue Bell, Inc., 297 S.E.2d 342, 343 (Ga. App. 1982) (summary judgment granted to corporation where "there is no evidence that the [affiliated] corporation 'was a sham, or that it was used to defeat a public

convenience, to justify wrong, protect fraud, defend crime, or any other reason which in equity and good conscience would justify the disregard of its separate entity'").[1]

**B.  Any Of Plaintiff's Claims Based On Events Occurring Prior To July 10, 1998 Are Barred By The Applicable Statutes Of Limitations.**

The U.S. Supreme Court has characterized a claim under 42 U.S.C. § 1981 as a personal injury cause of action to which state statutes of limitations for personal injury actions apply. Alexander v. Fulton Cnty., GA, 207 F.3d 1303, 1346 (11th Cir. 2000).  For § 1981 claims brought in federal courts in Georgia, "the applicable statute of limitations is found in O.C.G.A. § 9-3-33 and is 2 years."  Butler v. Matsushita Comm. Indns. Corp. of U.S.A., 203 F.R.D. 575, 582 (N.D. Ga. 2001).  Mr. Carr filed his Complaint on July 10, 2000.  Accordingly, any of his claims based on events arising prior to July 10, 1998, are barred as a matter of law.  Alexander, 207 F.3d at 1346; Butler, 203 F.R.D. at 582.[2]

_____

[1] Should the Court find that TSI is somehow vicariously liable to Mr. Carr, TSI is nonetheless entitled to summary judgment on Mr. Carr's claims on all of the same grounds as WCW.

[2] With respect to Mr. Carr's Title VII claim, a Charge of Discrimination must be filed with the EEOC within 180 days from the date of the alleged discriminatory act.  42 U.S.C. § 2000e-5(e).  Mr. Carr filed his Charge of Discrimination on May 10, 2000.  Thus, any Title VII claim by Mr. Carr arising more than 180 days before he filed his Charge, or before November 12, 1999, is barred by Title VII's statute of limitations as well.

Mr. Carr's FLSA claim, discussed infra, is also subject to a two-year statute of limitations, similar to his § 1981 claim.  See

It is undisputed that many of the actions alleged by Mr. Carr to have created a supposedly racially hostile work environment at WCW occurred (if at all) prior to July 10, 1998.  (Carr Dep. at 49-50, 87, 92-93, 166-167).  Likewise, it is undisputed that much of the conduct made the basis of Mr. Carr's claim that he was denied opportunities to provide wrestling services to WCW occurred before July 10, 1998.  (Carr Dep. at 25, 45-46).  Any claims of a hostile work environment or other types of discrimination based on these events are barred by the applicable statutes of limitations. In addition, any other § 1981 claims based upon events occurring before July 10, 1998, also are time-barred.  Mr. Carr obviously knew of these alleged discriminatory acts before he filed his Complaint:  Mr. Carr alleges that he was aware of WCW's alleged discriminatory actions as early as 1998, if not before.  (Carr Dep. at 137).  A plaintiff "who knowingly fails to seek relief is exactly the danger Congress was trying to protect against in establishing the statute of limitations."  Butler, 203 F.R.D. at 583.  Thus, any claims that Mr. Carr was subjected to a racially hostile work environment or otherwise discriminated against prior to July 10, 1998 are time-barred, and summary judgment should be granted on these claims.

---

29 U.S.C. § 255.  Accordingly, any claim for wages allegedly due for work performed before July 10, 1998 is also barred.

C. **Mr. Carr Cannot Produce Any Evidence That He Was Discriminated Against On The Basis Of His Race.**

1. *Federal Discrimination Laws Are Not Vehicles For General Judicial Review Of Business Decisions.*

Title VII and § 1981 are not vehicles for general judicial review of business decisions. Discrimination laws were "not intended to diminish traditional management prerogatives." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 259 (1981). Nor do these laws "limit an employer's right to exercise his informed judgment as to how to best run his shop." Gilchrist v. Bolger, 733 F.2d 1551, 1553-54 (11th Cir. 1986). This Court's role is to prevent unlawful practices, "not to act as a 'super personnel department' that second-guesses employers' business judgments." Lee v. GTE Florida, Inc., 226 F.3d 1249, 1254 (11th Cir. 2000), cert. denied, 121 S. Ct. 1486 (2001).

2. *Mr. Carr Is Required To Present Substantial Evidence That WCW Actually And Intentionally Discriminated Against Him On The Basis Of His Race.*

In a disparate treatment case such as this one, Mr. Carr must prove "intentional discrimination." Burdine, 450 U.S. at 256; Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 153 (2000). In such a case, "[p]roof of discriminatory motive is critical." Teamsters v. United States, 431 U.S. 324, 335-36 n.15 (1977). Mr. Carr must carry the initial burden of establishing a prima facie case of discrimination. McDonnell Douglas Corp. v.

Green, 411 U.S. 792 (1973).  Even if he can establish a prima facie case, WCW's burden is merely to offer evidence, but not persuade, showing that the actions complained of were taken for a "legitimate, nondiscriminatory reason."  Reeves, 530 U.S. at 142.

Once such a reason is articulated, any presumption of discrimination arising out of the prima facie case "simply drops out of the picture."  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11 (1993).  Mr. Carr must then "prove by a preponderance of the evidence that the legitimate reason(s) offered . . . were not [the] true reasons, but were a pretext for discrimination."  Burdine, 450 U.S. at 253; see Reeves, 530 U.S. at 143.  Mr. Carr must present "concrete evidence in the form of specific facts which show that [WCW's] proffered reason is mere pretext.  Conclusory allegations and assertions will not suffice."  Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).  "The ultimate burden of persuading the trier of fact that defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  St. Mary's Honor Center, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 253).

### 3.  Mr. Carr Cannot Produce Any Evidence That He Was Denied Wrestling Opportunities Because Of His Race.

Most of Mr. Carr's allegations boil down to a "failure-to-hire" type claim.  He alleges that since 1998, WCW failed to provide him with opportunities to wrestle, both on a non-contract,

independent contractor basis and under an Independent Contractor Agreement. Mr. Carr, however, cannot produce any evidence that WCW _actually_ and _intentionally_ refused to give him wrestling opportunities "because of" his race. Oncale v. Sundowner Offshore Services, Inc. 523 U.S. 75, 78 (1998)(quoting 42 U.S.C. § 2000e-2(a)(1)). Further, Mr. Carr cannot produce any evidence that WCW's legitimate, nondiscriminatory reasons for its decisions were false and a mere pretext for unlawful discrimination.

> ### (a) *Mr. Carr Cannot Establish A Prima Facie Case Of Race Discrimination In WCW's Not Providing Him With Additional Wrestling Opportunities.*

In a "failure-to-hire" type case, establishing a prima facie case requires evidence to demonstrate that plaintiff: (1) is a member of a protected minority; (2) was qualified for and applied for a position for which the defendant was accepting applications; (3) was rejected despite these qualifications; and (4) after this rejection the position remained open or was filled by a person outside his protected class. Schoenfield v. Babbitt, 168 F.3d 1257, 1267 (11th Cir. 1999); Welborn v. Reynolds Metals Co., 810 F.2d 1026, 1028 (11th Cir. 1987). Here, Mr. Carr cannot establish the second or fourth elements of his prima facie case because he cannot establish that wrestling opportunities were available that he was qualified for but did not receive.

While Mr. Carr provided occasional, infrequent services to WCW as a wrestler, he claims that in 1998 and 1999, he should have received additional wrestling opportunities.  It is undisputed, however, that Mr. Carr did not receive more opportunities because he lacked unique wrestling skills, physique, demeanor, and other characteristics of WCW's better performers.  (Morrison Aff. ¶ 4). Mr. Carr's wrestling character, style, and persona were not particularly interesting, unique, or entertaining.  Id.  Further, by early 1999, WCW was already experiencing and responding to a business downturn and had less need for wrestling talent.  (Myers Aff. ¶¶ 5-6).   WCW was in no position to give additional opportunities to lesser performers.  (Id.; Morrison Aff. ¶ 4). Because  Mr.  Carr  cannot  dispute  that  there  were  fewer opportunities available and he was considered a lesser performer, he cannot make out a prima facie case.

Mr. Carr further claims that he should have been awarded an Independent Contractor Agreement with WCW.  (Carr Dep. at 51-52, 116).  But Mr. Carr offers no evidence that he was qualified for such a contract with WCW, and the undisputed evidence shows he was not judged to be a sufficient performer to warrant a contract. Mr. Carr had only limited experience as a wrestler, and he lacked unique wrestling skills, physique, demeanor, and the raw potential to become a successful professional wrestler worthy of being

compensated to train or having his professional services contracted to WCW. (Carr Dep. at 45-46; Morrison Aff. ¶¶ 4, 8). This is why he was not chosen to receive a contract. (Morrison Aff. ¶ 8). Because he cannot show that he was qualified for an Independent Contractor Agreement or possessed the skills and talent to be a contract performer, Mr. Carr cannot make out a prima facie case on this claim.

> **(b)  WCW Has Articulated Nondiscriminatory Reasons For Not Providing Mr. Carr With Additional Wrestling Opportunities.**

WCW has clearly articulated legitimate, nondiscriminatory reasons for Mr. Carr's not receiving more wrestling opportunities or a contract with WCW, and Mr. Carr can offer no evidence that these reasons are a pretext for unlawful discrimination. As shown above, (1) WCW had fewer wrestling opportunities available, and Mr. Carr was not considered a sufficient performer appropriate to be used for those appearances; and (2) Mr. Carr was not qualified for an Independent Contractor Agreement.[3] These reasons constitute

---

[3] That some of the qualifications for being a professional wrestler, such as demeanor or raw potential, involve subjective considerations in no way diminishes WCW's legitimate, nondiscriminatory reasons for selecting other wrestlers over Mr. Carr. Denney v. City of Albany, 247 F.3d 1172, 1185 (11th Cir. 2001) ("an employer's use of subjective factors in making a hiring or promotion decision does not raise a red flag"); Chapman v. Al Transport, 229 F.3d 1012, 1034 (11th Cir. 2000) (federal anti-discrimination statutes do not "deprive an employer the ability to rely on important criteria in its . . . decisions merely because those criteria are only capable of subjective evaluation").

legitimate, nondiscriminatory reasons for WCW's actions.   Thus, the burden shifts to Mr. Carr to "directly persuade the court that a discriminatory reason more likely motivated [WCW] or indirectly [prove discrimination] by showing that [WCW]'s proffered explanation is [pretextual and] unworthy of credence."   Burdine, 450 U.S. at 255 (1981).   This Mr. Carr cannot do.

To establish pretext, Mr. Carr must present "concrete evidence in the form of specific facts which show that the [WCW]'s proffered reason is mere pretext."   Earley, 907 F.2d at 1081.   Mr. Carr's assertion of his subjective belief that discrimination occurred is not enough.   Id.; Elliott v. Grp. Med. & Surg. Serv., 714 F.2d 556, 567 (5th Cir.), cert. denied, 467 U.S. 1215 (1994).

The undisputed evidence is that opportunities to wrestle for WCW on a non-contract basis were diminished at WCW post-1998, and because Mr. Carr had only limited experience as a wrestler and lacked the unique wrestling skills, physique, demeanor, and other characteristics consistent with WCW's better performers, he did not receive those opportunities, nor an Independent Contractor Agreement with WCW.   (Myers Aff. ¶ 6; Morrison Aff. ¶¶ 4, 8).   Mr. Carr's mere opinion that he was better qualified than wrestlers who appeared on WCW shows or were awarded contracts because he "trained at the Power Plant and these guys never trained anywhere" is insufficient.   (Carr Dep. at 119).   It is well-settled that "an

employee's own opinions about his qualifications do not give rise to a material factual dispute." Lee, 225 F.3d at 1254 (quoting Simms v. Oklahoma ex rel. Dept. of Mental Health & Substance Abuse Svcs., 165 F.3d 1321, 1329-30 (10th Cir.), cert. denied, 120 S. Ct. 53 (1999)); Ramsey v. Leath, 706 F.2d 1166, 1170 (11th Cir. 1983); see also Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997) ("The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perception of his performance."). Mr. Carr cannot substitute his own subjective judgment for WCW's judgment about how to weigh time spent training at WCW's facility against wrestling skills, persona, and other traits necessary to be a wrestler with WCW. See Lee, 226 F.3d at 1254 (court's role is "not to act as a 'super personnel department' that second-guesses employer's business judgments"); Nix v. WLCY Radio/Rahall Comm., 738 F.2d 1181, 1187 (11th Cir. 1984) (refusing to overturn an employer's decision that may seem "unfair" to outside observers); Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir.), cert. denied, 474 U.S. 829 (1985) ("courts must refrain from . . . second-guessing a business's decision-making process").

The only other "evidence" of discrimination that Mr. Carr offers is his own self-serving statement that he was denied opportunities to wrestle "because they [WCW] were racist." (Carr Dep. at 120-121). This baseless allegation does not satisfy his

burden of proving pretext. Mr. Carr presents no "concrete evidence in the form of specific facts" to show that WCW's proffered reasons are pretextual.[4] Earley, 907 F.2d at 1081. In short, none of Mr. Carr's proffered testimony establishes that WCW's reasons for not providing him with additional wrestling opportunities or a contract are pretextual. Mr. Carr has offered nothing but "conclusory assertions," which are insufficient to defeat summary judgment. Id.

---

[4] Mr. Carr may attempt to demonstrate pretext by pointing to an alleged statement by Joseph Hamilton that "we're not hiring any blacks." (Carr Dep. at 54-55, 90-91). Even assuming, for purposes of summary judgment only, that this alleged comment was in fact made, it is irrelevant to the issue of pretext in this case. Mr. Hamilton did not decide whether to offer Independent Contractor Agreements to wrestlers. (Hamilton Aff. ¶ 5). As Mr. Carr concedes, he does not even know who made the decisions regarding contracts or what factors went into those decisions. (Carr Dep. at 55-56, 90-91, 96). The Eleventh Circuit "has explained that comments by non-decisionmakers do not raise an inference of discrimination" at the pretext stage. Mitchell v. USBI Co., 186 F.3d 1352, 1355 (11th Cir. 1999); see Miller v. Bed, Bath & Beyond, Inc., No. CV 01-134-1277-S, 2002 WL 214762, at *14 (N.D. Ala. Jan. 31, 2002) ("comments indicating an improper bias by non-decisionmakers generally do not raise an inference of discrimination or pretext on the part of the employer"). Accordingly, Mr. Hamilton's alleged comments are insufficient to establish pretext. Mitchell, 186 F.3d at 1355; Fletcher v. ADT Sec. Services, Inc., No. 1:99-CV-0504-CC, 2000 WL 33231616, at *10 (N.D. Ga. Dec. 7, 2000) ("Statements made by a non-decisionmaker . . . are not relevant to the issue of whether a decisionmaker's reasons for firing an employee are pretextual" (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989)).

**4.    Mr. Carr Cannot Produce Any Evidence That WCW Paid Him Less Than Similarly Situated Individuals Because Of His Race.**

To establish a prima facie case of discriminatory pay, Mr. Carr must show that he was "paid less than a member of a different race was paid for work requiring substantially the same responsibility." Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981). Here, Mr. Carr cannot establish that he was paid less than anyone who worked in a substantially similar position. Mr. Carr limits his pay claim to the time that he was an employee on WCW's ring crew. (Carr Dep. at 128-130). Mr. Carr asserts that he was paid less than his fellow ring crew employee Mike Wenner. (Id. at 105-106, 129-130). In fact, the undisputed evidence is that Mr. Carr was paid more than Mr. Wenner for performing the same job. (Myers Aff. ¶ 12).[5] Accordingly, Mr. Carr cannot establish a prima facie case of discriminatory pay, and summary judgment should be granted.

The foregoing discussion illustrates that Mr. Carr has utterly failed to meet his burden of producing "significant probative evidence" of intentional race discrimination. Clark, 717 F.2d at 529 n.5. There is simply no evidence that WCW discriminated against Mr. Carr due to his race at any time, or in

---

[5] Mr. Carr's hearsay statement that Mr. Wenner said he made $51,000 per year does not create a factual dispute. Indeed, Mr. Carr admits that Mr. Wenner could have been wrong about his salary or could have been making it up. (Carr Dep. at 105-106).

any form or fashion, because "[n]ondiscriminatory reasons just as readily explain [any alleged] difference in treatment." <u>Id.</u> at 1186. This Court therefore should enter summary judgment on all of Mr. Carr's discrimination claims because he has failed to "put on sufficient evidence to allow a factfinder to disbelieve [WCW's] proffered explanation for its actions." <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1532 (11th Cir. 1997), <u>cert. denied</u>, 522 U.S. 1045 (1998).[6]

### 5. *Mr. Carr Cannot Produce Any Evidence Of A Racially Hostile Work Environment.*

To succeed with his hostile environment claim, Mr. Carr must demonstrate that the alleged actions of WCW "altered the condition of the workplace, creating an objectively abusive and hostile atmosphere." <u>Edwards v. Wallace Community College</u>, 49 F.3d 1517, 1521 (11th Cir. 1995) (citing <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)). "For example, the racial slurs allegedly

---

[6] Summary judgment should also be entered on any retaliation claim brought by Mr. Carr. Although he asserts that WCW retaliated against him for filing the instant lawsuit, Mr. Carr cannot demonstrate that WCW took any adverse action against him in retaliation for filing his Complaint or otherwise. (Carr Dep. at 133, 135-36, 138-39). A retaliation claim requires proof of three elements: (i) engaging in statutorily protected conduct; (ii) suffering an adverse employment action; and (iii) a causal connection between the adverse action and the protected conduct. <u>Farley v. Nationwide Mut. Ins. Co.</u>, 197 F.3d 1322, 1336 (11th Cir. 1999). Mr. Carr cannot provide any evidence that he suffered any adverse employment action after filing his lawsuit. (Carr Dep. at 133, 135-36, 138-39). Nor can he show any causal relation between any action and the filing of his Complaint. Accordingly, summary judgment should be granted on Mr. Carr's retaliation claim.

spoken . . . had to be so 'commonplace, overt and denigrating that they created an atmosphere charged with racial hostility.'"   Id. Factors to consider include the frequency and severity of the alleged discriminatory conduct, whether the conduct was threatening or humiliating, and whether it unreasonably interfered with Mr. Carr's work performance.   Id. at 1521-22.

Even assuming *arguendo* the truth of every incident Mr. Carr describes to support his claim, these incidents are insufficient as a matter of law to create a racially hostile work environment. The alleged discriminatory conduct was far from "commonplace;" it was not harsh or severe; and it was not physically threatening. (Carr Dep. at 94-95, 97-100, 103).   Nor did the conduct affect Mr. Carr's performance at WCW.   In fact, he continued performing his job on the ring crew without impact until WCW completely closed down.   (Myers Aff. ¶ 12; Carr Dep. at 107, 114).   Simply put, Mr. Carr can offer no evidence of the kind of "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."   Harris v. Forklift Systems, 510 U.S. at 21; Wallace, 49 F.3d at 1521.   Accordingly, summary judgment should be granted on Mr. Carr's hostile environment claim.

D.   **Summary Judgment Should Be Granted On Mr. Carr's State Law Intentional Infliction Of Emotional Distress Claim.**

To establish a claim for intentional infliction of emotional distress ("IIED") under Georgia law, a plaintiff must establish four elements: (1) intentional or reckless conduct, and (2) extreme and outrageous conduct by the defendant; (3) severe emotional distress suffered by the plaintiff; and (4) a causal connection between the conduct and the emotional distress. Hendrix v. Phillips, et al., 428 S.E.2d 91, 92-93 (Ga. App. 1993). To be "extreme and outrageous," the alleged conduct must be "so terrifying or insulting as naturally to humiliate, embarrass or frighten" the plaintiff and so severe that "no reasonable man could be expected to endure" these actions. Beck v. Interstate Brands Corp., 953 F.2d 1275, 1276 (11th Cir. 1992). Liability for IIED does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Ward v. Papa's Pizza To Go, Inc., 907 F. Supp. 1535, 1540 (S.D. Ga. 1995). Thus, when a plaintiff alleges that conduct such as race discrimination constitutes IIED, he must provide more than just allegations of discrimination. Rather, the alleged conduct must be severe, such as an on-going pattern of explicit and oppressive harassment that includes or resembles a physical assault, see Coleman v. Hous. Auth. of Americus, 381 S.E.2d 303 (Ga. App. 1989), or racial epithets and race-based decisions in carrying out

a contract combined with extreme and graphic threats of bodily harm, dismemberment and death, see Brown v. Manning, 764 F. Supp. 183, 185 (M.D. Ga. 1991).

Here, Mr. Carr cannot meet this high burden of establishing the required level of outrageous conduct. Rather, Mr. Carr testified that there is nothing other than WCW's alleged discrimination that caused him emotional harm. (Carr Dep. at 132). Because Mr. Carr must establish more than just allegedly discriminatory conduct to proceed with his claim for IIED, summary judgment should be entered on this claim. Beck, 953 F.2d at 1276 (discharge of employee for allegedly discriminatory reasons insufficient to support IIED claim); Ward, 907 F. Supp. at 1542 (repeated refusal to hire an individual under circumstances that could constitute unlawful discrimination insufficient to establish IIED claim); Borden v. Johnson, 395 S.E.2d 628 (Ga. App. 1990) (demotion or discharge for whatever reason, even a discriminatory reason, does not give rise to IIED claim).

E.   **Plaintiff's FLSA Claims Have No Merit.**

1.   *Mr. Carr Was Not An Employee Of WCW During The Relevant Time Period.*

Mr. Carr asserts that WCW failed to pay him the minimum wage and overtime, as required by the FLSA, during the time he was training at the Power Plant and providing wrestling services to

WCW.   (Complaint ¶¶ 54-65; Carr Dep. at 140).[7]   The FLSA, however, provides   minimum   wage   and   maximum   hour   protection   only   to employees as defined therein.     29 U.S.C. §§ 203(e)(1) and (g), 206(a), and 207(a).   As shown below, Mr. Carr cannot demonstrate that he was an "employee" of WCW during the time for which he brings claims for minimum wage and overtime pay.

To   determine   whether   an   FLSA-covered   employer/employee relationship   exists,   courts   "look   not   to   the   common   law definitions of those terms, . . . but rather to the 'economic reality' of all the circumstances concerning whether the putative employee is economically dependent upon the alleged employer." Aimable v. Long and Scott Farms, 20 F.3d 434, 439 (11th Cir. 1994) (emphasis added) (citing Rutherford Food Corp. v. McComb, 331 U.S. 722,   730   (1947)).     Where   an   individual   provides   services   to several   different   companies,   performs   his   services   by   the   job rather than on a more permanent basis, uses his own material, and exercises   control   over   the   manner   in   which   he   performs   his services, he is in "economic reality" an independent businessman, not an employee covered by the FLSA.   Donovan v. Tehco, Inc., 542 F.2d 141, 143-44 (5th Cir. 1981).

---

[7] Mr. Carr does not claim that he was not paid minimum wage or overtime during his employment on WCW's ring crew.   (Carr Dep. at 140).

Applying the "economic reality" test to Mr. Carr, during the time he was training at the Power Plant and providing services to WCW as a wrestler he was in reality an independent businessman. He "worked for several other [employers] during the period at issue, invariably worked by the job rather than by the hour, supplied his own materials on occasion, and possessed complete independence in" deciding when and whether to come to the Power Plant and train.  Id. at 440; (Carr Dep. at 43-44, 48, 50, 61-62, 69-70).  He also filed federal income tax returns as a sole proprietorship, listing his income from WCW as "nonemployee compensation."  (Id. at Exh. 4).  These undisputed facts demonstrate, as a matter of "economic reality," that Mr. Carr was not "economically dependent upon" WCW.  Aimable, 20 F.3d at 439. Accordingly, he was not an employee under the FLSA, and WCW is entitled to summary judgment on Mr. Carr's FLSA claims.  Id.; Donovan v. Tehco, 542 F.2d at 143-44.

### 2.    Mr. Carr Did Not Work Any Overtime During The Relevant Time Period.

Mr. Carr's claim for overtime pay also fails because he did not work more than forty (40) hours in any workweek.  The FLSA requires an employer to pay overtime only if an employee is required to work "a workweek longer than forty hours." 29 U.S.C. § 207(a)(1).  As Mr. Carr admitted, he never performed more than five or six hours of work per week for which he claims he should

have been paid but was not paid.   (Carr Dep. at 140-43).   Since Mr. Carr concedes that the work for which he is claiming overtime never involved work hours in excess of forty hours per week, WCW is entitled to summary judgment on Mr. Carr's overtime claims.   29 U.S.C. § 207(a)(1).

## IV.   CONCLUSION

For all of the foregoing reasons, Defendants' Motion for Summary Judgment should be granted.


This 8th day of March, 2002.

TROUTMAN SANDERS LLP


_Evan H. Pontz_

JOHN J. DALTON
Georgia Bar No. 203700
JAMES A. LAMBERTH
Georgia Bar No. 431851
EVAN H. PONTZ
Georgia Bar No. 583577

Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

Attorneys for Defendants
Universal Wrestling Corporation
(f/k/a World Championship Wrestling,
Inc.) and Turner Sports, Inc.

## CERTIFICATION

Pursuant to Local Rule 7.1(D), I certify that this Memorandum of Law has been prepared with one of the fonts and point selections ("Courier New 12") approved by the Court in Local Rule 5.1(B).

This 8th day of March, 2002.

_Evan H. Pontz_
Evan H. Pontz
TROUTMAN SANDERS LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TONY BYRON CARR,                            )
                                            )
                Plaintiff,                  )
                                            )
v.                                          )        CIVIL ACTION FILE
                                            )        NO. 1:00-CV-1721-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
and TURNER SPORTS, INC.,                    )
                                            )
                Defendants.                 )

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of this

*MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY*

*JUDGMENT* upon the interested parties by depositing a copy of same

in the U.S. Mail, properly addressed with adequate postage, to:

> Lee Breedlove
> 1st Union Bank Building
> 250 E. Ponce DeLeon Avenue
> Suite 425
> Decatur, Georgia   30030

This 8th day of March, 2002.

Evan H. Pontz
TROUTMAN SANDERS LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA   30308-2216
(404) 885-3000

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| TONY BYRON CARR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE |
| v. | ) | |
| | ) | NO. 1:00-CV-1721-CC |
| WORLD CHAMPIONSHIP WRESTLING, INC., | ) | |
| and TURNER SPORTS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF DIANA MYERS

DIANA MYERS, who having personally appeared before the undersigned officer duly authorized to administer oaths and having been first duly sworn according to law, deposes and states the following:

1. My name is Diana Myers. I am of majority age, and I give this testimony of my own free will. I have personal knowledge of and am competent to testify to the facts stated herein. The facts stated herein are true and correct.

2. I was employed by Universal Wrestling Corporation (f/k/a/ World Championship Wrestling, Inc. and hereinafter referred to as "WCW") beginning in October 1997 and most recently held the title of Vice President of Business and Legal Affairs. In my position at WCW, I was familiar with virtually all aspects of WCW's business and legal affairs.

3.   WCW created, produced, and marketed professional wrestling programs during the 1990s and through March 2001. WCW's wrestling programs were seen by live audiences and/or aired on various television networks and pay-per-view cable and satellite systems.   WCW's wrestling programs, both live and taped, were created by writers and producers at WCW, with the goal of entertaining wrestling fans and general audiences nationwide.

4.   WCW's wrestling programs included appearances by many types of live or "on-screen" talent, including wrestlers, match referees, and other wrestling talent appearing on camera or at live (but non-televised) events.   These individuals appearing in wrestling programs provided their services to WCW as independent contractors, either through formal Independent Contractor Agreements or without written contracts.

5.   WCW had much commercial and financial success during the mid to late 1990s.   In 1999, WCW's business suffered from a sharp downturn and WCW was losing significant sums of money. Therefore, WCW began downsizing it operations by reducing the number of talent it contracted with, reducing the compensation of existing talent, and producing fewer and fewer wrestling programs.   As part of the downsizing, WCW considered canceling some of its shows.   In early 2000, WCW in fact terminated some

of its programs and also reduced the length of some of its other remaining wrestling programs.

6.   Due to these business circumstances and WCW's downsizing efforts, in 1999 and over the next two years, WCW had less and less need for wrestling services, including on-screen wrestling talent.

7.   The downsizing efforts did not stop WCW's business downturn, and in March 2001, WCW sold its principal assets and completely closed down its operations.  After the sale of assets was completed, WCW changed its name to Universal Wrestling Corporation to close up remaining corporate operations.

8.   From 1995 through approximately 1999, Mr. Carr provided occasional, infrequent services to WCW as an independent contractor wrestler.  Mr. Carr was paid a flat fee each time he provided wrestling services.

9.   In 1998, WCW decided to move the Power Plant from the previous location on Carroll Drive in Smyrna, Georgia to a new location on Log Cabin Drive, also in Smyrna.  This new Power Plant facility was specifically established to work with a smaller group of wrestler trainees rather than the large, undefined group that had been training or working out at the previous Power Plant location.

10.  This smaller group of wrestlers who would be training at the new facility were given the opportunity to sign

Independent Contractor Agreements with WCW. Previously, these wrestlers had not had agreements with WCW but were non-contract independent contractors paid a flat fee each time they participated in a WCW event.

11. After evaluating all of the individuals who were then training at the Power Plant, including Mr. Carr, WCW selected approximately twelve trainees who would be allowed to continue training at the new facility and would be offered ICAs. This selection process was based on the evaluation of these individuals' wrestling skills and persona and their display of the traits necessary to become successful professional wrestlers. Mr. Carr was not selected to train at the new facility because he was not considered among the best talents of those training at the Power Plant.

12. In 1999, Mr. Carr became an employee of WCW, working on WCW's ring crew. As a ring crew employee, Mr. Carr earned $35,000 annually. Mr. Carr's co-employee on the ring crew, Mike Wenner, who at the time held the same ring crew position as Mr. Carr, earned $34,000 annually in that position. Mr. Carr remained an employee on the ring crew until WCW ceased its operations in March 2001, when the employees on the ring crew and elsewhere with WCW were discharged.

FURTHER AFFIANT SAYETH NAUGHT.

This $\overline{28}^{th}$ day of February, 2002.

_____
DIANA MYERS

Sworn to and subscribed
before me this $28th$ day
of February, 2002.

_____
Notary Public

My Commission Expires:
Notary Public, Henry County, Georgia
My Commission Expires Jan. 11, 2006.
_____

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TONY BYRON CARR,                          )
                                          )
            Plaintiff,                    )
                                          )    CIVIL ACTION FILE
v.                                        )
                                          )    NO. 1:00-CV-1721-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
and TURNER SPORTS, INC.,                  )
                                          )
            Defendants.                   )

## AFFIDAVIT OF JOSEPH HAMILTON

BEFORE ME, the undersigned Notary Public, appeared JOSEPH
HAMILTON, who deposes and says as follows:

1.   My name is Joseph Hamilton.  I am of majority age, and
I give this testimony of my own free will.  I have personal
knowledge of and am competent to testify to the facts stated
herein.  The facts stated herein are true and correct.

2.   I was employed by World Championship Wrestling, Inc.
("WCW") through the 1990s and until March 2001, most recently as
Director of Transportation of Ring Equipment for Television.
Prior to that position, I was in charge of training programs at
WCW's Power Plant wrestling training facility located at Carroll
Drive in Smyrna, Georgia.

3.    As part of my duties in charge of the wrestling training programs at the Power Plant at Carroll Drive, I worked with WCW's wrestlers and trainees.   From 1995 through approximately 1999, Tony Carr provided occasional, infrequent services to WCW as an independent contractor wrestler without a written agreement.

4.    In 1998, WCW decided to move its Power Plant wrestling training facility from the location on Carroll Drive to a new location on Log Cabin Drive, also in Smyrna.  At this new Power Plant location, WCW worked with only a smaller group of wrestler trainees than the large number that had been training or working out at the previous location.

5.    It is my understanding that this smaller group of wrestlers who would be training at the new facility were selected to sign Independent Contractor Agreements ("ICAs") with WCW.   I had no involvement in the decisions whether to offer ICAs to wrestlers.

6.    After the Power Plant moved to the Log Cabin Drive location, I assumed the position of Director of Transportation of Ring Equipment for Television.   In this position, I was responsible for directing WCW's ring crew.   The ring crew consisted of a number of individuals who, working in teams of

two, were responsible for the wrestling rings used for the matches. The ring crew transported the ring to each match location; set up the ring; maintained and cleaned it before, during and after the wrestling matches; and then broke down the ring and hauled it to the next designated match location.

7. Sometime after the move to the new location, Mr. Carr was offered a position as an employee on the ring crew. The ring crew jobs provided steady work, and offered better compensation than wrestling on an independent contractor basis. Mr. Carr accepted the position as a ring crew employee.

FURTHER AFFIANT SAYETH NAUGHT.

This 27th day of February, 2002.

JOSEPH HAMILTON

Sworn to and subscribed
before me this 27th day
of February, 2002.

Notary Public

My Commission Expires:
Notary Public, Cobb County, Georgia
My Commission Expires March 22, 2004

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TONY BYRON CARR,                          )
                                          )
                Plaintiff,                )
                                          )     CIVIL ACTION FILE
v.                                        )
                                          )     NO. 1:00-CV-1721-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
and TURNER SPORTS, INC.,                  )
                                          )
                Defendants.               )

### AFFIDAVIT OF JAMES A. MORRISON

BEFORE ME, the undersigned Notary Public, appeared JAMES A. MORRISON, who deposes and says as follows:

1.    My name is James A. Morrison, professionally known as J.J. Dillon.  I am of majority age, and I give this testimony of my own free will.  I have personal knowledge of and am competent to testify to the facts stated herein.  The facts stated herein are true and correct.

2.    I was employed by World Championship Wrestling, Inc. ("WCW") from approximately November 1996 until March 2001. Prior to becoming an employee of WCW, I provided services to WCW as an independent consultant.

3.    As part of my duties as a WCW employee, I worked with WCW's wrestlers and trainees.  During my employment with WCW, Tony Carr provided occasional, infrequent services to WCW as an independent contractor wrestler without a written agreement.

4.   Based on my experience in the wrestling industry and at WCW, the creators, producers, and marketers of professional wrestling programming such as WCW's use their better performers with greater frequency in their wrestling programs.   The reason Tony Carr did not receive more opportunities to wrestle for WCW on an independent contractor basis was that he was not one of WCW's better performers.   Mr. Carr lacked unique wrestling skills, physique, demeanor, and other characteristics consistent with WCW's better performers.   Mr. Carr's wrestling character, style and persona were not particularly interesting, unique, or entertaining.

5.   In 1998, WCW decided to move its Power Plant wrestling training facility from its original location on Carroll Drive to a new location on Log Cabin Drive.   As part of my duties as a WCW employee, I oversaw the changes in office structure and setup that occurred when the Power Plant moved to the new location.

6.   At the new Power Plant location, WCW elected to work with a smaller group of wrestler trainees rather than the large number that had been training or working out at the previous location.   This smaller group of wrestlers who would be training at the new facility were selected to sign Independent Contractor Agreements with WCW.

7.    As part of my duties as a WCW employee, I evaluated the wrestler trainees who wanted to continue training at the new location.    This evaluation was based on these individuals' wrestling skills, physique, and demeanor and their drive, ambition, and raw potential to become successful professional wrestlers.

8.    Mr. Carr was not among the roughly 12 individuals selected to train at the new facility because in my opinion he lacked unique wrestling skills, physique, demeanor, and the raw potential to become a successful professional wrestler worthy of being given compensation to train or having his professional services contracted to WCW.    The decision not to select Mr. Carr was not based in any way on his race.


FURTHER AFFIANT SAYETH NAUGHT.

This ___ day of March, 2002

JAMES A. MORRISON

Sworn to and subscribed
before me this __ day
of March, 200_.

Notary Public

My Commission Expires:

_____

959496-1                                  3



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

FILED IN CLERK'S OFFICE
U.S.D.C. Athens

MAR 25 1994

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROBERT ROSS, JR.        )
                        )
        Plaintiff,      )
                        )
vs.                     )        CIVIL ACTION
                        )        FILE NO. 1:93-CV-1206-JEC
WORLD CHAMPIONSHIP      )
WRESTLING, INC.         )
                        )
        Defendant.      )

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT WORLD CHAMPIONSHIP WRESTLING, INC.'S MOTION FOR SUMMARY JUDGMENT

COMES NOW World Championship Wrestling, Inc. ("WCW"),
Defendant in the above-styled action, and pursuant to Rule 56(c)
of the Federal Rules of Civil Procedure and Rule 220-5 of the
Local Rules to the United States District Court, Northern
District Court of Georgia, timely files this Memorandum of Law in
support of its Motion for Summary Judgment.

### I.   INTRODUCTION

On June 1, 1993, Plaintiff Robert L. Ross, Jr. ("Plaintiff")
filed the instant lawsuit against WCW. In his Complaint,
Plaintiff alleged that WCW: (1) paid him less than similarly
situated white wrestlers, (2) failed to promote him to
heavyweight champion, (3) denied him promotion and/or endorsement
opportunities with other companies, and (4) "terminated" him on
the basis of his race (black), in violation of Title VII of the
Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000(e). WCW
timely filed an Answer to Plaintiff's Complaint, denying its

WCW 102106

material allegations and asserting several affirmative defenses. The discovery period as established by this Court's local rules has ended, and pursuant to this Court's Order, dated December 11, 1993, WCW now moves for summary judgment on Plaintiff's claims on the following grounds:

1. The undisputed facts establish that Plaintiff was never an employee of WCW, but was an independent contractor as a matter of law, and therefore, this Court lacks subject matter jurisdiction over Plaintiff's claim;

2. The undisputed facts establish that Plaintiff cannot present a _prima facie_ case of race discrimination as a matter of law; and

3. The undisputed facts establish that at all times WCW acted with respect to Plaintiff on the basis of legitimate, non-discriminatory reasons unrelated to Plaintiff's race.

Because the undisputed facts show that Plaintiff cannot meet the burden of proving his claims at trial, WCW's Motion for Summary Judgment should be granted and Plaintiff's Complaint should be dismissed.

## II.   STATEMENT OF FACTS

### A.   Plaintiff's Background

Plaintiff graduated from North Cobb High School in 1977, and immediately entered the Army. (Deposition of Plaintiff Robert L. Ross, Jr. (hereinafter "Ross Dep."), pp. 9-10)). While in the Army, Plaintiff rose to the rank of Platoon Sergeant in the Army Rangers, and was honorably discharged in 1986. (Ross Dep., p. 10) Prior to his discharge, Plaintiff determined that he wanted to pursue a career as a professional wrestler.[1]

---

[1]    Plaintiff had previously wrestled in high school and in the Army. (Ross. Dep., p. 21)

In pursuit of this goal, Plaintiff took an extended vacation
from the Army in October 1985 and attended well-known wrestler
Thunderbolt Patterson's wrestling school in Atlanta, Georgia.
(Ross Dep., pp. 20-24)   Thunderbolt Patterson trained Plaintiff
approximately two to three (2-3) hours per night, three to four
(3-4) times per week for a period of three months.   (Ross Dep.,
p. 20)   For his training, Plaintiff paid Thunderbolt Patterson
the sum of twelve hundred dollars ($1200) from his savings.

Upon his discharge from the Army, Plaintiff adopted the ring
name "Ranger Ross," and the "gimmick" of portraying himself as a
war hero.   (Ross Dep., p. 19)   Plaintiff purchased a costume and
equipment with his own money, and began wrestling for Deep South
Championship Wrestling ("DSCW").   (Ross Dep., pp. 12-16)
Plaintiff testified that his relationship with DSCW was typical
of the relationship between wrestlers and wrestling companies
throughout the industry.   Plaintiff wrestled three or four times
weekly, under the terms of an oral independent contractor
agreement, and was subject to minimal supervision.   (Ross Dep.,
pp. 13-16)

Plaintiff's boss at DSCW, Jody Hamilton, would contact
**Plaintiff, provide him with the schedule of events and their
locations, instruct Plaintiff as to the outcome of his matches,
and pay him the agreed upon amount.   (Ross Dep., pp. 13-16)
Although the wrestlers were told where, when and whom to wrestle,
as well as who was to win the match, the details of each match
were left to Plaintiff and his opponent.   During the entire year**

3

WCW 102108

and a half that Plaintiff wrestled for DSCW, DSCW did not
withhold social security tax or payroll tax from Plaintiff's pay,
and DSCW did not provide Plaintiff with any vacation, pension,
insurance or medical benefits.  (Ross Dep., pp. 14-16)

While wrestling for DSCW, Plaintiff also held a full-time
position (40 hours per week) as a press operator at a local
textile company, Coates & Clarke, at a salary of $250.00 per
week.  (Ross Dep., p. 16)  Plaintiff testified that nothing in
his agreement with DSCW precluded him from holding other jobs
with other employers.  (Ross Dep., p. 16)

By January 1988, it was apparent to Plaintiff that DSCW was
not drawing large enough crowds and was in financial trouble.  So
Plaintiff went to work for Southern Championship Wrestling
("SCW") under an oral agreement almost identical to his deal with
DSCW.[2]  (Ross Dep., p. 18)  Plaintiff wrestled for SCW
approximately three days per week, was paid by the match, and
also was paid a percentage of the gate.  (Ross Dep., pp. 18-19)
Plaintiff's pay averaged between two hundred to three hundred
dollars ($200-$300) per week.  Plaintiff continued to wrestle
under the name "Ranger Ross."  Like DSCW, SCW did not reimburse
Plaintiff for the cost of his costumes or equipment, did not
withhold social security or payroll taxes, and did not provide
Plaintiff with any vacation, pension, insurance, or medical
benefits.  Plaintiff wrestled for SCW for approximately one year,

---

[2]     DSCW went bankrupt shortly after Plaintiff left in
1988.  (Ross Dep., p. 17)

4

WCW 102109

and continued to hold other full time jobs the entire time.
(Ross Dep., pp. 24, 35)

Around 1987, or 1988, Plaintiff approached The National
Wrestling Alliance's ("NWA") owner, David Crockett, about
wrestling for NWA.  While Crockett declined Plaintiff's request,
Crockett introduced Plaintiff to Nelson Royal, who wrestled for
the NWA and owned a wrestling school in Mooresville, North
Carolina.  (Ross Dep., p. 25)  At the suggestion of Crockett,
Plaintiff went to Royal's wrestling school to be evaluated by
Nelson Royal.  Royal later informed Crockett that Plaintiff was
qualified to wrestle for the NWA.  (Ross Dep., pp. 26-28)

**B.   Plaintiff's First Stint With WCW**

In January 1989, Plaintiff left SCW and began wrestling for
WCW, which had bought out the NWA in 1988.  (Ross Dep., p. 29)
WCW, like other wrestling companies, stages, promotes and
televises professional wrestling matches.  Plaintiff wrestled for
WCW as "Ranger Ross," and retained his original gimmick.  (Ross
Dep., pp. 19, 32-33)  He wrestled approximately fifteen to twenty
days per month under the terms of an oral independent contractor
agreement and was paid $1000.00 per week.  (Ross Dep., pp. 37,
**39, 42) Sometimes Plaintiff received a percentage of the gate
from the wrestling events in which he participated.  (Ross Dep.,
p. 45)** Plaintiff wrestled for a total of seventeen months before
he was released by WCW in May of 1990.  Plaintiff was released
due to budgetary constraints.  (Ross Dep., p. 46)

5

**WCW 102110**

C.   Max 1990 and Subsequent Events.

After leaving WCW, in May of 1990, Plaintiff went to Japan and wrestled for one month.  (Ross Dep., pp. 58-60)  In July 1990, upon his return from Japan, Plaintiff began wrestling for North Atlantic Championship Wrestling ("NACW").  (Ross Dep., p. 61)  Plaintiff wrestled for NACW under the terms of an oral independent contractor agreement, three or four nights per week, and was paid $100 per night.  (Ross Dep., pp. 50, 61-62)  As is standard practice with wrestling companies, NACW did not withhold social security tax, federal or state payroll tax from these payments, and provided Plaintiff with no pension, medical, insurance or vacation benefits.  (Ross Dep., p. 62)  Further, Plaintiff, who was still wrestling as "Ranger Ross," paid for all of his costumes and equipment.  (Ross Dep., p. 46)

D.   **Plaintiff's Second Stint With WCW.**

In January of 1991, WCW President Jim Herd telephoned Plaintiff and asked him if he wanted to wrestle for WCW again. Plaintiff accepted immediately and met with Jim Herd to negotiate a contract.  (Ross Dep., pp. 65, 72)  Herd and Plaintiff agreed on a six month contract under which Plaintiff would earn $1500.00 per week for his services.  (Ross Dep., pp. 68, 72)  Plaintiff testified that he agreed to these terms and signed a "WCW Freelance Wrestler/Independent Contractor Agreement" (the "Agreement") on January 9, 1991.  (Ross Dep., pp. 70-71; Defendant's Exhibit 2 (attached hereto as Exhibit "A"))

6

WCW 102111

The Agreement itself is in plain language and is simple to read.  As Plaintiff testified, he read the Agreement prior to signing it and understood it in its entirety.  (Ross Dep., pp. 71-72)  Paragraph 2 of the Agreement states:

> I understand and agree that I perform such services as an independent contractor and not as an employee of WCW.  I agree that I shall be fully responsible for taxation on the amounts paid to me by WCW as compensation for my services and that WCW shall bear no responsibilities for such taxation.  I agree that I am not entitled to the benefits provided by WCW to its employees.  I understand that WCW makes no commitment to use my services and makes no guarantee of any number of events or amount of compensation.

(See Exhibit "A" hereto)  As this language makes clear, Plaintiff was not an employee of WCW, but was an independent contractor. In fact, Plaintiff testified that he understood that he was not an employee of WCW.  (Ross Dep., pp. 72-73)

During his service with WCW from January, 1991 through July, 1991, WCW communicated with Plaintiff primarily through booking sheets which contained pertinent scheduling information.  (Ross Dep., pp. 79-80)  The booking sheets sent to Plaintiff specified which wrestlers would wrestle whom, and the location and dates of the matches.  The booking sheets announced matches anywhere from two weeks to thirty days in advance.  (Ross Dep., pp. 79-81) Plaintiff and the other WCW wrestlers were responsible for buying plane tickets and getting to the matches.  Once at the venue, the wrestlers would go to the dressing room, get dressed in their costumes, and wait for further instructions.  (Ross Dep., pp. 81-82)

7

WCW 102112

Then, a representative of WCW, usually the road agent, or sometimes the referee, would make sure that all wrestlers scheduled to wrestle were present, specify which wrestler was supposed to win or lose the various matches, and tell the wrestlers how to finish the match. (Ross Dep., p. 82) The wrestlers themselves were free to choreograph the remainder of the match up to the finish. Plaintiff testified that beyond specifying who was to win or lose, and ensuring that the wrestlers were ready to wrestle, WCW did not supervise him further. (Ross Dep., pp. 83-84)

During the January 1991-July 1991 time period, Plaintiff's primary contact at WCW was Dusty Rhodes. Mr. Rhodes was responsible for: (a) arranging or booking WCW's professional wrestling matches at various venues throughout the country, (b) determining which wrestlers would wrestle at the events (including which wrestlers would wrestle against each other), (c) determining the final outcome of the wrestling matches, (d) evaluating and recruiting talent, and (e) deciding which wrestler(s) would progress or be "pushed" to the rank of heavyweight champion. (Affidavit of Virgil Runnels, a/k/a Dusty Rhodes (hereinafter "Rhodes Aff."), ¶ 3)

During the January 1991 through July 1991 time period, it became apparent to WCW that Plaintiff lacked the talent, skills and, most importantly, the audience appeal necessary to be considered to be WCW's heavyweight champion. (Rhodes Aff., ¶ 6) Professional wrestlers must be capable of whipping the crowd into

8

WCW 102113

a frenzy. Crowds who are vocal and involved in a match enjoy themselves and return to other wrestling events, which ensures the continued financial viability of companies like WCW. (Rhodes Aff., ¶ 6)  According to Dusty Rhodes, Plaintiff was unable to generate sufficient excitement and interest among the crowd. (Rhodes Aff., ¶ 6)  His performances simply were not sufficiently entertaining. (Rhodes Aff., ¶ 6)

While Plaintiff's gimmick of portraying himself as war hero "Ranger Ross" generated some interest among the crowd (particularly during 1991's Operation Desert Storm), Plaintiff failed to sustain and build upon that interest. (Rhodes Aff., ¶ 6)  In short, Plaintiff was one of the hundreds of professional wrestlers who could not sell tickets and could not draw crowds.[3] (Rhodes Aff., ¶ 6)  He simply did not stand out. Accordingly, Plaintiff was not qualified to be named WCW's heavyweight champion. (Rhodes Aff., ¶ 6)  Conversely, Rick Flair (white), Ron Simmons (black), and Lex Lugar (white), all of whom were heavyweight champions for WCW, each had an appealing gimmick and the charisma and audience appeal to generate massive and unmistakable reactions from the audience. (Rhodes Aff., ¶ 6)

**Plaintiff testified that Rhodes approached him in early 1991 and enlisted Plaintiff's help in pushing Ron Simmons, a black wrestler, to the position of WCW's heavyweight champion. (Ross Dep., pp. 77-79, 93) Specifically, Plaintiff testified that**

---

[3]     WCW used the services of approximately 334 male wrestlers in 1991. (Holman Aff., ¶ 5)

9

Rhodes hoped to make Simmons the heavyweight champion, and
further that Rhodes enlisted Plaintiff's assistance by asking
Plaintiff to serve as Simmons' "trainer."  (Ross Dep., pp. 77-79)
The idea was to highlight Plaintiff's military background and to
portray Plaintiff as putting Simmons through military style
training in preparation for an "assault" on the heavyweight
title.  (Ross Dep., pp. 77-79)  It is undisputed that Rhodes
initiated Simmons' push to heavyweight champion, and asked for
Plaintiff's help in that process, before the expiration of
Plaintiff's Agreement in July of 1991.  (Ross Dep., pp. 77-79)
Further, it is undisputed that Ron Simmons, a black male,
thereafter became WCW's heavyweight champion.  (Ross Dep., pp.
122-123)

     In mid-1991, due to the declining popularity of professional
wrestling, WCW was forced to cut its budget.  (Herd Aff., ¶ 6)
As part of the measures taken to cut the budget, WCW did not
renew the independent contractor agreements of several wrestlers,
including Plaintiff's.  (Herd Aff., ¶ 6)  It is, however,
undisputed that Plaintiff was not terminated or fired by WCW.
Rather, his Agreement simply was not renewed.  (Ross Dep., p. 73)

     **Plaintiff was one of fourteen professional wrestlers whose
agreements were not renewed by WCW during the summer of 1991.
(Rhodes Aff., ¶ 8; Affidavit of WCW's James Herd (hereinafter
"Herd Aff.") ¶ 6)  Significantly, Plaintiff was the only black
among the fourteen wrestlers released by WCW in the summer of
1991.  (Rhodes Aff., ¶ 8)  Moreover, Plaintiff earned more than**

10

WCW 102115

ten of the fourteen wrestlers that were released with him in the summer of 1991. Pertinent data on the fourteen (14) wrestlers released by WCW in the Summer of 1991 (i.e. their names, their 1991 earnings, the length of time they were active, and their race) is as follows:

| NAME | 1991 EARNINGS/TIME ACTIVE | | RACE |
|------|------------|------------|------|
| Ranger Ross | $36,250.00 | (6 MOS.) | Black |
| Rip Morgan | $29,622.00 | (7.5 MOS.) | White |
| Randy Colley | $29,925.00 | (6.0 MOS.) | White |
| Robert Gibson | $00.00 | (inactive) | White |
| George Gray | * $74,000.00 | (8.5 MOS.) | White[4] |
| Billy Jack Haynes | $16,500.00 | (4.0 MOS.) | White |
| Oliver Humperdink | $00.00 | (inactive) | White |
| Black Bart | $26,350.00 | (7.5 MOS.) | White |
| Dutch Mantel | * $58,240.00 | (9.5 MOS.) | White |
| Dick Murdoch | $16,750.00 | (4.5 MOS.) | White |
| Jack Victory | $32,200.00 | (6.0 MOS.) | White |
| Dick Slater | $16,750.00 | (4.0 MOS.) | White |
| Sam Houston | $19,150.00 | (5.0 MOS.) | White |
| Danny Spivey | * $57,000.00 | (5.5 MOS.) | White |

(Rhodes Aff., ¶ 8; Holman Aff., ¶ 9)

Upon expiration of Plaintiff's Agreement, Plaintiff was informed that his Agreement would not be renewed. (Ross Dep., pp. 92-93) After Plaintiff's release, however, WCW contacted him once to ask him to wrestle at a special event. (Ross Dep., p. 111) Plaintiff agreed to do so and in fact wrestled at a WCW event in August 1991. (Ross Dep., p. 111) WCW paid Plaintiff a **flat fee for that one match.** (Ross Dep., p. 111) Plaintiff later filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). After receipt from the EEOC of

---

[4]    The three wrestlers who earned more than Plaintiff's $1500.00 weekly salary are marked with an asterisk (*).

WCW 102116

his Right-to-Sue Notice, Plaintiff filed the instant action on June 1, 1989.

**E.   Events Since Plaintiff's Lawsuit was filed.**

Plaintiff's discovery efforts in this case highlight the fact that (a) Plaintiff cannot prove the requisite elements of his claims and (b) that Plaintiff intends to distort the facts in an attempt to confuse and mislead the Court.  Of the thousands of documents that WCW made available for Plaintiff's inspection, Plaintiff chose to copy only a handful of documents.  Instead of copying all of the documents relating to payments made by WCW to hundreds of WCW wrestlers, Plaintiff copied only the <u>largest</u> paycheck stubs of a handful of top white[5] WCW wrestlers from selected pay periods.  Undoubtedly, Plaintiff will attempt to distort this limited information and make incorrect extrapolations about how much certain WCW wrestlers were paid.  Because Plaintiff did not look at all of the documents and because Plaintiff did not analyze all of the pertinent data, Plaintiff has no idea of how much other WCW wrestlers were paid,

---

[5]     Plaintiff ignored the files of Ron Simmons and Teddy Long, black wrestlers who rank among the highest paid at WCW.

12

WCW 102117

and Plaintiff admitted as much during his deposition.[6]   (Ross Dep., pp. 117-118)

Plaintiff took no depositions during discovery in the case. Moreover, throughout his deposition Plaintiff conceded that on every point crucial to his case, his claims rest on nothing but his opinions and conjectures.  Plaintiff admitted that he does not know (a) who at WCW made the decisions about which he complains, or (b) what factors the individuals who did make the decisions relied upon.  (Ross Dep., pp. 53-54, 56-58, 97, 100, 117-121, 123-126, 128, 132-137, 139)  In such circumstances, WCW is entitled to summary judgment because Plaintiff can produce no evidence whatsoever to support his claims beyond baseless accusations that fly in the face of the voluminous, unrebutted facts.

### III.   ARGUMENT AND CITATION OF AUTHORITY

In his Complaint, Plaintiff alleges that WCW: (1) paid him less than similarly situated white wrestlers, (2) failed to promote him to heavyweight champion, (3) denied him promotion and/or endorsement opportunities, and (4) "terminated" him on the basis of his race in violation of Title VII of the Civil Rights

---

[6]     Amazingly, during his deposition Plaintiff requested the 1099s that show each independent contractors annual earnings, but as of the date of this filing, Plaintiff has not come to Defendant's counsel's office to inspect them.  The 1099s, and other records produced, conclusively establish that there were approximately two hundred and seventy-eight (278) WCW wrestlers, the vast majority of whom were white, who in 1991 were paid less than Plaintiff.  (Holman Aff., ¶ 5-6)

13

WCW 102118

Act of 1964 ("Title VII"), 42 U.S.C. §2000(e). Plaintiff's claims are meritless for several reasons.

First, Plaintiff readily admitted during his deposition that he was never an employee of WCW. Rather, at all times relevant to this action, Plaintiff was an independent contractor, who wrestled under the terms and conditions of a written agreement that clearly and unambiguously provided that he was an independent contractor. As an independent contractor, Plaintiff is not entitled to the protections of Title VII of the Civil Rights Act of 1964. Accordingly, this Court lacks subject matter jurisdiction over Plaintiff's claims, and Plaintiff's Complaint should be dismissed.

Second, Plaintiff cannot establish a <u>prima</u> <u>facie</u> case of discrimination. Plaintiff cannot show: (1) that he was the victim of any adverse employment action whatsoever, (2) that he was qualified to be "pushed" to the rank of heavyweight champion, or, alternatively, that he was even satisfying the legitimate expectations of WCW, or (3) that he was replaced, much less by someone outside the protected classification.

Third, assuming <u>arguendo</u> that Plaintiff can establish a <u>prima</u> <u>facie</u> case of discrimination, WCW has articulated nondiscriminatory, legitimate business reasons for each action about which Plaintiff complains. Plaintiff has produced no evidence whatsoever to meet his burden of rebutting WCW's non-discriminatory, legitimate business reasons for its actions. For

14

WCW 102119

these reasons, Plaintiff's claims all fail and are subject to
summary judgment.

**A.    Standard of Review.**

Under Rule 56(c) of the Federal Rules of Civil Procedure,
"[s]ummary judgment is appropriate where there is no genuine
issue of material fact."  Earley v. Champion International
Corporation, 907 F.2d 1077, 1080 (11th Cir. 1990); Fed. R. Civ.
P. 56(c).  As held by the U.S. Supreme Court: "Summary judgment
procedure is properly regarded not as a disfavored procedural
shortcut, but rather as an integral part of the federal rules as
a whole, which are designed 'to secure the just, speedy and
inexpensive determination of every action.'"   Celotex Corp. v.
Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555 (1986).
Consequently:

> Rule 56 must be construed with due regard not
> only for the rights of persons of asserting
> claims and defenses . . . but also for the
> rights of persons opposing such claims and
> defenses to demonstrate in the manner
> provided by the rule, prior to trial, that
> the claims and defenses have no factual
> basis.

Celotex Corp., 477 U.S. at 327, 106 S.Ct. at 2555; Barnes v.
Southwest Forest Industries, Inc., 814 F.2d 607, 609 (11th Cir.
1987).  Also, "a court must bear in mind the actual quantum and
quality of proof necessary to support liability" in a given case.
Barnes, 814 F.2d at 609 (quoting Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 106 S.Ct. 2505, 2513 (1986)).  "The mere existence
of a scintilla of evidence in support of the Plaintiff's position

15

WCW 102120

will be insufficient; there must be evidence on which the [trier
of fact] could reasonably find for the Plaintiff . . . If the
evidence is merely colorable or is not significantly prohibitive
summary judgment may be granted." Earley, 907 F.2d at 1080
(quoting Anderson, 477 U.S. at 249-250, 106 S. Ct. at 2511)
(emphasis in Earley).  While, under Rule 56, a court considering
a motion for summary judgment must consider all the evidence in
the light most favorable for the non-moving party," Rollins v.
Techsouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987); "[a] trial
court is not required to resolve all doubts in such a manner."
Earley, 907 F.2d at 1080 (quoting Barnes, 814 F.2d at 609)
(emphasis in original).

In an employment discrimination case, summary judgment is
appropriate where "the Plaintiff fails to raise any issue of fact
indicative of . . . discriminatory conduct by the Defendant."
Beard v. Annis, 730 F.2d 741, 743-744 (11th Cir. 1984).  Where
there is a "complete failure of proof concerning an essential
element of the non-moving parties case . . . summary judgment is
appropriate."  Celotex Corp., 477 U.S. at 327, 106 S.Ct. at 2552-
53.

## B.  Plaintiff Was An Independent Contractor And As Such Does Not Fall Within The Ambit Of Title VII's Protections.

Section 703(a) of Title VII prohibits discrimination against
"any individual" with respect to "compensation, terms,
conditions, or privileges of employment."  This Court has held
that Title VII does not apply to independent contractor
relationships, as the requisite employment setting is lacking.

16

WCW 102121

See <u>Mathis v. Standard Brands Chemical Industries, Inc.</u>, 10 FEP
295 (N.D.Ga. 1975)(Title VII does not extend to cover attempts to
enter into independent contract relationships).  In the instant
case, Plaintiff admits that he was never an employee of WCW.
(Ross Dep., pp. 72-73)  Thus, the requisite employment setting is
wholly absent.  Moreover, the plain language of Plaintiff's
Agreement states that Plaintiff is an independent contractor, not
an employee.  (<u>See</u> Exhibit "A" hereto)  In such circumstances,
Plaintiff plainly does not fall within the ambit of Title VII's
protection.

In this circuit, "general common law concepts" are used to
determine whether an individual is an independent contractor or
employee.  <u>Cobb v. Sun Papers, Inc.</u>, 673 F.2d 337 (1982).  In
fact, in the <u>Cobb</u> case the Eleventh Circuit Court of Appeals
adopted an eleven-part test which found its origins in general
principles of the law of agency.  <u>Cobb</u>, 637 F.2d at 340-341.  The
eleven factors enunciated in <u>Cobb</u> are as follows: (1) the
intention of the parties, (2) whether the worker accumulates
retirement benefits, (3) whether the "employer" pays social
security taxes, (4) whether annual leave is afforded, (5) the
**length of time during which the individual has worked, (6) the
kind of occupation, with reference to whether the work usually is
done under the direction of a supervisor or is done by a
specialist without supervision, (7) the skill required in the
particular occupation, (8) the manner in which the work
relationship is terminated;** *i.e.*, by one or both parties, with or

17

WCW 102122

without notice and explanation, (9) whether the "employer" or the individual in question furnishes the equipment used and the place of work, (10) whether the work is an integral part of the business of the "employer", and (11) the method of payment, by time or by the job. Id. at 340. While Cobb advocates an analysis using the above listed factors, the Court cautioned that "no one factor is determinative."[7] Id. at 340 (citing, Spirides v. Reinhardt, 613 F.2d 826 (D.C. Cir. 1979)).

In the instant case, no fewer than ten of the eleven factors point to the inescapable conclusion that Plaintiff was an independent contractor, not an employee of WCW. Paragraph 2 of Plaintiff's Agreement itself addresses the first four elements of the test. That language provides:

> **I understand and agree that I perform such services as an independent contractor and not as an employee of WCW.** I agree that I shall be fully responsible for taxation on the amounts paid to me by WCW as compensation for my services and that WCW shall bear no responsibilities for such taxation. I agree that I am not entitled to the benefits provided by WCW to its employees. I understand that WCW makes no commitment to use my services and makes no guarantee of any number of events or amount of compensation.

(Exhibit "A" hereto) (emphasis added) Plaintiff bargained for, read, and signed the Agreement fully knowing and understanding that it contained the above-quoted language. (Ross Dep., pp. 72-75) More importantly, Plaintiff testified that he understood the

---

[7]    Indeed, review of Cobb reveals that the Court ignored several of the above-listed factors, and affirmed the district court's determination that the appellant was an independent contractor because most of the evidence supported the lower court's reasoning.

WCW 102123

entire agreement.  (Ross Dep., pp. 72-78)  In fact, Plaintiff
testified that he was well aware that he was not an employee of
WCW. (Ross Dep., pp. 72-73)  Thus, the intention of the parties
was clear and unmistakable:  Plaintiff was to be an independent
contractor and not an employee.

The second factor, whether the individual accumulates
retirement benefits, is also addressed in Paragraph 2, which
states, "I agree that I am not entitled to the benefits provided
by WCW to its employees."  (Exhibit "A" hereto)  Plaintiff
accumulated no benefits whatsoever beyond the $1500 weekly
compensation required under the Agreement.  (Ross Dep., pp. 73-
75)  Plaintiff was provided no retirement, medical, or insurance
benefits.  (Ross Dep., pp. 73-75)  Moreover, Plaintiff admitted
that WCW paid no social security or payroll taxes on his behalf.
(Ross Dep., p. 73)

The next factor, whether annual leave is provided, also
leads to the conclusion that Plaintiff was not an employee.
Again, Paragraph 2 states that Plaintiff would receive no
benefits usually accorded WCW employees, and Plaintiff testified
that WCW provided him with no annual leave.  (Ross Dep., p. 74;
**see also**, Exhibit "A" hereto)  The next element of the test
pertains to the length of time during which the individual
worked.  Plaintiff's set six month tenure is inconsistent with an
employment relationship.  An employment relationship is not
usually of a set duration, but is continuous.

19

WCW 102124

Next, Plaintiff's testimony establishes that the level of supervision that he and other WCW wrestlers were subjected to was negligible at best. Plaintiff was instructed where to wrestle, whom to wrestle against, and the finish of the match. (Ross Dep., pp. 81, 83) The match itself, up to the finish, was choreographed by the wrestlers themselves. (Ross Dep., pp. 76, 83-84) Such a minimal level of supervisory involvement is not consistent with an employment relationship. Instead, as in the typical independent contractor arrangement, WCW specified little else but what the finished product should look like, and left the details up to the wrestlers. Further, Plaintiff admitted that WCW did nothing to change his gimmick.[1] Plaintiff chose his own costume, and performed his own techniques while in the ring, without direct supervision.

The next element requires analysis of the level of skill involved in the endeavor. Professional wrestlers are specialists. The wrestling techniques and moves Plaintiff employed were developed through years of training. Plaintiff wrestled throughout high school, continued to wrestle competitively while in the army, and planned to wrestle in the 1980 Olympics, but the U.S. boycott prevented his participation. (Ross Dep., pp. 21, 23-24) Moreover, Plaintiff attended two professional wrestling schools to receive the necessary training. (Ross Dep., pp. 21, 23-24) In fact, David Crockett of the NWA,

---

[1]     WCW only required a costume change if there was a conflict between two costumes, such as two wrestlers with the same color shorts. (Ross Dep., pp. 84-85)

20

WCW 102125

WCW's predecessor, would not hire Plaintiff until he attended Nelson Royal's wrestling school in Mooresville, North Carolina, where his skills could be evaluated.  There can be no question, then, that Plaintiff, was a highly trained specialist, which supports the conclusion that Plaintiff was an independent contractor.

The next factor, the manner in which the work relationship terminated, also weighs heavily in favor of the conclusion that the Plaintiff was an independent contractor.  Although Plaintiff alleged that he was "terminated," Plaintiff readily admitted during his deposition that he was not terminated.  (Ross Dep., pp. 92-93)  Instead, the parties' relationship in this case just expired when Plaintiff's Agreement expired.  Such an arrangement is wholly inconsistent with a finding that Plaintiff was an employee.  Additionally, Plaintiff knew when he signed the Agreement that his Agreement expired in six months.  Thus, Plaintiff had notice at the very start of his contract that he would be subject to a release in July 1991.  Such notice is consistent with an independent contractor arrangement, not an employment relationship.

Although WCW provided "the place of work," this factor still supports the conclusion that Plaintiff was not an employee.  WCW only provided the place of work to the extent that it booked the particular arena where the matches took place.  The nature of the business itself dictated that WCW, of necessity, provided the place of work.  Also, Plaintiff testified that during his entire

21

professional wrestling career (including his time with WCW), he provided his own costume and equipment.[9]   (Ross Dep., pp. 18, 85) Without exception, Plaintiff paid for his costumes from his own money, and was not reimbursed.   (Ross Dep., p. 85)

Next, the work in question was not an integral part of the business of the employer.   While WCW staged, promoted, and televised professional wrestling matches, Plaintiff's involvement in those matches was not essential to that business.   Plaintiff was not one of the top wrestlers, and was relatively fungible.[10]

Thus, application of the Cobb test to the facts in this case leads to the inescapable conclusion that Plaintiff was an independent contractor.   As such he is not entitled to Title VII's protections.   Thus, Plaintiff's Complaint should be dismissed, as this Court lacks subject matter jurisdiction over Plaintiff's claims.

---

[9]     Plaintiff testified that on one occasion, WCW provided him with a rope from which he rappelled from the ceiling of an arena.   (Ross Dep., p. 46)

[10]     While not a factor listed in Cobb, some weight must be given to the practice in the wrestling business.   As stated by Dusty Rhodes, who has over twenty (20) years of experience as a professional wrestler, "[i]t is, and always has been, standard industry-wide practice for wrestling promotion companies (like WCW) to retain the services of all professional wrestlers as independent contractors, and not employees."   (Rhodes Aff., ¶¶ 11-13)   Moreover, Plaintiff admitted that he was treated as an independent contractor in all of his prior wrestling work.   (Ross Dep., pp. 13-16, 18-24, 50, and 61-62)

22

WCW 102127

C.   **Plaintiff's Claims Pertaining To His Work For WCW From
     January 1989 through May 1990 Are Untimely.**

Plaintiff testified in his deposition that WCW discriminated
against him during his first stint at WCW (from January, 1989
through May, 1990). (Ross Dep., pp. 49-50) But Plaintiff
admitted that after he was released by WCW in May, 1990, he did
not file a charge of discrimination with the Equal Employment
Opportunity Commission ("EEOC"). (Ross Dep., p. 49)

Under Title VII, an individual wishing to bring suit must
satisfy several administrative requirements. See 42 U.S.C.
§2000e-5(b)-(k); Tolbert v. U.S., 916 F.2d 245, 247 (5th Cir.
1990); Law v. Hercules, Inc., 713 F.2d 691, 692-93 (11th Cir.
1983). One of those requirements is that any "charge under
[Title VII] must be filed [with the EEOC] within one hundred and
eighty days after the alleged unlawful employment practice
occurred...." 42 U.S.C. §2000e-5(e). Thus, by its plain
language, Title VII requires any prospective plaintiff to notify
the EEOC (through the filing a charge of discrimination) of an
alleged discriminatory act no later than one hundred and eighty
(180) days after the last discriminatory act took place. Id.

In Plaintiff's case, the last discriminatory act during his
**first stint with WCW could not have occurred later than**
**Plaintiff's May, 1990 release. Accordingly, Plaintiff needed to**
**file an EEOC charge by no later than November 1, 1990 (assuming a**
**May 30, 1990 release date) in order to make a timely claim under**
**Title VII.** Plaintiff testified, however, that he never filed a
charge of discrimination pertaining to his work for WCW during

23

the January 1989 through May 1990 time period. (Ross Dep.,

pp. 50)  Therefore, any and all allegations of discrimination

regarding Plaintiff's work for WCW during the January 1989

through May 1990 time period are untimely and should not be

considered by the Court.  <u>United Airlines, Inc. v. Evans</u>, 431

U.S. 533, 97 S.Ct., 1855 (1977).

**D.   <u>Plaintiff's Claims Pertaining To His Work For WCW From
      January 15, 1991 Through July 14, 1991 Are Subject To
      Summary Judgment</u>.**

As noted in Section III(B) of this Brief, as an independent

contractor, Plaintiff does not even fall within the ambit of

Title VII's protections.  Moreover, even if this Court were to

find that Plaintiff might fall within the ambit of Title VII,

Plaintiff's claims still are subject to summary judgment for two

reasons.  First, Plaintiff has failed to establish a prima facie

case of race discrimination.  Second, even if he could establish

a prima facie case, Plaintiff has not rebutted (and cannot rebut)

WCW's articulated legitimate, non-discriminatory reasons for its

actions involving Plaintiff.  For these reasons, Plaintiff's

claims are subject to summary judgment.

**1.   Plaintiff's Burden Of Proof**

In a Title VII discrimination case, Plaintiff bears the

**fundamental burden of proving that an adverse employment decision**

**taken against him/her was based upon an unlawful factor.  In this**

**action, Plaintiff is alleging disparate treatment under Title**

**VII.  Accordingly, Plaintiff is required to prove that WCW acted**

**towards him with discriminatory intent.  <u>International</u>**

24

WCW 102129

Brotherhood of Teamsters v. United States, 431 U.S. 324, 355
n.15, 97 S. Ct. 1843, 1854 n.15 (1977); Pace, 701 F.2d at 1387.
Absent direct evidence, the establishment of discriminatory
motive is governed by the burden of proof and order of proof
requirements set forth in McDonnell-Douglas Corp. v. Green, 411
U.S. 792, 802-804, 93 S. Ct. 1817, 1824 (1973). Archambault v.
United Computing Systems, Inc., 786 F.2d 1507, 1512 (11th Cir.
1986).

   Under McDonnell-Douglas, Plaintiff first has the burden of
establishing a prima facie case of illegal discrimination.
McDonnell-Douglas, 411 U.S. at 802, 93 S.Ct. at 1824. Second, if
Plaintiff succeeds in establishing the prima facie case, the
burden shifts to the Defendant to "articulate some legitimate,
non-discriminatory reason" for the adverse employment action. If
the Defendant carries this burden, the Plaintiff must prove by a
preponderance of the evidence that the legitimate reason offered
by the Defendant was merely a pretext for discrimination. Id. at
804; 93 S.Ct. at 1825; Perryman v. Johnson Products Co., 698 F.2d
1138, 1142 (11th Cir. 1983). However, the Defendant's burden of
rebuttal is merely one of production, not proof. Lee v. Russell
County Board of Education, 684 F.2d 769, 773 (11th Cir. 1982).
At all times, the "ultimate burden of persuading the trier of
fact that defendant intentionally discriminated . . . remains
with the Plaintiff." Texas Department of Community Affairs v.
Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093 (1981).

25

WCW 102130

In evaluating whether a Plaintiff has satisfied the initial burden of establishing a prima facie case, the central inquiry is whether the circumstantial evidence presented is sufficient to create an inference, i.e., a rebuttable presumption, that the employer's personnel decision was based upon an illegal factor. Furnco Construction Corp. v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949 (1978).

In light of these standards, Plaintiff's own deposition testimony is fatal to his Title VII claim. During his deposition, Plaintiff admitted that his claims of discrimination rest on nothing other than his opinion. (Ross Dep., pp. 53-54, 56-58, 97, 100, 117-121, 123-128, 132-137, 139) Plaintiff repeatedly admitted that he has absolutely no idea of who made **any** of the decisions of which he complains, the reasons they made them, or the factors they considered. (Ross Dep., pp. 53-54, 56-58, 97, 100, 117-121, 123-124, 126, 128, 132-134, 136-137, 139) Therefore, Plaintiff has no evidence to carry his burden. The law is clear that when an employment discrimination Plaintiff does no more than state his conclusion that alleged actions were discriminatory, a prima facie case of discrimination is not established and summary judgment must be granted as a matter of law. Locke v. Commercial Union Insurance Co., etc., 676 F.2d 205, 206 (6th Cir. 1982); Mason v. Continental Illinois National Bank, 704 F.2d 361, 367 (7th Cir. 1983); Patterson v. General Motors Corp., 631 F.2d 476, 482 (7th Cir. 1980), cert. den., 451 U.S. 914, 101 S. Ct. 1988 (1988). In this case, because

26

Plaintiff has come forward with <u>no</u> <u>evidence</u> of any
discrimination, Plaintiff's claims are subject to summary
judgment.

### 2. Plaintiff Has Failed To Establish A Prima Facie Case Of Race Discrimination.

In a race discrimination case, a Plaintiff can establish a
<u>prima</u> <u>facie</u> case in one of three ways; 1) through direct evidence
of discriminatory intent; 2) by demonstrating a pattern of
discrimination through the introduction of statistics; or 3) by
satisfying the elements of <u>McDonnell-Douglas</u>. <u>Early</u>, 907 F.2d at
1081.

Plaintiff testified during his deposition that no one at WCW
made comments to him that were directly attributable to his race.
(Ross Dep., p. 148-150) Thus, it is apparent that Plaintiff
cannot prove his <u>prima</u> <u>facie</u> case through direct evidence. <u>See</u>
<u>Early</u>, 907 F.2d at 1081-82. Likewise, Plaintiff has not
attempted to prove his <u>prima</u> <u>facie</u> case through the use of
statistics. Indeed, as detailed hereinbelow, the statistical
evidence in this case refutes each of Plaintiff's assertions.
Accordingly, Plaintiff must meet the standard enunciated in
<u>McDonnell Douglas</u> to establish a <u>prima</u> <u>facie</u> case.

To establish a <u>prima</u> <u>facie</u> case under <u>McDonnell-Douglas</u>,
Plaintiff must show that he was: (1) a member of the protected
classification, (2) was qualified for the promotion, or at least
was performing up to the legitimate expectations of his employer,
and (3) was subjected to an adverse employment action. <u>Flanagan</u>
<u>v. McKesson Corp.</u>, 48 F.E.P. Cases 343, 344 (N.D. Ga. 1988);

27

<u>Goldstein v. Manhattan Industries, Inc.</u>, 758 F.2d 1435, 1442-43
(11th Cir. 1985); <u>Hawkins v. CECO Corp.</u>, 883 F.2d 977, 982 (11th
Cir. 1989), <u>cert. denied</u>, 110 S.Ct. 2180 (1990). While there is
no dispute that Plaintiff satisfies the first element of the
**prima facie** case under Title VII, Plaintiff cannot satisfy the
remaining elements.

      **a.   Plaintiff Cannot Show That He Was A Victim Of An
            Adverse Employment Action.**

           **(i)  Plaintiff was not "terminated."**

To establish a **prima facie** case under Title VII, Plaintiff
must show that he was the victim of an adverse employment action.
In his Complaint, Plaintiff alleges that he was "terminated" on
July 14, 1991. (Complaint, ¶ 3). However, "[t]he discharge that
is proscribed by Title VII is either an actual or constructive
discharge." <u>Frazer v. KFC National Management Company</u>, 491 F.
Supp 1099 (M.D. Ga. 1980), aff'd 636 F.2d 313 (5th Cir. 1981).

"An actual discharge occurs when an employer fires,
dismisses, releases, ousts, lets go, terminates, sacks, gets rid
of, gives the gate to, cans, axes, bounces, or give walking
papers to an employee . . ." <u>Id</u>. The undisputed facts establish
that no such "termination" occurred in this case. In fact,
Plaintiff admitted during his deposition that he was not
terminated. (Ross Dep., p. 73) On the contrary, Plaintiff
testified that WCW fulfilled each and every one of its
obligations under the Agreement. (Ross Dep., p. 87) The
Agreement simply expired on July 14, 1991. Therefore, Plaintiff

WCW 102133

cannot establish a <u>prima facie</u> case by claiming that he was
terminated.

> (ii) Black wrestlers were not paid less than white
> wrestlers.

In his Complaint, Plaintiff alleges that WCW "[c]reated a
practice and/or unwritten policy of putting nonwhite employees
**and independent contractors** into the role of subsidiary
employment or other position, and without concomitant salary,
commission, bonus . . ." (Complaint, ¶ 6)(emphasis supplied)
This claim is not supported by the facts. In 1991, Plaintiff
earned $1500.00 per week, and $36,250.00 through the term of his
contract. As reported on the 1099's, and other accounting
records produced to Plaintiff, **Plaintiff earned more money than
approximately 278 of the 334 male independent contractor
wrestlers who wrestled for WCW in 1991.** (Holman Aff., ¶ 5-6)
Further, Plaintiff earned more than ten of the thirteen wrestlers
who also were released by WCW during the Summer of 1991, all of
whom were white. (Holman Aff., ¶ 9)

Additionally, six black wrestlers were paid more than
Plaintiff. (Holman Aff., ¶ 7-8) In fact, Ron Simmons, a black
male, was one of the highest paid WCW wrestlers, and earned
$190,442.26 in 1991 (not including $26,592.07 in endorsements
paid to him by companies that retained Mr. Simmons to endorse
their products and/or services). (Holman Aff., ¶ 7-8) Thus, the
unrefuted facts in this case show that WCW paid many white
wrestlers less than Plaintiff and several black wrestlers more
than Plaintiff. Thus, Plaintiff's allegation that WCW

29

discriminated against him through disparate compensation has no

basis in fact.  Accordingly, Plaintiff cannot rely upon this

claim to satisfy the second element of the prima facie case,

i.e., that he suffered an adverse employment decision.

> (iii)  **WCW was not the decisionmaker responsible for
> determining which wrestlers received endorsement
> and/or promotion opportunities.**

Plaintiff, likewise, cannot claim that his failure to garner

endorsement and/or promotion opportunities supports his prima

facie case.  While several WCW wrestlers, both black and white,

have endorsement and/or promotion deals with companies that hire

them to promote their products or services, the vast majority of

professional wrestlers, including Plaintiff, never receive such

opportunities.  (Rhodes Aff., ¶¶ 16-17; Holman Aff., ¶ 8)

Nevertheless, Plaintiff alleges that WCW prevented him from

getting a wrestling doll contract or other endorsement deals.

(Ross Dep., p. 57)

Plaintiff admits that he has no evidence to support his

claim.  Indeed, while Plaintiff makes bald allegations about

alleged endorsement deals that he was denied, Plaintiff testified

that he has no idea who makes the decisions about which wrestlers

**are retained to endorse products or services.  (Ross Dep., pp.**

**58, 139)**  Likewise, Plaintiff testified that he has no idea what

factors such unidentified decisionmakers rely upon.  (Ross Dep.,

**p. 139)  The undisputed facts in this case reveal that the**

decisions regarding which wrestlers are selected to endorse

and/or promote particular products or services are made by the

30

companies who retain the wrestlers, not WCW. (Rhodes Aff., ¶¶ 16-17; Holman Aff., ¶ 8) In short, WCW does not decide which wrestlers endorse the products or services of other companies.

Even if Plaintiff could establish that WCW had some role in the decisions on endorsements (which Plaintiff cannot), Plaintiff's claim still would fail since it is undisputed that several black WCW wrestlers in the January-July 1991 time period (including Ron Simmons and Teddy Long), did receive such opportunities from companies.[11] (Rhodes Aff., ¶¶ 16-17; Holman Aff., ¶ 8) Further, the fact that Mr. Ross did not receive any such opportunities to endorse or promote products should not be surprising, as hundreds of WCW's other wrestlers, both white and black, never received such opportunities either. (Rhodes Aff., ¶¶ 16-17; Holman Aff., ¶ 8) Therefore, Plaintiff cannot claim that his failure to garner endorsement opportunities from other companies supports a prima facie case that WCW somehow discriminated against him.

> (iv) Plaintiff Was Not Qualified To Be WCW's Heavyweight Champion.

In his deposition, Plaintiff alleged that he was discriminated against because WCW did not make him its heavyweight champion. (Ross Dep., p. 54) In order to establish a prima facie case as to this claim, Plaintiff must prove by a preponderance of the evidence that he was more qualified to be the heavyweight champion than those selected, or alternatively

---

[11]   Ron Simmons made $26,592.07 from endorsements and promotions in 1991 alone. (Holman Aff. ¶ 8)

WCW 102136

that he satisfied WCW's legitimate expectations of performance. Hamalinen, 54 F.E.P. Cases at 70; Halsell v. Kimberly-Clark Corp., 683 F.2d 285, 290 (8th Cir. 1982); Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 239 (4th Cir. 1982); Bauer v. Bailar, 647 F.2d 1047 (10th Cir. 1981). Plaintiff can make no such showing.

Plaintiff has come forward with no evidence whatsoever that he was as qualified as those eventually chosen to be champion, or even that he was satisfying WCW's performance expectations. Instead, Plaintiff relies upon his opinion that he was as good a wrestler as any of WCW's other wrestlers. Even if true, Plaintiff misses the point. The object of professional wrestling is for wrestlers to excite the crowd to a level where they want to return to events again and again. Plaintiff was not arousing sufficient interest or selling tickets. (Rhodes Aff., ¶ 6) He was not sufficiently entertaining to justify pushing him to champion, or even renewing his Agreement. (Rhodes Aff., ¶ 6)

Plaintiff ignores the fact that only one person at a time can be the WCW heavyweight champion. In WCW's opinion, Plaintiff was unqualified to be heavyweight champion. (Rhodes Aff., ¶ 6) Plaintiff's assertions to the contrary are entirely irrelevant.

> An [individuals] self-serving statements about his ability
> . . . are insufficient to contradict an employer's negative
> assessment of that ability. (citations omitted).  Such
> statements may create a material dispute about [their]
> ability, but do nothing to create a dispute about the
> employer's honesty – [they] do nothing, in other words, to
> establish that the proffered reason is a pretext for
> discrimination.

Gustovich v. AT&T Communications, Inc., 972 F.2d at 849.

WCW 102137

Always, it is the supervisor's perception of Plaintiff's ability (not Plaintiff's perception) which is relevant to a determination of the employers' motive.  Smith v. Flax, 618 F.2d at 1057; See, Newton v. W. R. Grace & Co., Slip Op. No. 87-8961 (11th Cir. 1989); Moore v. Sears Roebuck & Co., 683 F.2d 1321, 1323 n.4 (11th Cir. 1982); Green v. Martin Marietta Data Systems, 42 F.E.P. 1695 (D.D.C. 1987); see, Meiri v. Dacon, 759 F.2d 989 (2d Cir. 1985).  Indeed:

> While an employer's judgment or course of action
> may seem poor or erroneous to outsiders, the
> relevant question is whether the given reason [for
> not renewing the Agreement] was a pretext for
> illegal discrimination.  The employer's stated
> legitimate reason . . . does not have to be a
> reason that the judge or juror, would act or
> approve on.

Loeb v. Textron, Inc., 600 F.2d 1003, 1012 n.6 (1st Cir. 1979).

Plaintiff has wholly failed to demonstrate that he was qualified to be champion, or that he even met the legitimate performance expectations of WCW.  Plaintiff's opinion about his qualifications is not evidence, and is irrelevant to the issue of his qualifications.  Gustovich v. WCW Communications, Inc., 972 F.2d 845, 849 (7th Cir. 1992).  Moreover, it is unrefuted that WCW did not think that Plaintiff was qualified to be its heavyweight champion.  (Rhodes Aff., ¶ 6)  Indeed, WCW did not believe that Ross was even meeting WCW's expectations.  (Rhodes Aff., ¶ 6; Herd Aff., ¶ 6)

Plaintiff undoubtedly will argue that WCW's views about his qualifications are subjective, not objective.  Plaintiff again misses the point, as even if it is determined that WCW relied

33

WCW 102138

solely upon subjective criteria in assessing Plaintiff's
performance, the law is clear that the use of subjective criteria
does not violate Title VII.  Hester v. Southern Railway Co., 497
F.2d 1374 (5th Cir. 1975).  This is especially true here, since
WCW used the same criteria to justify promoting another black
wrestler, Ron Simmons, to heavyweight champion.  There simply is
no evidence that any discriminatory motive was part of WCW's
evaluation of Plaintiff.  "[W]hatever motives [WCW] may have had
in choosing between two people [in the protected classification]
discrimination cannot be one of them."  De Volld v. Bailar, 568
F.2d 1162 (5th Cir. 1978).

     For the foregoing reasons, Plaintiff has not established a
prima facie case of discrimination on any grounds.  EEOC v.
Western Electric Co., 713, F.2d 1011, 1014, (4th Cir. 1983).
Having failed to establish several of the essential elements of a
prima facie case, summary judgment should be granted in favor of
WCW.  Celotex, 474 U.S. 921, 106 S.Ct. at 253.

     3.    **Plaintiff Has Not Rebutted WCW's Legitimate,
Nondiscriminatory Reasons for Its Actions**

     Assuming arguendo that Plaintiff could establish a prima
facie case of discrimination, WCW has the burden of articulating
a legitimate, non-discriminatory reasons for the complained of
actions.  Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181,
1184 (11th Cir. 1984); Conner v. Ft. Gordon Bus Company, 761 F.2d
1495, 1499 (11th Cir. 1985).  This burden of rebuttal is
"exceedingly light."  Id.  To satisfy this burden, WCW need only

34

WCW 102139

"articulate" legitimate reasons without being required to prove
its motivation.  Burdine, 450 U.S. at 254-55, 101 S.Ct. at 1094.

WCW refused to renew Plaintiff's Agreement for a legitimate
business reason:  budgetary constraints.  (Herd Aff., ¶ 6)
Moreover, Plaintiff's performances were not sufficiently
productive to justify renewing his contract.  (Herd Aff., ¶ 6;
Rhodes Aff., ¶ 6)  It must be remembered that in this Court, "[a]
statement that Plaintiff was less productive than others in her
department, without more, constitutes a sufficient articulation
of reasons to carry the employers burden."  Evans, 35 F.E.P.
Cases at 1200; Heffernan v. Western Electric Co., 510 F. Supp.
712, 715 (N.D. Ga. 1981).

In this case, Plaintiff testified that he has no evidence to
rebut WCW's explanation for its actions.  (Ross Dep., pp. 53-54,
56-58, 97, 100, 117-121, 123-126, 128, 132-137, 139)  Plaintiff
not only has no idea of who made the decision not to renew his
contract, but he does not know the reason the decision was made,
or the factors considered by the decisionmaker.  (Ross Dep., p.
97)

Next, the evidence shows that Plaintiff was not paid less
than less qualified white wrestlers.  On the contrary, Plaintiff
earned more than two hundred and seventy eight (278) WCW
wrestlers in 1991, the overwhelming majority of whom were white.
(Holman Aff., ¶¶ 5-8)  Again, Plaintiff has admitted that he has
no evidence to rebut these facts.  (Ross Dep., pp. 117-119, 135-
139)  Plaintiff Has no idea what amounts other wrestlers were

35

WCW 102140

paid, who decided what each wrestler was paid, or what factors were considered in making those decisions. (Ross Dep., pp. 117-119, 135-139)

On Plaintiff's claim that he should have become WCW's heavyweight champion, Plaintiff has not offered evidence to overcome WCW's legitimate non-discriminatory reasons for not making him its champion, i.e., he lacked the charisma and audience appeal and just was not that entertaining. (Rhodes Aff., ¶ 6) As detailed in Section III D.2(iv) of this Brief, supra, all Plaintiff offers to refute WCW's rationale is Plaintiff's subjective opinion that he was a good wrestler and should have been WCW's champion. Such allegations are simply legally insufficient. Gustovich v. WCW Communications, Inc., 972 F.2d 845, 849 (7th Cir. 1992).

Finally, WCW was not responsible for Plaintiff's lack of endorsement and\or promotion opportunities. Since WCW was not the decisionmaker, WCW cannot responsible for those decisions. Moreover, the undisputed facts show that several black wrestlers received significant endorsement and/or promotion opportunities, while hundreds of white WCW wrestlers did not. (Rhodes Aff., ¶ 16-17; Holman Aff., ¶ 8) Thus, Plaintiff's claim that he was discriminatorily denied the chance at endorsement deals flies in the face of the undisputed facts.[12]

---

[12]   Naturally, Plaintiff readily admitted he has no idea of who made these decisions either, or what factors were considered. (Ross Dep., pp. 124-126, 135-139)

36

WCW 102141

Once the Defendant has rebutted Plaintiff's prima facie case, the Plaintiff must satisfy his ultimate burden of establishing by a preponderance of the evidence that a discriminatory intent motivated the Defendant's actions. McDonnell-Douglas, 411 U.S. at 802, 93 S.Ct. at 1824; Nix, 738 F.2d at 1184. Thus, to succeed on the dispositive issue of motivation, Plaintiff must prove that WCW acted with discriminatory intent.

Plaintiff cannot produce any cognizable evidence of discriminatory intent to establish a genuine issue of whether WCW's reasons for its decisions are pretextual. Plaintiff's "subjective belief, however genuine cannot be the basis for judicial relief" [in a Title VII or ADEA case]. Elliott v. Group Medical and Surgical Service, 714 F.2d 556, 567 (5th Cir. 1983), cert. den., 467 U.S. 1215, 104 S.Ct. 2658 (1984); Houser v. Sears Roebuck & Co., 627 F.2d 756, 759 (5th Cir. 1980). In the Eleventh Circuit, Plaintiff must controvert WCW's legitimate reasons "by setting forth specific facts . . . showing [an illegal factor] was a substantial factor in [the] decision." Mauter v. Hardy Corp., 825 F.2d 1554, 1558 (11th Cir. 1987). Plaintiff has failed to do so, and the result is that his claims must fail.

## IV.  CONCLUSION

For the above and foregoing reasons, Defendant's Motion for Summary Judgment should be granted on all Plaintiff's claims.

37

WCW 102142

This ___25ᵗʰ___ day of March, 1994.

Respectfully submitted,

*Stephen W. Riddell*
_____
Stephen W. Riddell, Esq.
Georgia State Bar No. 604810

*Kip P Roth (by SWR)*
_____
Kip P. Roth
Georgia State Bar No. 615615

Attorneys for Defendant
World Championship Wrestling,
Inc.

TROUTMAN SANDERS
5200 NationsBank Building
600 Peachtree Street, N.E.
Atlanta, Georgia  30308-2216
(404) 885-3000

(coopsjc)=pdocs\kip\roar\smsj.now

38

WCW 102143

**World Championship Wrestling, Inc. Freelance**
**Wrestler/Independent Contractor Agreement**

1.  I, <u>Robert Ross, Jr.</u>          (<u>Ranger Ross</u>),
         Name                    Ring Name

agree to perform services for World Championship Wrestling, Inc.
("WCW") as requested by WCW at the rate of $1,500.00 per week
for the period of January 15, 1991 through July 14, 1991.  I
understand that I shall be entitled to such compensation only if
I appear and complete the services requested by WCW for such
event and in the manner requested by WCW.

2.  I understand and agree that I perform such services as
an independent contractor and not as an employee of WCW.  I
agree that I shall be fully responsible for taxation of the
amounts paid to me by WCW as compensation for my services and
that WCW  shall bear no responsibility for such taxation.  I
agree that I am not entitled to the benefits provided by WCW to
its employees.  I understand that WCW makes no commitment to use
my services and makes no guarantee of any number of events or
amount of compensation.

3.  I understand that if I am injured inside the ring and
within the crowd barriers at an event while performing services
for WCW pursuant hereto, as determined by the schedule of
physicians provided by WCW, WCW shall assume responsibility for
medical expenses directly related to such injury through and
according to its respective insurance program.  I understand
that I will be paid only for events for which I was scheduled at
the time I was injured and only if WCW's doctor certifies that
the injury prevents me from wrestling and I appear at the event
for interviews and other tasks as requested by WCW (unless I am
unable to appear as certified by WCW's doctor); provided,
however, that such payment shall be reduced by payments other
than those for medical treatment to which I may be entitled
under WCW's insurance or otherwise.  I understand I will not be
paid for events for which I might have been scheduled while I am
injured.

4.  I agree that all programs, recordings and work product
in connection with which I perform services and my contributions
thereto (the "Works") shall belong solely and exclusively to
WCW.  To the extent that such Works are considered contributions
to collective works and/or parts or components of audio-visual
works, I agree that the Works shall be considered "works made
for hire" under the U.S. Copyright Act of 1976, as amended.  To
the extent that such Works are deemed otherwise, I assign to WCW
all rights, title and interest in and to the copyright of such
Works.

EXHIBIT "A"

WCW 102144

5.   I release WCW and its agents from and waive any and all claims arising out of my independent contractor relationship with WCW, except as set forth specifically above in paragraph 3.   I have read this Agreement and understand its terms.   I agree that my relationship with WCW is covered by this Agreement for all purposes and at all times unless and until it is superseded by a subsequent written agreement, and that this Agreement shall be governed by the laws of the state of Georgia, whose courts shall have jurisdiction with respect to any dispute arising under this Agreement or my relationship with WCW.

World Championship Wrestling, Inc.

By: _____
            Signature

_____
            Date

Independent Contractor

_____
            Signature

9 Jan 1991
_____
            Date

-2-

WCW 102145

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROBERT ROSS, JR.,                    )
                                     )
        Plaintiff,                   )
                                     )        CIVIL ACTION FILE
v.                                   )
                                     )        NO. 1:93-CV-1206-JEC
WORLD CHAMPIONSHIP                   )
WRESTLING, INC.,                     )
                                     )
        Defendant.                   )

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the
within and foregoing MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
WORLD CHAMPIONSHIP WRESTLING, INC.'S MOTION FOR SUMMARY JUDGMENT
upon opposing counsel by depositing a copy in the United States
Mail with sufficient postage thereon addressed to:

        Gary J. Pernice, Esq.
        Pernice & Associates, P.C.
        110 Hammond Drive, N.E.
        Atlanta, Georgia 30328-4806

This 25th day of March, 1994.

                        _Stephen W. Riddell_
                        Stephen W. Riddell
                        Georgia State Bar No. 604810

                        Attorney for Defendant
                        World Championship Wrestling, Inc.

TROUTMAN SANDERS
600 Peachtree Street, N.E.
Suite 5200
Atlanta, Georgia 30308-2216
(404) 885-3000



# EXHIBIT / ATTACHMENT

## N

(To be scanned in place of tab)

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Davis v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1716-CC;
Saengsiphan v. World Championship Wrestling, Inc. and
Turner Sports, Inc., Civ. File No. 1-00-CV-1719-CC;
Speight v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1718-CC;
Worthen v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1717-CC;
Reeves v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1720-CC;
Easterling v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1715-CC
Onoo v. World Championship Wrestling, Inc., Turner Sports,
Inc., Civ. File No. 1:00-CV-0368-CC
Norris v. World Championship Wrestling, Inc., Turner
Sports, Inc., Civ. File No. 1:00-CV-0369-CC
Walker v. World Championship Wrestling, Inc., Turner
Sports, Inc. Civ. File No. 1:00-CV-0367-CC; Patterson v.
World Championship Wrestling, Inc., Turner Sports, Inc.,
Turner Entertainment Group, Inc. Civ. File No. Civ. File
No. 1:01-CV-1152-CC

SUPPLEMENTAL EXPERT REPORT FOR PLAINTIFFS
TESTIMONY OF DR. DAVID W. RASMUSSEN

This supplemental report uses more recent evidence on the

number of African-Americans attending wrestling tryouts

sponsored by WCW. Additional testimony confirms the results

reported in my initial report, i.e., that the average estimate

of the availability of African-Americans for employment as

wrestlers is about 25 percent. This report also uses more

complete data on the racial identification of wrestlers training

at the Power Plant and those actually employed as wrestlers.

The substantive conclusions reported in the original report are

not only confirmed, but the statistical evidence that African-Americans are under-represented as wrestlers is in fact stronger than previously reported.

The availability of African-Americans, the benchmark by which African-American representation is to be evaluated, was based on the personal impressions of five individuals familiar with try-outs held at the Power Plant. I have now received data on the impressions of three more persons whose estimates of African-American availability are included in this report.

The methodology used here is identical to that of the initial report. Seven individuals who have testified as to their impressions of the representation of African-Americans among persons at the try-outs are recorded in Table 1.[1] As is clear in the Table, four of these individuals provide an estimated range and three provide a specific figure. Estimates of the percent African-American range from 10 to 40 percent. Column 1 counts each estimate as an independent observation, so Hamilton, Norris, Snakovsky, and Walker, in effect, get two votes. The mean of these eleven estimates is 26.0 percent

---

[1] This information is given in depositions or by declaration, the date of which is following the person's name: D.E. Bruce (November 21, 2002); Joseph N. Hamilton (March 22, 2002); H. Norris (December 13, 2002); Brenda F. Smith (April 30, 2002); John Paul Snakovsky (May 30, 2002); B. Walker (November 7,2002); and Moses Williams (May 28, 2002). Tony Byron Carr provided his impressions of African-American participation in a deposition (January 28, 2002) and his estimates were included in my original report. His estimates varied widely (from a low of 10 percent to approximately 40 percent), but upon further inspection it is not clear whether these estimates pertain to wrestling tryouts or training at the Power Plant. Given the uncertainty of his testimony, his estimates are not included in this summary report. However, including this estimate has virtually no effect on the benchmarks reported in Table 1 below.

- 2 -

TABLE 1

ESTIMATES OF AFRICAN-AMERICAN REPRESENTATION AT
POWER PLANT TRYOUTS

| SOURCE | PERCENT AFRICAN AMERICAN | |
| --- | --- | --- |
| | ESTIMATES | AVERAGE |
| D. E. Bruce | 33 | 33 |
| J. N. Hamilton | | 12.5 |
| Low | 10 | |
| High | 15 | |
| H. Norris | | 35 |
| Low | 30 | |
| High | 40 | |
| J. Snakovsky | | 35 |
| Low | 30 | |
| High | 40 | |
| B. F. Smith | 12 | 12 |
| B. Walker | | 18 |
| Low | 16 | |
| High | 20 | |
| M. Williams | 40 | 40 |
| Mean | 26 | 26.5 |
| Median | 30 | 33 |
| Mode | 40 | 35 |

African-American, the median (the mid-point of the range of
estimates) is 30 percent, and the mode (the most frequent
estimate) is 40 percent.

As noted in the original report, one could reasonably
object to counting any individual's estimate twice, so column
two provides the mid-point of the ranges provided by Hamilton,
Norris, Snakovsky, and Walker.  The resulting mean is 26.5

- 3 -

percent African-American, the median is 33 percent, and the mode
is 35 percent.[2]

Another source of information about the availability of
African-Americans as wrestlers was provided in a list that
identifies the race of 82 individuals who were trainees at the
Power Plant over the 1996-2000 period.  I have been informed
that the most complete list of such persons, identified by
whether they are African-American, is in the Declaration of
Harrison Norris (dated December 13, 2002).  Of 82 persons being
trained at the Power Plant, 14 (17.1 percent) are identified as
being African-American.

Five benchmarks are used in the following statistical
analysis.  The lowest is the 17.1 percent that represents the
actual known African-American participation in the Power Plant.
The others are from Table 1: the mean, median, and mode of
column one (26, 30 and 40 percent respectively) and the mode of
column 2 (35 percent).

As in the initial report, Tables 2 and 3 report the results
of the statistical analysis of African-American representation
among wrestlers during the 1996-2000 period.  First consider
Table 2. The first column shows the number of contract wrestlers
reported in the Declaration of H. Norris. Column two shows the

---

[2] Recall that even if collectively these approximations of applicant flow give
an accurate picture of African-American representation at the Power Plant,
this estimate of interest among qualified African-Americans could be biased
downward due to the chilling effect that was described in the initial report.

- 4 -

various benchmarks, the percent African-American expected among these wrestlers. Column three shows the number of African-American wrestlers expected given the benchmark (column 1 times column 2); column 4 shows the actual number of African-Americans identified in the declaration of Harrison Norris, and column five reports the difference between the actual and expected numbers of African-Americans. The last column shows the number of standard deviations. Recall that the prevailing standard is that a difference of two or more standard deviations is statistically significant.

The first benchmark, African-American representation among trainees at the Power Plant, is 17.1 percent. WCW hired 227 persons during 1996-2000, and had they hired African-Americans at a rate of 17.1 percent the expected number of African-American hires would be 38.8. Instead, only 17 were hired; -5.26 standard deviations from the expected number of 38.8. This is statistically significant.

Subsequent benchmarks, as noted above, come from Table 1. The number of standard deviations range from -6.36 to -10.0, far beyond the standard of -2.00 standard that indicates that chance accounts for the under-representation of African-Americans at WCW. When the shortfall of African-American wrestlers is more than -6.00 standard deviations, as in row two of Table 2, this result is expected by chance in less than 1 chance out of

- 5 -

100,000.[3] The subsequent comparisons are even less likely to

occur from an equal opportunity employer if the benchmarks

reflect African- American availability and interest in a

wrestling career.

### TABLE 2

#### STANDARD DEVIATION ANALYSIS OF AFRICAN-AMERICAN REPRESENTATION AMONG WRESTLERS (1996-2000)

##### A. EXCLUDING DISPUTED WRESTLERS

| NUMBER OF WRESTLERS | BENCHMARK | EXPECTED NO. OF AFRICAN-AMERICANS | ACTUAL NUMBER | DIFFERENCE | NO. OF STD DEVIATIONS |
|---|---|---|---|---|---|
| 227 | 17.1 | 38.8 | 17 | -21.8 | -3.85 |
| 227 | 26.0 | 59.0 | 17 | -42.0 | -6.36 |
| 227 | 30.0 | 68.1 | 17 | -51.1 | -7.40 |
| 227 | 35.0 | 79.5 | 17 | -62.5 | -8.69 |
| 227 | 40.0 | 90.8 | 17 | -73.8 | -10.00 |

##### B. INCLUDING DISPUTED WRESTLERS

| NUMBER OF WRESTLERS | BENCHMARK | EXPECTED NO. OF AFRICAN-AMERICANS | ACTUAL NUMBER | DIFFERENCE | NO. OF STD DEVIATIONS |
|---|---|---|---|---|---|
| 231 | 17.1 | 39.5 | 20 | -19.5 | -3.41 |
| 231 | 26.0 | 60.1 | 20 | -40.1 | -6.01 |
| 231 | 30.0 | 69.3 | 20 | -49.3 | -7.08 |
| 231 | 35.0 | 80.9 | 20 | -60.9 | -8.39 |
| 231 | 40.0 | 92.4 | 20 | -72.4 | -9.72 |

Panel B of Table 2 is identical to Panel A except that the

four disputed wrestlers are included in the analysis.  Three of

the disputed persons are African-American, so the total number

of wrestlers rises to 231 and the actual number of African-

Americans hired rises to 20.  The results do not change: the

number of standard deviations range from -3.41 to -9.72, once

---

[3] In Table 2 of the original report there was a typographical error in row two
of Panel A.  When the benchmark is 23.5 in that table, the number of standard
deviations is -5.71, not -7.71 as originally reported.

- 6 -

again indicating statistically significant under representation
of African- Americans.  The number of African-American wrestlers
will be 3.41 standard deviations below the expected number by
chance alone about one time in 1,000.  Recall that -6.00
standard deviations will occur less than one chance in 100,000
cases.

As noted in the initial report, the analysis in Table 2 is
flawed in that it considers the number of persons in Exhibit A
but does not account for the actual frequency of employment.  As
an illustration, suppose an employer hired two persons, a
Caucasian and an African-American, over a 10-year period.  Using
the method employed in Table 2, African-American representation
would be 50 percent.  But suppose that the Caucasian worked in
each of the 10 years and the African-American worked in only
one.  By looking at African-American representation by salary
years a very different picture emerges: instead of 50 percent,
African-American representation is only 1 out of 11, or 9.1
percent.

Table 3 investigates African-American representation among
WCW wrestlers using salary years as the unit of observations.
Based on data used in the original report and the Norris
Declaration, there are 680 cells in which a person is reported
to have received a salary.  Of these cells, 51 (7.5 percent)

- 7 -

represent salaries earned by African Americans.[4]  The benchmarks
that measure African-American availability are identical to
those in Table 2.  When the benchmark is 17.1 percent, the
lowest in the table, the shortfall of African-American wrestlers
is -6.65 standard deviations from the expected number.  As in
Table 2, the number of standard deviations rises with the
benchmark: when the benchmark is 40 percent, the shortfall is
-17.30 standard deviations.   There is less than one chance in a
million that this result could happen by chance alone.

TABLE 3

STANDARD DEVIATION ANALYSIS OF AFRICAN-AMERICAN
AMONG WRESTLERS BY SALARY YEARS (1996-2000)

EXCLUDING DISPUTED WRESTLERS

| NUMBER OF SALARY YEARS | BENCHMARK | EXPECTED NO. OF AFRICAN-AMERICANS | ACTUAL NUMBER | DIFFERENCE | NO. OF STD DEVIATIONS |
|---|---|---|---|---|---|
| 680 | 17.1 | 116.3 | 51 | - 65.3 | -6.65 |
| 680 | 26.0 | 176.8 | 51 | -125.8 | -11.00 |
| 680 | 30.0 | 204.0 | 51 | -153.0 | -12.80 |
| 680 | 35.0 | 238.0 | 51 | -187.0 | -15.03 |
| 680 | 40.0 | 272.0 | 51 | -221.0 | -17.30 |

This analysis strongly suggests that African-Americans are
significantly under-represented among wrestlers at WCW.  Even
when African-American representation at the Power Plant is used
as the benchmark, African Americans are significantly under-
represented.  Even the highest benchmark in Tables 2 and 3 may
under estimate the true availability of qualified African-

---

[4] In the original report there were 681 total salary years, 51 of which were
African-American.

Americans, as noted in the previous report, since it is possible that if WCW was a truly equal opportunity employer it would confront an applicant pool of interested and qualified persons that mirrored that of professional basketball or professional football.

*David W Rasmussen*

Dr. David W. Rasmussen

Plaintiffs specifically reserve the right to supplement this disclosure in any manner permitted under the Federal Rules of Civil Procedure, the Local Rules of this Court or any other applicable law.

This __3rd__ day of January, 2003.

*Charles Gernazian*

Cary Ichter
Georgia Bar No. 382515
Charles J. Gernazian
Georgia Bar No. 291703
Michelle M. Rothenberg-Williams
Georgia Bar No. 615680

MEADOWS, ICHTER & BOWERS, P.C.
Eight Piedmont Center, Suite 300
3525 Piedmont Road
Atlanta, GA  30305
Telephone:  (404) 261-6020
Telecopy:   (404) 261-3656

- 9 -

## CERTIFICATE OF SERVICE

This is to certify that I have this date served

opposing counsel to this action with the foregoing

**Supplemental Expert Report for Plaintiffs' Testimony of**

**David W. Rasmussen** via hand delivery, addressed as follows:

John J. Dalton
James Lamberth
Eric Richardson
Evan Pontz
Troutman Sanders LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia  30308-22165

This _____ day of January, 2003.

Michelle M. Rothenberg-Williams
Georgia Bar No. 615680



# EXHIBIT / ATTACHMENT

**(To be scanned in place of tab)**

```
Author:  Randy Melcher at TBSCENTRAL
Date:    3/15/99  02:51 PM
Priority: Normal
TO: Brenda Smith at TBSCNNCTRWCW
CC: Diana Myers at TBSCNNCTRWCW
CC: JJ Dillon at TBSCNNCTRWCW
CC: Brett Hellenga at TBSCENTRAL
CC: Paul Boatman at TBSCENTRAL
Subject: WCW - Power Plant Trainees / Workers Compensation
-------------------------------- Message Contents -----------------------------------
```

Brenda,

According to Diana Myers, WCW is leaning towards having the WCW Power Plant
trainees sign agreements under which they will receive a small stipend for
expenses and/or another form of compensation, etc.  Only those trainees who have
potential in WCW's estimation will be allowed to train and workout at the Power
Plant.  It was agreed that going-forward, all WCW Power Plant trainees should be
covered under the WCW worker's compensation program.

Once the WCW Power Plant reopens for tryouts, we will continue to have the
participants sign releases.  Diana has a copy of the latest version.

Please let me know if you have any questions or if I may be of further
assistance.

Best regards,

Randy


PLAINTIFF'S
EXHIBIT
26

WCW 018436
CONFIDENTIAL



# EXHIBIT / ATTACHMENT

**(To be scanned in place of tab)**

**WCW** WORLD CHAMPIONSHIP WRESTLING ™
A Time Warner Company

# MEMO

TO:        Dr. Harvey Schiller

CC:        Eric Bischoff
           David Payne
           Matt Stroer
           Bill Busch

FROM:      Diana Myers

RE:        Talent Budget Summary

DATE:      March 31, 1999

---

The following is a synopsis of the Talent Contract Changes for March 1999. The back up documentation in the form of the Talent Contract Summary has been forwarded directly to Matt Stroer.

We added two (2) new talent:                    $895,000
(David Abbott, Brian Yandrisovitz)

We negotiated increased contracts for two (2) talent:    $115,000
(Glenn Gilbertti, Ron Reis)

Impact to WCW Total Talent Commitment (increase):   $1,010,000

With this increase and our variables, we are currently $1,858,000 under budget for 1999.



PLAINTIFF'S EXHIBIT 75

WCW 019229
CONFIDENTIAL



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)



World Championship Wrestling
A Division of Turner Sports
One CNN Center
Box 105366
Atlanta, GA 30348-5366

## MEMO

TO:        Dr. Harvey Schiller

CC:        Eric Bischoff
           David Payne
           Matt Stroer
           Bill Busch

FROM:      Diana Myers

RE:        Talent Budget Summary

DATE:      May 28, 1999

---

The following is a synopsis of the Talent Contract Changes for May 1999.  The back up documentation in the form of the Talent Contract Summary has been forwarded directly to Matt Stroer.

| | |
|---|---|
| We added thirteen (13) new talent: | $457,600 |
| (David Fliehr, Emory Hail, and eleven trainees) | |
| | |
| We negotiated increased contracts for three (3) talent: | $51,714 |
| (Jacobus Strauss, and two(2) former non-contract | |
| talent Scott James and Steve James) | |
| | |
| We terminated two (2) contracts: | $450,000 |
| (Steve McMichael, Kevin Wacholz) | |

With this increase and our variables, we are currently $100,000 under budget for 1999.

PLAINTIFF'S
EXHIBIT
7 6



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)



TO:        Eric Bischoff
           Bill Busch

FROM:      Diana Myers

DATE:      June 9, 1999

RE:        New ICAs and Trainees

| Name | Salary (1st year) |
|---|---|
| **Cornell, Richard** (trainee-referred by Kanyon) | **$ 26,000** |
| **Davis, Marcial** (trainee) | **$ 31,200** |
| **Durham, Michael** (Public Enemy) | **$170,000** |
| **Fliehr, David** (David Flair) | **$ 45,000** |
| **Forrester, Ryan** (trainee-referred by Kanyon) | **$ 20,800** |
| **Funk, Allen Eric** (trainee) | **$ 31,200** |
| **Gruner, Pete** (Billy Kidman) | **$300,000** (increase from $125,000) |
| **Hail, Emory** (Emory Hale) | **$ 85,000** |
| **Helms, Gregory Shane** (referred by Kanyon) | **$ 45,000** |
| **Hugger, Jon** (trainee) | **$ 15,600** |
| **James, Scott** (Scott Armstrong) | **$ 52,143** (increase from $31,286) |
| **James, Steve** (Steve Armstrong) | **$ 52,143** (increase from $31,286) |
| **Jindrak, Mark Robert** (trainee) | **$ 39,000** |
| **Jones, Allen** (trainee-referred by Kanyon) | **$ 20,800** |
| **Massengale, Jason** (trainee-referred by Kanyon) | **$ 20,800** |
| **Moore, Shannon** (referred by Kanyon) | **$ 45,000** |
| **Norris, Harrison** (trainee) | **$ 39,000** |
| **Palumbo, Charles** (trainee) | **$ 39,000** |
| **Petty, Ted** (Public Enemy) | **$170,000** |
| **Rodman, Dennis** | **$1,000,000** |
| **Roman, Sammy Lee** (trainee) | **$ 26,000** |
| **Sanders, Michael** (trainee) | **$ 31,200** |
| **Siaki, Sonny Uaita** (trainee) | **$ 31,200** |
| **Skipper, Elix** (trainee) | **$ 39,000** |
| **Strauss, Jacobus** (Jakes) | **$ 75,000** |
| **Thornton, Randy** (Swoll) | **$350,000** ($50k signing bonus) |
| **Tilton, Kevin** (trainee) | **$ 15,600** |
| **Wilson, Luther** (referred by Kanyon) | **$ 45,000** |
| **Yokley, Jay Brett** (trainee) | **$ 15,600** |
| **Yun, James** (trainee-referred by Kanyon) | **$ 20,800** |

PLAINTIFF'S EXHIBIT

WCW 018865
CONFIDENTIAL



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

| | |
|---|---|
| **From:** | ...dson, Georgia |
| **Sent:** | Friday, December 03, 1999 1:57 PM |
| **To:** | Edwards, Don ; Prince, Greg; Lipscomb, Dee ; Davidson, Amy |
| **Cc:** | Busch, Bill ; Dillon, JJ ; Juster, Cary , Myers, Diana |
| **Subject:** | Talent Summary |

*World Championship Wrestling*
*A Division of Turner Sports*
*One CNN Center*
*Box 105366*
*Atlanta, GA 30348-5366*

*CONFIDENTIAL*

The following is a synopsis of the Talent Contract Changes for *November 1999*:

We added **two (2) new talent**:
Vito Lograsso ($120,000 plus $12,000 signing bonus),
Stacy Keibler ($15,000 plus $250 for non-TV and $500 TV events)

We negotiated **increased contracts for two (2) talent**:
Tonga Fifita ($175,000 plus $1,500 per day over 100 and $300 per day wrestling in Japan),
David Fliehr ($125,000 and $1,000 for each PPV)

We are in the process of negotiating a **decreased contract for one (1) talent**:
Lash Huffman ($240,000 plus $2,000 for each day over 80)

We **terminated twenty-two (22) contracts**:
(Chris Adams, Brian Adams, Scott Antol, Brian Bernick, Adam Birch, Amy Crawford, James Gibson, Steve James, Rob Knapik, Ray Lloyd, Jeremy Lopez, Juan Banos, Sonny Onoo, Ron Reis, Dean Roll, Jeremiah Ross, Hector Segura, Jason Spence, Kenny Stasiowski, Dave Taylor, Barry Windham, Kendall Windham)

*Please treat this e-mail as you would any other confidential document.*

Thanks,
GA



PLAINTIFF'S
EXHIBIT
44

A Time Warner Company

WCW 019238
CONFIDENTIAL



## MEMO

TO:        Dr. Harvey Schiller

CC:        Bill Busch
           David Payne
           Matt Stroer
           JJ Dillon
           Greg Prince
           Dee Lipscomb
           Amy Davidson

FROM:      Diana Myers

RE:        Talent Budget Summary

DATE:      November 1, 1999

---

The following is a synopsis of the Talent Contract Changes for October 1999.  The back up documentation in the form of the Talent Contract Summary has been forwarded directly to Matt Stroer.

| | |
|---|---|
| We added three (3) new talent: | $800,000 (estimate) |
| Donald Harris (200,000), Ronald Harris (200,000), Jeff Jarrett (400,000) | |

We negotiated increased contracts for three (3) talent:    $166,714
(Perry Satullo, Dale Torborg, Jerry Tuite)

We negotiated *decreased* contracts for one (1) talent:    $150,000
(Ian Hodgkinson)

We terminated twelve (12) contracts:    $1,943,000
(Bryan Clark, Barry Darsow, Ryan Forrester,
Chad Fortune, James Fullington, Lash Huffman,
Mark Johnson, Ed Leslie, Robert Smedley,
Kevin Tilton, Eric Watts, James Yun, Johnny Green)

With this decrease and our variables, we are currently $4.85 million over budget for 1999.

WCW 019226
CONFIDENTIAL

**MEMO**

TO:        Dr. Harvey Schiller

CC:        Eric Bischoff
           David Payne
           Matt Stroer
           Bill Busch
           Greg Prince

FROM:      Diana Myers

RE:        Talent Budget Summary

DATE:      September 1, 1999

---

The following is a synopsis of the Talent Contract Changes for August 1999. The back up documentation in the form of the Talent Contract Summary has been forwarded directly to Matt Stroer.

| | |
|---|---|
| We added six (6) new talent:<br>Brian Bernick (45,000), James Gibson (45,000),<br>Jeremy Lopez (45,000), Charles Spencer III (45,000),<br>Ray Lloyd (150,000), Dustin Runnels (500,000) | $830,000 |
| We negotiated increased contracts for two (2) talent:<br>(William Brenneman, Ian Hodgkinson) | $270,000 |
| We terminated six (6) contracts:<br>(Ted Petty, Michael Durham, Scott Levy,<br>Denise Riffle, John Watson, Chase Tatum) | $796,286 |

With this increase and our variables, we are currently $6.3 million over budget for 1999.

*A Time Warner Company*

WCW 019225
CONFIDENTIAL



World Championship Wrestling
A Division of Turner Sports
One CNN Center
Box 105366
Atlanta, GA 30348-5366

## MEMO

TO:        Dr. Harvey Schiller

CC:        Bill Busch
           David Payne
           Matt Stroer
           JJ Dillon
           Greg Prince
           Dee Lipscomb
           Amy Davidson

FROM:      Diana Myers

RE:        Talent Budget Summary

DATE:      September 30, 1999

---

The following is a synopsis of the Talent Contract Changes for September 1999.  The back up documentation in the form of the Talent Contract Summary has been forwarded directly to Matt Stroer.

We added three (3) new talent:                     $170,000
Clare Cutrufello (15,000 plus 250-500 per event),
Ann-Marie Crooks (50,000), Nora Greenwald (105,000)

We terminated twenty-two (22) contracts:           $2,213,400
(Yoshihiro Asai, Scott Bednarski, Jose Carrera-Gomez,
Marcial Davis, Art Flores, Bret Hanmer, Kirt Hankton,
Theodore Harris, Greg Hunke, Percy Miller,
James Mitchell, Manuel Ortiz-Partida,
Randy Thornton, Robert Vick, Brett Yokley,
Barry Horowitz, Harrison Norris, Joe Dorgan,
Scott Chasser, Craig Mally, Scott Norton, Mike Enos)

With this decrease and our variables, we are currently $5.6 million over budget for 1999.

**WCW 019222
CONFIDENTIAL**



# MEMO

TO:        Brad Siegel

CC:        Greg Prince
             Don Edwards
             Amy Davidson
             Jennifer Carson

FROM:     Diana Myers

RE:        Talent Budget Summary

DATE:     October 31, 2000

---

The following is a synopsis of the Talent Contract Changes for October 2000.

We terminated three (3) contracts:
(Scott Hall, Anibal Gonzalez, Bret Hart)

We added three (3) contracts:
Lenita Erickson ($125,000 plus $500 per event)
Scott Oberholzer ($750 per week plus $300 per event)
Chris Harris ($750 per week plus $300 per event)

We negotiated an increase for one (1) contract:
Torrie Wilson ($1,600 for each day over 125 days per contract year)

As a result of these changes, we now estimate that our 2000 Talent Payroll is $38.1 million ($1.935) under the forecasted amount of $40,035,000 .

A Time Warner Company

WCW 019218
CONFIDENTIAL



World Championship Wrestling
A Division of Turner Sports
ONE CNN CENTER
Box 105366
Atlanta, GA 30348-5366

**MEMO**

TO:        Brad Siegel

CC:        Bill Busch
           Scott Wilkinson, Esq.
           Gary Juster
           JJ Dillon
           Greg Prince
           Don Edwards
           Felicia McDade
           Amy Davidson

FROM:      Diana Myers

RE:        Talent Budget Summary

DATE:      March 1, 2000

---

The following is a synopsis of the Talent Contract Changes for February 2000.

We added one (1) new talent:  Daniel Covell ($75,000)

We negotiated increased contracts for three (3) talent:
(Evan Karagias, Shannon Moore, Shane Helms)

We terminated four (4) contracts:
(Mark Hildreth, Ann-Marie Crooks, Bobby Eaton, Troy Martin)

These changes have resulted in an increase in our current talent payroll to $40.2 million
for 2000.  This is in comparison to our current forecast of $40.35 million.

A Time Warner Company

WCW 019217
CONFIDENTIAL

Director of Legal
and Business Affairs
diana.myers@turner.com

**World Championship Wrestling**
*A Division of Turner Sports*
ONE CNN CENTER
Box 105366
*Atlanta, GA 30348-5366*

**MEMO**

TO:          Brad Siegel

CC:          Greg Prince
             Don Edwards
             Felicia McDade
             Amy Davidson

FROM:        Diana Myers

RE:          Talent Budget Summary

DATE:        May 9, 2000

---

The following is a synopsis of the Talent Contract Changes for April 2000.

We added seven (7) new talent and one (1) wardrobe seamstress:
Mike Alfonso ($350,000 plus $2,000 for house shows and $3,000 for PPVs), Chris
Candito ($104,000 plus $500 per event), Troy Martin ($350,000 plus $1,750 for house
shows and $2,500 for PPVs), Shawn Stipich ($78,000 plus $500 per event), Troy Endres
(Trainee-$600 per week), Allison Pfau ($15,000 plus $250 for PR or non-TV events and
$500 for TV events), John Riker ($750 per event), Carol Pedigo (wardrobe-$1,000 per
month plus $250 per event)

We terminated two (2) contracts:
(Rob Kellum, Sione Vailahi)

We negotiated increased contracts for:
(Richard Fliehr, Kimberly Falkinburg, Ian Hodgkinson, Shannon Spruill, Sharmell
Sullivan, Vanessa Bozman)

As a result of these changes, we now estimate that our 2000 Talent Payroll is $1,100,000
($41,450,000) over the forecasted amount of $40,350,000.

**WCW 019215
CONFIDENTIAL**

*World Championship Wrestling*
*A Division of Turner Sports*
ONE CNN CENTER
Box 105366
Atlanta, GA 30348-5366

## MEMO

TO:        Brad Siegel

CC:        Greg Prince
           Don Edwards
           Felicia McDade
           Amy Davidson

FROM:      Diana Myers

RE:        Talent Budget Summary

DATE:      June 13, 2000

---

The following is a synopsis of the Talent Contract Changes for May 2000.

We added one (1) new talent:
Lance Evers ($245,000 plus $750 per event)

We terminated six (6) contracts:
(Jacobus Strauss, Brad Cain, Sonny Siaki, Dionicio Castellanos, Brad James, Clare Cutrufello)

We negotiated increased contracts for:
(Lenny Carlson, Jerry Tuite, Jeff Jarrett, Chris Ford, Norman Smiley, Vito LoGrasso, Ron Harris, Don Harris, Chuck Palumbo)

As a result of these changes, we now estimate that our 2000 Talent Payroll is $2.65 million ($43,000,000) over the forecasted amount of $40,035,000 .

A Time Warner Company

**WCW 019214
CONFIDENTIAL**



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

HARRISON NORRIS,                      )
                                      )
                Plaintiff,            )
                                      )       CIVIL ACTION FILE
v.                                    )
                                      )       NO. 1:00-CV-0369-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,   )
TURNER SPORTS, INC., and              )
TURNER BROADCASTING SYSTEM, INC.      )
                                      )
                Defendants.           )

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Universal Wrestling Corporation (f/k/a World Championship Wrestling, Inc. and hereinafter referred to as "WCW"), Turner Sports, Inc. ("TSI") and Turner Broadcasting System, Inc. ("TBS") submit this memorandum in support of their Motion for Summary Judgment on all claims brought by Plaintiff Harrison Norris ("Norris").

### INTRODUCTION

Norris filed this action on February 11, 2000, alleging claims of race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and under the Civil Rights Act of 1866, 42 U.S.C. § 1981; alleging failure to pay overtime and minimum wage, as required by the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq.; and alleging a state law claim of intentional infliction of emotional distress.  With respect to

Norris's race discrimination claims, he alleges that WCW (i) discriminated against him due to his race (African-American) with regard to wrestling opportunities and (ii) subjected him to a racially hostile work environment.  Norris also alleges that by engaging in such discriminatory conduct, WCW intentionally caused him emotional distress.  With respect to Norris's FLSA claims, he alleges that he provided clean-up and training services to WCW for which he was not paid minimum wage and/or overtime.  Based upon principles of agency and vicarious liability, Norris seeks not only to hold WCW liable for these alleged acts, but to hold TSI and TBS liable as well.

Norris's claims are completely baseless.  Norris has not presented even a scintilla of evidence showing that he was treated differently due to his race.  To the contrary, the undisputed evidence establishes that he was given job opportunities and managed like other similarly-situated white wrestlers and/or trainees at WCW.  In addition, the record shows that Norris was not subjected to a racially hostile work environment, and that he did not provide services to WCW for which compensation was required but not paid.

Because WCW's decisions and actions taken with regard to Norris were based on legitimate, non-discriminatory business reasons that had nothing to do with Norris's race, and because

Norris is not entitled to recover overtime or any other type of compensation under the FLSA for services allegedly provided to WCW, summary judgment should be granted in WCW's favor on all of Norris's claims.   Moreover, because Norris's claims against TSI and TBS derive from Norris's claims against WCW and are based on principles of agency and vicarious liability, summary judgment also should be granted in favor of TSI and TBS on all of Norris's claims.

**STATEMENT OF FACTS**

### WCW's Business

WCW created, produced, and marketed professional wrestling events during the 1990s and through March 2001.  (Affidavit of Diana Myers (hereinafter "Myers Aff.") ¶ 3 (a copy of this affidavit is attached hereto as Exhibit A)).  WCW's wrestling events were seen by live audiences and/or aired on various television networks and pay-per-view cable and satellite systems. (Id.)  The wrestlers and other on-screen talent who appeared in WCW's wrestling events provided their services to WCW as independent contractors, either through formal written contracts or without written agreements.  (Id. at ¶ 4).  WCW's wrestling events, both live and taped, were created by a creative team of

writers and producers at WCW, with the goal of entertaining wrestling fans and general audiences nationwide.[1]    (Id.)

After having much commercial and financial success in the mid-to-late 1990s, WCW's business suffered a sharp downturn in 1999. (Myers Aff. ¶ 6). In 1999, WCW lost significant sums of money and, thus, only added new talent that it perceived was likely to generate substantial revenue. (Id.) WCW also began reducing the compensation of existing talent where possible, and began producing fewer and fewer wrestling events to reduce costs. (Id.) Moreover, because of the downturn in 1999, which continued over the next two years, WCW had less and less need for wrestling services, including on-screen talent, trainers, and creative staff. (Id. at ¶¶ 6-7). WCW even terminated some of its televised events, including a taped show commonly referred to as its "Saturday Night" show, in early 2000. (Id. at ¶ 6). Despite these efforts, WCW's business downturn continued, and in March 2001, WCW sold certain of its assets and completely ceased its operations. (Id. at ¶ 8). After the sale of assets was

---

[1] Traditionally, individuals known as "bookers" were responsible for "booking" matches at arenas or live events. As the business changed and professional wrestling became more of a television property, "bookers" also began creating wrestling events for television. More recently, although individuals known as "bookers" continued to be involved in creating wrestling events, WCW brought in additional writers and staff as part of the creative team. (Deposition of Eric A. Bischoff ("Bischoff Dep.") at 46-49).

completed, WCW changed its name to Universal Wrestling

Corporation.  (Id.)

## Norris's Background And Relationship With WCW

Norris's relationship with WCW began in August 1995 when he

was accepted into the professional wrestling training program held

at WCW's "Power Plant" facility.  (Deposition of Harrison Norris,

Jr. (hereinafter "Norris Dep.") at 25).[2]  The purpose behind this

training program was to help Norris develop not only the physical

and wrestling skills necessary to wrestle professionally with WCW,

but also the charisma, acting ability, and uniqueness necessary

both to appeal to the masses and to compete in wrestling matches

with minimal instruction.  (Affidavit of Joseph N. Hamilton

(hereinafter "Hamilton Aff.") ¶ 5 (a copy of this affidavit is

attached hereto as Exhibit B)).  Norris initially paid a fee of

$250.00 for wrestling training and instruction at the WCW

Tryout/Workout Camp, and after completing this initial training

period, he continued to train at the Power Plant on an ongoing

basis and paid WCW periodically for his training and instruction.

(Hamilton Aff. ¶ 6).

Eventually, Jody Hamilton, who was the head of the Power

Plant at the time, extended a scholarship to Norris, which allowed

---

[2] Excerpts of deposition testimony and copies of deposition
exhibits referenced herein are included in the Appendix, filed
simultaneously herewith.

Norris to continue receiving wrestling instruction and training
without the obligation to pay the associated fees.  (Id.)  Such
additional training was necessary for Norris, because he had not
yet mastered certain wrestling maneuvers and needed to
substantially improve his wrestling skills.  (Hamilton Aff. ¶ 7;
Deposition of Martin Lunde (hereinafter "Lunde Dep.") at 58-59).
In fact, when Norris received this training scholarship, he
appeared clumsy and inexperienced in the ring, and lacked the
excitement and charisma necessary to generate crowd interest.
(Hamilton Aff. ¶ 7; Deposition of Paul Worden "Terry" Taylor, III
(hereinafter "Taylor Dep.") at 111; Lunde Dep. at 58-59).  Norris
had also developed a reputation as a troublemaker with a bad
attitude, who was too flamboyant and boastful.  (Hamilton Aff. ¶
7; Norris Dep. at 101; Deposition of Jimmy R. Hart (hereinafter
"Hart Dep.") at 104).  For those reasons, WCW never promised or
reassured Norris that it would heavily promote or push him.
(Norris Dep. at 36).  Nevertheless, Norris was offered the
opportunity to continue training because Mr. Hamilton believed
that Norris had the potential to become a fairly successful
wrestler at some point.  (Hamilton Aff. ¶ 7).

In a further effort to try to develop Norris's potential
during his training period, WCW offered Norris numerous wrestling
opportunities, for which he was paid a set fee.  (Norris Dep. at

62-67, 81-83). From 1996 through 1998 Norris wrestled in various televised WCW events, including "Monday Nitro," "WCW Pro Wrestling," "WCW Saturday Night," and "WCW Worldwide Wrestling." (Id.; Affidavit of James A. Morrison (p/k/a "J.J. Dillon") (hereinafter "Dillon Aff.") ¶ 6 (a copy of this affidavit is attached hereto as Exhibit C); Affidavit of Paul Orndorff (hereinafter "Orndorff Aff.") ¶ 5 (a copy of this affidavit is attached hereto as Exhibit D)). Because Norris was not a polished wrestler and lacked the charisma of WCW's better wrestling talent, he was generally used during these matches as "enhancement talent."[3] (Deposition of Paul Orndorff (hereinafter "Orndorff Dep.") at 74; Orndorff Aff. ¶ 5). Nevertheless, WCW gave Norris numerous and substantial opportunities to develop his stage presence, improve his wrestling technique, create a fan base and learn from those wrestlers who had already developed the requisite skills to be successful. (Orndorff Aff. ¶ 5).

Not only was Norris frequently selected to participate in wrestling matches with big-name wrestlers, he also was given other opportunities to promote himself within WCW, such as by making commercials for the organization. (Norris Dep. at 97). In fact,

---

[3] Enhancement talent would help to promote and market the talents of those wrestlers who were or had the potential to be big-name wrestlers for WCW, by allowing these wrestlers to win the matches, and, in the process, demonstrate their skills and signature moves. (Orndorff Dep. at 75; Taylor Dep. at 121).

while training, Norris appeared in a pay-per-view commercial and video shoot with Eric Bischoff, who was at that time the Vice President of WCW. (Id.)

## WCW Relocates And Restructures Its Training Program

At the end of 1998 and into 1999, WCW transferred its Power Plant facility from its previous location to a new location on Log Cabin Drive, in Smyrna, Georgia. (Orndorff Aff. ¶ 6). WCW established this new facility to serve as WCW's training facility for a smaller group of wrestler trainees than the group that had previously been training at the former Power Plant location. (Id.) WCW intended to enter into written independent contractor agreements with all of the wrestlers selected to train at this new facility. (Id.)

## WCW Selects Norris To Receive An Independent Contractor Agreement

To select the individuals who would be signed to these agreements, WCW training officials spent roughly six to eight weeks evaluating the skills and talents of the approximately forty individuals who were then training at the Power Plant. (Orndorff Aff. ¶ 7). At the end of this period, WCW conducted "tryout" sessions and matches among all of the trainees. (Id.) At the conclusion of these try-outs, Norris was among those trainees selected to be signed to an agreement and to continue training at the new Power Plant location. (Id.) Although Norris had not yet

developed his skills to the degree expected of WCW's professional wrestlers, Norris was chosen because he worked hard at the Power Plant. (Id.)

After the try-out process, Norris formally entered into a trainee Agreement with WCW, as an independent contractor, on April 19, 1999. (Norris Dep. at 61-62; Independent Contractor Agreement, dated April 19, 1999 ("1999 Agreement"), Defendants' Exhibit 7 to Norris Dep.). The Agreement had a term of one year, and established that Mr. Norris would be paid $3,250 per month. (Norris Dep. at Exh. 7). The Agreement also expressly provided that WCW could terminate it for any reason with fourteen (14) days advance notice. (Id.)

**Norris Fails To Improve And WCW Terminates His Independent Contractor Agreement**

After signing this Agreement, Norris continued to train in the new Power Plant location. (Orndorff Aff. ¶ 7). As before, he continued to receive enhancement talent opportunities as they became available. (Dillon Aff. ¶ 6). In 1999, Norris wrestled in several matches, including matches televised during "WCW Saturday Night" and "WCW Worldwide Wrestling." (Id.). However, because Norris had failed to master even the basic wrestling maneuvers and still appeared "green" in the ring, he was not given the same opportunities as other wrestlers who were more experienced,

polished and/or talented.  (Dillon Aff. ¶¶ 5-6; Orndorff Aff. ¶¶ 8-9).

In September of 1999, the Director of the Power Plant, Paul Orndorff, evaluated all of the trainees at the Power Plant, a process in which he periodically engaged, to assess their overall progress and development.  (Orndorff Aff. ¶ 8).  In evaluating Norris, Mr. Orndorff determined that his persona, character and talents were not particularly notable and that he did not stand out as a potential star wrestler among the trainees.  (Orndorff Aff. ¶ 9).  Moreover, Mr. Orndorff, drawing upon his extensive experience in the wrestling industry, concluded that Norris was not likely to be successful or to advance beyond the trainee level.  (Id.)  At this same time WCW was suffering from financial difficulties and had embarked on a major cost reduction effort.  (Dillon Aff. ¶ 8).  As part of this effort, WCW terminated the contracts of some of its lesser skilled trainees and wrestlers.  (Id.)  Because Norris was a lesser skilled trainee and wrestler, after giving him the required advance notice, WCW terminated his Agreement in October of 1999.  (Norris Dep. at 125; Dillon Aff. ¶¶ 8-9; Orndorff Aff. ¶¶ 9-10).

## ARGUMENT AND CITATION OF AUTHORITY

### I.   THE SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate if the evidence before the Court shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see Vason v. City of Montgomery, 240 F.3d 905, 907 (11th Cir. 2001).  To survive summary judgment, the nonmoving party must come forward with concrete evidence in the form of "specific facts showing that there is a genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (emphasis added).

The summary judgment rule applies with equal force in discrimination cases.  In fact, the Eleventh Circuit recently held:

> While acknowledging that questions of fact in job discrimination cases are "both sensitive and difficult" and "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes," the [U.S.] Supreme Court has told us that "none of this means that trial courts or reviewing courts should treat discrimination differently from other ultimate questions of fact." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 524 (1993).  ...And quite recently, the [U.S. Supreme] Court rejected a rule which would have made it easier for job discrimination plaintiffs to get their case to a jury, explaining that "[t]o hold otherwise would be effectively to insulate an entire category of employment discrimination cases from [appropriate] review..., and we have reiterated that trial courts should not treat discrimination differently from other

> ultimate questions of fact." <u>Reeves</u>, 120 S. Ct. at
> 2109. ...The long and short of it is that the summary
> judgment rule applies in job discrimination cases just
> as in other cases. No thumb is to be placed on either
> side of the scale.

<u>Chapman v. Al Transport</u>, 229 F.3d 1012, 1026 (11th Cir. 2000). As

demonstrated herein, Norris has not and cannot present evidence

sufficient to create a genuine issue of material fact on any of

his claims. Accordingly, Defendants are entitled to summary

judgment on all of Norris's claims.[4]

## II. SUMMARY JUDGMENT SHOULD BE GRANTED AS TO NORRIS'S § 1981 CLAIMS BECAUSE NORRIS CANNOT ESTABLISH THAT HE WAS DISCRIMINATED AGAINST ON THE BASIS OF HIS RACE.

In a disparate treatment case such as this one, Norris must

prove "intentional discrimination" to prevail. <u>See Reeves v.

Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 153, 120 S. Ct.

2097, 147 L. Ed. 2d 105 (2000); <u>Texas Dep't of Community Affairs

v. Burdine</u>, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207

(1981). Because Norris cannot present direct evidence of

discrimination, the proof scheme articulated in <u>McDonnell Douglas

Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668

(1973), applies to his claim of disparate treatment. <u>See Texas</u>

---

[4] Norris's claims against TSI and TBS are based on theories of
derivative liability. (Third Amended Complaint ¶¶ 33-45). Norris
does not claim that either TSI or TBS took any improper actions
against Onoo or violated any law as to Onoo. Rather, Onoo claims
that WCW took such actions, and that TSI and TBS should be held
accountable due to their purported relationship with WCW. (<u>Id.</u>)
Because Onoo's claims against WCW fail as a matter of law, Onoo's
derivative claims against TSI and TBS also fail.

Dep't of Community Affairs, 450 U.S at 254.  Under the McDonnell Douglas proof scheme, Norris must present circumstantial evidence sufficient to establish a prima facie case of discrimination. Farrior v. H.J. Russell & Co., 45 F. Supp. 2d 1358, 1366 (N.D. Ga. 1999).

The mere presentation of circumstantial evidence is not sufficient to defeat a motion for summary judgment.  Even if a plaintiff can establish a prima facie case of race discrimination, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions regarding the plaintiff.  Reeves, 530 U.S. at 142.  The defendant is not required to prove absence of discriminatory motive, but merely to articulate some legitimate reason for its actions.  Moreover, the defendant's burden is one of production and not persuasion.  See id.; Burdine, 450 U.S. at 253.

Once such a reason is articulated, any presumption of discrimination arising out of the prima facie case "simply drops out of the picture."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).  The plaintiff must then "prove by a preponderance of the evidence that the legitimate reasons offered . . . were not [the] true reasons, but were a pretext for discrimination."  Texas Dep't of Community Affairs, 450 U.S. at 253; see Reeves, 530 U.S. at 143.  The

plaintiff must present "concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice." Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." St. Mary's Honor Center, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 253).

As demonstrated herein, Norris cannot establish that WCW intentionally discriminated against him because of his race by not providing him with additional, more prestigious, wrestling opportunities. Moreover, Norris's hostile work environment claim lacks legal or factual support. Accordingly, Defendants are entitled to summary judgment on Norris's § 1981 claims.

### A. Norris Cannot Establish That He Was Denied Wrestling Opportunities Because Of His Race.

Most of Norris's allegations boil down to a "failure-to-promote" or "failure-to-advance" type claim. Norris alleges that WCW failed to provide him with opportunities to wrestle on televised events and/or in more prestigious matches because of his race. (Third Amended Complaint ¶ 53). Norris, however, cannot produce any evidence that WCW actually and intentionally refused to give him additional wrestling positions "because of" his race. Oncale v. Sundowner Offshore Services, Inc. 523 U.S. 75, 78, 118

14

S. Ct. 998, 140 L. Ed. 2d 201 (1998)(quoting 42 U.S.C. § 2000e-2(a)(1)) (emphasis added).

Norris cannot establish a prima facie case of failure to promote on account of his race.  To do so under the McDonnell-Douglas framework, Norris must show:  (1) that he was a member of a protected class; (2) that he sought or applied for one or more positions; (3) that he was otherwise qualified for the positions sought; and (4) that, after his rejection, the positions remained open or were filled by a person outside his protected class.  See Schoenfield v. Babbitt, 168 F.3d 1257, 1267 (11th Cir. 1999).  The record is devoid of any evidence establishing that Norris was qualified for the wrestling positions or opportunities about which he complains.

Because wrestling matches are a form of entertainment and are scripted, charisma, crowd appeal, uniqueness, wrestling skill, physical capabilities, persona and acting ability are essential prerequisites for a wrestler to receive consistent wrestling opportunities on WCW's more popular televised events.  (Dillon Aff. ¶ 4; Orndorff Aff. ¶ 4).  The uncontroverted evidence shows that Norris lacked the requisite skills to wrestle on WCW's more popular events as a top talent.  (Orndorff Aff. ¶¶ 9, 10; Dillon Aff. ¶¶ 5-8; Hamilton Aff. ¶¶ 7-8; Lunde Dep. at 58-59; Taylor Dep. at 111).  Norris was clumsy in the ring, lacked the ability

to improvise in the ring, lacked stage presence and charisma, and lacked the ability to entertain.  (Hamilton Aff. ¶¶ 7-8; Dillon Aff. ¶¶ 5-8; Lunde Dep. at 58-59).  Even after receiving extensive training and performance opportunities with WCW, Norris's wrestling skills, ability to follow instruction, and ability to entertain never significantly improved.  (Dillon Aff. ¶ 8; Hamilton Aff. ¶¶ 7-8).  Norris's poor attitude and reputation as a troublemaker also impeded his advancement.  (Hamilton Aff. ¶ 7). For all of the foregoing reasons, and not because of Norris's race, WCW generally only used Norris in wrestling matches as enhancement talent and Norris never advanced to a higher wrestling status within WCW.  (Dillon Aff. ¶¶ 5, 7, 8; Hamilton Aff. ¶ 7-8). Because Norris cannot establish that he was qualified for the opportunities he claims he was denied, his failure to promote claim fails.

Norris has also failed to make out a prima facie case of disparate treatment with respect to advancement opportunities, because he cannot point to any **similarly situated** white wrestler within WCW who was given more and better wrestling opportunities than Norris was given.

To succeed on a disparate treatment claim for failure to promote, Norris must establish "that similarly situated or less qualified [individuals] were promoted or transferred" to the

position about which he complains.   Pashoian v. GTE Directories,
208 F. Supp. 2d, 1293, 1308 (M.D. Fla. 2002).   Norris claims that
Kevin Nash, Lex Luger, Scott Steiner, and Tank Abbott were
"similarly situated to him."   (Norris Dep. at 265-66).   In making
this assertion, however, Norris relies on nothing more than his
own subjective opinion.   Norris's subjective opinion that he was
similarly situated to or better qualified than other wrestlers who
received opportunities to wrestle on WCW's more popular events is
insufficient.   See Lee v. GTE Florida, Inc., 226 F.3d 1249, 1254
(11th Cir. 2000) (explaining that "an employee's own opinions
about his . . . qualifications do not give rise to a material
factual dispute")(quoting Simms v. Oklahoma ex rel. Dept. of
Mental Health and Substance Abuse Svcs., 165 F.3d 1321, 1329-30
(10th Cir. 1999), cert. denied, 528 U.S. 815, 120 S. Ct. 53
(1999)); see also Ramsey v. Leath, 706 F.2d 1166, 1170 (11th Cir.
1983) (instructing that an employee's subjective belief does not
establish a jury issue).

     In any event, to sustain a claim of discrimination, Norris
must do more than show that he was better qualified than another
individual who received the position that he wanted.   Denney v.
City of Albany, 247 F.3d 1172, 1187 (11th Cir. 2001) (quoting Lee
v. GTE Florida, Inc., 226 F.3d 1249, 1253-54 (11th Cir. 2000
(quotations omitted).   "Disparities in qualifications are not

enough in and of themselves to demonstrate discriminatory intent
unless these disparities are so apparent as virtually to jump off
the page and slap you in the face." Id.; see also Miller v. Bed,
Bath & Beyond, Inc., 185 F. Supp. 2d 1253, 1271 (N.D. Ala. 2002).
Here, Norris cannot even establish that the wrestlers to whom he
points were similarly situated to him with respect to charisma,
crowd appeal, experience, persona, wrestling skill, uniqueness,
the ability to take instruction well, and acting ability.  Because
he is unable to meet this lesser burden as to these other
wrestlers, he most certainly cannot establish that he was more
qualified than they were.  Accordingly, Norris cannot establish a
prima facie case of discrimination in denial of opportunities, and
this claim fails.

**B.    WCW Has Articulated Legitimate, Nondiscriminatory
       Reasons For Not Providing Norris With Additional
       Wrestling Opportunities.**

Norris's failure to promote/advance claim also fails because
WCW has established that it had legitimate, nondiscriminatory
reasons to explain why Norris was not provided with additional,
more prestigious wrestling opportunities.  The undisputed evidence
of record establishes that Norris received less prestigious
wrestling opportunities because he lacked the basic skills
necessary to be a highly successful wrestler within WCW despite
extensive training and numerous opportunities as enhancement

talent.  The record also shows that in 1999, WCW was experiencing and responding to a business downturn, had less need for mediocre wrestling talent and terminated many talent as a cost-cutting measure.  (Myers Aff. ¶ 5).  Accordingly, WCW could not afford to provide additional opportunities to inferior performers such as Norris.  Because Norris cannot and does not dispute that such a downturn occurred, that there was less need for mediocre wrestling talent and that he was considered a lesser performer, he is unable to establish that the nondiscriminatory reasons offered by WCW are a pretext for discrimination.  Accordingly, Norris's claim fails.  See Burdine, 450 U.S. at 256 (to survive summary judgment, a plaintiff must directly persuade the court that a "discriminatory reason more likely motivated [WCW] or indirectly [prove discrimination] by showing that [WCW]'s proffered explanation is [pretextual and] unworthy of credence.").

### C.   Norris Cannot Establish That He Was Subjected To A Racially Hostile Work Environment.

Norris also alleges that while with WCW he was subjected to a racially hostile environment.  (Third Amended Complaint ¶ 54).  In support of this claim, Norris claims that while he was at WCW, racial slurs were allegedly made to third parties, he was "required" to assist in cleaning the Power Plant facility during his training period, and that he was "required" to help assemble and disassemble the wrestling ring during training.  (Norris Dep.

at 222-35).  With respect to the alleged statements about which

Norris complains, Norris claims (1) that Terry Taylor allegedly

said that African-American women generally have large behinds; (2)

that another trainee allegedly told him that people do not like

him because he is black; and (3) that some of the trainees and

wrestlers allegedly used the word "nigger" in reference to other

WCW wrestlers and/or trainees.  (Norris Dep. at 226-35).  Even

assuming the truth of Norris's allegations, as a whole they are

insufficient to establish that he was subjected to a racially

hostile work environment.

     To succeed on his hostile work environment claim, Norris must

demonstrate that the alleged actions of WCW "altered the condition

of the workplace, creating an objectively abusive and hostile

atmosphere."  Edwards v. Wallace Community College, 49 F.3d 1517,

1521 (11th Cir. 1995) (citing Harris v. Forklift Sys., Inc., 510

U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).  "For

example, the racial slurs allegedly spoken . . . had to be so

'commonplace, overt and denigrating that they created an

atmosphere charged with racial hostility.'"  Id. (quotations

omitted).  Factors that must be considered in assessing the merits

of a hostile environment claim include the frequency and severity

of the alleged discriminatory conduct, whether the conduct was

threatening or humiliating, and whether it unreasonably interfered

with Norris's work performance with WCW.  Id. at 1521-22.  In light of this standard, Norris's claim fails, because, even assuming the truth of every incident that Norris describes in support of his claim, these incidents are insufficient as a matter of law to create a racially hostile work environment.[5]

It is undisputed that the alleged statements about which Norris complains were allegedly made over a four-year time period. (Norris Dep. at 222-35).  Such sporadic comments, although inappropriate if made, are insufficient to establish that the environment at WCW was permeated with racial hostility.  See Hudson v. Norfolk Southern Railway Co., 209 F. Supp. 2d 1301, 1314 (11th Cir. 2001) (explaining that instances of racial slurs must be more than sporadic to be sufficient to support a hostile work environment claim); Ealey v. Dekalb County Hosp. Auth., 59 Fair Empl. Prac. Cases (BWA) 1803, 1998 WL 384902 (N.D. Ga. 1988) (same); see also Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982) (explaining that the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee

---

[5] To the extent that any of Norris's claims are based on events that occurred prior to February 11, 1998, such claims are barred by the statute of limitations.  More specifically, in Georgia, the applicable statute of limitations for § 1981 claims is two (2) years.  See Alexander v. Fulton County, GA, 207 F.3d 1303, 1346 (11th Cir. 2000); Butler v. Matsushita Comm. InCHECK Corp. of U.S.A., 203 F.R.D. 575, 583 (N.D. Ga. 2001).

does not rise to a Title VII [or Section 1981] violation" and that
isolated incidents of harassment are not actionable).

The Eleventh Circuit has clearly instructed that infrequent,
petty annoyances do not give rise to the level of severity and
pervasiveness necessary to establish a hostile environment claim.
Harris, 510 U.S. at 21; E.E.O.C. v. Beverage Canners, Inc., 897
F.2d 1067, 1068 (11th Cir. 1990). The alleged discriminatory
conduct about which Norris complains was far from "commonplace";
it was not harsh or severe; and it was not physically threatening,
as must be established for his claim to succeed. See Edwards, 49
F.3d at 1521 (explaining that racial slurs must be so
"commonplace, overt and denigrating that they create an atmosphere
charged with racial hostility"). Accordingly, this claim fails.

Not only does the record establish that these alleged
statements were sporadic in nature, but the record also
establishes that the majority of the alleged statements were not
even directed towards Norris or made in his presence, but rather,
were simply unconfirmed hearsay and conjecture. Norris concedes
that many of the alleged statements that were made outside his
presence, were made by third parties who were speculating about
him and his relationship with WCW, or were directed to other
wrestlers. (Norris Dep. at 222-35). Norris may not rely on
hearsay statements of this type to defeat summary judgment. See

Pritchard v. Southern Co. Servs., 92 F.3d 1130, 1135 (11th Cir.
1996) (instructing that inadmissible hearsay cannot be offered to
defeat a summary judgment motion when it is not reducible to
admissible form at trial); Evans v. McClain of Georgia, Inc., 131
F.3d 957, 962 (11th Cir. 1997) (concluding that the district court
correctly dismissed hearsay evidence because it was "not
significantly probative" and was based on "gossip, common
knowledge and hearsay statement of an unidentified
representative"); see also Edwards, 49 F.3d at 1520-21 (concluding
that hostile work environment claim was without merit because many
of the alleged statements were either speculation or hearsay, and
because there was insufficient information as to when the alleged
statements were made).

     Norris's hostile work environment claim also fails because he
cannot support his allegation with "any specific examples of how
[the alleged] discriminatory conduct . . . had a deleterious
effect on his [work] performance."  See Mitchell v. Carrier Corp.,
954 F. Supp. 1568, 1578 (M.D. Ga. 1995), aff'd, 108 F.3d 343 (11th
Cir. 1997); see also Evans v. Pemco Aeroplex, 1998 WL 1048470, No.
CIVACV96-S-2801-S (N.D. Ala. Feb. 23, 1998) (explaining in case in
which five incidents of racist conduct occurred, including the use
of nooses and the letters "KKK," that without evidence that the
incidents affected [the plaintiff's] work performance, the court

could not conclude that the alleged harassment was sufficiently severe and pervasive to alter a term or condition of employment). In this case, not only has Norris failed to establish that his performance declined because of any alleged acts of discrimination, he has, to the contrary, claimed that his performance at WCW was so exemplary as to warrant advancement. (Norris Dep. at 149, 152, 156, 163-64, 167). Norris can offer no evidence of the kind of "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. at 21.

Norris's assertions that he was required to help clean up the Power Plant and to help assemble and take down the wrestling ring do not salvage his claim. (Norris Dep. at 228-29). As Norris has admitted, WCW also instructed white wrestler trainees at the Power Plant to help clean up the Power Plant and to help assemble and take down the wrestling ring as part of the training program. (Norris Dep. at 46-47). Because cleaning up the Power Plant and assembling the wrestling ring were race-neutral incidents of training at the Power Plant, Norris cannot rely on that evidence in support of his hostile work environment claim, and his claim

fails.   Smith v. Mount Sinai Medical Ctr. of Greater Miami, Inc.,
36 F. Supp. 2d 1341, 1346 (S.D. Fla. 1998).

**III. SUMMARY JUDGMENT SHOULD BE GRANTED AS TO NORRIS'S TITLE VII
CLAIMS BECAUSE NO EMPLOYER-EMPLOYEE RELATIONSHIP EXISTED
BETWEEN NORRIS AND WCW.**

Norris also asserts claims of race discrimination under Title
VII of the Civil Rights Act of 1964.   (Third Amended Complaint
¶¶ 51-53).   The undisputed facts of record conclusively establish
that Norris cannot maintain a discrimination claim under Title
VII.

A Title VII race discrimination claim requires that an
**employment relationship** exist between the plaintiff and the
defendant.   Holloman v. Northeast Georgia Area Development Comm'n,
740 F. Supp. 1571, 1575 (M.D. Ga. 1990).   Independent contractor
relationships are outside the statute's scope.   See Cobb v. Sun
Papers, Inc., 673 F.2d 337, 339-42 (1982), cert. denied, 459 U.S.
874, 103 S. Ct. 163, 74 L. Ed. 2d 135 (1982); see also Holloman,
740 F. Supp. at 1575 (explaining that if the plaintiff "were an
independent contractor, and not an agent or employee [of the
defendant], then there would be no 'employment relationship'
between the two and [the plaintiff] would not be subject to Title
VII's protections").

To determine whether a particular individual is an employee
or an independent contractor, courts employ common law principles

of agency.  See Cobb, 673 F.2d at 341.  Among the factors to be considered in determining whether an individual is an employee or an independent contractor are the hiring party's right to control, the level of skill required, the source of equipment and tools, the duration of the relationship, the method of payment, the provision of employee benefits, the tax status of the parties and the intent of the parties.  Nationwide Mutual Ins. Co. v. Darden, 503 U.S. 318, 323-24, 112 S. Ct. 1344, 117 L. Ed. 2d 581, 589-90 (1992) (citing Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751-52, 109 S. Ct. 2166, 104 L. Ed. 811 (1989)). Applying the above factors, the uncontroverted evidence establishes that Norris was an independent contractor with WCW, and not an employee.

First, WCW exercised minimal control over the means and the manner of Norris's performance as a professional wrestler.  Norris was given significant creative freedom to choreograph his matches and to achieve the predetermined result.  (Dillon Aff. at ¶ 7). Norris also developed his own persona, character, stage name, costume and gimmick.  (Id.; Norris Dep. at 88-89).

Further, professional wrestling requires significant specialized skills.  By his own admission, Norris underwent extensive training to develop the skills necessary to be a professional wrestler with WCW.  (Norris Dep. at 88).  This factor

also supports the conclusion that Norris was an independent contractor. <u>Wolf v. Coca-Cola Co.</u>, 200 F.3d 1337, 1360 (11th Cir. 2000).

Also consistent with the conclusion that Norris was an independent contractor, and not an employee, Norris's Agreement with WCW was for a short and fixed term (one year), Norris received no fringe benefits, and he paid his own taxes. (Norris Dep. at Exh. 7 (1999 Independent Contractor Agreement, ¶ 2).

Lastly, the parties indisputably understood and intended an independent contractor relationship. Norris admitted that he was an independent contractor with WCW during all times relevant to this lawsuit. (Norris Dep. at 119). Moreover, the Agreement Norris signed expressly states that Norris was providing services to WCW as an independent contractor, and not as an employee. (Norris Dep. at Exh. 7 (1999 Independent Contractor Agreement, ¶ 2). The Agreement is also labeled on the first page as an "Independent Contractor Agreement." (<u>Id.</u>) All of the above facts establish that Norris was an independent contractor, and not an employee, of WCW.

This Court has previously considered the issue of whether a professional wrestler for WCW was an independent contractor for purposes of Title VII. In <u>Ranger Ross v. World Championship Wrestling, Inc.</u>, Civil No. 1:93-CV-1206-JEC (N.D. Ga. 1994)

(unpublished opinion),[6] the Court concluded that, because the
plaintiff professional wrestler had a certain level of control
over his performance in matches and creativity for his character,
he was an independent contractor and not an employee for purposes
of Title VII.  (Id. at 15-16).  Likewise, in this case, given the
control Norris had over the performance of his services in
wrestling events, and all of the factors noted above, the
requisite employment relationship did not exist between Norris and
WCW for Title VII to apply.   Therefore, summary judgment should be
granted as to all of Norris's Title VII claims.[7]

## IV.  SUMMARY JUDGMENT SHOULD BE GRANTED AS TO NORRIS'S FLSA CLAIMS BECAUSE NO EMPLOYER-EMPLOYEE RELATIONSHIP EXISTED BETWEEN NORRIS AND WCW.

Norris asserts that WCW failed to pay him minimum wage and
overtime, as required by the FLSA, during the time that he was
training at the Power Plant and providing wrestling services to
WCW.  (Third Amended Complaint ¶¶ 61-63, 67-69).  However, FLSA
provides minimum wage and maximum hour protection only to
**employees** as defined therein.  29 U.S.C. §§ 203(e)(1) and (g),
206(a), and 207(a).  Because Norris cannot demonstrate that he was

---

[6] A copy of the Court's opinion is attached hereto as Exhibit E.
[7] Even assuming arguendo, that the requisite employer-employee
relationship did exist between Norris and WCW, Norris's Title VII
claim still fails for all of the same reasons that Norris's § 1981
claims fail.  See Standard v. A.B.E.L. Servs., Inc., 161 F.3d
1318, 1330 (11th Cir. 1998) (explaining that "both Title VII and
Section 1981 have the same requirements of proof and use the same
analytical framework").

an "employee" of WCW during the time for which he asserts claims for minimum wage and overtime pay, Norris's FLSA claim fails.

To determine whether a FLSA-covered employer-employee relationship exists, courts "look not to the common law definitions of those terms, . . . but rather to the 'economic reality' of all the circumstances concerning whether the putative employee is economically dependent upon the alleged employer." Aimable v. Long and Scott Farms, 20 F.3d 434, 439 (11th Cir. 1994) (emphasis added) (citing Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947)), cert. denied, 513 U.S. 943, 115 S. Ct. 351, 130 L. Ed. 2d 306 (1994). Where an individual provides services to several different companies, performs his services by the job, rather than on a more permanent basis, uses his own material, and exercises control over the manner in which he performs his services, he is, in "economic reality", an independent businessman, not an employee covered by the FLSA. Donovan v. Tehco, Inc., 542 F.2d 141, 143-44 (5th Cir. 1981).

Application of the "economic reality" test to Norris conclusively establishes that, during the time he was training at the Power Plant and providing services to WCW as a wrestler, Norris was an independent businessman and not an employee. He "worked for several other [employers] during the period at issue, invariably worked by the job rather than by the hour, supplied his

own materials . . ., and possessed . . . independence and creative freedom in" deciding the manner in which he would achieve the desired results in his wrestling matches. Donovan, 542 F.3d at 140. (See Norris Dep. at 74, 78-81; Dillon Aff. ¶ 7).

During the same period that Norris was training with and providing wrestling services to WCW, Norris also performed in a number of "tough man" competitions for a competing enterprise. (Norris Dep. at 74-75). He also managed his own wrestling organization during this time and was paid accordingly. (Norris Dep. at 106, 246-49). The fact that Norris engaged in other compensated work outside of WCW during this time evidences that he was not an employee of WCW.

Additionally, as discussed in Section III above, in connection with his performances for WCW, Norris developed his own gimmick, character, name and persona, and provided his own costume. (Norris Dep. at 88-89; Dillon Aff. ¶ 7). All of the above facts demonstrate that, as a matter of economic reality, Norris was not an "employee" under the FLSA. Therefore, Defendants are entitled to summary judgment on Norris's FLSA claim. See Donovan, 542 F.2d at 143-44.[8]

---

[8] Even assuming arguendo, that Norris qualifies as an employee for purposes of FLSA, Norris's claim with respect to overtime under FLSA must fail, nonetheless, because Norris has failed to establish that he worked in excess of forty (40) hours in any given week that he provided services to WCW. Likewise, because

**V.   SUMMARY JUDGMENT SHOULD BE GRANTED ON NORRIS'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM BECAUSE WCW DID NOT ENGAGE IN ANY OUTRAGEOUS CONDUCT.**

Norris contends that WCW, by allegedly engaging in racially discriminatory conduct, intentionally inflicted severe emotional distress on him.   (Third Amended Complaint ¶ 58).   This claim is baseless.

To establish a claim for intentional infliction of emotional distress under Georgia law, a plaintiff must establish: (1) intentional or reckless conduct; (2) extreme and outrageous conduct by the defendant; (3) severe emotional distress suffered by the plaintiff; and (4) a causal connection between the conduct and the emotional distress.   Hendrix v. Phillips, 207 Ga. App. 394, 395, 428 S.E.2d 91, 92-93 (1993).

To be "extreme and outrageous," the alleged conduct must be so "terrifying or insulting as naturally to humiliate, embarrass or frighten" the plaintiff and so severe that "no reasonable man could be expected to endure" these actions.   Beck v. Interstate Brands Corp., 953 F.2d 1275, 1276 (11th Cir. 1992).   Liability for intentional infliction of emotional distress does not extend to "mere insults, indignities, threats, annoyances, petty

---

the statute of limitations on FLSA claims is two (2) years, any conduct on which Norris bases his FLSA claims that occurred prior to February 11, 1998 is time-barred.   See, e.g., Reich v. Department of Conservation & Natural Resources, 28 F.3d 1076, 1084 (11th Cir. 1994).

oppressions, or other trivialities." Ward v. Papa's Pizza To Go, Inc., 907 F. Supp. 1535, 1540 (S.D. Ga. 1995). Thus, when a plaintiff alleges that conduct such as race discrimination constitutes intentional infliction of emotional distress, the alleged conduct must be severe, such as an on-going pattern of explicit and oppressive harassment that includes or resembles a physical assault. See Coleman v. Housing Auth. of Americus, 191 Ga. App. 166, 381 S.E.2d 303 (1989). When the alleged conduct is racial epithets and race-based decisions in carrying out a contract, it must be combined with extreme and graphic threats such as of bodily harm, dismemberment and death. See Brown v. Manning, 764 F. Supp. 183, 185 (M.D. Ga. 1991). Norris does not even come close to meeting this standard.

In this case, Norris cannot provide any evidence of conduct by WCW that satisfies the requirements of "extreme and outrageous" behavior. Rather, Norris testified that there is nothing other than WCW's alleged acts of discrimination that caused him emotional harm. (Norris Dep. at 238, 273). Because the undisputed evidenced shows that Norris was not subjected to discriminatory treatment, and because Norris must establish more than just alleged discriminatory conduct to sustain his intentional infliction of emotional distress claim, summary judgment should be entered on this claim. Beck, 953 F.2d at 1276

(discharge of employee for allegedly discriminatory reasons insufficient to support intentional infliction of emotional distress claim); <u>Ward</u>, 907 F. Supp. at 1542 (concluding that repeated refusal to hire an individual under circumstances that could constitute unlawful discrimination insufficient to establish an intentional infliction of emotional distress claim); <u>Borden v. Johnson</u>, 196 Ga. App. 288, 395 S.E.2d 628 (1990) (establishing the demotion or discharge for whatever reason, even discriminatory reason, does not give rise to an intentional infliction of emotional distress claim).

## CONCLUSION

For all of the foregoing reasons, Defendants' Motion for Summary Judgment on all of Norris's claims asserted in this action should be granted, and all of Norris's claims should be dismissed.

This 17th day of December, 2002.

TROUTMAN SANDERS LLP

JOHN J. DALTON
Georgia Bar No. 203700
JAMES A. LAMBERTH
Georgia Bar No. 431851
ERIC A. RICHARDSON
Georgia Bar No. 233873
EVAN H. PONTZ
Georgia Bar No. 583577

Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

Attorneys for Defendants

## CERTIFICATION

Pursuant to Local Rule 7.1(D), I certify that this Memorandum of Law has been prepared with one of the fonts and point selections ("Courier New 12") approved by the Court in Local Rule 5.1(B).


This 17th day of December, 2002.


Evan H. Pontz
TROUTMAN SANDERS LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

HARRISON NORRIS,                    )
                                    )
                Plaintiff,          )
                                    )          CIVIL ACTION FILE
v.                                  )
                                    )          NO. 1:00-CV-0369-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC., and            )
TURNER BROADCASTING SYSTEM, INC.    )
                                    )
                Defendants.         )

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of this
*MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT* upon the interested parties by hand delivery to:

Cary Ichter
Kelly Jean Beard
Charles Gernazian
Michelle M. Rothenberg-Williams
MEADOWS, ICHTER AND BOWERS, P.C.
Eight Piedmont Center, Suite 300
3525 Piedmont Road
Atlanta, GA  30305

This 17th day of December, 2002.

_Evan H. Pontz_
Evan H. Pontz
TROUTMAN SANDERS LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Walker v. World Championship Wrestling, Inc., Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-0367-CC
Onoo v. World Championship Wrestling, Inc., Turner Sports, Inc.
    and Turner Broadcasting System, Inc., Civ. File No. 1:00-
    CV-0368-CC
Norris v. World Championship Wrestling, Inc., Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-0369-CC
Easterling v. World Championship Wrestling, Inc. and Turner
    Sports, Inc. and Turner Broadcasting System, Inc., Civ.
    File No. 1:00-CV-1715-CC
Davis v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1716-CC
Worthen v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1717-CC
Speight v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1718-CC
Saengsiphan v. World Championship Wrestling, Inc. and Turner
    Sports, Inc. and Turner Broadcasting System, Inc., Civ.
    File No. 1:00-CV-1719-CC
Reeves v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1720-CC
Patterson v. World Championship Wrestling, Inc., Turner Sports,
    Inc., Turner Entertainment Group, Inc. and Turner
    Broadcasting System, Inc., Civ. File No. 1:01-CV-1152-CC

## AFFIDAVIT OF DIANA MYERS

DIANA MYERS, who having personally appeared before the
undersigned officer duly authorized to administer oaths and
having been first duly sworn according to law, deposes and
states the following:

1.    My name is Diana Myers.   I am of majority age, and I give this testimony of my own free will.   I have personal knowledge of and am competent to testify to the facts stated herein.   The facts stated herein are true and correct.

2.    I was employed by Universal Wrestling Corporation (f/k/a/ World Championship Wrestling, Inc. and hereinafter referred to as "WCW") beginning in October 1997 and most recently held the title of Vice President of Business and Legal Affairs.   In my position at WCW, I was familiar with virtually all aspects of WCW's business and legal affairs.

3.    WCW created, produced, and marketed professional wrestling programs during the 1990s and through March 2001. WCW's wrestling programs were both witnessed by live audiences and aired on various television networks and pay-per-view cable and satellite systems.   WCW's wrestling programs, both live and taped, were created by writers and producers at WCW, with the goal of entertaining wrestling fans and general audiences nationwide.    The individuals responsible for writing WCW's wrestling programs were often referred to as "bookers".

4.    WCW's wrestling programs included appearances by many types of live or "on-screen" talent, including wrestlers, match

referees, and other wrestling talent appearing on camera or at live (but non-televised) events. These individuals appearing in wrestling programs provided their services to WCW as independent contractors, either through formal written contracts or without written agreements.

5. Wrestlers, referees and other wrestling talent were aware of the planned outcome of each wrestling match or appearance and provided appropriate services to attempt to convincingly carry out that pre-determined outcome of the event for the audience.

6. WCW had much commercial and financial success during the mid to late 1990s. In 1999, WCW's business suffered from a sharp downturn and WCW was losing significant sums of money. Therefore, WCW began downsizing its operations by reducing the number of talent it contracted with, reducing the compensation of existing talent, and producing fewer and fewer wrestling programs. As part of the downsizing, WCW considered canceling some of its shows. In early 2000, WCW in fact terminated some of its programs, including a taped show commonly referred to as its "Saturday Night" show. Before it was canceled, the task of writing or "booking" the Saturday Night wrestling show was being performed by individuals experienced in booking wrestling

programs.  At the same time, WCW also reduced the length of some of its other remaining wrestling programs.

7.    Due to these business circumstances and WCW's downsizing efforts, in 1999 and over the next two years, WCW had less and less need for wrestling services, including on-screen talent, trainers, referees and writers or "bookers". Specifically, in and after 1999, there were no open opportunities available for a position solely as a booker of WCW's Saturday Night wrestling program and WCW was not actively seeking bookers solely for its Saturday Night show.

8.    The downsizing efforts did not stop WCW's business downturn, and in March 2001, WCW sold certain of its assets and completely closed down its operations.  After the sale of assets was completed, WCW changed its name to Universal Wrestling Corporation to close up remaining corporate operations.

9.    In my capacity as Vice President of Business and Legal Affairs for WCW, I was responsible for reviewing and documenting merchandizing agreements in which WCW was a party.

10.   In 1998, WCW entered into a merchandizing agreement with Toshiba in Japan to produce and distribute a music compact

disc in Japan entitled "New World Order" containing WCW entrance music. Mr. Kazuo "Sonny" Onoo was involved in this agreement. Mr. Onoo was paid all money he was due from WCW regarding this New World Order compact disc.

11. WCW also entered into a different agreement with Tommy Boy Records. Pursuant to the terms of this agreement, Tommy Boy Records developed and distributed a music CD entitled "WCW Mayhem." WCW Mayhem was a compilation of WCW music along with material created by Tommy Boy artists.

12. Kazuo "Sonny" Onoo was not a party to or involved in WCW's merchandizing agreement with Tommy Boy Records regarding the WCW Mayhem CD. Mr. Onoo did not have a financial interest in the CD's creation, marketing or sales, nor was he entitled to any profits or other compensation from the sale of this CD.

13. As a result of my position at WCW, I also have personal knowledge regarding how on-air talent was compensated by WCW and the basis of their level of compensation. Further, I have personal knowledge regarding how on-air talent was generally utilized by WCW.

14.   At WCW, Wrestlers were compensated and given wrestling opportunities that were commensurate with their skill level and crowd appeal.  Mr. Walker was no exception.

15.   Mr. Walker wrestled in over eighty (80) matches while he was under contract with WCW.  In some of these matches, he prevailed over his opponent.  In other instances, the match was scripted in Mr. Walker's opponent's favor.

FURTHER AFFIANT SAYETH NAUGHT.

This **12ᵗʰ** day of December, 2002.

DIANA MYERS

Sworn to and subscribed
before me this **12ᵗʰ** day
of December, 2002.

Notary Public

My Commission Expires:
_March 31, 2005_

Sandra M. Gaudet
Commission # DD 002932
Expires March 31, 2005
Bonded Thru
Atlantic Bonding Co., Inc.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

HARRISON NORRIS,                          )
                                          )
              Plaintiff,                  )
                                          )        CIVIL ACTION FILE
v.                                        )
                                          )        NO. 1:00-CV-0369-CC
WORLD CHAMPIONSHIP                        )
WRESTLING, INC., TURNER                   )
SPORTS, INC., and TURNER                  )
BROADCASTING SYSTEM, INC.,                )
                                          )
              Defendants.                 )

## AFFIDAVIT OF JOSEPH HAMILTON

JOSEPH HAMILTON, who having personally appeared before the undersigned officer duly authorized to administer oaths and having been first duly sworn according to law, deposes and states the following:

1.      My name is Joseph Hamilton. I am of majority age, and I give this testimony of my own free will. I have personal knowledge of and am competent to testify to the facts stated herein. The facts stated herein are true and correct.

2.      I first began providing services to Universal Wrestling Corporation (f/k/a World Championship Wrestling, Inc. and hereinafter referred to as "WCW") in 1989 as a member of the creative staff. After working with the organization in various capacities, I eventually became the Director of the Power Plant, WCW's training facility.

3.      As part of my duties as Director of the Power Plant, I worked with WCW's professional wrestlers and trainees. At times, members of the creative staff and I would discuss my opinion with respect to wrestling and training talent.

4.     Based on my experience in the wrestling industry and at WCW, the creators, producers, bookers and marketers of professional wrestling programming such as WCW's use their better performers with greater frequency in their wrestling programs. Factors considered by the creators, producers, bookers and marketers of these programs in determining who the better wrestlers are include the wrestler's crowd appeal, stage presence, charisma, uniqueness, wrestling ability and physique. In light of these factors, I periodically evaluated wrestlers and trainees at the Power Plant, to determine how well they were progressing.

5.     Harrison Norris first became affiliated with WCW in 1995 when he was accepted into the professional wrestling training program at the Power Plant facility. The goal in including Mr. Norris in the training program was to help him develop the physical skills, charisma, stage presence and other characteristics necessary to be a successful wrestler with WCW.

6.     Mr. Norris initially paid a fee of $250.00 to train at the WCW tryout/workout camp. Thereafter, he continued to train at the Power Plant facility and paid WCW periodically for the training and instruction that he received. Eventually, Mr. Norris ceased paying the fees associated with training, because he received a training scholarship.

7.     Although Mr. Norris was in good physical condition at the time that he received his training scholarship, he lacked charisma, appeared clumsy and inexperienced in the wrestling ring, and needed to substantially improve his wrestling skills. Mr. Norris had also developed a reputation for being too boastful and flamboyant outside of his wrestling matches or appearances, for having a bad attitude, and for being a troublemaker. Despite his deficiencies, I believed that, with a lot of hard work, Mr. Norris had the potential to be a moderately successful wrestler with WCW.

8.      Although I was hopeful that Mr. Norris would significantly improve his wrestling talent, he never developed the skills and charisma of WCW's better wrestlers, and he never improved beyond being a preliminary wrestler with WCW.


FURTHER AFFIANT SAYETH NAUGHT.

This ___16 th___day of ___December___, 2002.

_____
JOSEPH HAMILTON


Sworn to and subscribed
Before me this _16 th_ day
of _December_, 2002.

_____
Notary Public

My Commission Expires:

___Oct 24, 2005___

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

HARRISON NORRIS,                         )
                                         )
            Plaintiff,                   )
                                         )        CIVIL ACTION FILE
v.                                       )
                                         )        NO. 1:00-CV-0369-CC
WORLD CHAMPIONSHIP                       )
WRESTLING, INC., TURNER                  )
SPORTS, INC., and TURNER                 )
BROADCASTING SYSTEM, INC.,               )
                                         )
            Defendants.                  )

## AFFIDAVIT OF JAMES A. MORRISON

JAMES A. MORRISON, who having personally appeared before the undersigned officer duly authorized to administer oaths and having been first duly sworn according to law, deposes and states the following:

1.      My name is James A. Morrison, professionally known as J.J. Dillon. I am of majority age, and I give this testimony of my own free will. I have personal knowledge of and am competent to testify to the facts stated herein. The facts stated herein are true and correct.

2.      I was employed by World Championship Wrestling, Inc. ("WCW") from approximately November 1996 until March 2001. Prior to becoming an employee of WCW, I provided services to WCW as an independent consultant.

3.      As part of my duties as a WCW employee, I worked with WCW's wrestlers and trainees. During my employment with WCW, Mr. Norris provided wrestling and training services to WCW as an independent contractor.

4.      Based on my experience in the wrestling industry and at WCW, the creators, producers, bookers and marketers of professional wrestling programming such as WCW's use their better, more polished performers with greater frequency in their wrestling programs. Factors considered by the creators, producers, bookers and marketers of these programs in determining who the better and more polished wrestlers are include the wrestler's crowd appeal, stage presence, charisma, uniqueness, wrestling ability and physique.

5.      Although Mr. Norris was in good physical condition for a wrestler, he was unpolished in the wrestling ring, and needed more experience to substantially improve his wrestling skills.

6.      In mid-1999, Mr. Norris entered into a wrestling trainee contract with WCW. After signing this agreement, he was given the opportunity to wrestle on several venues, some of which included "WCW Saturday Night" and "WCW Worldwide Wrestling". Mr. Norris' opportunities to wrestle in WCW events and on WCW programs were never based on his race.

7.      As a wrestler at WCW, Mr. Norris was given significant creative freedom to choreograph his wrestling matches and to achieve the predetermined result. Mr. Norris also developed his own stage name, persona, character, costume and gimmick.

8.      In late 1999, WCW was required to terminate the contracts of some of its wrestlers because it was suffering from financial difficulties. Given that Mr. Norris had been training with WCW for a number of years, had been given exposure and wrestling opportunities through both live and televised appearances in WCW programs and performances, and had been given opportunities to show his level of crowd appeal, stage presence, charisma, uniqueness, and wrestling ability and performance, but had not become a polished wrestler with WCW or a success with WCW's audiences, WCW reached the opinion that his services were no longer

needed by WCW. Accordingly, after giving him the required advance notice under his trainee contract, WCW terminated his trainee contract.

9.     The decision to terminate Mr. Norris's contract was not based in any way on his race. Mr. Norris simply never moved above his existing level of crowd appeal, stage presence, charisma, uniqueness, and wrestling ability and performance, and this level did not justify continuing to keep him under his trainee contract with WCW.


FURTHER AFFIANT SAYETH NAUGHT.

This 16TH day of DECEMBER, 2002.

JAMES A. MORRISON

Sworn to and subscribed
Before me this $16t$ day
of December, 2002.

Notary Public

My Commission Expires:
OCT 4 2005

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| HARRISON NORRIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION FILE |
| v. ) | |
| ) | NO. 1:00-CV-0369-CC |
| WORLD CHAMPIONSHIP ) | |
| WRESTLING, INC., TURNER ) | |
| SPORTS, INC., and ) | |
| TURNER BROADCASTING ) | |
| SYSTEM, INC., ) | |
| ) | |
| Defendants. ) | |

## AFFIDAVIT OF PAUL ORNDORFF

PAUL ORNDORFF, who having personally appeared before the undersigned officer

duly authorized to administer oaths and having been first duly sworn according to law, deposes

and states the following:

1.      My name is Paul Orndorff. I am of majority age, and I give this testimony of my

own free will. I have personal knowledge of and am competent to testify to the facts stated

herein. The facts stated herein are true and correct.

2.      I first began providing services to Universal Wrestling Corporation (f/k/a World

Championship Wrestling, Inc. and hereinafter referred to as "WCW") in 1994 as a professional

wrestler. After working with the organization in various capacities, I eventually became the

Director of the Power Plant, WCW's training facility.

3.     As part of my duties as the Director of the Power Plant, I worked with WCW's professional wrestlers and trainees. At times, members of the booking committee and I would discuss my opinion with respect to wrestling and training talent.

4.     Based on my experience in the wrestling industry and at WCW, factors to be considered in determining which wrestlers and/or trainees will be well-received by wrestling audiences include the wrestler's crowd appeal, stage presence, charisma, uniqueness, wrestling ability and physique. In light of these factors, I periodically evaluated wrestlers and trainees at the Power Plant, to determine how well they were progressing.

5.     When I first became familiar with Harrison Norris as a Power Plant trainee, he had been training for a number of years and was a basically capable professional wrestler. Mr. Norris received various wrestling opportunities with WCW because he devoted a significant amount of time and energy to his training efforts. In the wrestling matches in which he was used, Mr. Norris was generally used as enhancement talent, because that role fit the level of his wrestling skills. By allowing Mr. Norris to perform in matches as enhancement talent, WCW gave Mr. Norris the opportunity to further develop his skills; however, Mr. Norris never progressed beyond his then-current level of skills.

6.     At the end of 1998 and into 1999, WCW transferred its Power Plant facility from its previous location on Carroll Drive, to a new location on Log Cabin Drive, in Smyrna, Georgia. This new establishment was to serve as the training facility for a smaller group of wrestler trainees than the group that had previously been training at the old Power Plant location Each wrestler selected to train at the new Power Plant facility was to be signed to a trainee independent contractor agreement.

1084160_4.DOC                                    2

7.     To determine which wrestler trainees would receive agreements, I, along with other WCW training officials, spent roughly six to eight weeks evaluating the talent of approximately forty individuals who were then training at the Power Plant. At the end of this evaluation period, WCW conducted "try outs" for all of the wrestler trainees. Mr. Norris was selected as one of the wrestler trainees to be signed to an agreement and to continue training at the new Power Plant location. Although Mr. Norris still lacked charisma and had not yet developed his wrestling skills to the level of WCW's more popular wrestlers, he was chosen to be signed to an agreement because he was then considered to be one of the most hard-working and most committed wrestler trainees at the facility. After signing his agreement, Mr. Norris continued training at the new Power Plant facility.

8.     In September of 1999, I and others evaluated all of the trainees at the Power Plant, as we did periodically, to determine how the wrestler trainees were progressing. In assessing Mr. Norris's progress, we looked at his charisma, crowd appeal, persona, wrestling skill and physique. Based upon my extensive experience in the wrestling industry and with WCW, these skills are prerequisites to a wrestler receiving wrestling opportunities on the more popular, televised wrestling programming.

9.     Upon evaluating Mr. Norris's skills, we concluded that despite his many years of training, Mr. Norris's persona, character and talents were not particularly notable, and that he did not stand out as a potential star wrestler among the trainees. We also concluded that Mr. Norris was not likely to be a successful wrestler or to advance beyond the level that he had attained at that point as a trainee.

10.      Based on this evaluation of Mr. Norris after his many years of training, WCW terminated his trainee contract in late 1999. This decision had nothing to do with Mr. Norris's race.

FURTHER AFFIANT SAYETH NAUGHT.

This __16th__ day of __December__, 2002.

_(signature)_
PAUL ORNDORFF

Sworn to and subscribed
Before me this __16th__ day
of __December__, 2002.

_(signature)_
Notary Public

My Commission Expires:
Notary Public, DeKalb County, Georgia
My Commission Expires Feb. 10, 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROBERT L. ROSS, JR.,                :

            Plaintiff,              :

vs.                                 :          CIVIL NO. 1:93-CV-1206-JEC

WORLD CHAMPIONSHIP WRESTLING,       :
INC.,                               :

            Defendant.              :

## ORDER

The above entitled action is presently before the Court on the Magistrate Judge's Report and Recommendation [15] granting defendant's Motion For Summary Judgment [11] and denying as moot plaintiff's Motion to Extend Time To April 25, 1994 To Respond To Defendant's Motion For Summary Judgment [12].  Plaintiff has filed no objection(s) to the Magistrate Judge's Report and Recommendation.  The Court has reviewed the record and arguments of the parties and concludes that the Magistrate Judge's Report and Recommendation should be received with approval and adopted as the opinion and order of the Court.

ACCORDINGLY, the Court **ADOPTS** the Magistrate Judge's Report and Recommendation [15] **GRANTING** defendant's Motion For Summary Judgment [11] and **DENYING AS MOOT** plaintiff's Extension Of Time [12].

SO ORDERED, this 19 day of October, 1994.

_____
JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

ENTERED ON DOCKET

OCT 21 1994

U.S. CLERK

BY        DEPUTY CLERK

2

U.S.D.C. ???? ??????
MAY 1 7 1994
LUTHER ?. ????? Clerk
By: _____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROBERT ROSS, JR.,                    :    CIVIL ACTION

    Plaintiff,                       :    NO. 1:93-CV-1206-JEC

    vs.                              :    *Adopted by Judge Carnes*
                                          *via order dated*
WORLD CHAMPIONSHIP WRESTLING, INC., :    *10-19-94*

    Defendant.                       :

## ORDER FOR SERVICE OF REPORT AND RECOMMENDATION

Attached is the report and recommendation of the United States Magistrate Judge made in this action in accordance with 28 U.S.C. § 636 and this Court's Local Rule 260-2. Let the same be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the report and recommendation within ten (10) days of the receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the district court. If no

1

objections are filed, the report and recommendation may be adopted as the opinion and order of the district court and any appellate review of factual findings will be limited to a plain error review. <u>United States v. Slay</u>, 714 F.2d 1093 (11th Cir. 1983), <u>cert. denied</u>, 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984).

The Clerk is directed to submit the report and recommendation with objections, if any, to the district court after expiration of the above time period.

IT IS SO ORDERED, this _____ 17th _____ day of May, 1994.

_____

WILLIAM L. HARPER
UNITED STATES MAGISTRATE JUDGE

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROBERT ROSS, JR.,                    :    CIVIL ACTION

          Plaintiff,                 :    NO. 1:93-CV-1206-JEC

               vs.                   :

WORLD CHAMPIONSHIP WRESTLING, INC.,  :

          Defendant.                 :


## MAGISTRATE JUDGE'S ORDER, REPORT AND RECOMMENDATION


     The above-styled employment discrimination action is
presently before the undersigned Magistrate Judge for
consideration of defendant's motion for summary judgment. For
the reasons set forth below, the undersigned Magistrate Judge
hereby RECOMMENDS that defendant's motion for summary judgment
be GRANTED.


     Defendant filed its motion for summary judgment on March
25, 1994. (Docket No. 11). In a letter dated March 30, 1994,
the Clerk of Court notified plaintiff of the filing of
defendant's summary judgment motion, of his duty to respond,
and of the possible consequences of a failure to respond. On
April 14, 1994, plaintiff filed a motion for an extension of
time within which to respond to defendant's motion, seeking an
extension through and including April 25, 1994. (Docket No.
12). Without the benefit of a ruling on this motion,

AO 72A
(Rev. 8/82)

plaintiff filed an untimely response to defendant's motion for summary judgment on April 26, 1994. (Docket No. 13). Defendant has subsequently filed a reply brief. (Docket No. 14).

As plaintiff's response was not filed until April 26, 1994, this response would be untimely even if the court were to grant plaintiff's motion for an extension of time. Accordingly, plaintiff's motion for an extension of time is hereby DENIED as moot.

Local Rule 220-1(b)(1) provides in relevant part that "[f]ailure to file a response [to a motion] shall indicate that there is no opposition to the motion." Accordingly, as no timely response was filed to defendant's motion for summary judgment, the undersigned Magistrate Judge deems this motion to be unopposed.

The applicability of Local Rule 220-1(b)(1) in the specific context of a motion for summary judgment was considered by the Eleventh Circuit Court of Appeals in Dunlap v. Transamerica Occidental Life Insurance, 858 F.2d 629 (11th Cir. 1988). In upholding the District Court's grant of summary judgment in favor of defendant, the court noted:

2

In <u>Simon v. Kroger Company</u>, 743 F.2d 1544
(11th Cir. 1984) this court upheld the entry of
summary judgment under similar circumstances. The
result in <u>Simon</u> was based upon both a finding that
the summary judgment motion was well supported and
a finding that a local rule in the Northern
District of Georgia--which apparently was the
predecessor to one of these local rules--was
properly applied.

Had the district court based its entry of
summary judgment solely on Local Rule 220-1(b), a
different question would be presented.  Local Rule
220-1(b)(1) might well be inconsistent with
Fed.R.Civ.P. 56 if it were construed to mean that
summary judgment could be granted as a sanction for
failure to respond to a motion for summary
judgment. <u>Cf. Arundar v. DeKalb Cty. School Dist.</u>,
620 F.2d 493 (5th Cir. 1980).  In this case,
however, Transamerica's motion was supported by
evidentiary materials of record, and the district
court's orders indicate that the merits of the
motion were addressed.

<u>Dunlap</u>, 858 F.2d at 632.  <u>See also, Kinder v. Carson</u>, 127
F.R.D. 543, 545 (S.D. Fla. 1989).

The proper approach, therefore, given the applicability
of Local Rule 220-1(b)(1) to the present case is succinctly
stated by the court in <u>Kelly v. United States</u>, 924 F.2d 355,
358 (1st Cir. 1991):

3

In the precincts patrolled by Rule 56, the decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence.  This case is no exception.  Given appellant's failure to contest either the government's affidavits or the Statement, the jurisprudence of both Rule 56 and Local Rule 18 demands that the movant's version of the facts be taken as true.

Of course, the district court was still obliged to consider the motion on its merits, in light of the record as constituted, in order to determine whether judgment would be legally appropriate.  See Mendez v. Banco Popular, 900 F.2d 4, 7 (1st Cir. 1990); Jaroma v. Massey, 873 F.2d 17, 19-20 (1st Cir. 1989) (per curiam); see generally Amsden, 904 F.2d at 753 (court of appeals may reverse a grant of summary judgment, regardless of uncontroverted nature of facts, if "the district court erred in expounding the law").

See also, Anchorage Associates v. Virgin Islands Board of Tax Review, 922 F.2d 168 (3rd. Cir. 1990); Mendez v. Banco Popular de Puerto Rico, 900 F.2d 4, 7-8 (1st. Cir. 1990).

Additionally, the procedural deficiency of plaintiff's response likewise compels this court to accept defendant's statement of material facts not in dispute as true for purposes of ruling on the merits of defendant's motion for

4

summary judgment.  Local Rule 220-5(b)(2) of the Local Rules of Practice for the United States District Court for the Northern District of Georgia provides:

> The respondent to a motion for summary judgment shall attach to his response a separate and concise statement of material facts, numbered separately, to which he contends there exists a genuine issue to be tried.  Response should be made to each of the movant's numbered material facts.  All material facts contained in the moving party's statement which are not specifically controverted by the respondent in his statement shall be deemed to have been admitted.  The response that a party has insufficient knowledge to admit or deny is not an acceptable response unless the party has complied with the provisions of F.R.Civ.P. 56(f).

Plaintiff's response to defendant's motion for summary judgment is not in compliance with Local Rule 220-5(b)(2). Accordingly, and based upon the untimely nature of this response, the undersigned Magistrate Judge adopts defendant's statement of material facts not in dispute for purposes of resolving the merits of defendant's motion for summary judgment.  These facts are briefly summarized below.

Following plaintiff's honorable discharge from military service, he embarked on a career in professional wrestling.

5

AO 72A
(Rev. 8/82)

Plaintiff adopted the ring name of "Ranger Ross," and adopted the persona of a decorated war hero.

After some time wrestling in smaller alliances and federations, plaintiff contacted David Crockett, the owner of the National Wrestling Alliance (NWA), regarding the possibility of wrestling within the NWA. At Crockett's urging, plaintiff attended a wrestling school in North Carolina operated by Nelson Royal. Based upon his observations, Royal notified Crockett that plaintiff was qualified to wrestle for the NWA.[1]

In 1988, the NWA was purchased by World Championship Wrestling, Inc. (WCW). In January 1989, plaintiff began to wrestles for WCW. Plaintiff retained the ring name of "Ranger Ross," and continued to use his assumed persona or gimmick. As was true in plaintiff's earlier professional wrestling experiences, plaintiff was required to provide his own equipment and costume at plaintiff's cost.

In this his first tour of duty with WCW, plaintiff received $1,000.00 per week plus an occasional percentage of

---

[1]  Plaintiff had previously attended a wrestling school in Atlanta, Georgia, conducted by a popular former professional wrestler, Thunderbolt Paterson.

6

the gate at his matches.  Plaintiff wrestled approximately 15 to 20 days per month.

In May 1990, plaintiff was released due to budgetary restraints on the part of WCW.  After his first WCW stint ended, plaintiff wrestled briefly in Japan.  In January 1991, plaintiff was contacted by WCW President Jim Herd.  After discussing the matter with Herd, plaintiff agreed to sign a form entitled "WCW Freelance Wrestler/Independent Contractor Agreement."  Plaintiff read and fully understood this document before signing.  This document provided that plaintiff would be engaged as an independent contractor rather than an employee, and would not enjoy any of the benefits afforded to WCW employees.  Furthermore, the document provided that plaintiff, rather than WCW, would be responsible for the payment of taxes on plaintiff's income pursuant to the agreement.  Plaintiff was to be paid $1,500.00 per week according to this agreement.

During the course of his relationship with WCW, plaintiff's primary contact was WCW Consultant Virgil Runnels (a/k/a Dusty Rhodes).  In his position as WCW Consultant, Runnels was responsible for booking and scheduling wrestling events, for evaluating and recruiting wrestling talent, for pre-determining the final outcome of each wrestling match, and

7

determining which wrestler or wrestlers to "push" into the position of heavyweight champion.

Plaintiff's performance of his work as a professional wrestler can be briefly summarized in the following manner. Plaintiff would receive a booking sheet from Runnels announcing the wrestling match's location and date approximately two weeks to 30 days in advance of the scheduled match. Plaintiff was responsible for travel to the wrestling match site, and was responsible for bearing the cost of such travel. On the date of a match, wrestlers would arrive at the venue, change into their wrestling costumes, and await further instructions. The participants were then informed which wrestler would win each match, and what the finishing move or technique for accomplishing the "victory" would be. The wrestlers were free to choreograph the remainder of the wrestling match on their own. Plaintiff and the other professional wrestlers received little if any other supervision in the performance of their duties.

During the spring and summer of 1991, professional wrestling suffered a decline in popularity. Based upon declining profits, WCW decided not to renew several wrestler's independent contractor agreements. Runnels suggested which wrestlers should be allowed to leave based primarily upon

8

their popularity and drawing power.   Rhodes then suggested which wrestlers to include to WCW President Herd.   Rhodes specifically found that plaintiff lacked the charisma and ability to generate significant fan interest or profit for WCW.   Accordingly, Runnels included plaintiff's name on the list of recommended non-renewals.   Runnels suggestions were accepted by Herd, and plaintiff's contract or agreement expired in July 1991.

In all, 14 wrestlers' independent contractor agreements were not renewed during the summer of 1991.  Plaintiff was the only African American included within this list.  At the time of his discharge, plaintiff received compensation at a higher rate than 10 of the other wrestlers whose contracts were allowed to expire.

During the period of plaintiff's association with WCW, defendant employed approximately 334 male wrestlers.  The vast majority (approximately 300) of these male wrestlers were white.   Plaintiff's rate of compensation was higher than approximately 278 of these other professional wrestlers.

Plaintiff was not "pushed" into the position of heavyweight champion by Runnels and other WCW agents based upon their determination that he lacked the charisma and

9

ability to generate widespread interest in his matches.  It was plaintiff's deficiency in these areas which primarily separated him from three individuals who were allowed to claim the title of heavyweight champion during approximately the same time period.  Of these three individuals, two (Rick Flair and Lex Lugar) were white, while the remaining individual (Ron Simmons) was black.

Runnels actually enlisted plaintiff's aid in pushing Simmons into the position of heavyweight champion.  Plaintiff was portrayed as conditioning Simmons through military training thereby preparing him for an "assault" on the heavyweight championship.

After exhausting his administrative remedies, plaintiff filed his complaint in the above-styled employment discrimination action on June 1, 1993.  (Docket No. 1). Plaintiff's complaint was premised solely upon Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. (Docket No. 1, ¶ 1) (See also, Plaintiff's Answer to Mandatory Interrogatories, Docket No. 2, ¶ 2, which identifies Title VII, albeit incorrectly, as 28 U.S.C. § 2000, et seq.). Within the framework of Title VII, plaintiff leveled the following charges against defendant:

10

a) Created a "glass ceiling" for non-white employees and independent contractors on hiring and promotional policies to positions of World Championship Wrestler;

b) Created a practice and/or unwritten policy of putting non-white employees and independent contractors into the role of subsidiary employment or other position, and without concomitant salary, commission, bonus and title advances;

c) Promoted white employees and independent contractors on a regular basis to higher titles, salaries, commissions and bonuses over non-white employees and independent contractors of longer employment with Defendant, higher performance achievements, better personal skills and management abilities;

d) Denied non-white employees interview (and thus promotion) opportunities on a regular basis; and

e) Replaced non-white employees with equal to or less qualified whites when a white employee for the position could be located and installed.

(Docket No. 1, ¶ 6).

11

Under the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Everett v. Napper, 833 F.2d 1507, 1510 (11th Cir. 1987). On summary judgment, the parties must satisfy the following burdens of proof:

> The party moving for summary judgment bears the initial burden of "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed. R. Civ. P. 56(c)). An issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio

12

Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89
L.Ed.2d 538 (1986).

Once the moving party meets this initial burden,
summary judgment is then appropriate as a matter of
law against the nonmoving party "who fails to make
a showing sufficient to establish the existence of
an element essential to that party's case, and on
which that party will bear the burden of proof at
trial." Celotex, 477 U.S. at 322, 106 S.Ct. at
2552. In making a sufficient showing, the
nonmoving party must "go beyond the pleadings and
by ... affidavits, or by the 'depositions, answers
to interrogatories, and admissions on file,'
designate 'specific facts showing that there is a
genuine issue for trial.'" Id. at 324, 106 S.Ct.
at 2553 (quoting Fed. R. Civ. P. 56(e). In
opposing summary judgment, the nonmoving party may
avail itself of all facts and justifiable
inferences in the record taken as a whole. See
United States v. Diebold, Inc., 369 U.S. 654, 655,
82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). In
reviewing whether the nonmoving party has met its
burden, the court must stop short of weighing the
evidence and making credibility determinations of
the truth of the matter. Anderson, 477 U.S. at
255, 106 S.Ct. at 2513. Instead, "[t]he evidence
of the non-movant is to be believed, and all
justifiable inferences are to be drawn in his
favor." Id. (citing Adickes v. S.H. Kress & Co.,
398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26
L.Ed.2d 142 (1970). If, so viewed, a rational
trier of fact could find a verdict for the

13

nonmoving party under the substantive evidential standard, the nonmoving party can defeat summary judgment. Id. 477 U.S. at 252, 106 S.Ct. at 2512.

Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-9 (11th Cir. 1992).

In order to fall within the statutory jurisdiction of Title VII, alleged discriminatory conduct must take place within the employer/employee relationship. Specifically, an aggrieved individual may only proceed under Title VII where that individual is an employee rather than an independent contractor. See, e.g., Wilde v. County of Kandiyohi, 15 F.3d 103, 104 (8th Cir. 1994); Cobb v. Sun Papers, Inc., 673 F.2d 337 (11th Cir. 1982), cert. denied, 459 U.S. 874, 103 S.Ct. 163, 74 L.Ed.2d 135 (1982).

In order to determine whether a particular individual is an employee or an independent contractor, courts are to employ common law principles of agency. See, Cobb, 673 F.2d at 341. See also, Nationwide Mutual Insurance Co. v. Darden, 503 U.S. ____, 112 S.Ct. 1344, 117 L.Ed.2d 581, 588-90 (1992). Among the factors to be considered in making this determination are the following: the hiring party's right to control, the level of skill required, the source of equipment and tools, the location of the work, the duration of the relationship between

14

the parties, the right to assign additional work, the method of payment, whether the work in question is an essential part of the hiring party's business in general, the provision of employee benefits, the tax status of the parties, and the intent of the parties. Darden, 117 L.Ed.2d at 589-90 (citing, Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751-52, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)). The application of these factors to the undisputed facts in the present case creates a somewhat "mixed" result. See, Cobb, supra. After carefully weighing these factors, as discussed below, however, the undersigned Magistrate Judge finds that plaintiff was an independent contractor, and that his complaints of alleged discrimination therefore fall outside of the statutory jurisdiction of Title VII.

As to the level of defendant's control over the means and manner of plaintiff's performance, the undisputed facts establish that this control was minimal. Plaintiff was allowed to create his own wrestling persona or gimmick. Furthermore, while the nature of the ending of each match was determined by defendant, plaintiff and his opponent were largely free to choreograph the bulk of the action. The balance struck between control and independence of action in this case is thus completely compatible with a finding that plaintiff was an independent contractor rather than an

15

employee. <u>See, e.g., North American Van Lines, Inc. v. NLRB</u>, 869 F.2d 596, 599 (D.C. Cir. 1989).

As to the issue of the skill level required in plaintiff's performance of his duties, plaintiff has testified regarding the fact that he attended two separate professional wrestling schools in order to receive training. Furthermore, plaintiff admitted that an individual lacking in such training would not be qualified to perform as a professional wrestler. Furthermore, plaintiff stated that defendant required him to be evaluated at the second of these wrestling schools in order to determine whether or not he was qualified for the position. Accordingly, this factor also weighs in favor of a finding that plaintiff was an independent contractor.

Plaintiff admits that with the exception of a rope on one occasion and perhaps one pair of boots, he was solely responsible for the provision of his equipment and costumes at his own expense. Therefore, this factor weighs in favor of a finding that plaintiff was an independent contractor.

As to the location of plaintiff's work, it is undisputed that defendant informed plaintiff of the location of his various matches. As defendant controlled the location of

16

AO 72A
(Rev. 8/82)

plaintiff's work, this factor would tend to weigh against a finding that plaintiff was an independent contractor.

In this case, it is undisputed that plaintiff and defendant's relationship was specifically contracted for a period of six months. This specified period of time for a short duration is consistent with a finding that plaintiff was an independent contractor.

It would not appear that plaintiff had the right or ability to assign his performance to other individuals or assistants. Accordingly, this factor weighs against a finding that plaintiff was an independent contractor rather than an employee. Likewise, the fact that plaintiff was paid a salary, rather than a commission, for the vast majority of his work also tends to weigh against a finding that plaintiff was an independent contractor.

As defendant's sole business is the promotion and performance of professional wrestling matches for profit, the work performed by plaintiff and his fellow grapplers is, of course, essential to defendant's business. The undersigned notes defendant's argument, however, that professional wrestlers often move between federations and alliances and are, in one certain sense, a "fungible good." The undersigned

17

finds ultimately with regard to this factor that it does not weigh heavily toward the conclusion that plaintiff was an independent contractor nor does it suggest that plaintiff was an employee.

The undisputed evidence establishes that plaintiff did not receive any fringe benefits with regard to his relationship with defendant. Furthermore, the agreement entered into between plaintiff and defendant expressly states that plaintiff is not eligible for any benefits provided to defendant's employees. Similarly, plaintiff was responsible for the payment of taxes on money received pursuant to the agreement. Accordingly, the undersigned finds that this factor weighs heavily in favor of a finding that plaintiff was in fact an independent contractor.

Finally, the undersigned considers the question of the party's intent. In the present case, the undisputed evidence inevitably points to the conclusion that both defendant and plaintiff intended to form an independent contractor relationship, and that each party considered the resulting relationship to be, in fact, an independent contractor relationship. Accordingly, the undersigned finds that this factor also weighs heavily in favor of a finding that plaintiff was an independent contractor.

18

As noted above, the application of this common law test to the facts in the present case generates mixed results. Without giving dispositive weight to any particular factor, the undersigned notes that generally the intent of the parties and the level of control over the performance of the individual's work are considered persuasive factors. Based upon the facts of this case, both of these factors point to a finding that plaintiff was an independent contractor. Additionally, the undersigned finds that the balancing of the remaining elements of this test also indicate that plaintiff was an independent contractor.

Accordingly, the undersigned Magistrate Judge finds that plaintiff's relationship with defendant was that of an independent contractor, and that his claims of discriminatory treatment therefore fall outside of the jurisdictional scope of Title VII. Therefore, defendant is entitled to summary judgment in its favor based solely upon this ground.

The undersigned notes, however, that alternative grounds clearly exist in support of this outcome. Specifically, the undersigned finds that plaintiff has failed to meet his burden of producing some evidence which raises a material question of fact as to discriminatory intent on the part of defendant.

19

The basic standards for evaluating a motion for summary judgment have been set forth above. Other standards specific to claims of discrimination under Title VII are essential to an evaluation of defendant's motion on its merits.

It should be noted that conclusory allegations based on mere subjective beliefs do not create a genuine issue of material fact. Carter v. Miami, 870 F.2d 578, 585 (11th Cir. 1989); Ramsey v. Leath, 706 F.2d 1166, 1170 (11th Cir. 1983). See also, Earley v. Champion International Corp., 907 F.2d 1077, 1081 (11th Cir. 1990) (collecting cases). Specifically, in regards to plaintiff's claim under Title VII of the Civil Rights Act of 1964, it is well established that a Title VII plaintiff opposing a motion for summary judgment must present significantly probative evidence on the issue of discrimination to avoid summary judgment. Young v. General Foods Corp., 840 F.2d 825 (11th Cir. 1988), cert. denied, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989); Grigsby v. Reynolds Metals Co., 821 F.2d 590 (11th Cir. 1987). Reliance solely upon speculation and unsubstantiated hearsay constitutes a failure to meet this burden. See, e.g., Palucki v. Sears, Roebuck and Co., 879 F.2d 1568 (7th Cir. 1989) ("a party to a lawsuit cannot ward off summary judgment with an affidavit or deposition based on rumor or conjecture"); Benson v. Vermont American Corp., 723 F.Supp. 1439 (M.D. Ala. 1988)

20

("inadmissible evidence offered in the form of a deposition, cannot be considered by the court"), aff'd without opinion, 874 F.2d 820 (11th Cir. 1989); Williams v. Housing Authority, 709 F.Supp. 1554 (M.D. Fla. 1988) ("the court cannot base direct-evidence analysis on hearsay testimony by plaintiff"), aff'd without opinion, 872 F.2d 434 (11th Cir. 1989).

A Title VII plaintiff may demonstrate discriminatory intent through either direct or indirect evidence. Direct evidence consists of the actions or remarks of an employer reflecting a discriminatory attitude. Wall v. Trust Company of Georgia, 946 F.2d 805, 809-10 (11th Cir. 1991); Hill v. Metropolitan Atlanta Rapid Transit Authority, 841 F.2d 1533, 1539 (11th Cir. 1988), modified, 848 F.2d 1522 (11th Cir. 1988). See also, Bell v. Birmingham Linen Service, 715 F.2d 1552, 1556 (11th Cir. 1983), cert. denied, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984). Indirect evidence may be demonstrated through the framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). For example, an individual may produce indirect evidence of a discriminatory failure to hire by establishing that he is a member of a protected group and that he "applied for an available position for which [he]

21

was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." Burdine, 450 U.S. at 253. This framework, however, is flexible, and can be shaped to fit employment practices other than failure to hire.

If a plaintiff presents direct evidence of discrimination, the burden of proof shifts to defendant to establish that it would have reached the identical employment decision absent unlawful considerations. See, Wall, 946 F.2d at 810 (citing, Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)).

Conversely, where the plaintiff has established a prima facie case of discrimination through indirect evidence a burden of production shifts to the employer "to articulate some legitimate, non-discriminatory reason for the employee's rejection." McDonnell Douglas Corp., 411 U.S. at 802. If the defendant carries this burden, the plaintiff must then prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were merely pretexts for discrimination. Id. at 804; Wall, 946 F.2d at 809; Perryman v. Johnson Products Co., 698 F.2d 1138, 1142 (11th Cir. 1983). If the trier of fact rejects defendant's proffered reason as incredible, this rejection, coupled with the elements of

22

plaintiff's _prima facie_ case, may alone support a finding of pretext.  St. Mary's Honor Center v. Hicks, _____ U.S. _____, 113 S.Ct. 2742, 125 L.Ed.2d 407, 61 U.S.L.W. 4782, 4784 (1993).

The undersigned first notes that plaintiff has failed to submit any admissible evidence into the record tending to support his claim of discrimination or tending to discredit the affidavit testimony offered by defendant in support of its motion for summary judgment.  Instead, plaintiff's deposition testimony is littered with admissions that he has little if any actual knowledge regarding the alleged disparities which existed between him and other supposedly similarly situated white professional wrestlers.  (Deposition of Robert Lee Ross, Jr., hereinafter Ross Dep., pp. 118, 120, 124, 125-26). Plaintiff admits that no direct evidence of discrimination exists.  (Ross Dep., p. 150).  Additionally, the undisputed affidavit testimony offered by defendant is clearly contrary to plaintiff's vague allegations of disparate treatment. Specifically, this testimony indicates that defendant employed approximately 334 male wrestlers during the time that plaintiff wrestled with the WCW.  Of this number, approximately 300 were white. Significantly, 278 individuals (the vast majority of them white) earned less compensation

23

than plaintiff. (Affidavit of Eric Holman, hereinafter Holman Aff., ¶¶ 5 and 6).

As noted above, this testimony is not refuted by plaintiff. Instead, plaintiff's untimely response to defendant's motion for summary judgment is entirely devoted to the argument that plaintiff is entitled to proceed to trial on his claims pursuant to 42 U.S.C. § 1981 as well as his pendant state claims. Significantly, none of these claims were raised by plaintiff in his complaint nor referred to in his answer to mandatory interrogatories. Instead, these phantom allegations appear for the first time in plaintiff's untimely response. In sum, the only evidence arguably offered by plaintiff in contradiction to defendant's affidavit testimony are his conclusory allegations during the course of his deposition that defendant engaged in discrimination against black professional wrestlers. The record is devoid, however, of any admissible evidence tending to establish that similarly situated white wrestlers were given favorable treatment.

Assuming arguendo, however, that plaintiff had established sufficient probative evidence of discrimination to raise a material question of fact as to each element of his prima facie case, defendant has clearly discharged its duty to articulate a legitimate, non-discriminatory reason for its

24

actions. In short, the undisputed testimony establishes that Runnels and Herd jointly made the decision not to renew plaintiff's independent contractor agreement based upon his lack of wrestling skill, professional growth, popularity, and gate appeal. (Affidavit of James Herd, hereinafter Herd Aff., ¶ 6; Affidavit of Virgil Runnels, hereinafter Runnels Aff., ¶¶ 6-7).

The undersigned is aware of the recent precedent of this circuit that summary judgment is generally inappropriate in Title VII cases where a plaintiff has established sufficient evidence of each element of his prima facie case. Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 919 (11th Cir. 1993). The entry of summary judgment in favor of defendant is still appropriate, however, "when evidence of discriminatory intent is totally lacking." Hairston, 9 F.3d at 921. In the present case, plaintiff has failed to present one shred of admissible evidence which would tend to establish that defendant's proffered legitimate, non-discriminatory reason was pretextual, or to otherwise establish discriminatory intent on the part of defendant. In view of this fact, defendant is entitled to summary judgment in its favor even in light of the demanding standards set forth in Hairston, supra.

Based upon the above facts, the undersigned Magistrate Judge hereby RECOMMENDS that defendant's motion for summary judgment be GRANTED.

IT IS SO ORDERED, REPORTED AND RECOMMENDED, this 17th day of May, 1994.

WILLIAM L. HARPER

UNITED STATES MAGISTRATE JUDGE



ENTR
MAY 19 1994
L.E.T. CLERK
BY DEPUTY CLERK

26



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 23 2011

JAMES N. HATTEN, Clerk
By: J. Metz
Deputy Clerk

Davis v. World Championship Wrestling, Inc. and Turner Sports, Inc., Civ. File No. 1-00-CV-1716-CC;
Saengsiphan v. World Championship Wrestling, Inc. and Turner Sports, Inc., Civ. File No. 1-00-CV-1719-CC;
Speight v. World Championship Wrestling, Inc. and Turner Sports, Inc., Civ. File No. 1-00-CV-1718-CC;
Worthen v. World Championship Wrestling, Inc. and Turner Sports, Inc., Civ. File No. 1-00-CV-1717-CC;
Reeves v. World Championship Wrestling, Inc. and Turner Sports, Inc., Civ. File No. 1-00-CV-1720-CC;
Easterling v. World Championship Wrestling, Inc. and Turner Sports, Inc., Civ. File No. 1-00-CV-1715-CC
Onoo v. World Championship Wrestling, Inc., Turner Sports, Inc., Civ. File No. 1:00-CV-0368-CC
Norris v. World Championship Wrestling, Inc., Turner Sports, Inc., Civ. File No. 1:00-CV-0369-CC
Walker v. World Championship Wrestling, Inc., Turner Sports, Inc., Civ. File No. 1:00-CV-0367-CC; Patterson v. World Championship Wrestling, Inc., Turner Sports, Inc., Turner Entertainment Group, Inc. Civ. File No. Civ. File No. 1:01-CV-1152-CC

### PLAINTIFFS' RULE 26(a)(2) DISCLOSURES OF EXPERT TESTIMONY OF J. STEVE HICKS

Pursuant to Federal Rule of Civil Procedure 26(a)(2), Plaintiffs hereby identify the expert testimony of J. Steve Hicks as follows:

**A.   Opinions, Basis and Reasons:**

Professional wrestling is a staged event.  The outcome of these events are predetermined by writers, who create various stories and storylines for wrestling programs and events.

One measure of success in wrestling is whether an individual is scripted to hold a championship title.  The most

prestigious title for WCW is the World Heavyweight title, which
is an individually held title.

From the date that WCW first had a Heavyweight Champion,
July 14, 1991, through the date on which the first of these
lawsuits was filed, February 11, 2000, 3,286 days, WCW had only
one African-American Heavyweight Champion, Ron Simmons.  Mr.
Simmons held the title for 150 days, from August 2, 1992 until
December 30, 1992, i.e., that is 4.56 percent of the total
possible days.  WCW has never had an Asian or Hispanic
Heavyweight Champion.

As for other titles, I conducted an evaluation of the
racial composition of various WCW titles.  I found the following
with regard to titles:

WCW World Tag Team Title: Caucasian (86.4%), Black (6.2%)
and Asian (0%).
WCW United States Title: Caucasian (86.1%), Black (0%) and
Asian (2.8%).
WCW World TV Title: Caucasian (77.1%), Black (5.7%) and
Asian (5.7%).

Another measure of success in professional wrestling is
appearing in pay-per-view (PPV) events.  PPV events are the
cable broadcast events in which viewers pay cable providers fees
for viewing the offered programming.  Wrestling organizations
typically feature and showcase the wrestlers they are pushing,

- 2 -

i.e., promoting, in PPV events. Wrestlers are often paid
additional amounts for the PPV appearances.

During the period of its existence, WCW produced a
significant number of PPV events. In the vast majority of those
events, and in the aggregate, minorities, specifically African-
Americans and Asians were grossly underrepresented in those
events.

I have attached hereto a series of summaries of WCW PPV
events. I have also calculated the aggregate representation of
minority wrestlers in PPV events. My findings are as follows:

| Event | Percentage Blacks | Percentage Asian |
|-------|-------------------|------------------|
| Bash at the Beach | 7.66 | 1.44 |
| Fall Brawl | 7.92 | 1.49 |
| World War III | 2.36 | 3.94 |
| Uncensored | 10.26 | 1.28 |
| Superbrawl | 9.13 | 2.88 |
| Starcade | 8.07 | 7.45 |
| Spring Stampede | 8.40 | 4.20 |
| Souled Out | 3.16 | 1.05 |
| Slamboree | 7.39 | 3.98 |
| Road Wild | 6.30 | 1.57 |
| Mayhem | 5.36 | 3.57 |
| Great American Bash | 7.46 | 1.49 |
| Miscellaneous PPVs | 6.67 | 5.56 |
| Total (1987 total) | 6.99 | 3.02 |

Based upon my viewing nearly every WCW televised match that
has occurred in the past seven (7) years or more, and based upon

- 3 -

the statistical data I have accumulated over the years, it is my opinion that racism is prevalent in professional wrestling and in the WCW in particular.

**B. Data Considered:**

My opinions in this case are based upon my experience as a reporter in the wrestling industry and my review of relevant data. I have followed professional wrestling my entire adult life and am the publisher of a wrestling industry publication entitled *DragonKing Update Report*. I have been publishing *DragonKing Update Report* since 1999. It has a circulation base of approximately 5,000 readers and is read in the United States and internationally. As the writer and publisher of *DragonKing Update Report*, I use the pen name Karl Stern. Prior to publishing the *DragonKing Update Report* I published a similar wrestling newsletter called the *Global Pro-wrestling News* from 1994-1996. I am also the publisher of *The Ultimate History of Pro Wrestling* (2000) and *The Ultimate Pro Wrestling Book of Lists, Vols. I and II*.

As a consequence of my affiliation with *DragonKing Update Report*, I have maintained records that reflect the content and outcome of professional wrestling matches and events for various professional wrestling organizations, including the WCW, that date back to the early to mid-1990s. I have records that document who participated in, won, and lost every WCW PPV Event

- 4 -

since WCW's inception.   I have similar records for every WCW
Nitro and Thunder event since 1997.   I maintain a library of
wrestling reference books, including every edition of the annual
*Wrestling Almanac* (a Pro Wrestling Illustrated publication).

My opinions in this case are based upon my experience as a
reporter in the wrestling industry, the records I have
maintained and my library of wrestling reference books.

**C.   Exhibits to be Used:**

At this time, I have not identified any exhibits that I
plan to utilize at trial.

Plaintiffs reserve the right to have Sgt. Hicks utilize
exhibits at trial.   Plaintiffs will supplement this response as
necessary.

**D.   Qualifications:**

I am a full time law enforcement officer with the
Haleyville, Alabama Police Department.   I have been in law
enforcement for approximately ten (10) years.

As noted above, I have followed wrestling my entire adult
life and am the publisher of a wrestling industry publication
entitled *DragonKing Update Report*, which has been in publication
since 1999 and has a circulation base of approximately 5,000
readers, both domestically and internationally.   Prior to
publishing the *DragonKing Update Report*, I published a similar
wrestling newsletter, the *Global Pro-wrestling News* from 1994-

- 5 -

1996.   I am also the publisher of *The Ultimate History of Pro Wrestling* (2000) and *The Ultimate Pro Wrestling Book of Lists, Vols. I and II.*

I have maintained records that reflect the content and outcome of professional wrestling matches and events for the various professional wrestling organizations that date back to the early to mid-1990s.   I have records that document who participated in, won and lost every WCW Pay-Per-View Event since WCW's inception.   I also have records of this data for every Nitro and Thunder event since 1997.

I maintain a library of wrestling reference books, including every edition of the annual *Wrestling Almanac* (a Pro Wrestling Illustrated publication).

**E.**   **Compensation:**

None.

**F.**   **Other cases in which I have testified as an Expert at Trial or by Deposition within the Preceding Four (4) Years:**

None.

J. Steve Hicks
Steve Hicks

Plaintiffs specifically reserve the right to supplement this disclosure in any manner permitted under the Federal Rules of Civil Procedure, the Local Rules of this Court or any other applicable law.

- 6 -

This $\mathcal{I}\mathcal{U}^{\not\perp}$ day of September, 2002.

Cary Ichter
Georgia Bar No. 382515
Kelly Jean Beard
Georgia Bar No. 044380
Charles J. Gernazian
Georgia Bar No. 291703
Michelle M. Rotheneberg-Williams
Georgia Bar No. 615680

**MEADOWS, ICHTER & BOWERS, P.C.**
Eight Piedmont Center, Suite 300
3525 Piedmont Road
Atlanta, GA  30305
Telephone:  (404) 261-6020
Telecopy:   (404) 261-3656

- 7 -

## CERTIFICATE OF SERVICE

This is to certify that I have this date served counsel to this action with the foregoing **PLAINTIFFS' RULE 26(a)(2) DISCLOSURES OF EXPERT TESTIMONY OF J. STEVE HICKS** via hand delivery addressed as follows:

> John J. Dalton
> James Lamberth
> Evan Pontz
> Troutman Sanders LLP
> Suite 5200, Bank of America Plaza
> 600 Peachtree Street, N.E.
> Atlanta, Georgia  30308-22165

This ___ day of September, 2002.

Michelle M. Rothenberg-Williams

MEADOWS, ICHTER & BOWERS, P.C
Eight Piedmont Center, Suite 300
3525 Piedmont Road, N.E.
Atlanta, Georgia  30305
(404) 261-6020

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|------|---------------------------|-----------------|-------------|-----------------|-------------|
| 17-Jul-94 | 20 | 0 | 0.00% | 0 | 0.00% |
| 16-Jul-95 | 25 | 3 | 12.00% | 0 | 0.00% |
| 7-Jul-96 | 40 | 4 | 10.00% | 0 | 0.00% |
| 13-Jul-97 | 30 | 1 | 3.33% | 3 | 10.00% |
| 12-Jul-98 | 26 | 4 | 15.38% | 0 | 0.00% |
| 11-Jul-99 | 43 | 2 | 4.65% | 0 | 0.00% |
| 9-Jul-00 | 25 | 2 | 8.00% | 0 | 0.00% |
| | | | | | |
| TOTALS | 209 | 16 | 7.66% | 3 | 1.44% |

**(PPV)**

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|---|---|---|---|---|---|
| 18-Sep-94 | 27 | 0 | 0.00% | 0 | 0.00% |
| 17-Sep-95 | 30 | 4 | 13.33% | 0 | 0.00% |
| 15-Sep-96 | 24 | 3 | 12.50% | 0 | 0.00% |
| 14-Sep-97 | 28 | 2 | 7.14% | 1 | 3.57% |
| 13-Sep-98 | 27 | 3 | 11.11% | 0 | 0.00% |
| 12-Sep-99 | 26 | 2 | 7.69% | 1 | 3.85% |
| 17-Sep-00 | 40 | 2 | 5.00% | 1 | 2.50% |
| | | | | | |
| **TOTALS** | **202** | **16** | **7.92%** | **3** | **1.49%** |

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|---|---|---|---|---|---|
| 26-Nov-95 | 63 | 1 | 1.59% | 5 | 7.94% |
| 24-Nov-96 | 66 | 2 | 3.03% | 1 | 1.52% |
| 23-Nov-97 | 61 | 1 | 1.64% | 2 | 3.28% |
| 22-Nov-98 | 64 | 2 | 3.13% | 2 | 3.13% |
| | | | | | |
| TOTAL | 254 | 6 | 2.36% | 10 | 3.94% |

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|---|---|---|---|---|---|
| 19-Mar-95 | 24 | 3 | 12.50% | 0 | 0.00% |
| 24-Mar-96 | 33 | 2 | 6.06% | 0 | 0.00% |
| 16-Mar-97 | 27 | 2 | 7.41% | 1 | 3.70% |
| 15-Mar-98 | 19 | 1 | 5.26% | 0 | 0.00% |
| 14-Mar-99 | 22 | 4 | 18.18% | 1 | 4.55% |
| 19-Mar-00 | 31 | 4 | 12.90% | 0 | 0.00% |
| | | | | | |
| TOTALS | 156 | 16 | 10.26% | 2 | 1.28% |

**WCW SUPERBRAWL (PPV)**

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|---|---|---|---|---|---|
| 20-Feb-94 | 24 | 3 | 12.50% | 0 | 0.00% |
| 19-Feb-95 | 26 | 3 | 11.54% | 0 | 0.00% |
| 11-Feb-96 | 34 | 4 | 11.76% | 0 | 0.00% |
| 23-Feb-97 | 29 | 2 | 6.90% | 2 | 6.90% |
| 22-Feb-98 | 21 | 2 | 9.52% | 2 | 9.52% |
| 21-Feb-99 | 22 | 1 | 4.55% | 0 | 0.00% |
| 20-Feb-00 | 27 | 3 | 11.11% | 0 | 0.00% |
| 19-Feb-01 | 25 | 1 | 4.00% | 2 | 8.00% |
| | | | | | |
| TOTAL | 208 | 19 | 9.13% | 6 | 2.88% |
| | | | | | |
| | | | | | |
| | | | | | |

**WCW STARCADE
(PPV)**

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|---|---|---|---|---|---|
| 27-Dec-94 | 20 | 4 | 20.00% | 0 | 0.00% |
| 27-Dec-95 | 17 | 1 | 5.88% | 7 | 41.18% |
| 29-Dec-96 | 18 | 0 | 0.00% | 3 | 16.67% |
| 28-Dec-97 | 21 | 1 | 4.76% | 0 | 0.00% |
| 27-Dec-98 | 18 | 2 | 11.11% | 0 | 0.00% |
| 18-Dec-99 | 36 | 4 | 11.11% | 0 | 0.00% |
| 17-Dec-00 | 31 | 1 | 3.23% | 2 | 6.45% |
| | | | | | |
| **TOTAL** | **161** | **13** | **8.07%** | **12** | **7.45%** |

# W SPRING STAMPEDE
## (PPV)

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|------|---------------------------|-----------------|-------------|-----------------|-------------|
| 17-Apr-94 | 24 | 1 | 4.17% | 2 | 8.33% |
| 6-Apr-97 | 18 | 2 | 11.11% | 2 | 11.11% |
| 19-Apr-98 | 24 | 1 | 4.17% | 1 | 4.17% |
| 11-Apr-99 | 23 | 1 | 4.35% | 0 | 0.00% |
| 16-Apr-00 | 30 | 5 | 16.67% | 0 | 0.00% |
| | | | | | |
| TOTAL | 119 | 10 | 8.40% | 5 | 4.20% |

**WCW SOULED OUT**
**(PPV)**

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|------|------|------|------|------|------|
| 25-Jan-97 | 18 | 0 | 0.00% | 1 | 5.56% |
| 24-Jan-98 | 28 | 1 | 3.57% | 0 | 0.00% |
| 17-Jan-99 | 22 | 0 | 0.00% | 0 | 0.00% |
| 16-Jan-00 | 27 | 2 | 7.41% | 0 | 0.00% |
| | | | | | |
| **TOTAL** | 95 | 3 | 3.16% | 1 | 1.05% |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|---|---|---|---|---|---|
| 22-May-94 | 20 | 1 | 5.00% | 0 | 0.00% |
| 21-May-95 | 30 | 3 | 10.00% | 1 | 3.33% |
| 19-May-96 | 42 | 3 | 7.14% | 1 | 2.38% |
| 18-May-97 | 24 | 3 | 12.50% | 4 | 16.67% |
| 17-May-98 | 16 | 0 | 0.00% | 1 | 6.25% |
| 9-May-99 | 22 | 2 | 9.09% | 0 | 0.00% |
| 7-May-00 | 22 | 1 | 4.55% | 0 | 0.00% |
| | | | | | |
| TOTAL | 176 | 13 | 7.39% | 7 | 3.98% |

**(PPV)**

(a/k/a Hogg Wild)

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|---|---|---|---|---|---|
| 10-Aug-96 | 44 | 1 | 2.27% | 2 | 4.55% |
| 9-Aug-97 | 24 | 2 | 8.33% | 0 | 0.00% |
| 8-Aug-98 | 31 | 1 | 3.23% | 0 | 0.00% |
| 14-Aug-99 | 28 | 4 | 14.29% | 0 | 0.00% |
| | | | | | |
| TOTAL | 127 | 8 | 6.30% | 2 | 1.57% |

# WCW MAYHEM
## (PPV)

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|------|---------------------------|-----------------|-------------|-----------------|-------------|
| 21-Nov-99 | 23 | 1 | 4.35% | 0 | 0.00% |
| 26-Nov-00 | 33 | 2 | 6.06% | 2 | 6.06% |
|  |  |  |  |  |  |
| TOTAL | 56 | 3 | 5.36% | 2 | 3.57% |

# GREAT AMERICAN BASH
## (PPV)

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|------|---------------------------|-----------------|-------------|-----------------|-------------|
| 18-Jun-95 | 25 | 3 | 12.00% | 0 | 0.00% |
| 16-Jun-96 | 22 | 1 | 4.55% | 0 | 0.00% |
| 15-Jun-97 | 22 | 2 | 9.09% | 2 | 9.09% |
| 14-Jun-98 | 19 | 2 | 10.53% | 0 | 0.00% |
| 13-Jun-99 | 22 | 1 | 4.55% | 0 | 0.00% |
| 11-Jun-00 | 24 | 1 | 4.17% | 0 | 0.00% |
| | | | | | |
| TOTALS | 134 | 10 | 7.46% | 2 | 1.49% |

| DATE | TITLE OF PPV | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|---|---|---|---|---|---|---|
| 13-Aug-00 | New Blood Rising | 28 | 1 | 3.57% | 3 | 10.71% |
| 14-Jan-01 | Sin | 34 | 2 | 5.88% | 2 | 5.88% |
| 18-Mar-01 | Greed | 28 | 3 | 10.71% | 0 | 0.00% |
| | | | | | | |
| TOTALS | | 90 | 6 | 6.67% | 5 | 5.56% |



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)



# *MEMORANDUM*

**TO:** Brad Siegel
**FROM:** Meredith Young
**DATE:** December 14, 2000
**RE:** WCW Audience Composition
**CC:** Aaron Blitzstein, Gary Juster, Craig Leathers, Rob Garner, Sharon Sidello, Annette Yother,  Alan Sharp, Ken Leiker, Diana Myers, Kelley Komminsk, Kathy Shelley, Chelsea Reeves, Lisa Sturgis

Detailed below are audience composition figures for WCW's cable programming.  The percentages represent combined averages of NITRO and THUNDER produced during September, 2000.

Let me know if you have any questions or require further information.

| TERRITORIES | | EDUCATION | |
|---|---|---|---|
| Northeast | 25% | No College | 40% |
| East Central | 18% | Some College | 24% |
| West Central | 10% | 4+ years of College | 11% |
| Southeast | 26% | **OCCUPATION** | |
| Southwest | 11% | White Collar | 27% |
| Pacific | 9% | Blue Collar | 42% |
| **COUNTY SIZE** | | Not Working | 32% |
| A | 28% | **PRESENCE OF CHILDREN** | |
| B | 33% | Any less than 18 | 52% |
| C & D | 39% | Any less than 12 | 37% |
| **HOUSEHOLD SIZE** | | Any less than 6 | 17% |
| 1 Person | 11% | Children 6-11 | 26% |
| 2 Persons | 27% | Children 12-17 | 32% |
| 3+ Persons | 23% | **ADULTS** | **78%** |
| 4+ Persons | 39% | **FEMALES** | |
| **HOH AGE** | | 18+ | 26% |
| Less than 34 | 28% | 18-34 | 11% |
| 35-54 | 50% | 18-49 | 17% |
| 55-64 | 11% | 25-54 | 15% |
| 65+ | 11% | 55+ | 7% |
| **HOUSEHOLD INCOME** | | **MALES** | |
| $20K-$30K | 15% | 18+ | 52% |
| $30K-$40K | 10% | 18-34 | 21% |
| $40K-$60K | 24% | 18-49 | 38% |
| $60K+ | 20% | 25-54 | 35% |
| **RACE** | | 55+ | 11% |
| White | 79% | **NON-ADULTS** | |
| Non-White | 21% | Kids 2-11 | 12% |
| | | Teens 12-17 | 10% |

*Source: Nielsen Media Research, PNFII 9/00*



PLAINTIFF'S
EXHIBIT
72

**WCW 019288
CONFIDENTIAL**



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

# WCW Diversity Training
## 6/12/99
## Baltimore, MD

## 7:00 PM

1. Brutal Adams
2. Stevie Ray
3. Brian Knobbs
4. Hulk Hogan
5. Kevin Nash
6. Says that's at the Bar
7.
8. Chris Benoit
9. Scott Hall
10.
11. Hulk Hoganman
12. Rodney King
13. Malcolm X
14. David Duke
15. Al Sharpton
16. Jesse Jackson
17. Rush Limbaugh
18. Jimmy the Greek
19. Howard Cosell
20.



PLAINTIFF'S
EXHIBIT
18
3/19

CONFIDENTIAL
X 001561

WCW Diversity Training
6/12/99
Baltimore, MD

7:00 PM

1. Mickie Jay
2. Jerry Flynn
3. Michael Boitea
4. Curt Hennig
5. Mike King
6. Mike Hughes
7. Hak
8. Ross Forman
9. Randy Thornton
10. K. Bugg
11. Steve Borden
12. Rick Steiner
13. Scott Steiner
14. Craig Cinterage
15. Chris Deist
16. Jimmy F.
17.
18. Stephanie "Debacle"
19. Nora Greenwald
20.

CONFIDENTIAL
X 001566

# WCW Diversity Training
## 6/12/99
## Baltimore, MD

# 7:00 PM

1. Kennett M. Blackwashr ?
2. _S Wff_
3. Elizabeth Hulett ?
4. Eric B ?
5. _Ann Sull_
6. P Widn ?
7. Dusty Rhodes
8.
9.
10.
11.
12.
13.
14.
15.
16.
17.
18.
19.
20.

CONFIDENTIAL
X 001567



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

## AFFIDAVIT OF MOSES WILLIAMS

STATE OF GEORGIA
COUNTY OF FULTON

Personally appeared before the undersigned officer, duly authorized to administer oaths, Moses Williams, who, upon having been first duly sworn, deposed on oath and states:

1.

I worked for World Championship Wrestling ("WCW") in various capacities. I was initially hired as a stage carpenter in October, 1991, and worked as a stage coordinator when my employment was severed by WCW in March, 2001.

2.

In addition to the work that I did at WCW, I have extensive experience in stage production, and have worked on many large events. Among other clients, I have worked with entertainment groups such as the Rolling Stones and Michael Jackson. I was also involved in Farm Aid.

3.

Throughout the approximate nine and one-half years of working with WCW, I was always a very loyal and dedicated employee. I was extremely courteous to all personnel, and treated everyone with respect. I was also very respectful of managers and officials at WCW.

4.

Even though I was always very dedicated to WCW, I observed many actions that demonstrated a racial or ethnic bias against anybody who was not a Caucasian. I myself, am African-American. Although some of the WCW officials were more overt about their racial biases than others, I believe that there were many actions and decisions that were made based on a racial or ethnic bias.

5.

Over the years, I observed certain WCW officials make
statements and take actions in order to protect the "good old
boy" establishment. Unfortunately, the "good old boy"
establishment was exclusively Caucasian. Also, in my
experience, the favoritism and better treatment given to
Caucasians over minorities was pervasive throughout WCW.

6.

During nine and a half years at WCW, WCW never had an
African-American work in Security in any capacity. I even
recommended some qualified persons for Security, but they were
not hired. The decision-maker, Mr. Doug Dillinger, expressly
stated that there would not be a black "security" person at WCW.
True to his word, there never was an African-American hired to
work in Security. As I indicate further in this affidavit, Mr.
Dillinger made other statements showing his racial bias.

7.

Similarly, there was never an African-American hired to
work in Lighting at WCW. The decision-maker was Frank Santoro.
Mr. Santoro overlooked many qualified African-Americans. I
personally recommended several qualified African-Americans
directly to Mr. Santoro, but he did not hire an African-American
person for Lighting.

8.

Similarly, Mr. Santoro was also responsible for hiring
truck drivers for the WCW tractor-trailers. In the years I was
with WCW, I only recall one African-American truck driver
(female). She was involved in a minor incident, whereby she
collided with a painted post (or similar fixture) and did a
little damage to the truck. The truck had been leased, and I
myself inspected the truck. I did not see any significant
damage to the truck. The woman was crying as she told me that
Frank Santoro fired her for the accident. I did not feel this
was fair because I was aware of at least two Caucasian drivers
who were involved in much more serious accidents, but were not
fired. One Caucasian driver was involved an accident in
Nashville, Tennessee, whereby he took out a whole street light
and the pole it was on. There was damage to side of truck, and
the pole was destroyed. The police even came and took a report.

As to the other Caucasian driver, in Indiana, the driver lost control of the truck and it effectively destroyed the truck and the trailer.  But this Caucasian driver was not fired.

9.

WCW also never hired an African-American to work in Audio. Al Smith was the decision-maker for Audio.  I submitted many highly qualified African-Americans for his consideration, but he never hired an African-American for Audio.

10.

The Production Manager was William Byrd. As Production Manager, Mr. Byrd was ultimately responsible for Staging, Lighting, Audio, and Trucking.  He was the supervisor of Mr. Smith and Mr. Santoro.  I am aware that Mr. Byrd often asked if a prospective employee was Jewish.  If a prospective employee was Jewish, Mr. Byrd said to hire the individual.  I felt that this bias was unfair because many minorities were not Jewish. I also recall a statement Mr. Byrd made about the child of another WCW employee, Steve Small, who married an African-American woman.  Mr. Byrd stated, "Steve's kids will have problems in life because they are half black."

11.

Vince Russo often made statements demonstrating that he preferred Caucasian persons, especially Caucasian males, over other persons for WCW management and control.  I heard Vince Russo often refer to people as "blacks," "Japs," "spics" or "wetbacks."

12.

I heard Vince Russo make statements suggesting that "whites" were in control at WCW.  For example, I heard him say, "whites rule wrestling."  I also heard him say that it was a white man's sport and that "is why we don't have many black wrestlers." I also heard him say I am running things the way that I want and we are going to have a "white champion" because that's the way I want it.  Vince Russo made it clear that he did not want oriental persons, African-Americans, or Hispanics succeeding at WCW, much less gaining any position of management or control.

13.

Similarly, I heard Terry Taylor make statements
demonstrating his racial and ethnic bias against persons who
were not Caucasian.  Although he was somewhat careful around me,
I have heard from other persons that he routinely used words
such as "nigger."   I did, however, hear Terry Taylor express
his desire to promote Caucasian wrestlers.  For example, I
witnessed Mr. Taylor overtly "push" Caucasian wrestlers, but not
"push" African-Americans.

14.

I also heard Terry Taylor make statements about his
opinions of African-American fans.  I heard him say, "blacks
don't buy wrestling tickets."

15.

In my experience, WCW officials such as Taylor and Russo
treated Caucasians better than African-Americans, Hispanics, and
Asian-Americans.  Based on my observation, non-Caucasians
received a "B" treatment.  I use the term "B" treatment to
indicate that minorities were not treated as favorably as
Caucasians.

16.

I have personally observed WCW, through its employees and
managers, treat minority wrestlers differently than Caucasian
wrestlers.  For example, on numerous occasions, I observed WCW
officials "push" a Caucasian wrestler over a non-Caucasian
wrestler.  In wrestling terms, a wrestler is "pushed" when that
wrestler is provided television exposure and/or is scripted to
prevail in a particular match.  As it is well known in the
industry, the WCW officials would write scripts as to which
wrestler would prevail. On numerous occasions, I believe that
the Caucasian wrestler was unnecessarily scripted to prevail
over the African-American wrestler.

17.

For example, I recall a wrestling match between a wrestler
named Stevie Ray (African-American), who was one of two members
of the very successful Harlem Heat duo.  On that particular
match, the Caucasian wrestler, David Flair, was scripted to
prevail over Stevie Ray.  Although Stevie Ray had been extremely

successful in his participation with the Harlem Heat duo, and
although Stevie Ray was considered by myself and others a much
better athlete and performer than David Flair, David Flair was
scripted to prevail over Stevie Ray, nonetheless.  It is my
belief that this decision is one of the many times that
wrestling victories were scripted based on a racial bias.

18.

Similarly, David Flair was routinely scripted to prevail
over Ice Train (African-American) even though Ice Train was a
very strong and solidly built wrestler who was much bigger than
David Flair.  And on the one occasion when David was not
scripted to prevail, Ice Train effectively destroyed (and even
injured) David Flair.

19.

I also observed the treatment of an African-American
wrestler named "Hard Body" Norris.  I was told Hard Body was
referred to as a "dumb nigger."  I note that Hard Body was never
given any meaningful chance, and was never pushed.  Hard Body
was really badly treated.  A fan indicated that it seemed
puzzling that Hard Body was getting beaten so easily at WCW even
though he was winning the "Tough Man" Competition.  Another
"Tough Man" competitor, Tank Abbott (Caucasian) was pushed very
hard, and had great exposure.

20.

I recall another interesting event when a wrestler by the
name of Booker T was scheduled to wrestle Scott Steiner.  I
believe this was in the summer of 2000, and was a very big WCW
event.  Because it was a big event, I was very involved in the
stage production for that particular fight.

21.

I specifically recall everybody talking about the match,
and everyone stated that Scott Steiner (Caucasian) had been
scripted to win that match over Booker T (African-American).
Indeed, even during some of the stage preparations, it was a
known fact that Scott Steiner would be the world champion for
WCW by the end of the night.

22.

Even though Scott Steiner had been designated the world champion, I was informed before the match that there had been a change. I was informed that Booker T would become the champion instead of Scott Steiner. During my production work, I had my headsets on and I heard various conversations. During these conversations, I heard Vince Russo and Terry Taylor calling the shots. These two individuals made it known to the WCW workers that Booker T would be the champion that night, and not Scott Steiner.

23.

I was extremely surprised and taken back. In my experience, I had never witnessed a change of the designated winner so close before the match. Myself and many people all wondered what the reason was for the abrupt change in the scripted winner. We thought it was quite unusual, if not bizarre, to change the designated world champion on the day of the match. Even after the show, people were shocked at the abrupt change.

24.

I heard several WCW employees state that the reason for the abrupt change was a response to the racial allegations raised by wrestlers against WCW. These employees, recognizing that Booker T. was African-American, concluded that WCW officials such as Russo and Taylor made this move to conceal their racially discriminatory practices and to provide a defense to the lawsuits involving racial discrimination.

25.

Although I witnessed many discriminatory acts and statements, I did not personally raise any formal complaints. I am aware that another African-American, Pez Whatley, did vocalize his opposition to racially discriminatory practices that he perceived. I believe that Pez Whatley suffered retaliation for raising his concerns of racial issues and discrimination. For example, Pez Whatley was no longer pushed, was no longer involved in training as he had done before, and was essentially removed from wrestling and demoted to menial labor such as setting up the ring.

26.

In addition to discrimination against African-American wrestlers, I also believe that WCW has favored Caucasian wrestlers over Asian-American and Hispanic wrestlers. I recall a particular group of Asian-American wrestlers known as the Young Dragons. Although I felt that they had much to contribute to the wrestling entertainment, these individuals were never "pushed" or given any meaningful exposure. I recall one match whereby the fans were overwhelmingly in favor of the Young Dragons over Three Count (all of whom were Caucasian). Nevertheless, the Young Dragons were not pushed after this event, but WCW did continue to push Three Count.

27.

As to another individual Sonny Onoo, I believe that he was treated differently because he was not part of the "good old boys" network as I described earlier. Sonny, an Asian-American, was never accepted and brought into the inner circle even though he was extremely knowledgeable about the wrestling industry, and was a very capable and hard working person.

28.

As to Sonny Onoo, I am now aware that Sonny Onoo was not a full time employee of WCW. This surprises me because Sonny had an office, was listed on the extension list of WCW personnel, and contributed greatly to WCW. In addition to serving in numerous capacities such as agent, entertainer, coordinator of talent, Sonny also translated for Hispanic and Asian wrestlers.

29.

Jimmy Hart's work was very similar to the work done by Sonny Onoo. Similar to Sonny, he was responsible for recruiting and developing talent. Although Jimmy didn't work as a translator, they essentially performed similar work. Although I am not taking anything away from Jimmy Hart, I believe that Sonny was just as qualified (or even more so given his language skills) as Jimmy Hart.

30.

As to Asian-Americans, I also recall seeing a "Chinese menu," on the bulletin board at WCW. This "Chinese menu" portrayed Chinese in a very negative manner. This is one

example of the atmosphere at WCW, which tolerated and
perpetuated racial stereotypes and racial prejudices.

31.

As for me, I also believe that I was personally treated
differently because of my race when WCW hired Caucasians, and
paid them more compensation than I was receiving.

32.

As I indicated earlier, I have much experience in stage
production and am capable of performing every aspect of
preparing a stage event. At one point, I was working as the
prop master, carpenter, stage manager, and performing any and
all other work for WCW. Although I felt that I was being
overworked, and spread too thin, I did not complain and did what
was asked of me.

33.

I did become quite upset, however, when WCW hired
Caucasians to perform my tasks, but paid them even more than I
was making. For example, WCW hired Trevor George, Art Shipley,
and Scott Stevens (all of whom are Caucasian) to work on the
props. I believe that WCW paid each of these Caucasian
individuals more than what I was making even though they were
only doing one part of the job that I had done, and even though
they did not have nearly the extensive experience in stage
management and production. Similarly, WCW hired Ellis Edwards to
do the stunts and the props, and also paid him more than I was
making. Again, I was much more qualified for the type of work
than Mr. Edwards, but I believe WCW paid him more than I was
paid.

34.

I believe that the manner in which WCW handled this
situation, and paid the Caucasian workers more money than I was
making was racially biased.

35.

As I indicated earlier, I did not confront the WCW
officials with my complaints about discrimination. I heard from
several individuals that I was known as the "good nigger." I
was basically told that because I did not make any waves, called

the Caucasian officials "Sir" and "Mr.," and because I did everything that I was told, that I was considered "a good nigger."

36.

In addition to the racial discrimination against WCW wrestlers and employees, I also believe that WCW officials discriminated against wrestling fans based on race.

37.

I previously addressed Doug Dillinger. I also add that, on numerous occasions, I observed Doug Dilinger, the chief of security, provide promotional gifts and souvenirs to Caucasian children, but did not treat African-American children the same.

38.

I was offended by Mr. Dillinger's flagrant favoritism towards Caucasian kids. I made my best effort to treat all of the children the same, regardless of their race (although I did go out of my way to take care of any children with apparent handicaps). As to Mr. Dillinger, I recall, during the O.J. Simpson trial stating that "yes I used the "N word," and I will use it again." He then stated that it would not effect the way he would act in the work place, but I believe that his actions speak louder than his words.

39.

I recall Terry Taylor stating that they did not need to "worry about spies or brothers; they just need to get to the back of the line." I believe that he was referring to African-Americans, and any person who would raise complaints about the treatment of African-Americans. He was indicating that they would be put at the back of other persons seeking advancement at WCW.

M. W.

40.

As to Terry Taylor, I was told by another person that when WCW signed Hulk Hogan, that Terry Taylor stated that WCW was bringing in Hogan, and he didn't want any blacks on the show to take away from Hogan coming back into the limelight. From my understanding, Taylor didn't want any black wrestlers to take away from his intended effect in bringing in Hogan.

I have read the above. It is true and correct.

FURTHER THE AFFIANT SAYETH NOT.

Moses Williams

Sworn to and Subscribed
Before me this _18th_ day of
_February_, 2002.

NOTARY PUBLIC
MY COMMISSION EXPIRES NOV. 3, 2002



# EXHIBIT / ATTACHMENT

Y

(To be scanned in place of tab)

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION

 3
      PEZAVAN WHATLEY,                )
 4                                    )
               Plaintiff,             )
 5                                    )
         vs.                          ) CIVIL ACTION FILE
 6                                    ) NO. 1:01-CV-0916-CC
      WORLD CHAMPIONSHIP WRESTLING,   )
 7    INC.,                           )
                                      )
 8             Defendant.             )

 9

10

11    _____

12              DEPOSITION OF PEZAVAN WHATLEY
                     NOVEMBER 14, 2001
13                      10:09 A.M.

14    _____

15

16

17

18

19

20

21

22

23

24

25            CERTIFIED COURT REPORTERS
```

The Pinnacle, Suite 500 • 3455 Peachtree Road, N.E. • Atlanta, Georgia  30326 • www.premierrptg.com
404-237-1990

1    conversation, that he would confer with JJ Dillon.

2         Q    What was Mr. Bush's race?

3         A    White.

4         Q    And what was Mr. Goodley's race?

5         A    Black.

6         Q    Do you know what happened after that meeting

7    with Mr. Bush?

8         A    Yes -- only guesswork, but -- what

9    happened, but --

10        Q    What do you believe happened?

11        A    We talked to Mr. JJ Dillon, who stopped all

12   of the black people from being -- moving up in

13   positions, and I was stuck.

14        Q    Why do you believe that?

15        A    Because Mr. JJ Dillon is as racist as they

16   come.

17        Q    Why do you believe that?

18        A    Because I've known Mr. Dillon for the

19   longest time.

20        Q    What has he done to make you believe he's

21   racist?

22        A    Well, I worked with him at a time when we

23   were in a bathroom listening to country and western

24   music, and the country and western music involved a

25   song and the word "nigger."  He thought that was

1    great.

2        Q    Anything other than that?

3        A    Mr. JJ Dillon worked with me at times, with

4    Mr. James Crockett, and we were also given positions

5    to move up, but every time that I had to participate

6    in -- me, myself had to participate in any activity in

7    which I was under Mr. Dillon's hand -- it was always

8    racist, nigger.

9        Q    Let me back up for a minute.  When was this

10   incident with you and Mr. Dillon and country western

11   music in the bathroom?  Do you recall when that was?

12       A    That was in the '80s.

13       Q    In the '80s?

14       A    Yes.

15       Q    And you just said as far as working in

16   positions involving Mr. Dillon, it was always racist?

17       A    With me.

18       Q    What did he do?  Did he say anything racist?

19       A    He just stopped your opportunity to go

20   forward on your position.

21       Q    What evidence, Mr. Whatley, do you have that

22   JJ Dillon was responsible for stopping you from going

23   to any position?

24       A    I think he gave the talk to him.  He got --

25       Q    I don't want to know, Mr. Whatley  -- I want

1   assisting with Keith on editing and passing out

2   papers.

3       Q       Do you know who made the decision to let

4   them do this work as assistant booker?

5       A       No, I don't.  I don't know.  I could only

6   speculate.  I don't know for sure.

7       Q       Now, you talked about earlier who you talked

8   with in terms of wanting to be a booker?

9       A       Yes.

10      Q       You mentioned Mr. Hamilton.  We talked about

11  that.

12      A       Yes.

13      Q       You mentioned Tim Goodley --

14      A       Yes.

15      Q       -- and a meeting that you had with Tim.  Was

16  that the only time you talked with Mr. Goodley about

17  being a booker?

18      A       No.

19      Q       Were there other times?

20      A       Yes.

21      Q       What did you say to Mr. Goodley?  Those --

22      A       Same thing I told him at the beginning.

23      Q       Which --

24      A       That we have --  we have and --  we have not

25  had any black bookers in the main events of the major

1    Mr. Bruce were assigned trips in which that he could

2    make it back in time for his family or just one or two

3    days at different times.  But because of the fact that

4    my availability of being able to drive, after my

5    first-proven shot that I could drive a truck -- look

6    how this case is going --  that I could drive --  that

7    I could go then to be trusted to drive their truck and

8    their equipment from one designated point to another.

9        Q       Anything beyond what you've just told me as

10   far as the assignments of trucks that you believe was

11   discriminatory, or is that everything?

12       A       Yes.

13       Q       That's everything, or there's more?

14       A       No.  I mean, there's more.

15       Q       What else is there?  Please tell me.

16       A       In our --  Mr. Hamilton, part of his job was

17   to go at the television --  with the television, when

18   the television went out and --  at the beginning, and

19   our assignment was to take the people that applied to

20   --  that wanted to be wrestlers, into the training

21   facility both at Jonesboro and at Carroll Drive, and

22   at this time there was a man employed also with us,

23   because of Mr. Hamilton's absence sometimes, was

24   Blackjack Mulligan, and during the time we accepted as

25   trainers the people that applied into our jobs, and

1    when Mr. Hamilton arrived back and he first saw the

2    new recruits, his first comment was, oh, a different

3    color.

4        Q    All right.  When was this?

5        A    When we were in the training facility in

6    Jonesboro.

7        Q    So this is before you moved to Carroll

8    Drive?

9        A    Before we moved to Carroll Drive.

10       Q    Do you know what he was referring to?

11       A    Yes.

12       Q    What was he referring to?

13       A    Before there was never any -- maybe one,

14   two Afro-Americans or nonCaucasian people there.  The

15   applications that we received when he was there,

16   happened to include more than that, and which we

17   accepted, and they were in the facility when he came

18   and turned the corner.  This was not something that he

19   expected.

20       Q    Did he do anything about it other than to

21   say the comment that you just said?

22       A    What was done a little later is that they

23   were trimming the fat, multimillions of dollars.  They

24   were trimming the fat by cutting four of the black

25   guys that were down there and let two of the white

1   guys go, because the white guys were not talented.

2   The black guys were very, very, very talented, and

3   they said we had too many down there.  Too many, I

4   mean too many people of different color.

5        Q      Did someone say that to you?

6        A      We knew it, and they said it.

7        Q      Who said that?

8        A      Mr. Mulligan told us as a repeat of what Mr.

9   Hamilton had said.

10       Q      So in other words, Mr. Mulligan told you

11  that Mr. Hamilton had said something about the color

12  of the trainees?

13       A      Mr. Hamilton had spoken about the color of

14  the trainees before that period of time, but this

15  particular instance, what we're speaking of, that's

16  the way it went.

17       Q      Do you remember who it was who was cut?

18       A      Troy Hamilton.  I can't remember his tag

19  team partner.  Very, very highly talented young man.

20  Mr. --  I can't remember his name.  I can't remember

21  his name.  Very well built, muscular bodybuilding

22  phenomena that was in town that wanted to become a

23  wrestler.  And other individuals, I can't remember

24  their names, but they made it very difficult for them

25  to stay at the facility and still wrestle.

Page 101

1    A        It was as -- it was true for us to train

2    everybody really hard, but the emphasis was exactly on

3    the -- on the black individuals that they knew that

4    they could really pound on at the same time as you

5    would be -- white individuals would be given a

6    routine, whereas the black was to be given the

7    routine.

8              Now, if a white individual doing the

9    routine faltered, slumbered, could not get it done, he

10   was given extra opportunity to get hisself together so

11   that he could be able to -- to keep going on.  If a

12   black individual stumbled, faltered, or -- he didn't

13   want to be there; he had a bad attitude; they couldn't

14   teach him; he couldn't learn it.

15   Q        Who was in control of this?  Wasn't it the

16   trainers who were in control of this, including

17   yourself?

18   A        Including myself.

19   Q        So you took part in the process of what

20   you're claiming?

21   A        My process was that you were wrong.  He can

22   do this.  They're great talents sitting right here.

23   Q        Mr. Whatley, let me interrupt you, because I

24   want you to try to make yourself clear.  I'll let you

25   finish, but I don't understand what it is you're

1    wrestle, which would provide me with more money.

2        Q    Who told you that?

3        A    From Mr. Sullivan himself.

4        Q    He came to you and told you that?

5        A    Yes.

6        Q    Did he tell Mr. Bruce and Mr. Wenner that

7    too?

8        A    No.  Mr. Sullivan told me.

9        Q    Just you?

10       A    Whether he told Mr. Bruce and Mr. Wenner, I

11   can't remember, but I know what he told me.

12       Q    So he came to you and said, I'm going to

13   give you more chances to wrestle?

14       A    Now you're going to get chances to wrestle.

15   He and Mr. Mike Graham both, who were in the booking

16   position and assisted booking.

17       Q    Why is that discriminatory discipline?

18       A    Well, because of the fact that they --  that

19   Mr. Bischoff -- during this period of time we wrestled

20   in a place called Atlanta, Georgia, the Omni, and Mr.

21   Bischoff showed expressively his desire about

22   discrimination, because he took not only myself but

23   every black off the card, and he was quoted as saying,

24   this is white night.

25       Q    When was this?

Page 133

```
 1       A       In the Omni, when Mr. Shuler was in charge

 2   and at our first big Omni show.

 3       Q       Who else did he take off the card, according

 4   to you, besides you?  Who else?

 5       A       Jacqueline --  the female, Jacqueline, who

 6   was Mr. Sullivan's walk-in.

 7       Q       His valet?

 8       A       His valet.  The Harlem Heat, Harold Hogue.

 9   That was all, because that --  that wasn't any other

10   blacks on the card.  Any other blacks on the card that

11   had been wrestling previously.

12       Q       Did Mr. Bischoff make this comment to you?

13       A       Mr. Bischoff made that comment to Mr.

14   Sullivan.

15       Q       Were you there when he made that comment?

16       A       No.

17       Q       How did you hear about that comment?

18       A       Mr. Sullivan came out and told us why we

19   weren't going to be able to work.

20       Q       What did he say?

21       A       He said that this is going to be --  he took

22   off Jacqueline.  He took off the Heat.  He took off

23   Harold Hogue.  He took off any other persons except

24   for the --  what he wanted, and he told us, just

25   before he left, told us, turned around and say, Eric,
```



1    said this is white night.  In Atlanta, Georgia.

2       Q      Any other discipline beyond that, Mr.

3    Whatley?

4       A      That's all of them that I can remember right

5    now, sir.

6       Q      Is there anything you think that would help

7    you remember other instances?

8       A      I'm trying to, but that's all I can

9    remember.

10      Q      Why don't you take a minute and see if you

11   can remember anything more?

12      A      I spoke up to Mr. -- Mr. Randy Savage, who

13   was one of the prominent wrestlers at the time, about

14   having the opportunity to wrestle and to book, to be

15   the booker at that time, who was Kevin Sullivan.  I

16   mean, Kevin Nash.  Who at that time, Mr. Savage was

17   one of the few people that knew the --  about

18   qualifications of being the booker and that --  and

19   that I had them.

20             He spoke to him about him -- about doing

21   it, and at that time Mr. Nash could have done it if he

22   wanted to.  And he did not do it, and when Mr. Savage

23   came back to tell me the reason why he did not do it,

24   he included the fact that they were making some

25   changes.  But also he said, but the real changes, you

Page 135

1    know.  And we both pointed, and we parted.

2        Q      This was what Mr. Savage said to you?

3        A      Mr. Randy Savage.  When we discussed

4    wrestling and booking as one of the things that I

5    could continue doing on that job.  Oftentimes headline

6    wrestlers go to the booker and the --  and express,

7    this guy can do it.  This guy can do it.  Randy Savage

8    was a guy highly respected.  His opinion was highly

9    noted.  He done a lot in the business, and so -- even

10   more so than the guy that held the position in the

11   job.

12              And so when Mr. Savage came back, it was

13   told to me because they're going to make some changes,

14   but also in the conversation, we knew that changes

15   that were being made had nothing to do with my

16   request.  Changes was that they didn't want me in

17   there and that I was black.

18       Q      He didn't say that, but that's what you

19   understood him to be saying?

20       A      Well, he pointed to skin.

21       Q      Did he say that's what Mr. Nash said, or did

22   he say that's what he believed was going on?

23       A      He told me what Mr. Nash said about the

24   changes and that there were going to be those changes

25   made.  I can't remember verbatim, word for word.



1      A      Right now.

2                MR. PONTZ:  Well, I'm going to reserve

3      the right to reopen this deposition when Mr. Whatley

4      decides he can remember some other stuff, but I'm

5      taking him at his word that that's everything he knows

6      about.

7      BY MR. PONTZ:

8      Q      Mr. Whatley, you also indicated in your

9      complaint that you believe you were subjected to a

10     racially hostile work environment?

11     A      Yes.

12     Q      What do you think made your work environment

13     racially hostile?  What things happened at the

14     workplace that you think made it racially hostile?

15     Other than what we've talked about?  You don't need to

16     repeat the things we've talked about, although you can

17     point them out to me if you want.

18     A      I found it necessary to try to advance

19     knowledge or equip young black wrestlers on some of

20     the things that they were going to be facing when they

21     got into the business.  Not only was that

22     objectionable from Mr. Hamilton's point of view, but

23     it was objectionable to the assistant booker's point

24     of view, objectionable to the booker's point of view,

25     and objectionable to Mr. Bischoff's point of view.



1      Q      Well, what was racially harassing about

2   that?

3      A      Well, they would rather for those kids not

4   to know those things than to be told those things.

5   They would not --  they would rather for them not to

6   know that they weren't going to get an equal

7   opportunity and that they were going to be twice as

8   good as the white boys even to be able to look at, and

9   they didn't want them to know that even though they

10  could be twice as good as the white boys and wrestle

11  and have talent, charisma, talking and everything,

12  they still weren't going to be given the chance, even

13  though they colored it like you were going to be --

14  like they was going to give an equal opportunity to

15  them all.  Me being in that business and knowing that

16  before, knew that they were lying.

17     Q      Mr. Whatley, what I'm really asking you is,

18  what happened in your workplace --  what happened to

19  you in your efforts to do your work and provide your

20  services that you believe was racially hostile and  --

21     A      Okay.

22     Q      -- affected your ability to perform your

23  job?

24     A      During the time the four --  when they made

25  the cutbacks, when they made the cutbacks on the four

1    A.    Well, being a man of the experience that I

2    had, Mr. Hamilton first of all, who was in full

3    knowledge that I was a fully capable and able person

4    to be able to do not only my job but the job that he

5    was doing and to be booker.  Well, Mr. Hamilton made

6    no effort whatsoever to promote the fact that he had

7    an individual that could help with the company

8    overall.  Mr. Hamilton rather kept his mouth shut so

9    that no fur is fluffing.

10    Q    Anything else that Mr. Hamilton did that you

11    believe made a hostile work environment for you?

12    A    The fact that when we were in Carroll Drive

13    and wrestling, we would point out the different

14    individuals who working with them day by day, that

15    were really coming along real fine.  Well, Mr.

16    Hamilton came out there, and he would look under the

17    surmise of whatever period of time he was out there;

18    an hour, two hours, or whatever, and then come back

19    and make a decision on which ones he thought that was

20    good or bad, you know.

21         And oftentimes -- oftentimes nonCaucasian

22    or off-white or African people were -- were given

23    positions of --  he could stay down there and train

24    more, but it's always a little this that was wrong or

25    a little that, that was wrong.  Everybody had

Page 143

1    something wrong.  You know, so it should not be just

2    one group that should have been --  that should have

3    been identified as having something wrong.

4              They just whenever the administration

5    didn't want an extra black in there, they make up a

6    reason.  He don't come on time.  Some didn't come at

7    all, you know, and still were welcome back.  Also,

8    which was --  this is --  the terrible thing is that

9    they would bring down Keith and that young lady that I

10   can't remember her name to look at the talent, who had

11   no idea what's going on.

12             And myself, especially myself, who were

13   capable of doing a lot of things for the young men,

14   our opinions were swept under the rug.  I mean, when I

15   mean our opinions, I mean my opinion on who could be

16   doing --  like you could have a black man down there,

17   six-eight, 325 pounds, undeniably, undeniably money

18   walking, and because they would bring individuals down

19   there that had no idea about what was going on or what

20   the training, all they do is looked and thought he was

21   cute or had the hair long enough or they dyed their

22   hair blond.  They had enough steroids stuck in their

23   ass that they was the ones that would be chosen over

24   individuals with talent.

25        Q    Anything --  I'm sorry.  Go ahead.



```
 1      A       No.  Go ahead.

 2      Q       No.  Finish what you're saying, please.

 3      A       That was it.  That was it.

 4      Q       Anything else that you think was done that

 5   made your work environment a racially hostile work

 6   environment?  Besides what you've already told me?

 7      A       When I chose an individual that was --  that

 8   was talented enough to go around and --  and

 9   especially, you know, when I chose a black individual

10   that was good enough to be talented, useful, could

11   draw money, that was like a mark against him.

12      Q       Did you ever choose any white individuals

13   that you thought were good?

14      A       I tried to be fair.

15      Q       And what happened to the white guys that you

16   chose that were --

17      A       Quite a lot of them were chosen.

18      Q       And none of the black guys you pushed were

19   chosen?

20      A       No black guy that I endorsed was ever used

21   on a WCW main event on the assistant basis.

22      Q       Who were some of the African-American

23   trainees you endorsed?

24      A       Like, Mr. Bobby Walker is an individual I --

25   now, Mr. Bobby Walker had a talent that no other
```

Page 161

1    hold you on the sideline, especially me, because they

2    didn't want you to -- to display the guy giving

3    talent that you could do what was actually being

4    required of you to do.

5        Q      Anything else that you believe supports your

6    claim for a hostile work environment on the basis of

7    race?

8        A      Okay.

9        Q      What else?

10       A      Because of the fact that you -- I wrestled

11   in several -- I mean, I participated in several

12   different jobs in the WCW organization, it was not

13   unusual for you to hear amongst the work place, you

14   know, the N-word, or darky, or if you went and was

15   sitting down beside another employee that was an

16   individual that was there and the employee happened to

17   be a white female, better make sure that you were not

18   sitting down there for enticement of the white female.

19   Other white males who were always looking at that,

20   would come over and sit beside you.

21            If I was in a conversation with another

22   black individual, or another couple other black

23   individuals, it was not unusual for Terry Taylor,

24   Diamond Dallas Page to come over with a joke.  Hey,

25   not more than two or three black guys in a --  at one

Page 167

1    incidents with some lighting employees, is there

2    anything else?

3         A    Well, also in security, Doug Dellenger, who

4    was head of security from start to beginning, came up

5    and told one black individual they were playing the

6    music over the loudspeaker and turned it off and said,

7    we don't want to hear no more of that nigger music.

8    And when the individual turned around and got mad, he

9    said, I don't know what you got mad; we could say that

10   to Pez and it'll be all right.

11        Q    Were you there when that happened, Mr.

12   Whatley?

13        A    No.  I was just told about that after it

14   happened.

15        Q    Who told you about that?

16        A    The people that it was told to.

17        Q    Who?  Who?  Names?

18        A    The wrestle --  was Mr. William Boulware was

19   told, and he reported it to the human resources

20   department.

21        Q    How do you know he reported it to the human

22   resources department?

23        A    Because we went down there when he went down

24   there and told.

25        Q    Were you there when he went and told them?



1      Q      Did they ever say that to you?  Did you ever

2   hear them say that?

3      A      No.  Only time that I heard them say it is

4   when they thought I wasn't there.

5      Q      That's what I'm asking you, Mr. Whatley.

6   Were there times that you heard Diamond Dallas Page or

7   Chris Kanyon use the N-word about you?

8      A      When they was in dressing rooms and were

9   leaving the dressing room or coming out of the

10  dressing room and you're making suggestions about,

11  well, what can be happening in the ring, you would

12  hear them when you left saying, what that nigger

13  talking about?

14     Q      Who would you hear say that?  Chris Kanyon

15  and Diamond Dallas Page?

16     A      Different ones like that.

17     Q      Anybody else you can think of?

18     A      Not right off the bat.

19     Q      When did that happen?

20     A      During the  '98-'99 --  it continued to

21  happen all the way through, but most --  most of the

22  time, '98 and '99 sessions during the wrestling.

23     Q      And these were wrestlers who were making

24  these statements?

25     A      They were wrestlers, yes.

1    or come get security and say, hey, there's a guy in

2    the ladies' room?

3        A     Not to my knowledge.

4        Q     That's fine.  Any instance that we haven't

5    talked about -- Mr. Whatley, any instance we haven't

6    talked about involving the use of the word "nigger?

7        A     Only things that I could say is what I was

8    told after somebody said that it was said.  The

9    earshot of hearing it or up in front of your face,

10   hearing it, had been limited to just several

11   occasions.

12       Q     The ones we talked about?

13       A     Yes.

14       Q     Did anyone ever call you darky?  That was a

15   word you used a few minutes ago.

16       A     I heard the word "darky," but that was, you

17   know -- the word darky on the crew, with the people

18   that you worked with, and that because of the fact

19   that -- like I said before, that I wouldn't take

20   second citizenship to, like, for instance, a guy that

21   was -- I can't remember his name.  He was one of the

22   ones in charge of lighting.  Used in reference.  Used

23   it in reference to me, because of the fact that we

24   were all moving out our stuff at the same time.

25              He wanted us to stop doing our job so that

Page 181

1    he can complete the --  completely let the --  the

2    lights down.  But because of the fact that we were on

3    the move and they wanted economically to use the

4    locals to do all the things, they were trying to get

5    us out first, so therefore he was disgusted in the

6    fact that he had to wait, and now it's --  I had to

7    wait behind a darky too.

8        Q    Do you remember his name?

9        A    I can't remember --  I tried not to remember

10   his name, but I knew that he was one of the men that

11   was in charge of when the lights went up and went

12   down, and  --

13       Q    Did he work for the arena, or did he work

14   for WCW?

15       A    WCW.

16       Q    So he was a lighting employee of WCW?

17       A    WCW.

18       Q    Did you complain about that?

19       A    Oh, yes.

20       Q    Who did you complain to?  Do you recall?

21       A    Oh, yes.  Every instance that we did, that

22   we called, you know, I knew exactly that the person

23   that you can go to in the instance was human resources

24   department.

25       Q    Do you know if human resources department



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

INTERVIEW OF OLIE ANDERSON 

        This is the interview of Olie Anderson taken at the law
offices of Bentley & Bentley by Randall Bentley and Ronald J.
Freeman at 9:55 a.m. on January 23, 1992.

Q:   For the record, could you please state your full name.

A:   Olie Anderson.

Q:   Could you please give your name that you were given at
     birth.

A:   Allen Robert Rogalsky.

Q:   What are you commonly known as in the Atlanta area?

A:   Olie Anderson.

Q.   Can you please give us your business address and your
     residential address.

A:   The residential address is 1660 Rock Springs Lane,
     Woodstock, Georgia.

Q:   Zip code?

A:   30188

Q:   And your residential address?

A:   That is the residential address.

Q:   For the record, could you please tell us a little bit about
     your educational background?

A:   High school, four years of college, no degree.

Q:   Where did you attend high school?  City and State.

A:   St. Paul, Minnesota.

Q:   And where did you attend college?

A:   University of Colorado, University of Minnesota and St.
     Cloud State University.

Q:   After you left college, what did you do then?

A:   Served in the Army.

Q:   How many years were you in the Army?

WCW 102065

A:    Two years, nine months, 1 day.

Q:    Were you recruited for the Army or did you volunteer?

A:    Drafted and then volunteered, September, 1964.

Q:    Did you serve during any war time?

A:    During Viet Nam.  Viet Nam started then.

Q:    Did you in fact serve in Viet Nam?

A:    No, I did not.  I was in Germany.

Q:    What is the highest rank that you attained while in the service?

A:    E-4.

Q:    What branch of the service were you in?

A:    Army.

Q:    Which level was it, infantry, quartermaster?

A:    I was a clerk personnel specialist.

Q:    Now upon leaving the Army, what did you do?

A:    I went into professional wrestling.

Q:    How did you first become involved with professional wrestling?

A:    I was approached by a couple of people involved in professional wrestling in Chicago, where I was later stationed while I was still serving in the Army and was told that they would consider making an offer for me to get into professional wrestling. One was Vern Gagne, the other was Dick the Bruiser.

Q:    Did you eventually become involved in professional wrestling?

A:    In September of 1967 I started professional wrestling in Minneapolis.

Q:    Now, kind of chronologically walk us through your history of professional wrestling up in Minneapolis up until the time you arrived in Atlanta, Georgia.

A:    I wrestled in Minneapolis for approximately 6 months.  In April of 1968 I went to Canada for a very short time.  In

WCW 102066

June of 1968 I went to North Carolina – my first NWA.  NWA
at that time was recognized as being the largest sanctioned
body of wrestling.  I wrestled in North Carolina until
September of 1970.  I was injured and was out of wrestling
for approximately a year.  I came back into wrestling in the
summer of 1971 by wrestling for the NWA again in Florida.  I
stayed there until January of 1972 and was asked to come
back to the Carolinas.  I stayed in the Carolinas until
1974.  I went to Florida and then came back to...or went to
Georgia in about April of 1974.  I wrestled again off and on
in Georgia and Florida, or Georgia and Carolina I should
say, and then came to the Carolinas...I mean Georgia, in
1976 in September or October of that year as a wrestler and
for the first time in a management position as a booker and
stayed like that through December of 1979.  I got out of
wrestling for approximately 5 or 6 months and was asked to
come back in the manager and wrestling capacity in May of
1980, again in Georgia, and then became a booker in the
Carolinas in 1981.....I think around March of 1981....and a
few months after that became the booker for both Georgia and
Carolina until approximately June of 1982, when I became the
booker of Georgia exclusively until 1985, when I sold out my
position in wrestling and essentially retired.

Q:    Since being the exclusive booker here in Georgia in 1985,
      have you maintained any other managerial or wrestling
      positions with the WCW or the NWA?

A:    In 1989 I was hired by WCW at that time to be a road agent
      and later in 1990....May of 1990.....I was asked to be
      placed in the position of being the booker until November of
      1990.

Q:    Now while at the times when you were in a booker or manager
      position with the NWA or the WCW, were there any other black
      managers employed with the NWA or the WCW?

A:    No.  By managers again, you mean by administrative?

Q:    Administrative.

A:    No.

Q:    Throughout your entire tenure here in Georgia....or
      throughout your entire tenure with the NWA, have you ever
      known them to employ a black booker?

A:

Q:    You were telling me about Ernie Ladd, can you give me  the
      dates and what position you understood Mr. Ladd to hold.

A:   Well, Ernie was, I think, helping Bill Watts in booking the
     areas of Mississippi, Louisiana, Arkansas.  I believe it was
     probably in the early '80's......'81, '82, something like
     that.

Q:   Do you know what Ernie Ladd's title was at that time?

A:   I couldn't honestly say that he had a title, and I wouldn't
     say that he.....I don't know that he necessarily received
     any compensation for that job either.

Q:   Was he wrestling during that time period?

A:   Yeah, I think so.

Q:   Now Bill Watts, was he a white male?

A:   Yeah.

Q:   Is he a white male?

A:   Yes.........still is.

Q:   With the exception of Ernie Ladd, have you ever known any
     black to hold a booker or any other administrative position
     in the NWA or WCW?

A:   No, I don't think there has any time where a black has held
     a particular position as booker where he received any
     compensation for that particular situation.

Q:   Was it your understanding that white males that held those
     positions were paid salaries or other types of benefits?

A:   Yes.

Q:   Now, during the time that you were a booker exclusively here
     in Georgia, can you tell me approximately how many black
     wrestlers that you had either under a written contract or an
     oral contract to wrestle?

A:   Personally had?

Q:   That you personally had.

A:   When I was doing the booking and when I owned a portion of
     Georgia Championship Wrestling I used, I think, every black
     wrestler that existed.  What are we looking for at this
     point....names?

Q:   No....just.

A:   Everybody that was there.

WCW 102068

Q: Okay. Were you ever questioned by your superiors concerning your frequent use of black wrestlers?

A: Prior to my coming to WCW I would say probably not.

Q: And when you came to WCW.....tell me about the people that took over at WCW and what type of questions they raised concerning your hiring practices of black wrestlers.

A: When I got to the WCW I was working for a man by the name of Jim Heard. Jim Heard at one point I think just made a comment as to why or what favors I might have owed wrestlers that I had. At that time I was trying to bring in Thunderbolt Patterson. I had brought in Junkyard Dog, Ranger Ross........there were conversations I think about Abdullah the Butcher and several other people, and I think....the best I can remember is that Heard asked me what allegiance or what favors or whatever that I owed these people. I tried to work out things for instance with Thunderbolt Patterson because I thought he would be a way to encourage people to come to wrestling matches, particularly blacks, because we went to a lot of cities that had black populations....and had some things set up for Thunderbolt Patterson too which would have been economically sound....and the WCW wouldn't do it.

Q: Had you ever experienced those types of problems prior to your coming on board with the WCW?

A: No.

Q: Okay, Olie, start describing to me the time when Ted Turner bought out the NWA.....and what your understanding of the name change...and what your position was with the WCW.

A: My understanding is that Turner bought out Jim Crockett Promotions. Jim Crockett Promotions at the time was a member of the NWA....and I didn't have any association to do with that until a year later....September of 1989.....in the capacity of a road agent, which was basically nothing.....going to the towns and watching over the matches and the wrestlers. During that time there was....

Q: What was your understanding of your duty as a road agent.....as it relates to the wrestlers?

A: Well, primarily to see that they were there....to watch the matches. That would be basically it.

Q: So you just watched the matches.....made sure the wrestlers showed up?

A: Yeah, there were some things going to the televisions and things like that. I also sat in on different meetings that

they had.....talking about what they were going to do, programs they were going to have and talent that they were using, that type of thing.

Q:   As a road agent, did you have anything to do with who would be wrestling that night?

A:   At that point, no.

Q:   Did you have anything to do with who....could you enter into a contract with a wrestler to come to work for the WCW?

A:   No.

Q:   Okay, what position held that responsibility?

A:   Well, that would have been up to the booker and primarily to the guy that was the vice president of WCW working for Turner, and that would have been Jim Heard.

Q:   Who was the booker when you came on board as the road agent?

A:   They had several...they had a booking committee.....I was a part of that committee, supposedly.....and then there were several of the wrestlers as well.....as well as at least one announcer.  There were maybe 8 or 9 people who were in this so called booking committee who decided what they were going to do.

Q:   Were there any black wrestlers or black people on that booking committee that you knew about?

A:   No.

Q:   Were there any blacks in management with the WCW during that time period?

A:   Administratively, no.

Q:   Do you recall how many black wrestlers were involved with the WCW during the time that you came on board as a road agent?

A:   I think there were four.  Ranger Ross, Teddy Long, Butch Reed and Ron Simmons come to mind as the only ones that were there.

Q:   Now out of the four that you just named, do you know how many had contracts with WCW?

A:   I think that they all did, although I'm not sure.  I thought they might have all had contracts.  I never saw them.

Q:   Now, you were a road agent for how long?

A:   Until May of '91.

Q:   And what happened in May of '91?

A:   In May of '91 they apparently thought they....being Heard
     and the organization.....Turner decided that they weren't
     doing well enough for....things needed to be
     changed......and I was asked by Jim Heard if he and I could
     get along and that he would recommend me and like to have me
     take over the job as booker.

Q:   Now tell me from your own personal observation what was
     going on as far as the revenue that WCW was able to generate
     based on the attendance at the matches?

A:   Well, things hadn't hit the bottom yet, although they felt
     that they were at the bottom, and because of the fact that
     they weren't doing the money that they wanted to do, they
     decided that there had to be a change.  The houses were
     probably....well significantly less than they had been in
     the '70's and the early '80's, and they were concerned about
     it and they thought that a change was needed, and that was
     when I was asked to become the booker.

Q:   Now, what cities were you'all servicing around May of '91?

A:   Everywhere in the country.

Q:   Did a lot of these cities have a majority black population?

A:   Yes.

Q:   Can you tell me in your opinion what was the percentage of
     attendance at the matches?

A:   Blacks to whites?

Q:   Blacks to whites.

A:   Well, I think in cities like Atlanta, Chicago, Baltimore,
     Philadelphia were....I personally have wrestled before and
     have booked before and have seen the crowds well enough to
     have an idea.  I would say that while I was with WCW there
     were virtually no blacks that came to the wrestling matches.
     The Atlanta area used to be...I would guess 30 to 40% blacks
     ten years ago in attendance.  Columbus, Georgia would easily
     have been 40% blacks.  Augusta auditorium would have had
     that same type of figure.  WCW might have lost total
     attendance in terms of the total number of people that were
     going, but the black attendance dropped off to a point where
     I think I would hazard a guess as to percentage.  It would
     be easier to say there just were no blacks that were coming
     to the wrestling matches.

Q:   By this time, how many years of experience had you had in
     the wrestling industry?

A:   Starting in 1967 and this was in 1989, 1990.

Q:   Now during the time that there were a lot of blacks in
     attendance at wrestling matches, were there also a lot of
     black wrestlers?

A:   Yes, more so than there are now or that where were when I
     came to WCW.

Q:   Did you attribute the decrease of black attendance to any
     particular fact that was going on in '90 or '91 when you
     were a road agent and booker with WCW?

A:   Yeah, I thought definitely that....

Q:   What did you attribute it to?

A:   The fact that we didn't have the blacks that were wrestling.

Q:   Did you present that idea to anyone?

A:   Yes I did.  I presented it to the committee at various
     times, and when I became the booker, that idea was presented
     to my boss at that time, Jim Heard.

Q:   When you presented it to the committee, what type of
     response did you get?

A:   The committee, I think, was basically ruled by Jim Heard, so
     I was kind of......nobody had an opinion.....unless it was
     voiced by Jim Heard.....and then they would mimic that
     opinion, I think.

Q:   Did you eventually go to Jim Heard and get his opinion?

A:   Yeah, I think his comment as I mentioned was something like
     "what favors do you owe that would make you want to have
     these people or have this guy or that guy wrestle."  My
     answer was "I don't owe this person anything, and I don't
     owe anybody any favors.  I'm just looking at it from the
     standpoint of trying to be able to draw a crowd and bring
     spectators into the buildings; and I think for that we need
     to have blacks as well as the whites in order to do that."

Q:   Once you assumed the role of booker, did you begin to sign
     more blacks?

A:   Yeah, the first guys I tried to get were.....the first one I
     brought in was Junkyard Dog.

Q:   Okay, did you enter into a contract with Junkyard Dog?

A:   I can't say that we've made a contract.  There was a verbal agreement with Junkyard Dog for sure.  Whether there was a contract, I don't know.

Q:   Do you remember what the salary was?

A:   I believe it was around $400 or $450 per event, and of that sum I think it was $100 that was to be withheld until the end of the month, at which time he would then be paid that sum.

Q:   Was there a certain number of events that he was to participate in per month?

A:   No.  That was pretty much up to me, but I booked him regularly.....I booked him as much as I could.

Q:   So in '91 the first person you remember...

A:   May of '90.

Q:   May of '90, the first person you remember entering into a contract with was Junkyard Dog, and it was based on the events........he was being paid a certain salary based on the number of events that he participated in.

A:   Yeah.......based on a per event situation.

Q:   Per event situation.  Were there any other black wrestlers that you entered into that same type of agreement with.

A:   No.  I ran into a lot of flack when I brought in Junkyard Dog.

Q:   What kind of flack did you run into?

A:   Well, as I've said, what favors did I owe?  What past deals might there be between he and I?  There was just a lot of heat, as I would call it, to have Junkyard Dog, because nobody seemed to want to have him there.  The reasons were because he was overweight, because he was fat, because he was undependable.  They didn't know if he was going to show up and that type of thing.

Q:   Were there any overweight white wrestlers that were on contract?

A:   I don't know.

Q:   Can you think of anyone that was proportionately the same size as Junkyard Dog that happened to be a white wrestler that was wrestling during this time period?

WCW 102073

Patterson is in the same situation, having drawn sell-out crowds in all parts of the country, particularly here in the southeast. A guy like Tony Abbus....the same exact situation....sell-out crowds. A guy like Abdullah the Butcher....the same type of situation....sell-out crowds. Ernie Ladd.....sell-out crowds. I've seen these people sell the buildings out because I either was with them or worked with them or I was booking them. Conversely, if I look at Sid Vicious....I don't believe there has been one sell-out....well, in fact there hasn't been a sell-out crowd in years.....so I guess he couldn't have been responsible for a sell-out crowd, because there hasn't been any. Lex Luger is the same way. Lex Luger is paid a high salary, but there is never any evidence anywhere to show that he's ever drawn any money.

Q:   Now, during the time that you were the booker, was the policy of WCW to pay black wrestlers a lower salary than what they were paying white wrestlers?

A:   Yeah, I don't think there is any question. I think that I offered, for instance in JYD's case....I offered him several hundred dollars per event less than I would have offered a white person, and did do that. In the case of JYD I think offered him $450 an event, $100 to be withheld to be paid later on at the end of the month, and approximately a month later or so I hired a guy by the name of Stan Hanson, who was white, and paid him $600, because I knew it was going to be difficult for the black man to argue about it...for JYD to argue about it. He was kind of between a rock and a hard spot and pretty much had to take what we'd offered, where Stan Hanson was in a better position to argue about his wages and said I'll go for $600. If I would have suggested $450 he would have just thrown it back in my face. In fact, now I'm remembering Paul _____ I think offered him something like $400/$450. He wouldn't take it.....he said no.....and I think we upped his to $600. Thunderbolt Patterson, when I started him I paid him $100 because I felt that there was so much heat and so much flack from hiring anybody who was black. When I suggested Tony Atlas everybody just kind of farted at it and decided that they didn't want Tony Atlas, and I don't know whether they thought I was gonna flood the place with blacks or what, but my intention was simply to be able to draw money, that's all, and business. I didn't care about it. I wasn't pro black, white, green....I just wanted to try to draw money, and the only way I knew how to do it was the way that it had been successful for years and year and years and years, and that is to have blacks on the card to draw not only blacks, because that wasn't the idea exclusively to draw blacks, it was a black that could perform to the point where he would draw blacks as well as whites.

Q:   Now how long did you say in a booker position with WCW?

WCW 102074

**A:**

**Q:** You were talking about...they had raised some concerns concerning JYD's dependability....do you have an opinion as to Junkyard Dog's dependability?

**A:** Well, the time that he worked for me off and on during the years prior to my being with WCW there was never a problem. He always was on time, and he always showed up. I had no reason to question whether or not he would make it.

**Q:** Did he work with you while you were with the WCW?

**A:** Well, I hired him. That's when he first came to work for WCW.

**Q:** Were there any wrestlers that you were having problems with concerning their dependability?

**A:** Yeah, a lot of them.

**Q:** Can you tell me....can you give me the names of a couple of them and the types of problems that you had with them?

**A:** We had two wrestlers that were chronically a problem....one in particular by the name of Lex Luger, who was making....my understanding was he was making $500,000 a year....and he was always a problem. He was always late. I talked to him several different times about his being tardy because it raised problems in the buildings and required that in some cases we give money back. We had to inform the spectators that he wasn't there, and I told him that unless he showed up we had no way of knowing if he intended to be there later or if something had happened where he couldn't be there....so he needed to be there on time. At the very least, on occasion, he needed to give us a phone call. If he couldn't be there on time he needed to give us a phone call and say he was running a little bit late. Well, he never thought that that was important, and I thought that was kind of funny.....well, difficult to deal with because I wouldn't do business that way. They were so concerned about JYD, and I never had a problem with JYD, and for the period of time that I was there, to my knowledge there was never a problem with JYD. And yet the guys that they had problems with, Lex Luger, Sid Vicious and a few others.....nothing was done...except in most cases they gave them a raise.

**Q:** Now isn't it your professional opinion that a JYD or a Thunderbolt Patterson could draw a larger crowd that a Lex Luger or a Sid Vicious.

**A:** Well, I can only say that the past tells me that JYD has drawn large crowds....sell outs.....in various parts of the country. Personally I know that. A guy like Thunderbolt

WCW 102075

A:  From May '91 until November of '91....November 22 or 23, something like that.

Q:  Now prior to your becoming a booker with WCW, can you tell me how many blacks you understood were on contract with WCW, prior to May of 1991?

A:  I think four would be about it.  There might have been one two more.  I'm thinking Teddy Long, Butch Reed, Ron Simmons and Ranger Ross I think at that time might have been under contract, or he had been prior to that.

Q:  Now once you became booker you said that you signed Junkyard Dog.  Were there any other blacks that you signed?

A:  Well no, I said that I don't know about a contract, because I didn't personally negotiate any contract.  I negotiated a verbal commitment on my part.  Whether that translated to a written contract later on or even at that time, I don't know.  But I brought in JYD.  I tried to bring in Tony Atlas.

Q:  What happened when you tried to bring in Tony Atlas?

A:  Everybody just nixed the idea.  He had been in a lot of trouble.  He was another unpredictable commodity, and I think again the comment against was something like "What do you owe these people, anyway?"

Q:  Had you ever wrestled with or signed Tony Atlas prior to your association with the WCW?

A:  I started Tony Atlas.  My brother Gene and myself...we started Tony Atlas.  He's from Roanoke, Virginia.....one of the toughest kids that I've ever run into.  In all the years that I wrestled we only started about three people.  We only introduced two that I can think of....one being Tony Atlas....that we introduced to wrestling, so we were rather selective over a period of 20 years.  Tony Atlas, in my estimation, was probably one of the.....he was a draw very much like Thunderbolt Patterson.....very much like Junkyard Dog.  He had the ability to talk.  He looked good.  He fit the mold that WCW seemed to want....that is the Superman type of mold.....the body builder.  Tony Atlas was a body builder before Lex Luger knew how to put his pants on.  Tony Atlas was a legitimately strong individual as well.  He did demonstrations where he would bench press 500 pounds and so forth and so on.....and he was a legitimate guy.  He was also the kind of guy that I could work with.  I took him to the Children's Hospital and did community service type things that I thought were important to help wrestling and to help Tony Atlas become popular in wrestling, and he was willing to do it.  He was just....he was, I thought, an

outstanding individual, and he would have contributed an
awful lot to wrestling.  At that point the argument couldn't
be made, like Junkyard Dog, that he was heavy, because he
wasn't.  They couldn't make the argument that he was old,
because he wasn't.  They couldn't make any argument that
would go against him, so I could only draw my own
conclusion, and that was they just didn't want Tony Atlas;
and I guess I can go further to say that I would assume that
it had to be because he was black.  If there was another
reason, I don't know what it would be.  But in any event, we
never got Tony Atlas.

Q:   Were there any other blacks that you attempted to introduce?

A:   Thunderbolt Patterson.

Q:   What happened with Thunderbolt Patterson.

A:   I just ran into a lot of crap all the time.  I had
     Thunderbolt show up every week I think for three months.  I
     hope he'll remember better than I do.  I'm not quite certain
     the length of time.  For somewhere in the neighborhood of
     like three, maybe four months, I had Thunderbolt Patterson
     come to the TV tapings.  I had him on occasion do an
     interview or two.  Every time I did that the word got back to
     the office...Jim Heard...in such a way that it was brought
     to me the next day or whatever....wanting to know what in
     the world I intended to do with the guy and so forth and so
     on, and I just made it very low key then for Thunderbolt,
     and I explained to him many times that it's real tough.  I
     said just take it easy and maybe we can work this doggone
     thing out and maybe I can finally get you into a position
     where we can try to draw some money with you, either by
     having you in the ring or by having you manage somebody in
     the ring, which was the choice, or by putting you in a
     position, which I suggested several times, where you would
     be involved directly in our management in a way where we
     could help to promote wrestling through the black community,
     and let Thunderbolt Patterson, who was well known in the
     black community in cities all over the country, work in that
     capacity to encourage black participation.  We had a deal
     set up for him to go to the.....or I should say I had an
     idea set up for Thunderbolt to attend the black tenants
     association, which was taking place in Washington, D.C., and
     it would have cost WCW say a thousand dollars.  That would
     have been way more than was necessary for the plane ticket,
     hotel, the whole works, to attend this meeting, which I
     think lasted two or three days, which I thought could have
     done a lot of elbow rubbing, etc. with the intention of
     following that up by going to black mayors all around the
     country and black officials, politicians or whatever and try
     to put wrestling back on the map and try to get communities
     and those people interested in wrestling again through black
     participation, by bringing blacks in, not only to wrestle,

but by having blacks in management and to show that things
had changed, that Turner, who is the humanitarian as we now
know....the man of the decade....was trying to change things
that had happened in the past....to include
segregation.....to include the Ku Klux Klan and all that
crap.  Thunderbolt Patterson used to say it's a new day,
it's a new day, and we tried to expound on that to show that
this was in fact a new day, and that was our idea....that
was our theory....that we would be able to go to the
officials at WCW.....Jim Heard let's say in this
case.....and convince him that would be something that would
on paper sell and would in fact could become reality.  It
could make a significant change.  Whether Heard actually
felt that way or anybody else felt that way, or for that
matter, whether I felt that way in terms of making some kind
of a sociable economic change.....I'm not trying to be that
damn goody goody....but I could see where a person could
make money out of it.  I could see where business could be
improved, and I was all for it.  So when that idea was
presented, the same thing.  What do you owe the guy?  Just
comments that indicated that I was treading on thin ice.

Q:  Who made those comments?

A:  Well it was kind of general feeling, but primarily it would
be Jim Heard.

Q:  Were there any other black wrestlers besides Junkyard Dog,
Tony Atlas and Thunderbolt Patterson, that you tried to
introduce during that time period of May '91 through
November of '91?

A:  Yeah, there were quite a few, and I'm sure that I could just
about name them.  I can think of Abdullah the Butcher, Pez
Whatley, Ranger Ross, who was, I think, out at that time,
and I would see him frequently looking for employment.
Something had happened in there, and I didn't even know what
it was.  I was really busy so I can't......I'm not quite
sure.  But I just had an overall view of the situation,
which was to promote and utilize black wrestlers because we
weren't doing business, because we didn't have the black
wrestlers and the population in terms of the wrestling body
that I thought was necessary in order to bring business back
to a comfortable level.

Q:  Now during the time that you served as the booker, what was
the average salary of a white wrestler?

A:  I couldn't tell you what the average salary was.  I can tell
you what I thought some of the salaries were.....Lex Luger
at $500,000 and Sting I think at $350,000 and Rick Flair at
probably $700,000 or $750,000.  They were white.  I think
the Steiners were probably promoted later on at about
$250,000 a piece.  Sid Vicious was in the range of $180,000

I think I told you, and then he was raised to $250,000. I think the Freebirds and Brian Pillman and those people were probably making around $104,000. To my knowledge all the white wrestlers, save one, made in excess of $100,000. The once exception would have been Tommy Rich, and my understanding there was he was making $1,500.00 a week. The black wrestlers, I don't know what they were making. I thought Ranger Ross was making like at $100,000 or $104,000. Simmons and Reed I thought were making somewhere between $104,000 and $150,000. Teddy Long I thought was like at $104,000, and that takes care of all the black wrestlers.

**Q:**   Now Butch Reed and Ron Simmons at one point were the heavy weight champions.

**A:**   Tag champions.

**Q:**   Tag champions. Do you know the average salary for two white males when they held the heavy weight tag team championship with the WCW?

**A:**   Well I don't know who had the tag.....I guess the Steiners did. At one time I think there were probably some _____ there in terms of salaries....if, in fact, Simmons and Reed were making $150,000. The Steiners, I think, also held those titles, and I think they were making $150,000. But I'm quite certain as of now that the Steiners are making $100,000 more. Arn Anderson was there, and he started at about $150,000, but if I'm not mistaken I think his salary has provision for a wage increase for something like $200,000 after the first year and $250,000 in the final year. I don't know that those provisions existed for Ron Simmons or Butch Reed, and of course, Butch Reed is no longer there. I know they wrestled Sting. I know they wrestled Luger. I know they wrestled Flair and Arn, and I know they wrestled a lot of other white people who without question were making more money than Ron Simmons and Butch Reed.

**Q:**   Now as a booker, how were you paid?

**A:**   I was an employee. I had no contract. I was paid $250,000 a year.

**Q:**   Were you paid a straight base salary at $250,000 a year?

**A:**   Yeah.

**Q:**   Were you to receive any commissions based on the gross revenue at the event?

**A:**   The deal with Heard was in his office. Prior to my becoming a booker I was given an appearance fee or talent fee I think they called it....one or the other.....interchangeably

probably....for any participation in any matches, and we did
the one thing with the Black Scorpion where I was the whole
thing, and they agreed to pay me then for all appearances
and they agreed to pay me for all pay-per-view events.
Since I was the once that booked it, since I was the once
that put the talent in the thing, and I was responsible for
making it work, it was only right in my opinion, and they
agreed, that I would get a percentage, because later on I
found out that they had offered something like $50,000 for
each show that Sid Vicious might appear in or that Rick
Flair might appear in.  They were just going to give him
fifty grand.  Now that's what I was told by Heard.  It kind
of let it slip when we were arguing about my deal.  So since
I was the one that would orchestrate what Rick Flair would
do and provide everything that would enable him to be in
that show, and the same thing as far as Sid Vicious was
concerned, and they could pick up fifty by just doing what I
told them to do, I didn't find it too difficult to imagine
that my compensation might be a little bit more, as it
always had been in years past, because a booker was
considered to be the glue that put everything together....
well, more than the glue.  He was the glue and he was the
parts and he was the man that wrote, directed,
produced....everything....and that was the way it used to
be.  He used to have the ability to hire, fire, and so forth
and so on, and I was told that I would have one year to turn
this thing around.

Q:    Who told you that you had one year?

A:    Jim Heard.

Q:    And that year commenced in May of '91?

A:    It commenced in May of '91 and ended in November of '91.

Q:    It was your understanding that it was to run until April of
      '92?

A:    It should have run until May 1 of '92.

Q:    And in fact you remained the booker until...

A:    I was actually there....the first two months....May....it
      was nothing to do with me or anything.....I started out as a
      booker, but things had already been in the works by the
      previous people.  So there was discussion at that point
      because the business was still horrible, and there was
      discussion at that point....I said well, you know, I need a
      grace period here because certainly this May thing isn't
      mine, and part of June wasn't mine.  I was making up the
      TV's for May and June, but they weren't going to be played
      until the latter part of June, because we were like four to
      six weeks ahead.  So I said we won't be able to see what I'm

WCW 102080

able to do until six weeks down the road.  All I'm doing is just cleaning up all the crap that's been thrown my way.  So when we got to July, August, September, October and November, I booked such things as the Clash in September, the July Bash, and the Halloween Havoc in October.  The Clash turned out to be the best numbers they had.  It was a classic example of how things should be.  August revenues....my understanding was the August revenues were in excess of $1,000,000.  Revenues now on a monthly basis are probably $250,000 - $300,000.  The numbers went as high as a seven two if I remember right on the Clash in September.  The Halloween Havoc....Heard badmouthed me and told everybody before....the personal crap.  He told me when I talked about getting my money for pay-per-view, he said that was the worst show they ever had so I should just hide my head in shame and walk out the damn door.  It turns out that that was the best pay-per-view they ever had, but still there was no money forthcoming.  Anyway....that period of time was the best that they've had as far as numbers as concerned, as far as revenues are concerned, as far as pay-per-view things are concerned.  When the five months got over, because I think I argued vociferously, if that's the word I can use, for different things that I thought should be done to a make it right.  I think he just got tired of listening to me and just decided that they didn't need me, and then after that we can draw our own conclusions as to why.

Q:   Now for the pay-per-view, did you have any idea how much money you thought you were entitled to?

A:   I'm from the old school, and in the old school there were no set figures, you know.  If a person treated you right, you worked for them.  If a person didn't treat you right, you walked away.  A lot of things were done on handshakes.  In fact, there were no contracts back then.  You walked in and you say, well, I'm gonna work blah, blah, blah, and once again you had an idea what the house was....they wouldn't have to tell you....the house was $20,000.  If I was_____, I could expect that I would make somewhere between 6, maybe 7, 8 percent of that figure.  When I'd get my pay check and I could compute what 6% of $20,000.....1,200 bucks.....if I'd get 1,200 bucks I was happy.  If I got 1,300 bucks I was happy.  If I got 1,100 bucks, I wasn't going to argue about it.  If I got 800 bucks I'd go in and argue.  I'd say something.  To hell with this thing....hold it....what's going on here.  Then they might tell me their story, whatever it might be.  If it sounded plausible, like there were extra guys on the doggone card, or if we had unusual expenses, you might just swallow it and say okay, live and let live, and we all got to get along.  So when you say did I anticipate anything out of the pay-per-view.  All I could do was say that I would anticipate that whatever they had offered completely to somebody, that

WCW 102081

I had to be entitled to at least to that. And if they offered that to several people, well then it kind of gets screwed up because if there were ten people and they were all offered $50,000, I wouldn't reasonably say I should get $500, but I'll tell you when I first took the job I didn't know what some of the other wrestlers were making, and when I found out and found out that Flair was making $700 or $750 and Luger $500, I seriously, based on the old days, said well, the booker always makes more, because the booker was responsible for putting that guy in that position to make that money, and so I was going to go with the argument and say, I'll settle for the same as Luger's got - $500. Well shoot, they'd have laughed me right out of the deal. So I said okay, $250, and they went for $250. But there again the $250 was to be sliced with the pay-per-view, which in my estimation could have brought it up to something significantly better that $250.

Q:   During your six months as a booker did they pay you based on an annual salary of a quarter of a million dollars a year?

A:   Yes.

Q:   Mr. Anderson, let me just ask you some housekeeping questions now. Have you given this statement based on your own personal knowledge?

A:   Yes, I have.

Q:   Has anyone promised or induced you in any way to give this information.

A:   No.

Q:   Are you presently under the influence of any drugs or alcohol?

A:   No.

Q:   Have you given this statement on what you believe to be the truth as it relates to your employment with the NWA and the WCW?

A:   Yes, I have.

Q:   That concludes the statement of Olie Anderson.

Q:   This is a continuation of the statement of Olie Anderson. Could you please give us your opinion as it relates to who's really behind taking a wrestler and helping him to ascend to the ranks of Heavyweight Champion or Television Champion?

A: Going back, it used to always be the booker or the owner of the territory as such that would be able to determine who was going to be what. With the acquisition by Turner it became even more pronounced that the ability to make a star was with the position of either the booker or whoever it was that was running the organization. In this case it would have been like Jim Heard. You just took a body and did whatever you wanted to do.

Q: Can you tell us about the facts or circumstances that led up to Ron Simmons and Butch Reed becoming the Tag Team Heavyweight Champions.

A: Well, I think there was a period there in the summer or so of '91 where there was some concern. Some of the black wrestlers.....Rocky King was rumored to being upset...unhappy with his situation in the wrestling world....not making enough money or whatever. The rumor was pretty much that he may be attempting to make some kind of a legal problem as a result of racial discrimination or whatever, and we then made black tag team of Ron Simmons and Butch Reed. Somewhere in that time period we made them the World Tag Team Champions, and as Heard said, this should prove that we're not discriminatory. This should prove that we've taken a black team and we've made them champion so that they wouldn't have any bitch from a racial point of view.....not using blacks and not making them champion.

Q: So it's your opinion that that was done to pacify the black community such that they would believe that the WCW did not discriminate against black wrestlers?

A: Yeah, I would say so.

**TURNER BROADCASTING SYSTEM, INC.**
ONE CNN CENTER, Box 105366, Atlanta, GA 30348-5366

**GINGER S. McRAE**
Assistant General Counsel
(404) 827-3113
Telecopy (404) 827-1995

April 8, 1992

Ms. Lois S. Madison
Investigator
Equal Employment Opportunity Commission
Citizens Trust Building, Suite 1100
75 Piedmont Avenue, N.E.
Atlanta, GA  30335

    Re:  Robert L. Ross v. World Championship Wrestling, Inc.
         EEOC Charge No. 110920735

Dear Ms. Madison:

    This letter is in response to your request for a position
statement and certain other information with respect to the
referenced Charge.  This response is provided with the
understanding that all information and documents will be kept
confidential.

I. Position Statement

    World Championship Wrestling, Inc. ("WCW") is a company which
promotes matches between professional wrestlers for viewing by
live and television audiences.  WCW associates professional
wrestlers under various arrangements to perform in its matches.
None of these wrestlers is employed by Respondent.  Some of them
are associated by the event and others are associated over a
longer term for a larger number of events.

    Charging Party is a professional wrestler who performed
services for Respondent at various times.  He first worked for
Respondent from February 1989 to April 1990.  He performed
services pursuant to a verbal agreement for $2,000.00 bi-weekly.
The decision to associate Charging Party for this period was made
by Jim Herd, Respondent's Executive Vice President at the time.
Of course, Mr. Herd was aware Charging Party is black.  Charging
Party made no complaints of race discrimination at the end of
this initial association with Respondent.

    In late 1990 or early 1991, Charging Party approached
Respondent about again using him as a wrestler.  He had adopted

WCW 102084

the professional name "Ranger Ross", and portrayed himself as loosely connected with the military to take advantage of the Persian Gulf War and the current popularity of people and things associated with the military. Mr. Herd was interested in this idea and thought it might play well to Respondent's audience. He therefore agreed to a contract to use Respondent's services for a six-month term, to expire July 14, 1991. The agreement entered into by Charging Party and Respondent is attached as Exhibit A. It is entitled "WCW Freelance Wrestler/Independent Contractor Agreement" and clearly sets forth that Charging Party is an independent contractor. Charging Party explicitly acknowledged this fact in signing the contract. He agreed that the commitment was for a definite term of six months. He agreed that he, not Respondent, was fully responsible for all taxes owed by him on compensation for his services and that he was not entitled to the benefits provided by WCW to its employees.

The agreement signed by Charging Party did not limit his ability to work elsewhere. He provided his own costumes and makeup in performing as "Ranger Ross". Charging Party performed and was paid through July 14, 1991. Respondent fully performed its contractual obligations to him. At the end of his term, he was told by Mr. Herd, who had associated Charging Party on both occasions, that "Ranger Ross" had not achieved a satisfactory level of success with WCW's audiences and WCW was not interested in signing him to a new contract. Charging Party and a number of white wrestlers whose achievement of success with audiences also had been unsatisfactory ceased services for Respondent in the summer of 1991.[1]

It is clear that Charging Party was not an employee covered by Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e(f); Mathis v. Standard Brands Chemical Industries, 10 FEP cases 295 (N.D. Ga. 1975). Although, as is customary in the industry, Respondent gave Charging Party direction as to the ultimate outcome of his matches, the details of his performance were left to him. He supplied his own professional name and persona, and accompanying costumes and makeup. The agreement between the parties clearly specified that Charging Party was an independent contractor and Charging Party freely acknowledged that fact in signing the agreement. The agreement allowed Charging Party the freedom to work elsewhere. He did not receive the benefits provided by Respondent to its employees. The industry has consistently treated professional wrestlers such as Charging Party as independent contractors. All these facts are indicative of an independent contractor situation. Cobb v. Sun Papers, Inc., 673 F.2d 337 (11th Cir.), cert. denied, 459 U.S. 874 (1982).

---

[1]Charging Party was asked to and agreed to perform for one event on September 5, 1991.

-2-

WCW 102085

Assuming for purposes of argument only that Charging Party
was an employee, it is clear he was not discriminated against in
any way.  Mr. Herd made the decision to use Charging Party's
services on both occasions.  Mr. Herd also made the decision not
to offer a new contract when Charging Party's contract expired in
July 1991.  When such a short time passes between such actions,
and the same manager is involved in both decisions, a claim of
racial animus in the discharge, but not in the hire, is
irrational and does not support any finding of intentional
discriminations.  Proud v. Stone, 945 F.2d 796 (4th Cir. 1991).

Moreover, as stated above, a number of white wrestlers were
released in the summer of 1991.  A list of those individuals is
attached as Exhibit B.  A number of black wrestlers and other
performers worked for WCW at this time and were retained.  They
are Curtis Hughes, Teddy Long, Sylvester Ritter and Ronald
Simmons.  All these individuals still perform for WCW.
Obviously, race was not a criteria for the releases in the summer
of 1991.  Rather, it was based on purely business reasons.

Further, it is clear that race was not a factor in Charging
Party's compensation.  There are no scales or ranges of
compensation for wrestlers.  The compensation a wrestler or other
performer receives in each case is wholly dependent on
negotiation between the parties.  Obviously, Respondent strives
to negotiate as low an amount as possible and the wrestler seeks
to get as much money as possible.  The resulting amount depends
on the wrestler's stature in the industry, his bargaining skills,
Respondent's economic capacity at the time, Respondent's
bargaining skills and many other factors.  White wrestlers
similar to Charging Party made comparable amounts.  Thus, Rick
Jones was paid five $250.00 per event and worked about five times
every week, a total of $1,250.00, an amount less than Charging
Party.  Richard Slater earned $300.00 per event for about five
events per week, or about the same as Charging Party.  Matt
Osburne made $3,000.00 every two weeks, the same as Charging
Party, who made $1,500.00 per week.  Charging Party's wage claim
is without merit.

## II.  Response to Charge

1.  As explained and supported in Section I, Charging Party
performed as an independent contractor from January 15, 1991
through July 14, 1991 pursuant to a written agreement.  As set
forth above, compensation of wrestlers is individually negotiated
and is the result of many factors, and therefore comparisons to
other wrestlers have little value.  However, as shown above,
Charging Party's earnings were about the same as or more than
several white wrestlers.

2.  Charging Party was told WCW was not interested in signing
a new contract with him due to his lack of success during the

-3-

WCW 102086

term of his agreement, as explained above. Respondent cannot admit or deny the second sentence of this paragraph; however, as also explained above, each wrestler's compensation is individually negotiated and comparisons are not especially meaningful.

3. Respondent denies that it discriminated against Charging Party in any way.

## III. Response to Request for Information

1. Information shown on the Charge is correct.

2. See Section I above.

3. Charging Party was an independent contractor, as explained in Section I, and written rules, policies and procedures for employees did not apply to him. With respect to independent contractors such as Charging Party, it is up to the manager to decide whether and when to use their services.

## Discharge

1. As explained fully in Section I, Charging Party was not "discharged". Respondent complied in every way with its agreement with Charging Party, set forth in Exhibit A. Respondent opted not to enter a new agreement with Charging Party, as it had every right to do. The agreement did not contemplate any extension and Respondent was under no obligation to offer one. Jim Herd, then Respondent's Executive Vice President, white, made the decision not to enter a new agreement with Charging Party in conjunction with discussions with his assistants. Charging Party had no personnel file. The independent contractor agreement is attached as Exhibit A and documents regarding Charging Party's compensation are attached as Exhibit C.

2. Because Charging Party was an independent contractor, not an employee, and was not "discharged", Respondent objects to this request.

3. See response to 2 above.

4. See response to 2 above.

5. See response to 2 above. But see Exhibit B for a list of white wrestlers released in the summer of 1991.

## Additional Questions

1. a. See Exhibit A.

-4-

WCW 102087

     b.   See Exhibit C.  Charging Party was paid in accordance with Respondent's and the industry practice for paying performers.  Thus, he received a "draw" of $100.00 at the time of the event and a "talent event fee", or an allocation of the gross revenues of an event to an individual based on his position on the "card", according to industry practice.  The balance between these amounts and Charging Party's contractual compensation was paid on a bi-weekly basis.  This system of payment is not typical of payments to employees who are generally paid the same amount on a regular schedule.

     c.   See Exhibit A.

     d.   See Exhibit C.  Such taxes were not withheld.

     e.   No benefits were provided.

     f.   Charging Party was covered under a separate policy applicable only to wrestlers.

     g.   Charging Party was told his contract was expiring and that WCW was not interested in a new agreement.

     h.   The agreement did not restrict Charging Party's freedom to work elsewhere.

     i.   Charging Party could not delegate his wrestling duties.

     j.   Respondent does not understand this question; however, Charging Party supplied his own costumes and makeup.

## IV. Conclusion

As fully set forth above, Charging Party's Charge is completely without merit for two reasons.  First, he was an independent contractor not covered by Title VII.  Charging Party assented to and never challenged this arrangement, which is followed throughout the professional wrestling industry.  He should not be able to claim now that he was an employee.

Second, even assuming for purposes of argument only that Charging Party was an employee, Respondent chose not to enter a new contract with Charging Party due to business reasons having to do with his failure to achieve a satisfactory level of success as a wrestler and not at all with race.  A number of white wrestlers met the same fate during the summer of 1991.  Other black wrestlers have continued to perform for WCW.  While working for Respondent, Charging Party suffered no discrimination in compensation.  Compensation was a subject of individual negotiation and depended on a number of factors, none of them related to race.

-5-

WCW 102088

Charging Party's Charge is without merit. Respondent
requests that the Commission promptly issue a finding of no
reasonable cause.

Sincerely,

*Ginger S. McRae*

Ginger S. McRae
Assistant General Counsel

GSM:lwt

\mcrae\letters\madison.rsp/lwt

-6-

WCW 102089

**EXHIBIT A**

## World Championship Wrestling, Inc. Freelance
## Wrestler/Independent Contractor Agreement

1.  I, <u>Robert Ross, Jr.</u>          (<u>Ranger Ross</u>),
        Name                            Ring Name

agree to perform services for World Championship Wrestling, Inc.
("WCW") as requested by WCW at the rate of $1,500.00 per week
for the period of January 15, 1991 through July 14, 1991.  I
understand that I shall be entitled to such compensation only if
I appear and complete the services requested by WCW for such
event and in the manner requested by WCW.

    2.  I understand and agree that I perform such services as
an independent contractor and not as an employee of WCW.  I
agree that I shall be fully responsible for taxation of the
amounts paid to me by WCW as compensation for my services and
that WCW shall bear no responsibility for such taxation.  I
agree that I am not entitled to the benefits provided by WCW to
its employees.  I understand that WCW makes no commitment to use
my services and makes no guarantee of any number of events or
amount of compensation.

    3.  I understand that if I am injured inside the ring and
within the crowd barriers at an event while performing services
for WCW pursuant hereto, as determined by the schedule of
physicians provided by WCW, WCW shall assume responsibility for
medical expenses directly related to such injury through and
according to its respective insurance program.  I understand
that I will be paid only for events for which I was scheduled at
the time I was injured and only if WCW's doctor certifies that
the injury prevents me from wrestling and I appear at the event
for interviews and other tasks as requested by WCW (unless I am
unable to appear as certified by WCW's doctor); provided,
however, that such payment shall be reduced by payments other
than those for medical treatment to which I may be entitled
under WCW's insurance or otherwise.  I understand I will not be
paid for events for which I might have been scheduled while I am
injured.

    4.  I agree that all programs, recordings and work product
in connection with which I perform services and my contributions
thereto (the "Works") shall belong solely and exclusively to
WCW.  To the extent that such Works are considered contributions
to collective works and/or parts or components of audio-visual
works, I agree that the Works shall be considered "works made
for hire" under the U.S. Copyright Act of 1976, as amended.  To
the extent that such Works are deemed otherwise, I assign to WCW
all rights, title and interest in and to the copyright of such
Works.

WCW 102090

5.  I release WCW and its agents from and waive any and all claims arising out of my independent contractor relationship with WCW, except as set forth specifically above in paragraph 3.  I have read this Agreement and understand its terms.  I agree that my relationship with WCW is covered by this Agreement for all purposes and at all times unless and until it is superseded by a subsequent written agreement, and that this Agreement shall be governed by the laws of the state of Georgia, whose courts shall have jurisdiction with respect to any dispute arising under this Agreement or my relationship with WCW.

World Championship Wrestling, Inc.

By: _____
          Signature

_____
          Date

Independent Contractor

_____
          Signature

_____
          Date

-2-

WCW 102091

**EXHIBIT B**

| NAME | RING NAME | DATE RELEASED | RACE |
|------|-----------|---------------|------|
| Carline, Gary | Rip Morgan | August 1991 | White |
| Colley, Randy | Moon Dog | August 1991 | White |
| Gibson, Robert | Reuben Cain | August 1991 | White |
| Gray, George | One Man Gang | September 1991 | White |
| Haynes, William | Black Blood<br>Bill Jack Haynes | August 1991 | White |
| Humperdink, Oliver | John Sutton | August 1991 | White |
| Jones, Rick | Black Bart | August 1991 | White |
| Keown, Wayne | Dutch Mantell | August 1991 | White |
| Murdock, Richard | Dick Murdock | August 1991 | White |
| Reininghaus, Kenny | Jack Victory<br>Russian Assassin | August 1991 | White |
| Ross, Robert | Ranger Ross | July 1991 | Black |
| Slater, Richard | Dick Slater | August 1991 | White |
| Smith, Mike | Sam Houston | August 1991 | White |
| Spivey, Danny | Danny Spivey | June 1991 | White |

## EXHIBIT C

WORLD CHAMPIONSHIP WRESTLING, INC.
TALENT PAY SUMMARY
1991

NAME: ROSS.JR.       . ROBERT

| EVENT DATE | CITY | STATE | DESCRIPTION | AMOUNT |
|---|---|---|---|---|
| 1/30/91 | GAINESVILLE | GA | DRAW | (100.00) |
| 1/30/91 | GAINESVILLE | GA | TALENT EVENT FEE | 200.00 |
| 2/10/91 | ATLANTA | GA | AS PER CONTRACT | 2,800.00 |
| 2/24/91 | ATLANTA | GA | AS PER CONTRACT | 3,000.00 |
| 2/26/91 | ATLANTA | GA | AS PER CONTRACT | 2,775.00 |
| 2/26/91 | ATLANTA | GA | TALENT EVENT FEE | 225.00 |
| 3/12/91 | ATLANTA | GA | AS PER CONTRACT | 2,850.00 |
| 3/12/91 | ATLANTA | GA | TALENT EVENT FEE | 150.00 |
| 4/07/91 | ATLANTA | GA | AS PER AGREEMENT | 3,000.00 |
| 4/21/91 | ATLANTA | GA | AS PER CONTRACT | 3,000.00 |
| 4/24/91 | DOTHAN | AL | AS PER CONTRACT | 450.00 |
| 4/24/91 | DOTHAN | AL | DRAW | 0.00 |
| 4/24/91 | DOTHAN | AL | TALENT EVENT FEE | 150.00 |
| 4/25/91 | PANAMA CITY | FL | AS PER CONTRACT | 450.00 |
| 4/25/91 | PANAMA CITY | FL | DRAW | 0.00 |
| 4/25/91 | PANAMA CITY | FL | TALENT EVENT FEE | 150.00 |
| 4/26/91 | VALDOSTA | GA | DRAW | (100.00) |
| 4/26/91 | VALDOSTA | GA | TALENT EVENT FEE | 150.00 |
| 4/27/91 | JEKYLL ISLAND | GA | AS PER CONTRACT | 900.00 |
| 4/27/91 | JEKYLL ISLAND | GA | DRAW | 0.00 |
| 4/27/91 | JEKYLL ISLAND | GA | TALENT EVENT FEE | 150.00 |
| 4/28/91 | COLUMBIA | SC | AS PER CONTRACT | 450.00 |
| 4/28/91 | COLUMBIA | SC | TALENT EVENT FEE | 150.00 |
| 5/16/91 | RICHMOND | VA | AS PER CONTRACT | 1,350.00 |
| 5/16/91 | RICHMOND | VA | DRAW | (100.00) |
| 5/16/91 | RICHMOND | VA | TALENT EVENT FEE | 150.00 |
| 5/17/91 | WASHINGTON | DC | AS PER CONTRACT | 1,350.00 |
| 5/17/91 | WASHINGTON | DC | LICENSE FEE | (20.00) |
| 5/17/91 | WASHINGTON | DC | TALENT EVENT FEE | 150.00 |
| 6/02/91 | ATLANTA | GA | AS PER CONTRACT | 3,000.00 |
| 6/16/91 | ATLANTA | GA | AS PER CONTRACT | 3,000.00 |
| 6/30/91 | ATLANTA | GA | AS PER CONTRACT | 3,000.00 |
| 7/14/91 | ATLANTA | GA | AS PER AGREEMENT | 3,000.00 |
| 9/05/91 | AUGUSTA | GA | DRAW | (100.00) |
| 9/05/91 | AUGUSTA | GA | TALENT EVENT FEE | 250.00 |

TOTAL PAY 1991    35,830.00

*Add Back Draws*    420.00

0.t

35.830.00+
420.00+
36.250.00t

9-5-91
36.250.00+
250.00-

*9-5-91 Payment*    36,250.00
                    ( 250.00 )

                    36,000.00

WCW 102002

WORLD CHAMPIONSHIP WRESTLING
ROBERT ROSS, JR.
EARNINGS FOR 1990

| | | REFLEX AMOUNT | EVENTS WORKED |
|---|---|---|---|
| 18–Dec–89 | 31–Dec–89 | 2,000.00 | 7 |
| 01–Jan–90 | 14–Jan–90 | 2,000.00 | 9 |
| 15–Jan–90 | 28–Jan–90 | 2,275.00 | 11 |
| 29–Jan–90 | 11–Feb–90 | 2,000.00 | 3 |
| 12–Feb–90 | 25–Feb–90 | 2,000.00 | 9 |
| 26–Feb–90 | 11–Mar–90 | 2,000.00 | 9 |
| 12–Mar–90 | 25–Mar–90 | 2,000.00 | 4 |
| 26–Mar–90 | 08–Apr–90 | 2,000.00 | 7 |
| 09–Apr–90 | 22–Apr–90 | 2,000.00 | 2 |
| | | 3.63 | WRESTLERS RIGHTS |
| | | 0.84 | WRESTLERS RIGHTS |
| | | $18,275.00 | 61 |

```
                                    0 • *

        1990    18,275•00+
        1989    43,003•46+
                61,278•46*
```

WCW 102094

WORLD CHAMPIONSHIP WRESTLING
ROBERT ROSS, JR.
EARNINGS FOR 1989

| | | REFLEX AMOUNT | | EVENTS WORKED |
|---|---|---|---|---|
| 27–Feb–89 | 12–Mar–89 | 450.00 | | 3 |
| 13–Mar–89 | 26–Mar–89 | 1,850.00 | | 13 |
| 27–Mar–89 | 09–Apr–89 | 2,000.00 | | 12 |
| 10–Apr–89 | 23–Apr–89 | 2,000.00 | | 2 |
| 24–Apr–89 | 07–May–89 | 2,000.00 | | 5 |
| 08–May–89 | 21–May–89 | 2,000.00 | | 3 |
| 22–May–89 | 04–Jun–89 | 2,775.00 | | 14 |
| 05–Jun–89 | 18–Jun–89 | 2,752.00 | | 5 |
| 19–Jun–89 | 02–Jul–89 | 2,000.00 | | 3 |
| 03–Jul–89 | 16–Jul–89 | 2,400.00 | | 11 |
| | | 0.46 | MDSE SALES | |
| 17–Jul–89 | 30–Jul–89 | 2,000.00 | | 6 |
| 31–Jul–89 | 13–Aug–89 | 2,000.00 | | 6 |
| 14–Aug–89 | 27–Aug–89 | 2,000.00 | | 5 |
| | | 1.00 | MDSE SALES | |
| 28–Aug–89 | 10–Sep–89 | 2,000.00 | | 7 |
| 11–Sep–89 | 24–Sep–89 | 2,000.00 | | 3 |
| 25–Sep–89 | 08–Oct–89 | 2,000.00 | | 2 |
| 09–Oct–89 | 22–Oct–89 | 2,000.00 | | 1 |
| 23–Oct–89 | 05–Nov–89 | 2,000.00 | | 5 |
| 06–Nov–89 | 19–Nov–89 | 2,000.00 | | 4 |
| 20–Nov–89 | 03–Dec–89 | 2,775.00 | | 14 |
| 04–Dec–89 | 17–Dec–89 | 2,000.00 | | 7 |
| | | $43,003.46 | | 131 |



# EXHIBIT / ATTACHMENT

## AA

**(To be scanned in place of tab)**

DECLARATION OF PAMELA COLLINS

STATE OF GEORGIA
COUNTY OF *Cobb*

Pamela Collins gives the following declaration under penalty of perjury and states as follows:

1.

I worked for World Championship Wrestling Organization ("WCW") in the call center. My official position was the call center coordinator.

2.

I recall WCW submitting a written request for each employee to write a job description. This description was later to be used for WCW's Employee Job Profiles.

3.

In filling out the questionnaire, I correctly indicated that I "supervised" four to six customer service representatives. Although I was actually supervising four to six customer service representatives, I was never made a supervisor at WCW.

4.

Until the time that WCW ceased operating, I continued to work as the call center coordinator. I was never paid as a supervisor, and was only paid for being the "call center coordinator."

5.

Throughout my employment with WCW, I often heard various rumors about discrimination. I could not help but notice that Caucasians dominated WCW, and we had few minorities. I became aware that there were specific complaints of discrimination filed by some of the wrestlers at WCW. I am certain that I was aware of these claims of discrimination before July 9, 2000.

6.

On July 9, 2000, Booker T was made the world champion. Because I routinely watched various videotapes of WCW's events, I watched the videotape of Booker T. I am confident that I was aware of the claims regarding discrimination prior to the time in which Booker T became champion.

7.

As I watched the numerous videotapes of the WCW wrestlers, I often wondered why there was not more diversity among the wrestlers. The successful wrestlers were predominately Caucasian. With the exception of Booker T and a few other wrestlers, WCW was dominated by successful Caucasian wrestlers.

I declare under penalty of perjury that the foregoing is true and correct.

Pamela Collins

1-7-2003

Executed on (Date)



# EXHIBIT / ATTACHMENT

# BB

**(To be scanned in place of tab)**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BOBBY WALKER,                        )
                                     )
                  Plaintiff,         )
                                     )    CIVIL ACTION FILE
v.                                   )
                                     )    NO. 1:01-CV-0367-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,  )
TURNER SPORTS, INC., and             )
TURNER BROADCASTING SYSTEM, INC.,    )
                                     )
                  Defendants.        )

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Universal Wrestling Corporation (f/k/a World Championship Wrestling, Inc. and hereinafter referred to as "WCW"), Turner Sports, Inc. ("TSI") and Turner Broadcasting System, Inc. ("TBS") (collectively "Defendants") submit this Memorandum in Support of their Motion for Summary Judgment on all claims brought by Plaintiff Bobby Walker ("Walker").

### INTRODUCTION

Walker's Third Amended Complaint contains claims of race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and under the Civil Rights Act of 1866, 42 U.S.C. § 1981, and also alleges a Georgia state law claim of intentional infliction of emotional distress. With respect to Walker's race discrimination claims, he alleges that WCW (i) discriminated against him due to his race (African-American)

with regard to wrestling opportunities, (ii) retaliated against him for complaining about alleged racial discrimination, and (iii) subjected him to a racially hostile environment.  Walker also alleges that by engaging in such discriminatory conduct, WCW intentionally caused him emotional distress.  Based upon principles of agency and vicarious liability, Walker seeks not only to hold WCW liable for these alleged acts, but seeks to hold TSI and TBS liable as well.

As shown below, Walker's claims are completely baseless.  In fact, Walker has not presented even a scintilla of evidence showing that he was treated differently due to his race.  To the contrary, the evidence establishes that Walker was given numerous and significant wrestling opportunities and treated like other similarly-situated white wrestlers with WCW.  In addition, the record shows that Walker was not subjected to any retaliation or adverse action for complaining about discrimination, and that he was not subjected to a racially hostile environment.  Because WCW's decisions or actions taken with regard to Walker were based on legitimate, non-discriminatory business reasons that had nothing to do with Walker's race, summary judgment should be entered in WCW's favor on all of Walker's claims.  Moreover, because Walker's claims against TSI and TBS derive from Walker's claims against WCW, and are based upon principles of agency and vicarious liability,

summary judgment should also be granted in favor of TSI and TBS on Walker's claims.

**STATEMENT OF FACTS**

**WCW's Business**

WCW created, produced, and marketed professional wrestling events during the 1990s and through March 2001. (Affidavit of Diana Myers (hereinafter "Myers Aff.") ¶ 3 (a copy of this affidavit is attached hereto as Exhibit A)). WCW's events were seen by live audiences and/or aired on various television networks and pay-per-view cable and satellite systems. (Id.) The wrestlers and other on-screen wrestling talent who appeared in WCW's wrestling events generally provided their services to WCW as independent contractors, either through formal written contracts or without written agreements. (Id. at ¶ 4). WCW's wrestling events, both live and taped, were created by a creative team of writers and producers at WCW, with the goal of entertaining wrestling fans and general audiences nationwide.[1] (Id. at ¶ 3).

After having much commercial and financial success in the mid-to-late 1990s, WCW's business suffered a sharp downturn in 1999.

---

[1] Traditionally, individuals known as "bookers" were responsible for "booking" matches at arenas or live events. As the business changed and professional wrestling became more of a television property, "bookers" also began creating wrestling events for television. More recently, while individuals known as "bookers" continued to be involved in creating wrestling events, WCW brought in additional writers and staff as part of the creative team. (Deposition of Eric A. Bischoff ("Bischoff Dep.") at 46-49).

(Myers Aff. ¶ 6).  In 1999, WCW lost significant sums of money and, thus, only added new talent that it perceived was likely to generate substantial revenue.  (Id.)  WCW also began reducing the compensation of existing talent, and began producing fewer and fewer wrestling events.  (Id.)  Moreover, because of the downturn and reduced number of productions, in 1999 and over the next two years, WCW had less and less need for wrestling services, including on-screen talent, trainers, and creative staff.  (Id. at ¶ 7).  WCW even terminated some of its televised events, including a taped show commonly referred to as its "Saturday Night" show, in early 2000.  (Id. at ¶ 6).  Despite these efforts, WCW's business downturn continued, and in March 2001, WCW sold certain of its assets and ceased its operations.  (Id. at ¶ 8).  After the sale of assets was completed, WCW changed its name to Universal Wrestling Corporation.  (Id.)

## Walker's Background And Relationship With WCW

Walker first became affiliated with WCW in July 1993, when he began training, pursuant to a written contract, at WCW's Power Plant facility.  (Deposition of Bobby L. Walker, Jr. (hereinafter "Walker Dep.") at 23).[2]  Walker's training contract ran through October 17, 1993 and provided that Walker would receive $400 per

---

[2] Excerpts of deposition testimony and copies of deposition exhibits referenced herein are included in the Appendix, filed simultaneously herewith.

week during his training period.  (Walker Dep. at 23-26, Exh. 1

(Independent Contractor Agreement, dated July 26, 1993)).  The

purpose behind this training period was to help Walker develop not

only the physical skills necessary to wrestle professionally with

WCW, but also to help him develop the charisma, acting ability, and

uniqueness necessary to carry out an entertaining wrestling match

with minimal instruction.  (Affidavit of James A. Morrison (p/k/a

"J.J. Dillon") (hereinafter "Dillon Aff.") ¶ 5 (a copy of this

affidavit is attached hereto as Exhibit B)).

In April 1994, after Walker's training contract expired, he

began wrestling professionally with WCW pursuant to a one-year

independent contractor agreement.  (Walker Dep. at 30, Exh. 3

(Independent Contractor Agreement, dated April 25, 1994)).  Walker

still lacked the level of excitement, wrestling skills, uniqueness

and acting ability necessary to be a successful talent with WCW.

(Affidavit of Joseph N. Hamilton ("Hamilton Aff.") ¶¶ 5-6 (a copy

of this affidavit is attached hereto as Exhibit C)).  Accordingly,

Walker continued to train at the Power Plant, even after he

received his wrestling contract.  (Walker Dep. at 31-32; Hamilton

Aff. ¶ 3).  Walker also had not yet perfected his "finishing move,"

which involved walking across the ropes surrounding the wrestling

ring.[3]  (Hamilton Aff. ¶ 7).  It was crucial for Walker to perfect his finishing move to gain substantial live television time because WCW fans were unforgiving when it came to blunders and failed wrestling attempts.  (Deposition of Jimmy R. Hart (hereinafter "Hart Dep.") at 74-75; Deposition of Martin Lunde (hereinafter "Lunde Dep.") at 54).

In a further effort to provide Walker with an opportunity to develop his potential, WCW again renewed Walker's contract in 1995 and entered into a series of independent contractor agreements with him through the end of 1997.  (Walker Dep. at 23-43, 51, 65-68, Exhs. 4-6 (respectively Independent Contractor Agreements, dated April 25, 1995, April 25, 1996 and April 25, 1997)).  Each of these agreements provided that WCW could terminate Walker "with or without cause", so long as Walker was given thirty days notice. (See Walker Dep. at Exhs. 4 and 5, ¶ 8(b)).  Even so, during this time, Walker was given a variety of wrestling opportunities that were commensurate with his skill level and crowd appeal.  (Myers Aff. ¶ 14).  In fact, Walker wrestled in over eighty events between 1996 and 1997.  (Myers Aff. ¶ 15).

---

[3] Wrestlers often use unique "signature moves" to "defeat" their opponents at the end of a wrestling match.  Walker's signature move involved walking on the ropes of the wrestling ring and then attacking his opponent from the ropes.  Although this is a unique concept, Walker was often unable to effectively execute this move and frequently fell off of the ropes when attempting to finish off his opponent.  (Dillon Aff. ¶ 7).

Despite WCW's significant efforts to provide Walker with wrestling opportunities, his performances never generated significant fan interest. Walker simply was unable to develop the charisma, excitement, and uniqueness of WCW's other, more popular wrestlers. (Affidavit of Paul Orndorff (hereinafter "Orndorff Aff.") ¶ 4 (a copy of this affidavit is attached hereto as Exhibit D); Hamilton Aff. ¶ 8). As Walker acknowledges, he lacked flash, uniqueness and excitement. (Walker Dep. at 58-59).

Not only did Walker's deficiencies in these areas limit the venues in which he could wrestle and his ability to generate significant crowd interest or rating revenue for WCW, but the fact that he sprained his right knee and tore his anterior cruciate ligament ("ACL") in that knee in June of 1997 also limited his wrestling opportunities. (Walker Dep. at 62-64, Exh. 6). In fact, for a period of time, Walker was unable to exercise for extended periods without his knee swelling or collapsing on him. (Id. at Exh. 6). In an attempt to return to proper wrestling condition, and because his injury impeded his career development, in 1998, Walker had surgery to repair his torn ACL and spent several months in rehabilitation. (Walker Dep. at 65-66, Exh. 6).

**WCW Terminates Walker's Independent Contractor Agreement And Walker Sues WCW**

In 1998, in an effort to significantly reduce its costs, WCW exercised its right to terminate the contracts of some of its less

skilled and less popular wrestlers, including Walker.   (Walker Dep. at 67).   Upon being informed that his contract would be terminated in light of the cutback, Walker met with WCW Vice President, Eric Bischoff, to discuss his status.   (Walker Dep. at 68-69).   As a result of this meeting, Mr. Bischoff offered Walker a new wrestling contract.   (Id.)   However, Walker rejected the offer and, instead, filed a charge of discrimination against WCW with the Equal Employment Opportunity Commission ("EEOC").   (Walker Dep. at 69-70).   Because no employer-employee relationship existed between Walker and WCW, the EEOC charge was dismissed.   Walker then filed suit against WCW alleging that he was denied wrestling and pay opportunities on account of his race.   (Walker Dep. at 71).

**Walker Settles His First Lawsuit Against WCW And Signs A New Independent Contractor Agreement**

On December 21, 1998, Walker resolved his first lawsuit against WCW, and the case was dismissed.   (Id.)   Pursuant to the settlement agreement between Walker and WCW ("the Settlement Agreement"), Walker voluntarily released any and all claims arising from or relating to his contractual relationship with WCW, the termination of his contract by WCW, and all other claims that could have been made as of the date of the Settlement Agreement.   (Walker Dep. Exh. 10 at ¶ 3).

Despite the fact that he had previously alleged that WCW somehow discriminated against him, Walker also sought, as part of

the Settlement Agreement, the opportunity to continue wrestling with WCW.  (Walker Dep. Exh. 10 at ¶ 2).  Therefore, pursuant to the Settlement Agreement, on January 1, 1999, Walker entered into yet another independent contractor agreement with WCW, which paid him $100,000 per year.  (Walker Dep. Exh. 11 (Independent Contractor Agreement, dated January 1, 1999 ("1999 Agreement"))).  The 1999 Agreement was for a two-year term, and provided that "[n]othing [within the agreement] shall be deemed to obligate WCW to use the services of [Walker] and WCW shall have fully discharged its obligations [under the agreement] by paying the amount specified [in the contract]."  (Id. at ¶ 11(g)).

Upon entering into the 1999 Agreement, the parties agreed that Walker would spend additional time at the Power Plant, so as to enable him to regain ring fitness, given that he had recently undergone knee surgery.  (Walker Dep. at 76).  Additional training time also was needed because Walker still had not mastered his finishing move and lacked the skills necessary to succeed on WCW's more popular televised events.  (Dillon Aff. ¶ 9).

By Walker's own admission, he was given various wrestling opportunities with WCW during 1999 and 2000, including the opportunity to wrestle on the "Saturday Night" show.  (Walker Dep. at 76-77, 151; Hart Dep. at 75).  The "Saturday Night" shows were the best fit for Walker's skill level because he frequently fell

off the ropes when attempting to complete his finishing move and could not improvise as well as the more popular wrestlers. (Lunde Dep. at 47-54; Deposition of Paul Orndorff (hereinafter "Orndorff Dep.") at 72-74; Deposition of Paul W. "Terry" Taylor, Jr., III (hereinafter "Taylor Dep.") at 12-13). Because the "Saturday Night" shows were taped, Walker's mistakes could generally be edited. (Hart Dep. at 75). In many of these matches, because Walker was not a crowd favorite, the match was scripted in his opponent's favor. (Id.; Walker Dep. at 215; Myers Aff. ¶ 15; Hamilton Aff. ¶ 6).

Toward the end of the term of the 1999 Agreement, WCW used Walker less for several reasons. In addition to lacking the requisite skills for the more popular televised events, Walker also had developed a reputation for being difficult to instruct. (Lunde Dep. at 47-54). These were factors that WCW considered when determining the types and number of opportunities to provide him. (Lunde Dep. at 47-54; Dillon Aff. ¶ 4). Moreover, in the beginning of 2000, when WCW eliminated its "Saturday Night" show due to financial difficulties, the opportunity to use Walker in a taped environment where his mistakes could be edited was further reduced. (Dillon Aff. ¶ 7; Myers Aff. ¶ 6).

## WCW Again Attempts To Work With Walker, But Walker Instead Sues WCW Again

After terminating the "Saturday Night" show in early 2000, WCW again attempted to work with Walker, by developing a new storyline involving his character. (Orndorff Aff. ¶ 6; Dillon Aff. ¶ 8). In fact, Kevin Sullivan, the head of the creative team at the time, contacted Walker and asked him to work with a tag team partner to prepare for appearances on WCW's upcoming television shows. (Orndorff Aff. ¶ 6). Walker, in an attempt to prepare for these shows, appeared for a few consecutive days at WCW's Power Plant to work with Paul Orndorff, the head trainer at the facility, and Harold Hogue, his new tag team partner. (Id.) However, Walker's wrestling efforts were poor and failed to meet WCW's expectations. (Id.) Walker's timing was off, he was sloppy, he did not try hard, and he lacked excitement. (Id.) After spending only a few days at the Power Plant, Walker unilaterally stopped attending training sessions. (Id. ¶ 7). Walker then initiated a second (the current) lawsuit for discrimination against WCW. More specifically, on February 11, 2000, Walker filed the instant action, alleging claims of race discrimination and intentional infliction of emotional distress. (Walker Dep. at 225-26).

After filing his lawsuit, Walker made no additional attempts to pursue wrestling opportunities with WCW. (Orndorff Aff. ¶ 8; Dillon Aff. ¶ 9). WCW did not terminate his contract, however, and

continued to pay Walker's salary.  (Walker Dep. at 219).  Walker's

contract expired by its own terms on December 31, 2000.  (Walker

Dep. at 86; Dillon Aff. At ¶ 10).

## ARGUMENT AND CITATION OF AUTHORITY

### I.    THE SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate if the evidence before the

Court shows that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(c); see Vason v. City of Montgomery, 240

F.3d 905, 907 (11th Cir. 2001).  To survive summary judgment, the

nonmoving party must come forward with concrete evidence in the

form of "*specific facts* showing that there is a genuine issue for

trial."  Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S.

574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (emphasis

added).

The summary judgment rule applies with equal force in

discrimination cases.  In fact, the Eleventh Circuit recently held:

> While acknowledging that questions of fact in job
> discrimination cases are "both sensitive and difficult"
> and "[t]here will seldom be 'eyewitness' testimony as to
> the employer's mental processes," the [U.S.] Supreme
> Court has told us that "none of this means that trial
> courts or reviewing courts should treat discrimination
> differently from other ultimate questions of fact."  St.
> Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 524 (1993).
> ...And quite recently, the [U.S. Supreme] Court rejected
> a rule which would have made it easier for job
> discrimination plaintiffs to get their case to a jury,
> explaining that "[t]o hold otherwise would be

> effectively to insulate an entire category of employment
> discrimination cases from [appropriate] review..., and
> we have reiterated that trial courts should not treat
> discrimination differently from other ultimate questions
> of fact." Reeves, 120 S. Ct. at 2109. ...The long and
> short of it is that the summary judgment rule applies in
> job discrimination cases just as in other cases. No
> thumb is to be placed on either side of the scale.

Chapman v. Al Transport, 229 F.3d 1012, 1026 (11th Cir. 2000). As

demonstrated herein, Walker cannot present evidence sufficient to

create a genuine issue of material fact on any of his claims.

Accordingly, Defendants are entitled to summary judgment on all of

Walker's claims.[4]

## II. SUMMARY JUDGMENT SHOULD BE GRANTED AS TO WALKER'S § 1981 CLAIM BECAUSE WALKER CANNOT PRODUCE ANY EVIDENCE THAT HE WAS DISCRIMINATED AGAINST ON THE BASIS OF HIS RACE.

In a disparate treatment case such as this one, Walker must

prove "intentional discrimination" to prevail. Reeves v. Sanderson

Plumbing Prods., Inc., 530 U.S. 133, 153, 120 S. Ct. 2097 (2000);

Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256, 101

S. Ct. 1089 (1981). Because Walker cannot present direct evidence

of discrimination, the proof scheme articulated in McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973),

---

[4] Walker's claims against TSI and TBS are based on theories of
derivative liability. (Third Amended Complaint ¶¶ 17-29). Walker
does not claim that either TSI or TBS took any improper actions
against Walker or violated any law as to Walker. Rather, Walker
claims that WCW took such actions, and that TSI and TBS should be
held accountable due to their purported relationship with WCW.
(Id.) Because Walker's claims against WCW fail as a matter of law,
Walker's derivative claims against TSI and TBS also fail.

applies to his claim of disparate treatment. See Burdine, 450 U.S. at 254. Under the McDonnell Douglas proof scheme, Walker must present circumstantial evidence sufficient to establish a prima facie case of discrimination. Farrior v. H.J. Russell & Co., 45 F. Supp.2d 1358, 1366 (N.D. Ga. 1999).

The mere presentation of circumstantial evidence is not sufficient to defeat a motion for summary judgment. Even if a plaintiff can establish a prima facie case of discrimination, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. Reeves, 530 U.S. at 142. The defendant is not required to prove absence of discriminatory motive, but merely to articulate some legitimate reason for its actions. Moreover, the defendant's burden is one of production, not persuasion. See id.; Burdine, 450 U.S. at 253.

Once such a reason is articulated, any presumption of discrimination arising out of the prima facie case "simply drops out of the picture." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-511, 113 S. Ct. 2742 (1993). The plaintiff must then "prove by a preponderance of the evidence that the legitimate reasons offered . . . were not [the] true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 253; Reeves, 530 U.S. at 143. The plaintiff must present "concrete evidence in the form of specific facts which show that the defendant's proffered reason is

mere pretext.  Mere conclusory allegations and assertions will not

suffice."  Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081

(11th Cir. 1990).  "The ultimate burden of persuading the trier of

fact that [the] defendant intentionally discriminated against the

plaintiff remains at all times with the plaintiff."  St. Mary's

Honor Center, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 253).

As shown below, Walker cannot establish that WCW intentionally

discriminated against him because of his race by denying him

opportunities.  Moreover, Walker's hostile work environment and

retaliation claims lack legal and factual support.  Therefore,

Defendants are entitled to summary judgment on Walker's § 1981

claims.

## A.  Walker Cannot Establish That He Was Denied Wrestling Opportunities Because Of His Race.

Most of Walker's allegations boil down to a "failure-to-

promote" or "failure-to-advance" type claim:  Walker alleges that

WCW failed to provide him with opportunities to wrestle on

televised events and/or in more prestigious matches because of his

race.  (Third Amended Complaint ¶¶ 44-47, 54).  Walker has not and

cannot produce any evidence that WCW actually and intentionally

refused to give him additional wrestling positions "because of" his

race.  Oncale v. Sundowner Offshore Servs., Inc. 523 U.S. 75, 78,

118 S. Ct. 998 (1998).  Walker cannot present evidence sufficient

to establish a prima facie case of failure to promote, because not

only was Walker given substantial opportunities to wrestle, the
record is devoid of any evidence establishing that Walker was
qualified for the wrestling opportunities about which he complains.

The record establishes that Walker wrestled in over eighty
events while he was under contract with WCW.  (Myers Aff. ¶ 15).
The record further establishes that WCW made numerous attempts to
use Walker in its wrestling programs, such as the "Saturday Night"
show, that were compatible with his skill level and his likelihood
of making wrestling errors.  (Hart Dep. at 75).  Also, after WCW
terminated its "Saturday Night" show, WCW developed a new storyline
for Walker, in an attempt to provide him with additional wrestling
opportunities.  (Orndorff Aff. ¶ 6).

Though Walker asserts that he should have been permitted to
wrestle on more live televised events, the record establishes that
Walker lacked the skills necessary to wrestle on WCW's more popular
events.  (Lunde Dep. at 47-54; Ordorff Dep. at 72-74; Taylor Dep.
at 12-13; Dillon Aff. ¶¶ 7,9; Orndorff Aff. ¶ 8).  Because
wrestling matches are a form of entertainment and are scripted,
charisma, crowd appeal, uniqueness, character, persona and acting
ability are prerequisites for a wrestler to receive frequent
wrestling opportunities on WCW's more popular live televised
events.  (Dillon Aff. ¶ 4).  Walker simply lacked the requisite
charisma, persona, crowd appeal and acting ability to qualify for

such opportunities.  (Dillon Aff. ¶¶ 6-7, 9; Orndorff Aff. ¶ 8).

Other impediments to Walker's ability to wrestle on WCW's more

popular shows were the facts that Walker did not take instruction   .

well, lacked the creativity necessary to improvise on stage, and

was frequently unable to successfully execute his signature move of

walking on the ropes.  (Lunde Dep. at 47-54; Orndorff Dep. at 72-

74; Taylor Dep. at 10-13; Dillon Aff. ¶ 7).  The fact that Walker

frequently fell from the ropes when attempting to finish off an

opponent prevented WCW from placing him on live, televised events,

because there was no way for WCW to edit out such errors.  (Hart

Dep. at 75; Lunde Dep. at 48-49).  It is for these reasons, and not

because of Walker's race, that he was limited to wrestling in non-

live televised and less popular events.  (Dillon Aff. ¶ 7).

Not only does the undisputed record evidence establish that

Walker lacked the basic skills necessary to be a highly successful

wrestler for WCW, but the record also shows that by early 1999, WCW

was experiencing and responding to a business downturn and had less

need for mediocre wrestling talent.  (Myers Aff. ¶ 7).  Thus, WCW

was in no position to give additional opportunities to lesser

performers.  Because it is undisputed that such a downturn

occurred, that there was less need for mediocre wrestling talent

and that Walker was properly considered a lesser performer, Walker

is unable to make out a prima facie case of failure to promote.

Walker also has failed to make out his prima facie case of disparate treatment with respect to advancement opportunities because he has not pointed to any white wrestler within WCW who lacked charisma and crowd appeal, was mediocre wrestler, lacked uniqueness in persona and character, and had a low success rate for completing his finishing move, but was, nonetheless, given more and better wrestling opportunities than Walker was given.  See Pashoian v. GTE Directories, 208 F. Supp. 2d 1293, 1308 (M.D. Fla. 2002) (explaining that to succeed on a disparate treatment claim for failure to promote, a plaintiff must establish "that similarly situated or less qualified [individuals] were promoted or transferred" to the position about which the plaintiff complains).

Walker claims that Disco Inferno, Chris Canyon, Evan Courageous, Billy Kidman, Lash LaRue, Hugh Morris and Bill Goldberg were "similarly situated" white wrestlers who received greater opportunities than him.  (Walker Dep. at 194-99).  In making this assertion, however, Walker relies on nothing more than his own subjective opinion.  Walker's mere opinion that he was more qualified than other wrestlers who received opportunities to wrestle on WCW's more popular events is insufficient.  See Lee v. GTE Florida, Inc., 226 F.3d 1249, 1254 (11th Cir. 2000) (explaining that "an employee's own opinions about his . . . qualifications do not give rise to a material factual dispute")(quoting Simms v.

Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Svcs.,
165 F.3d 1321, 1329-30 (10th Cir. 1999), cert. denied, 528 U.S.
815, 120 S. Ct. 53 (1999)); see also Ramsey v. Leath, 706 F.2d
1166, 1170 (11th Cir. 1983) (instructing that an employee's
subjective belief does not establish a jury issue).

    In any event, to sustain a claim of discrimination, Walker
must do more than establish that he was more qualified than the
wrestlers who received the opportunities about which he complains.
Denney v. City of Albany, 247 F.3d 1172, 1187 (11th Cir.
2001)(quoting Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253-54
(11th Cir. 2000) (quotations omitted)). "Disparities in
qualifications are not enough in and of themselves to demonstrate
discriminatory intent unless these disparities are so apparent as
virtually to jump off the page and slap you in the face." Id.; see
also Miller v. Bed, Bath & Beyond, Inc., 185 F. Supp. 2d 1253, 1271
(N.D. Ala. 2002). Here, Walker cannot even establish that the
wrestlers to whom he points were similarly situated to him with
respect to wrestling skills, charisma, crowd appeal, persona,
uniqueness, the ability to take instruction well, and acting
ability. Because he is unable to meet this lesser burden as to
these other wrestlers, he most certainly cannot establish that he
was obviously more qualified than they were. Accordingly, Walker

cannot establish a prima facie case of discrimination based on denial of opportunity, and this claim fails as a matter of law.

**B.  WCW Has Articulated Legitimate, Nondiscriminatory Reasons For Not Providing Walker With Additional Wrestling Opportunities.**

Walker's failure to promote/advance claim also fails because WCW has established that it had legitimate, nondiscriminatory reasons that explain why Walker was not provided with additional, more prestigious wrestling opportunities. The record establishes that Walker received less prestigious wrestling opportunities because he lacked the basic skills necessary to be a highly successful wrestler within WCW. The record also establishes that in 1999, WCW was experiencing and responding to a business downturn and had less need for mediocre wrestling talent. (Myers Aff. ¶¶ 6-7). Accordingly, WCW was in no position to give additional opportunities to lesser performers, such as Walker. Because Walker cannot dispute that such a downturn occurred, that there was less need for mediocre wrestling talent and that he was considered a lesser performer, he is unable to establish that the nondiscriminatory reasons offered by WCW are a pretext for discrimination. Accordingly, Walker's claim fails. See Burdine, 450 U.S. at 256 (1981) (to survive summary judgment, a plaintiff must directly persuade the court that a "discriminatory reason more likely motivated [WCW] or indirectly [prove discrimination] by

showing that [WCW]'s proffered explanation is [pretextual and] unworthy of credence").

## C.  Walker Cannot Establish That He Was Subjected To A Racially Hostile Environment.

Walker also alleges that while with WCW, he was subjected to a racially hostile environment.  (Third Amended Complaint ¶ 55).  In support of his hostile environment claim, Walker points to alleged derogatory statements that were supposedly made by WCW employees, to his claim that he was "required" to clean up and assemble the wrestling ring while at the Power Plant, and to WCW's decision not to provide him with additional wrestling and pay opportunities. (Walker Dep. at 207-15).  With respect to the alleged statements about which he complains, Walker simply points to a few statements that were allegedly made, at random, during a seven-year time frame (from July 1993 to December 2000), some of which were made either outside of his presence to a third party, or by a third party in the form of hearsay or unconfirmed conjecture.[5]

---

[5] According to Walker, these are the statements that were allegedly made outside of Walker's presence:  (1) "Blacks won't pay to see a Nitro.  They would rather see it on t.v.";  (2) "Get that nigger off my ropes";  (3) "What nigger we got tonight"; and  (4) "This is white night because no niggers going to be on the show."  Walker also alleges that the following statements were made to him:  (1) "You're only here cause you're black";  (2) "Only reason you're here is because they need color on t.v.";  (3) "You're black and this is still a good old redneck company.  And Terry Taylor don't like you"; and  (4) Terry Taylor did not "appreciate a black man questioning him."  (Walker Dep. at 144, 146, 149, 152, 163, 176-80).

To succeed on his hostile work environment claim, Walker must demonstrate that the alleged actions of WCW "altered the condition of the workplace, creating an objectively abusive and hostile atmosphere." Edwards v. Wallace Community College, 49 F.3d 1517, 1521 (11th Cir. 1995) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). "For example, the racial slurs allegedly spoken . . . had to be so 'commonplace, overt and denigrating that they created an atmosphere charged with racial hostility.'" Id. (quotations omitted). Factors that must be considered in assessing a hostile work environment claim include the frequency and severity of the alleged discriminatory conduct, whether the conduct was threatening or humiliating, and whether it unreasonably interfered with Walker's performance with WCW. Id. at 1521-22. In light of this standard, Walker's claim fails, because even assuming the truth of every incident that Walker describes in support of his claim, these incidents are insufficient as a matter of law to create a racially hostile environment.[6]

The record establishes that the alleged statements about which Walker complains were allegedly made at various times over a seven-

---

[6] Walker does not know the dates on which these statements were allegedly made. Any conduct that occurred prior to December 21, 1998 may not be relied upon by Walker in support of his hostile environment claim because such conduct is barred by the release in his Settlement Agreement. (Walker Dep. at Exh. 10, ¶ 3).

year period. (Walker Dep. at 144, 146, 149, 152, 163, 176-80, 207-15). Such sporadic comments, although inappropriate if made, are insufficient to establish that the environment at WCW was permeated with racial hostility. See Hudson v. Norfolk Southern Railway Co., 209 F. Supp. 2d 1301, 1314 (11th Cir. 2001); Ealey v. Dekalb County Hosp. Auth., 59 Fair Empl. Prac. Cases (BWA) 1803, 1998 WL 384902 (N.D. Ga. 1988) (explaining that instances of racial slurs must be more than sporadic to be sufficient to support a hostile work environment claim); see also Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982) (explaining the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee does not rise to a Title VII [or § 1981] violation" and that isolated incidents of harassment are not actionable).

The Eleventh Circuit has clearly stated that infrequent, petty annoyances do not give rise to the level of severity and pervasiveness necessary to establish a hostile environment claim. Harris, 510 U.S. at 21; E.E.O.C. v. Beverage Canners, Inc., 897 F.2d 1067, 1068 (11th Cir. 1990). The alleged discriminatory conduct about which Walker complains was far from "commonplace;" it was not harsh or severe; and it was not physically threatening, as must be established for his claim to succeed. See Edwards, 49 F.3d at 1521 (explaining that racial slurs must be so "commonplace,

overt and denigrating that they create an atmosphere charged with racial hostility"). Accordingly, this claim fails.

Not only does the uncontroverted evidence show that these alleged statements were sporadic in nature, but the record also establishes that the vast majority of the alleged statements were not even directed towards Walker or made in his presence, but rather, were simply unconfirmed hearsay and conjecture. (Walker Dep. at 144, 146, 149, 152, 163, 176-80, 207-15). Walker may not rely on hearsay statements of this type to defeat summary judgment. See Pritchard v. Southern Co. Servs., 92 F.3d 1130, 1135 (11th Cir. 1996) (instructing that inadmissible hearsay cannot be offered to defeat a summary judgment motion when it is not reducible to admissible form at trial); Evans v. McClain of Georgia, Inc., 131 F.3d 957, 962 (11th Cir. 1997) (concluding that the court correctly dismissed hearsay evidence because it was "not significantly probative" and was based on "gossip, common knowledge and the hearsay statement of an unidentified representative"); see also Edwards, 49 F.3d at 1520-21 (concluding that hostile environment claim was without merit because many of the alleged statements were either speculation or hearsay, and because there was insufficient information as to when the alleged statements were made).

Walker's hostile environment claim also fails because he cannot support his allegation with "any specific examples of how

[the alleged] discriminatory conduct . . . had a deleterious effect on his [work] performance." See Mitchell v. Carrier Corp., 954 F. Supp. 1568, 1578 (M.D. Ga. 1995), aff'd, 108 F.3d 343 (11th Cir. 1997); see also Evans v. Pemco Aeroplex, 1998 WL 1048470, No. CIVACV96-S-2801-S (N.D. Ala. Feb. 23, 1998) (explaining in case in which five incidents of racist conduct occurred, including the use of nooses and the letters "KKK," that without evidence that the incidents affected [the plaintiff's] work performance, the court could not conclude that the alleged harassment was sufficiently severe and pervasive to alter a term or condition of employment). In this case, not only has Walker failed to establish that his performance was affected by the alleged acts of discrimination, he has, to the contrary, claimed that his performance at WCW was so exemplary as to warrant advancement. (Walker Dep. at 194-202, 204-07). Walker can offer no evidence of the kind of "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. at 21.

Finally, any argument by Walker that he was required to help clean up the Power Plant and to help assemble and take down the wrestling ring does not salvage his claim. As Walker has admitted, white wrestlers at the Power Plant also were required to perform

these services as part of the training program.  (Walker Dep. at

102).  Because cleaning up the Power Plant and assembling the

wrestling ring were race-neutral requirements, Walker cannot rely

on that evidence in support of his hostile work environment claim,

and this claim fails.  See, e.g., Smith v. Mount Sinai Medical Ctr.

Of Greater Miami, Inc., 36 F. Supp. 2d 1341, 1346 (S.D. Fla. 1998).

### D. Walker Cannot Establish That WCW Retaliated Against Him Because Of Any Alleged Complaints About Race Discrimination.

Walker apparently also alleges that, as a result his filing

his first lawsuit in 1998, and his alleged complaints of

discrimination to Eric Bischoff and other members of the creative

staff in 1999, WCW retaliated against him by allowing the 1999

Agreement to expire in December 2000 and by refusing to provide him

with additional, more prestigious wrestling opportunities.

(Complaint ¶¶ 60-61).  Despite these bald assertions, Walker cannot

demonstrate that WCW took any adverse action against him in

retaliation for his purported complaints.

A prima facie claim of retaliation requires proof of three

elements:  (i) that plaintiff engaged in statutorily protected

conduct; (ii) that plaintiff suffered an adverse employment action;

and (iii) that the adverse action was causally related to the

protected conduct.  Farley v. Nationwide Mut. Ins. Co., 197 F.3d

1322, 1336 (11th Cir. 1999).  In this case, Walker has failed to

provide any evidence that he suffered any adverse action after purportedly complaining about race discrimination.

The record establishes that, after Walker allegedly complained to Eric Bischoff in February of 1999 about the alleged discrimination at WCW, WCW continued to offer him opportunities to wrestle for another *twenty-two* months, until his contract *expired* in December 2000. (Walker Dep. at 86, 142). Likewise, after Walker filed his first discrimination lawsuit in February 1998, WCW gave Walker *a new contract* at his demand in January of 1999, and continued to pay Walker his full salary until the 1999 Agreement *expired* in December 2000. Therefore, contrary to Walker's allegations, WCW did not *terminate* his contract and did not take any adverse action against Walker *because of* any alleged discrimination complaints.

Additionally, Walker's claim fails because he cannot establish a causal connection between the expiration and nonrenewal of his 1999 Agreement and his complaints of discrimination. In fact, the record establishes that once Walker's contract expired, it was not renewed because Walker was not among WCW's top talent, and because Walker showed no interest in continuing to pursue a career with the organization. (Dillon Aff. ¶¶ 9-10). Moreover, WCW was forced, because of a business decline, to be more selective with respect to the quality of wrestlers that it retained. (Myers Aff. ¶ 6). Even

though WCW had attempted to work with Walker and had invested
significant time and money in Walker to provide him with the
opportunity to develop his skills, once the "Saturday Night" show
was cut at the beginning of 2000, there was no real place for
Walker, given his continued deficiencies as a wrestler and
performer.  (Dillon Aff. ¶ 7).  Accordingly, once his contract
expired, it was not renewed.  (Id. ¶¶ 9-10).

Moreover, because Walker was one of a number of independent
contractors affected by WCW's decision not to continue contracting
with its less talented wrestlers, he has failed to establish a
causal connection between the expiration of his contract and his
complaints of discrimination.  See Leblanc v. TJX Companies, Inc.,
214 F. Supp. 2d 1319, 1330 (S.D.Fla. 2002) (explaining that where
the plaintiff's termination was inevitable, even before the
complaint of discrimination was filed, the plaintiff failed to
establish a causal connection between the complaint and the adverse
employment action).

Finally, Walker cannot establish a causal connection between
the expiration of his contract and his complaints of discrimination
because no temporal proximity exists between the events.  As
discussed above, Walker continued wrestling with WCW for almost
*three years* after filing his first lawsuit, and for *twenty-two*
months after he allegedly complained to Eric Bischoff about

discrimination.  Because no temporal proximity existed between the making of his complaints and the alleged adverse employment action, WCW's motion for summary judgment should be granted as to Walker's retaliation claim.  See Wascura v. City of South Miami, 257 F.3d 1238, 1248 (11th Cir. 2001) (explaining that a substantial delay between the complaint and the adverse action, and the absence of other evidence establishing causation, justifies judgment as a matter of law for the employer); Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999) ("[t]he more than 15-month period that elapsed between [the] grievance and the alleged adverse employment actions belies [the] assertion that the former caused the latter").

Walker also alleges in support of his retaliation claim that because he complained of discrimination to Eric Bischoff and because he filed his first lawsuit against WCW, WCW retaliated against him once be began wrestling under the 1999 Agreement by failing to allow him opportunities to advance within the organization.  (Third Amended Complaint ¶ 61).  However, Walker cannot establish a causal connection between WCW's "failure to advance" him and his complaints of discrimination.  As discussed earlier, Walker was not advanced within the organization because he lacked the wrestling skills, charisma, persona, uniqueness and crowd appeal necessary to make frequent live televised and/or pay-per-view appearances or for other advancement.  Therefore, even

absent his complaints of discrimination, Walker would have been
extended the same wrestling opportunities he received.  Because
Walker cannot show any causal connection between any action taken
by WCW and his alleged complaints, summary judgment should be
granted on Walker's retaliation claim.

### III. SUMMARY JUDGMENT SHOULD BE GRANTED AS TO WALKER'S TITLE VII CLAIMS BECAUSE NO EMPLOYER-EMPLOYEE RELATIONSHIP EXISTED BETWEEN WALKER AND WCW.

Walker also asserts claims of race discrimination under Title
VII of the Civil Rights Act of 1964.  (Third Amended Complaint ¶¶
54-55).  The undisputed facts of record conclusively establish that
Walker cannot maintain a discrimination claim under Title VII.

A Title VII race discrimination claim requires that an
**employment relationship** exist between the plaintiff and the
defendant.  _Holloman v. Northeast Georgia Area Development Comm'n_,
740 F. Supp. 1571, 1575 (M.D. Ga. 1990).  Independent contractor
relationships are outside the statute's scope.  _See Cobb v. Sun
Papers, Inc._, 673 F.2d 337, 339-42 (1982), _cert. denied_, 459 U.S.
874, 103 S. Ct. 163, 74 L. Ed. 2d 135 (1982); _see also Holloman_,
740 F. Supp. at 1575 (explaining that if the plaintiff "were an
independent contractor, and not an agent or employee [of the
defendant], then there would be no 'employment relationship'
between the two and [the plaintiff] would not be subject to Title
VII's protections").

To determine whether a particular individual is an employee or an independent contractor, courts employ common law principles of agency.  See Cobb, 673 F.2d at 341.  Among the factors to be considered in determining whether an individual is an employee or an independent contractor are the hiring party's right to control, the level of skill required, the source of equipment and tools, the duration of the relationship, the method of payment, the provision of employee benefits, the tax status of the parties and the intent of the parties.  Nationwide Mutual Ins. Co. v. Darden, 503 U.S. 318, 333-34, 112 S. Ct. 1344 (1992).  Applying the above factors, the undisputed evidence establishes that Walker was an independent contractor with WCW, not an employee.

First, WCW exercised minimal control over the means and the manner of Walker's performance as a professional wrestler.  (Walker Dep. at 103).  Walker was given significant creative freedom to choreograph his matches and to achieve the predetermined result. (Id.; Dillon Aff. ¶ 5).  Walker also developed his own persona, character, stage name, costume and gimmick.  (Third Amended Complaint ¶¶ 39-40; Walker Dep. at 99-100; Dillon Aff. ¶ 5).

Further, professional wrestling requires significant specialized skills.  By Walker's own admission, he underwent extensive training to develop the skills necessary to be a professional wrestler with WCW.  (Walker Dep. at 25-27; 31-32).

1066873_8.DOC                                31

This factor also supports the conclusion that Walker was an independent contractor, and not an employee.

Likewise, Walker's 1999 Agreement with WCW was for a short and fixed term, Walker received no fringe benefits, and he paid his own taxes.  (1999 Agreement, ¶ 2).

Lastly, the parties indisputably understood and intended an independent contractor relationship.  Walker admitted that he was an independent contractor with WCW during all times relevant to this lawsuit.  (Walker Dep. at 27, 75-76).  Moreover, the agreement Walker signed expressly states that Walker was providing services to WCW as an independent contractor, and not as an employee.  The agreement was also labeled on the first page as an "Independent Contractor Agreement."  (1999 Agreement, ¶ 2).  All of the above facts establish that Walker was an independent contractor, and not an employee, of WCW.

This Court has previously considered the issue of whether a professional wrestler for WCW was an independent contractor for purposes of Title VII.  In Ranger Ross v. World Championship Wrestling, Inc., Civil No. 1:93-CV-1206-JEC (N.D.Ga. 1994) (unpublished opinion),[7] the Court concluded that, because the plaintiff professional wrestler had a certain level of control over his performance in matches and creativity for his character, he was

---

[7] A copy of the Court's opinion is attached hereto as Exhibit E.

an independent contractor and not an employee for purposes of Title VII. (Id. at 15-18).  Likewise, in this case, given the control Walker had over the performance of his duties and his performance in wrestling events, and all of the factors noted above, the requisite employment relationship did not exist between Walker and WCW for Title VII to apply.  Therefore, summary judgment should be granted as to all of Walker's Title VII claims.[8]

## IV.   SUMMARY JUDGMENT SHOULD BE GRANTED ON WALKER'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM BECAUSE WCW DID NOT ENGAGE IN ANY EXTREME OR OUTRAGEOUS CONDUCT.

Walker contends that WCW, by allegedly engaging in racially discriminatory conduct, intentionally inflicted severe emotional distress on him.  (Third Amended Complaint ¶¶ 63-64).  This claim is baseless.

To establish a claim for intentional infliction of emotional distress under Georgia law, a plaintiff must establish: (1) intentional or reckless conduct; (2) extreme and outrageous conduct by the defendant; (3) severe emotional distress suffered by the plaintiff; and (4) a causal connection between the conduct and the

---

[8] Even assuming arguendo, that the requisite employer-employee relationship did exist between Walker and WCW, Walker's Title VII claim still fails for all of the same reasons that Walker's § 1981 claims fail.  See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) (explaining that "both Title VII and Section 1981 have the same requirements of proof and use the same analytical framework").

emotional distress.  Hendrix v. Phillips, 207 Ga. App. 394, 395,
428 S.E.2d 91, 92-93 (1993).

To be "extreme and outrageous," the alleged conduct must be so
"terrifying or insulting as naturally to humiliate, embarrass or
frighten" the plaintiff and so severe that "no reasonable man could
be expected to endure" these actions.  Beck v. Interstate Brands
Corp., 953 F.2d 1275, 1276 (11th Cir. 1992).  Liability for
intentional infliction of emotional distress does not extend to
"mere insults, indignities, threats, annoyances, petty oppressions,
or other trivialities."  Ward v. Papa's Pizza To Go, Inc., 907 F.
Supp. 1535, 1540 (S.D. Ga. 1995).  Thus, when a plaintiff alleges
that conduct such as race discrimination constitutes intentional
infliction of emotional distress, the alleged conduct must be
severe, such as an on-going pattern of explicit and oppressive
harassment that includes or resembles a physical assault.  See
Coleman v. Housing Auth. of Americus, 191 Ga. App. 166, 381 S.E.2d
303 (1989).  When the alleged conduct is racial epithets and race-
based decisions in carrying out a contract, it must be combined
with extreme and graphic threats such as of bodily harm,
dismemberment and death.  See Brown v. Manning, 764 F. Supp. 183,
185 (M.D. Ga. 1991).

In this case, Walker cannot provide any evidence of conduct by
WCW that satisfies the requirements of "extreme and outrageous"

behavior. To the contrary, Walker testified that there is nothing other than WCW's alleged acts of discrimination that caused him emotional harm. (Walker Dep. at 222-24). Because, as set forth above, there is no evidence that WCW discriminated against Walker, and because Walker must establish more than just alleged discriminatory conduct to sustain his emotional distress claim, summary judgment should be entered on this claim. Beck, 953 F.2d at 1276 (discharge of employee for allegedly discriminatory reasons insufficient to support emotional distress claim); Ward, 907 F. Supp. at 1542 (concluding that repeated refusal to hire an individual under circumstances that could constitute unlawful discrimination insufficient to establish an emotional distress claim); Borden v. Johnson, 196 Ga. App. 288, 395 S.E.2d 628 (1990) (establishing that demotion or discharge for whatever reason, even discriminatory reason, does not give rise to an emotional distress claim).

## CONCLUSION

For all of the foregoing reasons, Defendants' Motion for Summary Judgment on all of Walker's claims asserted in this action should be granted, and all of Walker's claims should be dismissed.

This 17th day of December, 2002.

TROUTMAN SANDERS LLP

JOHN J. DALTON
Georgia Bar No. 203700
JAMES A. LAMBERTH
Georgia Bar No. 431851
ERIC A. RICHARDSON
Georgia Bar No. 233873
EVAN H. PONTZ
Georgia Bar No. 583577

Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

Attorneys for Defendants

## CERTIFICATION

Pursuant to Local Rule 7.1(D), I certify that this Memorandum of Law has been prepared with one of the fonts and point selections ("Courier New 12") approved by the Court in Local Rule 5.1(B).


This 17th day of December, 2002.


Evan H. Pontz
TROUTMAN SANDERS LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BOBBY WALKER,                          )
                                       )
                   Plaintiff,          )
                                       )        CIVIL ACTION FILE
v.                                     )
                                       )        NO. 1:01-CV-0367-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC., and               )
TURNER BROADCASTING SYSTEM, INC.,   )
                                       )
                   Defendants.         )

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of this
*MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT* upon the interested parties by hand delivery to:

> Cary Ichter
> Kelly Jean Beard
> Charles Gernazian
> Michelle M. Rothenberg-Williams
> MEADOWS, ICHTER AND BOWERS, P.C.
> Eight Piedmont Center, Suite 300
> 3525 Piedmont Road
> Atlanta, GA  30305

This 17th day of December, 2002.

_____

Evan H. Pontz
TROUTMAN SANDERS LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000



# EXHIBIT / ATTACHMENT

## CC

**(To be scanned in place of tab)**

*Revised March 28, 2000*



## IV. Employee Job Profiles



CONFIDENTIAL

Revised March 28, 2000

# VICE PRESIDENT

Title: <u>Executive Vice President</u>
Department: <u>General Administration</u>
Extension: 3-1087

Name: **Cobb, Rita**
Title: <u>Executive Assistant</u>
Department: <u>General Administration</u>
Extension: 3-5200
I assist the Executive Vice President of WCW. I manage his calendar, coordinate meetings, and arrange travel and all other general administrative duties. People can come to me if they need help locating or getting a message to the Executive Vice President.

Name: **Chandler, Galen**
Title: <u>Manager Live Programming</u>
Department: <u>General Administration</u>
Extension: 3-1076

CONFIDENTIAL

Revised March 28, 2000

# STRATEGIC PLANNING

Name: **Edwards, Don**
Title: Director of Strategic Planning
Department: Strategic Planning
Extension: 3-3631
I am responsible for business planning and analysis group including preparing annual revenue budgets, monthly forecasts, and strategic long-range plans for various WCW networks. I participate in the development of the strategic direction of the division- identifying and analyzing issues of strategic significance. I analyze the impact of market trends on current and projected network distribution and profitability. I provide financial and analytical consultation support to the WCW sales and marketing teams as well as executive management. I prepare financial analyses of contractual terms and sales proposals to be used in deal negotiations. I develop and maintain client specific models to be used in long-range forecasting. I also perform general ad-hoc business/financial projects including analyzing new business concepts and developing pro formas as needed.

Name: **Reid, Octavia**
Title: Administration Assistant of Strategic Planning
Department: Strategic Planning
Extension: 3-1016
I assist the Director (Don Edwards) and other department managers of the WCW Strategic Planning Group. I manage schedules, calendars, and answer incoming calls. I am the contact for all departmental supplies and maintenance, and I perform all other administrative duties as requested.

Name: **Holman, Eric**
Title: Manager of Strategic Planning
Department: Administration- Strategic Planning
Extension: 3-3624
I am responsible for the financial analysis for TV production areas of WCW. I also deal with financial and/or business strategy projects related to new business opportunities or current operational issues. People can come to me for help with WCW business strategy and financial issues. I am not responsible for accounting issues for WCW.

Name: **McDade, Felicia**
Title: Senior Financial Manager
Department: Strategic Planning
Extension: 3-1073
I am responsible for strategic planning which incorporates the budget for WCW and budget distribution for each department. People can come to me for help with finance and planning.

Name: **Wormsby, Greg**
Title: Financial Analyst
Department: Strategic Planning
Extension: 3-5223
I am responsible for assisting the merchandise and magazine departments with monthly reporting of financial activity, forecasting the impact of projects on the department bottom line, audit of procedures and policy for compliance. I do Audit project work for Bill Busch and Don Edwards as needed. I am a liaison between accounting and assigned departments. People can come to me for help with inventory related information (stock levels, sales, comps, per caps, etc.), magazine invoice information and financial monthly records. It is often mistaken that I am responsible for purchase orders, comp/merchandise requests and invoice coding.

CONFIDENTIAL

Revised March 28, 2000

# FACILITY

Name: **Feagle, Karen**
Title: Office Manager
Department: General Administration
Extension: 3-1012
I am responsible for the WCW Log Cabin facility; which includes construction, outside grounds and any internal office needs. I can help with office space, construction questions, new hire/office moves, mailroom issues, heat/air questions or concerns, office parties and phone issues. I am not responsible for Human Resource issues such as benefits.

Name: **Williams, Allison**
Title: Office Coordinator
Department: General Administrator
Extension: 3-1033
I am responsible for new hire and office move coordination, request for services, stationary orders, new construction, mailroom issues, furniture needs, party planning, miscellaneous office projects and backup for Karen Feagle. People can come to me if they need help with services or repairs (ex: artwork, lights, heat/air problems, plumbing), stationary orders (business cards, letterhead, or notepads), plant issues, office depot questions, etc. My duties are often confused with those of Juliet Cuthbert-Borders, such as toner orders and vending machine refunds.

Name: **Cuthbert-Borders, Juliet**
Title: Office Assistant
Department: General Administration
Extension: 3-1072
I am responsible for pagers, cell phones, housekeeping, ID badges, keys, security card readers, telephone/detail master lists, break-room, copiers, fax machines, parking lot and landscaping, Airborne/Fed Ex supplies, and land-line phone extensions and problems. My duties are often confused with those of Allison Williams, such as heating and air.

Name: **Richardson, Kinnette**
Title: Receptionist
Department: General Administration
Extension: 3-1075
I answer incoming calls via the WCW switchboard and I greet and assist WCW guests and visitors. I also provide assistance to employees with MLQ/CS packages, conference room bookings, timesheets, and CNN parking access. People can come to me if they need help with locating a person, a package or a room, etc.

CONFIDENTIAL

*Revised March 28, 2000*

## LEGAL

Name: **Myers, Diane**
Title: Director of Legal and Business Affairs
Department: Legal
Extension: 3-1010
My job responsibilities include drafting and reviewing all contracts, the negotiation of legal issues in contracts, and the management of talent contracts and related issues. I oversee the Worker's Compensation Department, manage Intellectual Property and answer general legal questions. People can come to for help with general legal issues and contract drafting on review. It is often mistaken that I am responsible for negotiating business deals.

Name: **Wilkinson, Scott**
Title: Senior Counsel
Department: Legal
Extension: 3-3160
I provide legal counsel on all issues for all departments within WCW. People can come to me for help with talent contracts/releases, sponsorship contracts, independent contractor agreements and appearance contracts. I can assist with clip license agreements, employment issues, litigation, music rights, ad copy reviews, licensing/merchandise legal issues, CAA/business development (movies) and parody/copyright/trademark issues for on-air production.

Name: **Garwood, Andrea**
Title: Paralegal
Department: Legal
Extension: 3-2559
I draft customized form agreements- such as clip license agreements, music license agreements, trademark license agreements and merchandise license agreements. I handle all trademark and piracy issues. I register domain names for WCW and manage the litigation files. People can come to me for help with clip license agreements, registration of domain names, trademark and piracy issues, or if Scott and Diana are unavailable. It is often mistaken that I am responsible for talent contracts or talent related issues (Georgia Davidson).

Name: **Davidson, Georgia**
Title: Talent Business Manager
Department: Legal
Extension: 3-3626
I am responsible for contracts for wrestlers, contract files, immigration issues for talent and drug testing. I can help with talent issues. It is often mistaken that I work with TV Syndication (Susan Bowling).

Name: **Henderson, Debbie**
Title: Risk Management Coordinator
Department: Legal
Extension: 3-3118
I handle all of the Workers' Compensation Claims for WCW. I take care of the medical information, doctor's appointments, and insurance related information for work related injuries. I can help with any work-related injury or questions regarding them. I am not responsible for travel or personal medical needs.

CONFIDENTIAL

*Revised March 28, 2000*

## ARENA BOOKING

Name: **Juster, Gary**
Title: VP Wrestling Operations
Department: Arena Booking
Extension: 3-5217
I am responsible for booking, scheduling, and routing (overall planning) of the WCW Event Schedule. I work with Awesome Promotions regarding the promotion of WCW live events. I work with arena managers and their professional association (IAAM) re: WCW's position in the industry. People can come to for help with any matter concerning arenas- this could include move-in issues, contract terms, union issues, ticketing matters and routing concerns. It is often mistaken that I am responsible for certain production issues, wrestler appearances, ring crew and catering.

Name: **Ellis, Keila**
Title: Arena Assistant
Department: Arena Booking
Extension: 3-5215
I am responsible for comp ticket requests and television promotions. I am the assistant to Gary Juster, Vice President of Wrestling Operations. I am also an Awesome Promotions contact person. People can come to me if they need help with tickets or anything concerning the Arena department.

Name: **Burnham, Chip**
Title: Director of Arena Operations
Department: Arena Booking
Extension: 3-5225
I am responsible for the booking of WCW events at all U.S and Canada arenas. I oversee WCW compliance with state athletic commissions. I am also responsible for event coordination of WCW arena shows. People can come to me for any questions regarding arena events.

Name: **Barry, Laci**
Title: Events Booking Assistant
Department: Arena Booking
Extension: 3-5218
I am responsible for processing contracts. I am the main contact for arenas. I work with athletic commissions and I coordinate IAAM conferences. I can help with athletic commissions and arena information. I am not responsible for tickets.

CONFIDENTIAL

*Revised March 28, 2000*

## MERCHANDISE

**Name: Komminsk, Kelley**
Title: Director of Merchandising
Department: Merchandise
Extension: 3-5221
I develop all products that are sold in arenas, via catalog, direct response and over the internet. My department handles premiums, comps and corporate logo requests for other internal departments. We also work on promotional products for sponsored programs including lotteries, Slim-Jim, and licensed tie-ins. It is often mistaken that I am responsible for licensing (products sold in retail stores) which is handled by Casey Collins, charity donations which are handled by Brett McLain, and fulfillment which is handled by Leslie Cameron.

**Name: Johns, Cindy**
Title: Administrative Assistant
Department: Merchandise
Extension: 3-5220
I assist Kelly Komminsk in answering phones, fax, fed-ex, file, vending relations, coding, copying, filing invoices, follow up on late payments of invoices, receiving reports summary, etc. I order merchandise for catalog, arena, internet- analyze reports/order accordingly. I set up new products in mass, Excel Quick-books- maintain master product list. I maintain photo library of current images of wrestlers for artwork. I maintain disk library of catalog images/internet images, process comp forms, catalog photoshoots, and line ups- type for inserts into programs for arena sales and order supplies via internet. People can come to me for any of the above mentioned. If I do not handle it, I will direct them to the proper individual. I do not handle personal purchases of WCW merchandise i.e. people who want to purchase a T-shirt for themselves or relatives.

**Name: Jennings, Monica**
Title: Merchandise Coordinator
Department: Merchandise
Extension: 3-5222
I am responsible for any special merchandise promotions for all departments. (Ex: Premiums for PPV such as T-shirts, stuffed animals, mugs, screen savers etc). I handle all changes, updates, etc. on our wcwgear.com site. I order corporate merchandise for all departments within WCW. I proof all catalogs for mail-outs/submit corrections to proper people. I do a special sales flyer & a four-page merchandise spread in the WCW magazine. I give the weekly update of merchandise commercials we would like to air. I also provide the number of times the commercial will air and which product we would like to advertise.

Title: Warehouse Supervisor
Department: Merchandising
Extension: 3-1026
I maintain inventory control over catalog and arena merchandise. I supervise the staff responsible for filling and shipping catalog orders. I fill and pull requests for goods to be shipped to arena events and I make sure the warehouse procedures are adhered to. I can help with moving items/merchandise to their departments, CSR item inquiries (catalog descriptions, measurements, etc.), getting goods shipped to their locations, and office comp orders.

**Name: Smith, Pie**
Title: Inventory Control
Department: Merchandise
Extension: 3-5239
I receive all merchandise into department count for accuracy for merchandise to be stored in warehouse. I ship merchandise to arenas, and count and receive merchandise from arenas. People can come to me for help with anything concerning merchandise, supplies, fed-ex, packaging, security and morale of the warehouse staff. It is often mistaken that I am responsible for Call Center merchandise.

CONFIDENTIAL

*Revised March 28, 2000*

Names: **Avery-Neal, Catherine** (3-5239)
      **Clifton, Robert** (3-1070)
      **Nichols, William** (3-5239)
      **Jensen, Ralph** (3-1070)
Title: <u>Warehouse Clerk</u>
Department: <u>Merchandise</u>
Warehouse Clerks are responsible for fulfilling catalog merchandise orders: shipping, receiving, and pulling. They can process office comp orders and merchandise returns. They can also Fed Ex domestic, international, and Priority mail orders; and they order the supplies for Catalog use (boxes and Paks for Fed Ex and Priority mail). People can come to Warehouse Clerks if they need help with anything regarding Catalog merchandising and orders.

CONFIDENTIAL

*Revised March 28, 2000*

## CALL CENTER

Name: **Cameron, Leslie**
Title: Senior Catalog Operations Fulfillment Manager
Department: Merchandise and Catalog
Extension: 3-5219
I oversee the catalog operation; which includes Call Center, Warehouse for arena and catalog, and MACS software maintenance. I am responsible for all catalog and arena merchandise in and out of the warehouse. People can come to me for help with MACS software, catalog promotions or questions, merchandise shipments, lottery fulfillment, catalog system data extracts, and catalog reports.

Name: **Collins, Pamela**
Title: Call Center Coordinator
Department: Merchandising
Extension: 3-1026
I supervise four to six customer service representatives. This includes motivating, developing their skills and encouraging them to achieve their highest potential through effective communication, assigning job responsibilities, controlling employee conflict and treating employees fairly and consistently. Additional responsibilities include ensuring production jobs are run in a timely manner for our catalog business, responding to customer calls, running and analyzing the call center phone and production reports, offering suggestions on improving productivity, quality and morale for the call center operation- plus any additional assigned duties as needed. People can come to for help with placing personal merchandise orders, or if a fed-ex catalog order is returned undeliverable- any misdirected customer service orders or complaints.

Names: **Bonhomme, Kadija** (3-1026)
        **McAdoo, Frank** (3-1026)
        **Hester, Frankesha** (3-1093)
Titles: Call Center Rep
Department: Call Center
The call center reps are responsible for calls pertaining to WCW merchandise orders. They deal with customer service questions concerning previously made orders.

CONFIDENTIAL

Revised March 28, 2000

# INTERNATIONAL DEVELOPMENT

Name: **Sidello, Sharon**
Title: VP International Development
Department: International Development
Extension: 3-4054
I direct the strategic presence of WCW internationally via distribution television shows, setting up live tours, coordinating PR, marketing and promotions, and interfacing with worldwide licensees. People can come to me for help with any matters relating to WCW business outside of the US.

Name: **Johnson, Taisheka**
Title: Administrative Assistant
Department: International Development
Extension: 3-2577
I am responsible for all our international affiliate requests, such as marketing materials and Dubs, are filled and shipped out. I also have typical responsibilities such as filing, faxing, and typing letters and e-mails. My job is to be a productive support for the Vice President and Coordinator of the department. People can come to me if they would like to know the international companies we distribute the shows to. I also I have the knowledge of our international tours, such as talent list and itineraries. I am not responsible for tickets for international shows.

Name: **Sherman, Emily**
Title: International Coordinator
Department: International Development
Extension: 3-1014
I am responsible for all international affairs: productions of international shows, international production orders, international public relations and coordinating tours, etc. People can come to me for help with any international issues, but calls should not be forwarded to me just because the person has an accent.

Name: **Pearl, Lisa**
Title: Photo Editor
Department: Photo (Transition)
Extension: 3-3172
I am responsible for determining and re-vamping the "look" of WCW photography. I assign and direct photographers. I work closely with all departments to strategically plan and execute photographic campaigns to support WCW. I create promotional awareness of WCW through conceptual imagery. I manage the editing, cataloging and researching of photography for all internal departments and outside requests. I provide creative directions, production and consulting services regarding photography. It is often mistaken that I am responsible for logos or autograph sheets.

Name: **Franklin, Rene**
Title: Administrative Assistant
Department: Photo (Transition)
Extension: 3-1049
I am a liaison with PR, Merchandising, Licensing, Internet, Magazine, Production and all other divisions within WCW (such as photographers, clients, and external vendors). I make travel arrangements. I receive and return portfolios. I process and distribute expense reports, contracts and other documents. I coordinate FedEx and departmental shipping. I can assist people with the administrative needs regarding photography. It is often mistaken that I am responsible for locating film within the library.

CONFIDENTIAL

*Revised March 28, 2000*

# SYNDICATION AND AD SALES

Name: **Garner, Rob**
Title: VP Ad Sales/Syndication
Department: Advertising Sales and Syndication
Extension: 3-3629
I report to Bill Busch. I am responsible for all ad sales in WCW television network stations and for the selling of WCW Worldwide Wrestling program to over the air broadcast stations in all markets. I interface with Turner Broadcasting Sales in New York for ad sales and Telepictures for the selling of the Worldwide program. I break new advertisers and promotional programs into WCW's vast brand extension programs. People can come to for help with promotional advertising related questions or leads pertaining to WCW, questions regarding WCW television stations or advertisers, and WCW advertising target strategy. It is often mistaken that I am responsible for the buying of ad schedules to promote WCW arena events.

Name: **Bowling, Susan**
Title: Syndication Coordinator
Department: Domestic Syndication
Extension: 3-3630
I support the VP of Syndication and Advertising Sales for WCW (Rob Garner) and aid in the execution of duties associated with that position. I maintain and update the syndication database and process the daily Nielsen reports. I function as "customer service support" to our TBS and Telepictures sales office in New York, Chicago, Los Angeles and Detroit and supply them with merchandise, show videotapes and event tickets. People can come to for help with obtaining information regarding clearance reports, ad buys and sweeps amounts, station start and end dates, etc. It is often mistaken that I am responsible for handling PPV customer service issued and billing.

Name: **Wofford, Darrell**
Title: Traffic Coordinator
Department: Syndication and Ad Sales
Extension: 3-3636
I am responsible for the acquisition and organization of commercial spots, and commercial related materials that are to be included in all WCW programming. This includes, but is not limited to the creative elements for billboards, vignettes, special sponsorships, promotional considerations and standard commercial spots. I prepare and issue reports listing all items of a commercial or promotional nature to be included in each week's WCW programming. I also prepare and issue the formats for the syndicated program. In addition, I maintain a database of current local stations that carry the WCW program and issue reports for the Shipping Department detailing those destinations and the items to be shipped, plus the paperwork necessary to complete the shipping process. This also includes an accurate accounting of our international clients and the programming they have contracted for. Additionally, I am responsible for overseeing the completion of the PAL Conversion of International programming and directing those dubs to the proper clients. People can come to for help with any of the above, particularly formats for WCW. It is often mistaken that I am responsible for parking.

CONFIDENTIAL

# RESEARCH

*Revised March 28, 2000*

Name: **Williams, Matt**
Title: Senior Research Manager
Department: Research
Extension: 3-1015
I am responsible for consumer marketing research.  People can come to for help with questions regarding WCW's consumer markets.

Name: **Young, Meredith**
Title: Research Analyst
Department: Research
Extension: 3-1029
I am responsible for research concerning WCW ratings.

CONFIDENTIAL

*Revised March 28, 2000*

# PPV/MARKETING

Name: **Shelley, Kathleen**
Title: Senior Business Manager
Department: Pay Per View
Extension: 3-1042
I manage the account coordinator staff in garnering increased marketing participation from our cable affiliates. I am the main liaison for promotion with our distributors and between the TVKO affiliate relations staff and the WCW staff. I also participate in cable industry conventions, meetings, and functions. People can come to me for help with PPV department questions or cable affiliate information.

Name: **Menlen-Wilson, Markie**
Title: Pay Per View Account Coordinator
Department: Pay Per View
Extension: 3-1013
I build and maintain relationships with cable affiliates. I also facilitate marketing and promotional projects for the Pay Per Views each month. I can help with Pay Per View issues. I am not responsible for merchandise.

Name: **Samson, Mike**
Title: Account Coordinator
Department: PPV/ Marketing
Extension: 3-1068
I am responsible for soliciting as much PPV marketing/promotional participation as possible in local markets and I coordinate different aspects of affiliate's marketing/promotional tactics. People can come to me for help with issues concerning the marketing and promotion of our PPV's in local markets (particularly in the West) or with general PPV questions.

Name: **Thurmond, Jenna**
Title: Marketing Coordinator
Department: Pay Per View
Extension: 3-1043
I coordinate print and media advertising for Pay Per View. People can come to me for help with PPV logos and deadlines regarding PPV marketing.

Name: **Koelbel, Kathryn**
Title: Manager Data Base/Marketing
Department: PPV/Marketing
Extension: 3-1046

Name: **Dumbauld, Susan**
Title: Temp
Department: Pay Per View
Extension: 3-1045
I am responsible for the radio, generic, event specific spots and infomercials for cable affiliates on a monthly basis; as well as ticket distribution in the PPV department for each event. I coordinate and update the 1-800-Affiliate Hotline, handle marketing reimbursements, check requests and distribution for each PPV event. I also coordinate the hospitality suites for various PPV"S, distribute promotional T-shirts and assist in the upcoming promotions with satellite. I can help with questions relating to the PPV department, checks issued for PPV events, information on cable or satellite and inquiries on the upcoming PPV events.

CONFIDENTIAL
X 000676

Revised March 28, 2000

# LICENSING

**Name: Collins, Casey**
Title: Director of Licensing
Department: Licensing
Extension: 3-2554
I manage the day to day operation of WCW's Licensing Program. I review and approve all licensing deals that are submitted by LCI. I assist LCI's sales force with selling the WCW license to potential licensees. I provide licensees with any and all information that they need. I approve all artwork and product samples. I am also responsible for the WCW Nitro Grill, WCW Lottery, WCW Master Card Program and WCW Nascar Program (if we race in 2000). I work with retailers to ensure WCW Licensees the best possible shelf space. I educate WCW Licensees and Retailers about WCW. I track and review all royalty reports. I work with talent to obtain voice. Photos, filming of commercials, etc. for Licensees. I work hand in hand with Pace Motorsports on the creation of the new USHRA/WCW Monster Machines license (monster trucks). People can come to me for help with licensing and Motorsports questions, or licensed product samples. It is often mistaken that I am responsible for the merchandise department, or State License Contracts for our wrestlers to perform in various states.

**Name: Reeves, Chelsea**
Title: Licensing Manager
Department: Licensing
Extension: 3-2535
I am responsible for the day to day management of the Licensing Program which includes: communicating with potential and existing licensees, handling the daily needs of our licensees and/or LCI our licensing Agency and the receiving of deal memos. I am responsible for the review and approval of all artwork and submitted product samples so as to insure the integrity of the WCW property. In addition, will assist in the development and design of any and all new logos. I respond to various inquiries and provide information on an as needed basis to internal and external parties for the WCW property. I do the Draft Merchandising Licensing Agreements for all licensees and incorporate any needed changes for the WCW motorsport properties. I help coordinate details on special projects for the WCW property. I manage the following projects: WCW Lottery (currently 6 States), WCW's monthly QVC show, variety of Trade Shows, annual Licensee Summit, WCW Master Card program. I maintain a database of all WCW Licensees, as well as preparing a monthly status report for the Director of Licensing. I work with WCW talent & WCW Production Department to obtain voices, photos, filming of commercials, etc. for Licensees. I also assist the Director with educating and updating retailers and licensees about WCW and help to ensure that retailers provide WCW with prime retail space in all departments.

**Name: Messner, Kristen**
Title: Licensing Coordinator
Department: Licensing
Extension: 3-3130
I am responsible for the Nitro Grill, the Fan Club, and Cyberaction Virtual Trading Cards. I also assist with all licenses on projects, travel for appearances and product needs. People can come to for help with the Nitro Grill, the Fan Club, the Cyberaction Cards, and licensing related questions or assistance on the road. It is often mistaken that I am responsible for all Kimberly Ware's prior duties or that I am Casey Collins' assistant.

**Name: Gillen, Flossie**
Title: Licensing Assistant
Department: Licensing
Extension: 3-2548
I provide daily assistance to the Director of Licensing (Casey Collins). My duties include scheduling appointments, arranging travel, screening phone calls, filling, faxing, writing memos and fed-exing. I open mail and packages, and circulate artwork approvals. I maintain and update files, licensee lists and licensing status report . I keep up and update the photo library and send artwork to our licensing agency as needed. I forward all bootleg tips to our investigator. I also maintain the sample room and forward new licensed samples to talent as they are received.

CONFIDENTIAL

*Revised March 20, 2000*

Name: **Sturgis, Lisa**
Title: Motorsports Manager
Department: Licensing
Extension: 3-2556
I manage all aspects of WCW's motorsports program: Nascar, Busch and Winston Cup teams, and Monster Trucks. This includes operations, appearances and licensing ventures. People can come to me to proof and edit copy, as a former editor of WCW Magazine I am always happy to help.

CONFIDENTIAL

*Revised March 28, 2000*

## NEW MEDIA

Title: VP WCW Enterprises
Department: New Media
Extension: 3-1040

Name: **Thomas, Brooke**
Title: Administrative Assistant
Department: Enterprises
Extension: 3-1041

I provide administrative support to the VP of Enterprises and departmental invoices and secondary support to other areas that fall under Enterprises. I also coordinate hospitality suites for PPV and other special events. People can come to for help in scheduling appointments, invoices (paid and unpaid) for the Enterprises Department, and if they need to contact members of the department. It is often mistaken that I am responsible for PPV tape (radio and TV) distribution and PPV tickets.

Name: **Brent, Cameron**
Title: Home Video & Special Projects Administrator
Department: WCW Enterprises
Extension: 3-1044

I am responsible for WCW Home Videos, WCW Hotline and *Ring Side Rap* (monthly newsletter sent to media, licensees and cable operators. It is often mistaken that I work for the Legal Department.

CONFIDENTIAL
V 000602

# INTERNET

Revised March 28, 2000

Name: **Hulmes, Gary**
Title: Senior Webmaster
Department: Internet
Extension: 3-2562
I am the chief technical person, and sometimes editorial, for WCW.com. I am responsible for in office and remote operations, day to day operations, presentation of content, and I am a liaison to Turner Online Technical Group. People can come to me for help with the website: operations, advertising, content, etc.

Name: **Haynes, Timothy**
Title: Webmaster
Department: Internet
Extension: 3-2564
I am responsible for the daily updating of WCW websites, including new content development. I produce live internet broadcasts. I develop new relationships with agencies and vendors to keep WCW at the forefront of new technology. I also maintain a positive relationship with wrestling fans on the internet. It is often mistaken that I am responsible for finding/scanning photos for other departments.

Name: **Nowitzky, Jennifer**
Title: Internet Coordinator
Department: Internet
Extension: 3-2561
I am the content editor for the website. I am responsible for the PR/Marketing/Promotions/etc. for the site in terms of updating appearances or events. And I concern myself with almost anything related to the Nitro Girls site. People can come to for assistance pertaining to the website other than technical questions. It is often mistaken that I am responsible for scanning in pictures, sending pictures/logos to freelancers/press for other departments, and technical questions.

Name: **Sites, Brian**
Title: Internet Video Coordinator
Department: Internet
Extension: 3-3115
I am responsible for maintaining and creating multimedia content for WCW.com. I also do the daily updating of WCW websites including new content development. People can come to me for help with internet related issues, such as promotion and development. It is often mistaken that I am responsible for scanning photos for other departments.

CONFIDENTIAL
X 000683

*Revised March 28, 2000*

# PUBLIC RELATIONS

Name: **Sharp, Alan**
Title: Director of Public Relations
Department: Public Relations
Extension: 3-2550
I direct and handle all media coverage involving WCW events, talent and products. I communicate WCW positions and policies to media outlets that further the company's image. I coordinate activities that relate to charitable or community service projects. People can come to me for help with media and/or charities. It is often mistaken that I am responsible for promotions.

Name: **Seeman, Donna**
Title: Junior Publicist
Department: Public Relations
Extension: 3-2551
I publicize all WCW events that occur Tuesday through Friday, which includes all WCW Thunder and WCW Saturday night tapings. I travel to Nitro, Thunder and PPV events to handle media activity. I creatively produce wrestler bios, press releases and pitch letters; and I also work on other special projects for WCW. People can come to me for help with wrestler/talent bios and press releases, information about upcoming special projects, and if they have media questions or need a contact at a WCW event. I am not responsible for promotional pictures (color).

Name: **Glast, Jason**
Title: Publicist
Department: Public Relations
Extension: 3-2553
I am responsible for Goldberg's publicity and publicity for Nitro and Pay Per Views. People can come to me if they need help with Goldberg, Nitro, PPV's or general publicity or media relation's questions. I am not responsible for promotional appearances at on sales or meet-and-greet appearances at shows.

Name: **McLain, Brett**
Title: Temp- Public Relation's Assistant
Department: Public Relations
Extension: 3-3827
I arrange wish meetings for sick/dying children with Make-a-Wish, Kids Wish Network, etc. I fulfill charitable requests for auctions and donations. I maintain, submit and send out dub, ticket and media credential requests for the PR department. I maintain merchandise closet and send out merchandise for PR department. I maintain black-and-white promotional pictures (storage, requests for more, and disbursement). I send out press kits to media and assist the PR department in general. I can help with black-and-white promotional pictures, press kits, media credentials and charitable donations. I am not responsible for color promotional pictures and I cannot supply WCW employees, friends and families with autographed pictures or merchandise.

CONFIDENTIAL
X 000684

*Revised March 28, 2000*

## WCW MAGAZINE

Name: **Leiker, Ken**
Title: Publisher/Editor-in-Chief
Department: WCW Magazine
Extension: 3-3171
I manage the business and technical aspects of WCW Magazine: printer, pre-press, subscription, subscription fulfillment, newsstand contractors, and advertising sales. I also guide the editorial direction and look of the magazine. I can provide help with obtaining data and photos that have been published in the magazine.

Name: **Leson, Elliot**
Title: Print Production Coordinator
Department: WCW Magazine
Extension: 3-3177
I am responsible for trafficking and managing all editorial, advertising and insert materials for the magazine. I am the magazine's liaison between the pre-press facility and the printer. I am proficient with desktop publishing software; including Adobe Photoshop, Adobe Illustrator, Quark Express and Microsoft Word. I also have knowledge of imposition software, web offset printing, digital and analog pre-press, and production planning. I can help with questions concerning magazine editorials, advertising, insert materials and photographs. I do not work with the photo department.

Name: **Bell, Amy**
Title: Administrative Assistant
Department: Magazine
Extension: 3-3174
I assist the publisher (Ken Leiker). I also write and edit articles for the magazine, interview talent for articles, read the letters to the editor, oversee the processing of magazine invoices, assist clients and subscribers with problems and questions. I serve as magazine advertising coordinator and I serve as a liaison between the magazine and other WCW departments. I can help with the magazine by giving clients a complimentary subscription, coordinating ads, finding back-issues, getting magazine copies, or questions about the magazine's invoices. I cannot get pictures or merchandise for clients or employees, and I am not responsible for fan's questions about the shows.

Name: **Schlottman, Jim**
Title: Art Director
Department: WCW Magazine
Extension: 3-3173
I am responsible for the design of WCW Magazine and all related materials. I direct photoshoots of talent for the magazine and I approve/select all photography for publication. I can help with any design or creative related questions, photography, logos, illustration, pre-press or printing. I am not responsible for editorial content in the magazine and art used in merchandising.

Name: **Murphy, Joe**
Title: Photo Editor
Department: Magazine
Extension: 3-3175
I am responsible for coordinating all photo shoots for the magazine, editing all film from events and shoots, and selecting art for the magazine (working on layouts and choices with the art director). I also am responsible for all photo related tasks that require photo labs and I license images to other wrestling magazines. People can come to me for help if they have questions concerning photography or if they want to obtain photographs from the magazine. It is often mistaken that I am responsible for all photo needs (PR, Licensing, Merchandising, etc.).

Name: **Boain, Graham**
Title: Associate Editor
Department: WCW Magazine
Extension: 3-3716

CONFIDENTIAL
X 000685

*Revised March 28, 2000*

I am responsible for edit copy for WCW Magazine, writing stories and producing story ideas. People can come to me if they need help identifying wrestlers, if they have questions on stories or if they want to propose story ideas. I am not the photo editor of the magazine.

Name: **Eck, Kevin**
Title: Editor
Department: WCW Magazine
Extension: 3-3178
My job responsibilities include writing, editing and helping plan the editorial content of WCW Magazine. People can come to me with questions concerning the editorial content, or any general questions regarding WCW story lines or history.

CONFIDENTIAL
X 000686

# PROMOTIONS

Name: **Hunt, Tom**
Title: Director of Promotions
Department: Promotions
Extension: 3-2574
I am responsible for effectively concepting and executing WCW promotions that will reinforce the brand and key initiatives. I maximize communication with AD sales and licensed promotion sales to help them drive incremental revenue to Turner and WCW. I create promotional concepts that reinforce WCW initiatives and can be strategically and creatively executed on-air. I fully concept and develop customized Fantasy Prize Promotions (with maximum lead-time) to AD sales and licensed promotion sales to fit client's needs. I work with legal dept. to research promotional concepts and feasibility. I clear all concepts, spots, prizes etc. I develop promotion presentations/documents/one-sheets to Sales. I work with Creative Services to develop presentation boards for client pitches. I oversee project managers who communicate and liaise with client on all levels of promotional activity, including identifying and securing necessary client materials, production timeline, approvals, contracts, etc. I oversee the production of all versions of promotional spots, including timeline, budget, client approvals, legal parameters, sponsor tags, etc. I work closely with Ad Sales Operations and Master Control on scheduling of all promotional spots in either commercial inventory or promo time. I set up and manage entry mechanism for on-air contest, i.e. 800#, PO boxes, on-line and off channel entry. I create local extensions to WCW's national on-air promotions. I develop customized prizes to award contest winners and/or secure prizes from client (when appropriate). I manage the fulfillment and distribution of prizes. I handle travel for winners when necessary. I maintain and manage budget that pertains to Promotion projects. I provide recap packages of promotions/contest to internal divisions and client. And I also provide all necessary information pertaining to promotions to be included in sales collateral materials.

Name: **Stern, Suzanne**
Title: Promotions Manager
Department: Promotions
Extension: 3-2549

Name: **Wengerd, Andrew**
Title: Promotions Coordinator
Department: Promotions
Extension: 3-2563
I promote WCW through talent appearances, talent status, sponsor/contract fulfillment, and I work with outside clientele to establish promotional opportunities. People can come to me for help with promotional ideas and requests. It is often mistaken that I am responsible for Public Relations duties.

Name: **Woodyard, Amy**
Title: Promotions Assistant
Department: Promotions
Extension: 3-3820
I am responsible for wrestler appearances. I arrange travel for the talent and stay in contact with the sponsors so I can arrange and set up the appearance itinerary. I work with PPV sponsors to make sure all stipulations in the contract between PPV sponsors and WCW are executed. I also help Andrew Wengerd with on-sale appearances; which includes arranging travel for talent, typing up an itinerary and traveling to the on-sale location with the talent. People can come to for help with talent appearances or on-sale appearances, talent pictures or autograph sheets, and sponsors of WCW PPV's. It is often mistaken that I am responsible for public relations.

Name: **Sokol-Stewart, Marlene**
Title: Promotion Appearance Coordinator
Department: Promotions
Extension: 3-4077
I am the initial contact for all talent appearances. Basically, all departments that request for talent appearances, paid or otherwise, come to me first. I then contact talent and confirm they can do the event. I either execute the appearance myself, or turn it over to the specific department for them to

CONFIDENTIAL

*Revised March 28, 2000*

execute. I also update all appearance calendars, talent appearance data base and escort talent on many of the appearances. People can come to me for help with questions about the talent and whether they can do an appearance. It is often mistaken that I am responsible for other promotions that employees are working on.

CONFIDENTIAL
X 000688

*Revised March 28, 2000*

# ACCOUNTING

Name: **Prince, Greg**
Title: Controller, CPA
Department: Accounting
Extension: 3-3148

Name: **Henry, Jennifer**
Title: Accounting Manager
Department: Accounting
Extension: 3-3150
I manage the accounting staff for monthly, quarterly and annual reporting. I am the company liaison for payroll, human resource and Turner Group Services. People can come to for help with anything accounting related. It is often mistaken that I am responsible for licensing accounting (Jennifer Hudson). I also do not actually do the payroll; I am just the middleman.

Name: **Lipscomb, Dee**
Title: Financial Analyst
Department: Accounting
Extension: 3-3153
I work on special accounting and financial projects, and I have some budgeting and forecasting responsibilities for WCW. I am not responsible for Wrestling Operations, payroll, accounts payable or other routine accounting functions.

Name: **Gerlach, Tom**
Title: Staff Accountant II
Department: Accounting
Extension: 3-3154
I am responsible for production and magazine accounting, recording arena settlement information, tracking project information and creating invoices. I am also responsible for monthly closing, wire transfers and foreign checks. People can come to more for help with creating an invoice, arena settlement information, general accounting questions or if they need help with project set up.

Name: **Williams, Jimmy**
Title: Staff Accountant II
Department: Accounting
Extension: 3-3155
I assist in tracking Pay Per View carrier payments to WCW. I report, track and identify various property, plant, and equipment issues for 6010 (WCW-Arenas) and 6020 (WCW-Call Center/Mail Order). I serve as a tax liaison for Ernst & Young and local accounting group. I perform accounting related inventory functions for 6010, assist with 6020 inventory, and identify inventory obsolescence exposure for both. I support 6020/MACS (Merchandising and Catalog System) accounting functions. I analyze fixed asset and depreciation expenses. I perform month-end close, quarterly, and year-end close functions pertaining to previous mentioned responsibilities, reconcile accounts previously mentioned, and code monthly cash receipts. I can help with fixed assets, cash coding and inventory issues. I am not solely responsible for making deposits- Klippel, invoicing- Gerlach, or 6020 (Mail Order) Accounts Payable- Viberg.

Name: **Barlow, Celia**
Title: Accounting Assistant III
Department: Accounting
Extension: 3-3151
I am responsible for all aspects of Accounts Payable (Vendor Invoices); which includes coding invoices, allocating department and General Ledger code, and preparing coding ticket for Turner Group Services. I also am responsible for new vendor and independent contractor set-up; which includes contacting new vendors, sending W-9's, facilitating Independent Contractor Checklist for Human Resources and preparing new vendor forms for Turner Group Services. I can help with procedures for getting an invoice paid and for setting up a new vendor. I am not responsible for expense reports, credit applications for new vendors, or finding out the status of payment on an invoice (call 8-1200 or 1-800-646-7683 option 4).

CONFIDENTIAL
X 000689

*Revised March 28, 2000*

Name: **Carson-Hudson, Jennifer**
Title: Staff Accountant III
Department: Accounting
Extension: 3-3158
I am responsible for royalty accounting- calculating and distributing the royalties entitled to the talent, wrestler payroll- review function of wrestler payroll, and closing- reporting the revenue for the 900 telephone number, TMC, Syndicate, Ad Buys and Sweeps. People can come to me for help with talent royalty issues. It is often mistaken that I am responsible for Accounts Payable.

Name: **Klippel, Melissa**
Title: Staff Accountant I
Department: Accounting
Extension: 3-1025
I am responsible for expense reports, helping with closing and assisting Denise Velgouse with Sales and Use Taxes. Currently, people can come to me for help with expense reports. I am not responsible for Accounts Payable.

Name: **Velgouse, Denise**
Title: Tax Manager
Department: Accounting
Extension: 3-1007
I handle most tax and business license related matters (local, state, federal, international), other than income tax which is handled by E&Y downtown. These matters include compliance, audit defense and registrations. I have regular contact with taxing authorities, as well as arenas in which we perform, to ensure that proper procedures are being utilized. I can help with just about any tax matter (except income) or I can help through contacts and research. I do not handle wrestler's licensing matters and athletic commission taxes; they are concerns of the Arenas Department.

Name: **Viberg, Erik**
Title: Staff Accountant
Department: Accounting
Extension: 3-3156
I am responsible for inter-company accounts for 6010 and 6020, Accounts Payable for 6020 and MACS (Merchandising and Catalog System) Close.

Name: **Davidson, Amy**
Title: Staff Accountant II
Department: Accounting
Extension: 3-3152
I am responsible for talent payroll (independent contractors), talent expenses and various other accounting duties, such as month end, quarter end, and year-end functions. I can help with talent paychecks and talent expense reports. I am not responsible for employee payroll.

Name: **Gladney, Allison**
Title: Accounting Assistant III
Department: Accounting
Extension: 3-3149
My job responsibilities are accounts payable and expense reports. People can come to me if they need help with expense reports.

CONFIDENTIAL
X 000690

*Revised March 28, 2000*

## ON-AIR PRODUCTION

Name: **Leathers, Craig**
Title: VP/Executive Producer
Department: On-Air Production
Extension: 3-3823
As Vice President of the company, I oversee special projects such as the Warner Brothers movie "Ready to Rumble", outside music sources (TommyBoy Music), internet ventures (WCW Power Site), and any other projects that fall outside the realm of everyday WCW programming.  People can come to me for help with any aspects of live television or post production.

Name: **Sparks, Gail**
Title: Administrative Assistant
Department: On-Air Production
Extension: 3-1036
My job responsibilities are to handle the day to day administrative duties for the Vice President- Craig Leathers.  It is my responsibility to ensure that he has the most current and accurate information available to him daily, to keep up with his calendar and email, as well as answer his phone.  I also handle production issues to include music, outside talent hires (extras), etc.  People can come to me if they need help with reaching the Vice President, getting on his schedule, or obtaining information regarding production.  I am not responsible for items related to the programming department.

Name: **Yother, Annette**
Title: Director of Programming
Department: On-Air Production
Extension: 3-3825
I work with the Creative Members/Writers in developing, gathering, and compiling program elements and information.  I am the liaison between WCW & Network Operation/Programming for TNT & TBS.  I also take the Program elements and oversee the creation of a workable program script and format.  I oversee all distribution of the information to Production and other necessary WCW departments.  People can come to for questions concerning program elements.

Name: **Turner, Wendy**
Title: Programming Information Assistant
Department: Programming
Extension: 3-3826
I am responsible for Format Production and distribution on show days.  I put all show formats on the WCW shared computer databases.  I send out all show information regarding what can be promoted and announced.  I also give the announce team any announcements to be read on air.  I can help people with where to find the specific show formats, and with what matches have been releases for the PPV's or other shows.  I can assist with research of a specific match, person, first appearance or other general information regarding a wrestler.  You can ask me about the specific spelling or some biographical information regarding a specific wrestler.  It is often mistaken that I am responsible for anything related to talent issues- travel, talent lists, parking lists, booking sheets, etc.

Name: **Parent, Angela**
Title: Program Information Assistant
Department: Programming
Extension: 3-3836
I am responsible for show information distribution from week to week (Nitro/Thunder/Saturday Night).  I also am responsible for preparation of shot sheets for the shows, and I am involved in the approval process for props, extras and shoots for Nitro, Thunder and Saturday Night.  People can come to for help with show content information, prop information, logged shows and anything associated with programming of Nitro, Thunder and Saturday Night.  It is often mistaken that I am responsible for providing copies of past Nitro, Thunder, Saturday Night, and World Wide VHS copies for viewing.

CONFIDENTIAL
X 000691

*Revised March 28, 2000*

# CREATIVE SERVICES

Name: **Mussari, Lorry**
Title: Creative Services Manager
Department: Creative services
Extension: 3-2552
I produce commercials, sales reels, or any video/audio needs that any department has a use for- this includes pre-production through post-production stages. I also manage and oversee all projects done by others in my department and freelance producers. People can come to me for help with their requests for raw footage, spots, sales reels, conference reels, audio bites, commercials, etc. If you need to have a commercial produced for a new product, event or promotion, we will produce the spot from writing to final post-production stages. It is often mistaken that I am responsible for merchandise just because I produce commercial spots.

Name: **Velazco, Kris**
Title: Production Assistant
Department: Creative Services
Extension: 3-2542
I assist producers for Creative Services in every aspect of the pre-production, production and post-production. I make sure each producers has every piece of information, footage, or duty taken care of so as to make their time more beneficial to the creative services department of WCW. People can come to me if they need help assembling footage for companies that deals with WCW. I research and log footage that could become useful for future projects and share that information with all of production, as well as assisting on shoots in everything from catering to props. I am not responsible for producing.

Name: **Dovjak, Diane**
Title: Producer
Department: Creative Services
Extension: 3-4093
I produce whatever project I am assigned within Creative Services (T-shirt promo, PSA, PPV home video, infomercials, pre-game show, etc.). People can come to me with help on a Creative Service issue. It has been wrongly assumed that I am responsible for producing any and all PPV/home video projects. People also think that I am still involved with WCW Worldwice, but I have not been since September 99.

Name: **Juvinall, Nate**
Title: Production Assistant
Department: Creative Services
Extension: 3-4080
It is my responsibility to help the producers form a high quality product. This can mean working on projects independently from start to finish, or helping the producer research the footage, make location scouts, log tapes, etc. People can come to for help with anything in Creative Services, or if we are working on something for them they can come to me if they can't locate their producer. It is often mistaken that I am responsible for dubs. I no longer work in the tape room.

CONFIDENTIAL
X 000692

*Revised March 28, 2000*

## PRODUCTION

Name: **Tony Shiavone**
Title: Announcer/Supervising Producer
Department: Production
Extension: 3-4100

Name: **Mitchell, Keith**
Title: Supervising Producer
Department: Production
Extension: 3-4097
I am the supervising producer for all live programs produced by WCW including Nitro, Thunder, PPV's and international programs. I am the interim supervisor of the creative service personnel. People can come to me for help with live program/international programming/creative services questions.

Names: **Bissell, Kip** (3-4091)
      **Pruitt, Neal** (3-4099)
      **Johnson, Christine** (3-4094)
Title: Senior Producer
Department: Production
NP-I Produce video packages that are between :30 and 3:00 that help develop new wrestling characters and recap story lines to entice viewers to watch our television product. People can come to for help with finding out where you might find a video package that I have produced. It is often mistaken that I am responsible for the library. Although I have been at WCW for a long time, I am not able to physically put my hands on a lot of the videos or raw footage that I have been involved with in the past.

Name: **Douglas, Jason**
Title: Feature Producer
Department: WCW Production
Extension: 3-4092
I am responsible for Pay Per View graphics, packages and PPV show production. I can help with PPV graphics, PPV music and feature packages.

Name: **Kearce, Woody**
Title: Saturday Night Producer
Department: Production
Extension: 3-4095

Name: **Larson, Chris**
Title: International Producer
Department: Production
Extension: 3-4096
I am the producer of the syndicated Worldwide show. I also assist the supervising producer in overseeing the international program production currently being done by the associate producer-Michele Bayens. I can help people with questions concerning the Worldwide show or the international shows (Int'l Worldwide and Int'l Nitro).

Name: **Bayens, Michelle**
Title: Associate Producer
Department: Production
Extension: 3-4090

Name: **Chochol, Michael**
Title: Production Assistant
Department: Production
Extension: 3-5230
My primary job responsibilities include, but are not limited to- all Pre/Post/Live production involving the PPV. My duties include producing monitor walls, assisting the producer and producing packages. I help

CONFIDENTIAL
X 000693

*Revised March 28, 2000*

with digitizing of elements during the sessions. I assist with the building of the Op reels for each PPV. I coordinate tapes for our projects. My Live production duties include, but are not limited to- Truck AP. When we are on the road I produce b/roll and still packages. I also assist during the live pre-tapes by acting as a liaison between the producer and talent. I also do a lot of music selecting each month for our individual packages, and log shows and file music cue sheets. I am involved with Live Field Production when available. People can come to for help with Field Production work, assistance with video involving wrestlers, producing and general production work.

**Name: Marshall, Darryl**
Title: Production Assistant
Department: Production
Extension: 3-4098

**Name: Bill Hartley**
Title: Saturday Night Production Assistant
Department: Production
Extension: 3-2544
I help Woody Kearce with all aspects of pre-production, production and post-production. I help organize and coordinate Traffic sessions so that all the WCW shows have their billboards, promotional considerations, graphics and merchandising spots. At the Sat. night taping I help round up talent, take notes for editing purposes, and help Woody whenever possible. People can come to me for questions or comments concerning Traffic sessions, Saturday Nights or information dealing with wrestler appearances.

CONFIDENTIAL
X 000694

PRODUCTION (TECH)                    *Revised March 28, 2000*

Name: **Shaw, Robin**
Title: Director of Post Production Facilities
Department: Production (Tech)
Extension: 3-4075

The WCW Production department is responsible for an array of things regarding our product. Within the production department I am responsible for the following areas and employees:

*Duplication:* This area is responsible for making dubs of our shows. Currently we have a list of clients that require copies of our shows. We have a variety of international clients that air our show in their country. We have licensees that use our shows as models to create games and toys for WCW. There are cable affiliates that help promote our shows. When wrestlers make public appearances on other television shows and require highlight footage or clips they call the Duplication department. And of course, the duplication department works with Producers to insure they have the right footage in order to build their promos, spots and feature packages.

*Maintenance Engineers:* We have two maintenance engineers on staff to keep the technical operations of the duplication machines running efficiently and properly. When the machines fail, it causes us to lose a great deal of revenue. Also, the maintenance engineers help WCW remain on the cutting edge of technology by researching new equipment

*WCW Studio Operations:* WCW has a studio in which we shoot leads for our shows, wrestler interviews, and product shots such as t-shirts and photo shoots. We also have the capabilities to do a shoot in the studio and feed it to the remote site in order to air it as part of the live telecast.

*WCW Library:* WCW has its own library which consist of over 19,000 videotapes which includes show masters, camera originals, graphics, music, and highlight packages. This is a huge asset for WCW. We have two Tape Librarians that keep track of the footage so we can use it more effectively.

*Shipping & Recycle:* We ship our product all over the globe, domestically and internationally. Our Production shipper handles all videotape shipments that leave Log Cabin and will trace packages if they are misrouted. Additionally, since we use over $200,000 of videotape per year, we recycle our stock for multiple use.

*Music:* I oversee the Music Coordinator to insure that the music WCW uses on all of its telecasts is reported correctly. Any misrepresentation of the music usage could lead to severe penalties for WCW.

*Scheduling:* WCW used to have its own production edit suites; however, our equipment was relocated to the new Turner Studios technical building. When Producers have edit suites needs we must schedule edit time through Turner Studios. I oversee this as well to insure the Producers have what they need to do their promo.

There are 12 employees divided amongst the above mentioned areas. I manage each and am responsible for the entire facility operations and logistics. I should be able to answer questions pertaining to the 2nd floor of Log Cabin.

Name: **Hinton, Todd**
Title: Maintenance Engineer
Department: Production
Extension: 34071

I am responsible for maintaining and overseeing all technical aspects of the production facility. I also maintain and administrate the house RF system. People can come to for help with any technical problems in the production area or any issue with the house RF system. It is often mistaken that I am a member of the computer department.

Name: **Tinsley, Bill**
Title: Senior Camera Operator
Department: Production (Tech)
Extension: 3-4083

Name: **Rogers, Kemper**
Title: Senior Editor/Producer
Department: Production (Tech)
Extension: 3-4074

CONFIDENTIAL
X 000695

*Revised March 28, 2000*

Name: **Edwards, Joel**
Title: Editor
Department: Production (Tech)
Extension: 3-4082

Name: **Arbon, Ed**
Title: Senior Videotape Operator
Department: Operations
Extension: 3-4065
I am responsible for compiling an Archives File of all past WCW Shows in our library. I also assist in Tape Room Operations. People can come to me for help with past match information and information about past or current wrestlers. It is often mistaken that I am responsible for commercial traffic and production dub requests.

Name: **Bonds, Cliff**
Title: Tape Operator
Department: Production (Tech)
Extension: 3-4067
I am responsible for duplicate and offline edit tapes of shows for syndication and international, and requests as provided by the supervisor. People should go to the supervisor of Post Production for requests and information. It is often mistaken that I am responsible for research.

Name: **Davis, Jonathan**
Title: Tape Operator
Department: Post Production
Extension: 3-4068
I am responsible for prepping and executing the dubbing of standing orders as well as performing dubbing, off-line editing and other duties of per-need orders (production dub requests). Other duties include degaussing and maintaining recycled tape stock, black and coding new stock for editors and producers, rolling tape for audio or video and audio studio sessions. Also, quality checking my work (either spot checking or 100% Q.C.) to watch for audio/video drop out, time base corrector "hits", tape damage (creasing, etc.), and spelling and continuity errors. People can come to for help with setting up viewing rooms for remote viewing, finding sources, getting stock (usually recycled), creating/printing labels, technical questions/advise about how to set up a job, etc.

Name: **Green, Elliot**
Title: Tape Operator
Department: Production (Tech)
Extension: 3-4070

Name: **McKay, Stephen**
Title: Tape Operator
Department: Production
Extension: 3-4072
I work as part of a team to maintain weekly standard workbooks (Nitro, Thunder, International dubs. etc.) and non-standard work books, such as production dub request and special projects. People can come to me for help with anything.

Name: **Delaine, Christopher**
Title: Edit Assistant
Department: WCW Productions
Extension: 3-4079
I accompany Nitro and Thunder Field Production crew and provide Avid services for producers in the field. I also provide Avid services for WCW motorsports and any other Producer or WCW client, as needed. I can help with building promos and packages, dubbing and logging, repairs to finished spots, digitizing and Avid maintenance.

CONFIDENTIAL
X 000696

*Revised March 28, 2000*

Name: Bresler, Robert (Breeze)
Title: Tape Librarian
Department: Production (Tech)
Extension: 3-4066
It is my responsibility to keep track of and distribute the show tapes, spot reels and features/packages that are generated on a weekly basis; as well as, maintain and categorize the substantial archival video/audiotape library. People can come to for help with locating and confirming the existence of the tapes for viewing or duplication purposes if Robin Shaw has given approval. It is often mistaken that I am responsible for having knowledge of the participants, outcome, and event date of every match ever wrestled in the entire history of WCW.

Name: **Miller, Darrell**
Title: Videotape Librarian
Department: Post Production
Extension: 3-4078
I assist all employees with footage tapes of all our PPV shows, TV tapings, and promotional appearances of our wrestlers. I then ship the tapes to our international and domestic clients. On Wednesdays I stage manage for our weekly taping of Worldwide and I order the Raw Stock (VHS, 1", beta, etc.) for our company.

CONFIDENTIAL
X 000697

*Revised March 28, 2000*

## REMOTE PRODUCTION

Name: **Crockett, David**
Title: Vice President Production
Department: Production
Extension: 3-3627
I supervise the coordination and hiring of television crews. I oversee the acquisition of technical support equipment and staff. This includes lighting, audio, pyro, security, rings, scenic and catering. I also manage the Production Travel Department. People can come to me for help with ENG Production, live remote production, arena/location sight coordination, special effects, event management, on sight coordination of phones and uplink, and catering. It is often mistaken that I am responsible for the Travel Department and Arena Booking.

Name: **Nordahl, Linda**
Title: Production Office Coordinator
Department: Remote Production
Extension: 3-3628

Name: **Atkinson, Joyce**
Title: Director of TV Production
Department: Remote Production
Extension: 3-3634
My job responsibilities are to apply direction and supervise a group of people coordinating the technical production for all live and taped events. This would include hiring the mobile units for the telecast, hiring the best qualified crew members, overseeing the travel issues for the technical crew, renting equipment, timesheets, production invoices, etc. I work on the day to day operations and needs of the vendors, crew members, co-workers, etc. I keep an open line of communication to all aspects of production. People can come to me for help with Remote Production, production work that is done off site.

Name: **Barrett, Steve**
Title: Production Manager
Department: WCW Production
Extension: 3-3632
I oversee the arena production for Nitro/Thunder/PPV's and Saturday Night shows. This includes lighting, audio, staging, transportation, catering, crew and all other logistics that go into live and taped television shows.

Name: **Small, Steve** (3-3637)
Title: Arena Production Manager
Department: Remote Production
Extension: 3-3637
I am responsible for every element of a televised wrestling show in a remote location i.e. taking an empty arena, filling it for our show, turning it over to the director and producer, and then removing it. People can come to me for help with building problems, logistics, personnel problems between departments or local stagehands, safety issues, and audience issues. I am not responsible for Publicity, Promotions or Comp tickets.

Names: **Blackwell, Katrina** (3-3625)
         **Piccolo, Jason** (3-3639)
         **Holscher, Ragan** (3-3117)
         **Dailey, Daniel** (3-3116)
Title: Production Coordinator
Department: Remote Production
Production Coordinators are responsible for various duties such as finding cost-effective flights for the crews, arranging taxi service, and assembling information in production books for each show. People can come to them for help with questions concerning logistics (what crew is booked, flight schedules, cab services, etc.).

CONFIDENTIAL
X 000698

*Revised March 28, 2000*

Name: Callloway, Kerri
Title: Site Coordinator
Department: Production
Extension: 3-3126
I perform show advances at arenas throughout the country, establish seat kits needed for production use, and compile arena info/photos/diagrams for use by the Production Managers, TV Crew, Promoters and Website. I distribute database information and arena diagrams to the Production department and establish positive public relations with arenas. I can help with arena information, diagrams, photos and contacts. I am not responsible for promotional duties such as advertising.

Name: **Hamilton, Joseph**
Title: Director of Ring Transportation
Department: Production
Extension: 3-1031
I am responsible for building new rings, maintaining current rings, and ordering parts, materials and equipment for all rings. I schedule and route all the ring crews and their trucks. People can come to for help with anything pertaining to wrestling, wrestling rings or ring transportation.

CONFIDENTIAL
X 000699

*Revised March 28, 2000*

# POWER PLANT

Name: **Orndorff, Paul**
Title: Training Center Staffing
Department: Power Plant
Extension: 3-3831

Name: **Smith, Brenda**
Title: Training Center Coordinator
Department: Power Plant
Extension: 3-1030
I assist Paul Orndorff with daily office procedures, such as directing phone calls to proper persons, etc. I update incoming calls in reference to new trainees. I update waivers of liability for trainees. I issue waivers for WCW power plant full-time employees. I open mail, sort videotapes for viewing of new applicants. I request tapes for our present contract staff to view past matches. I make sure all talent in the ring signs a liability waiver. I direct traffic to Paul Orndorff's office by appointment. I keep our front office clear of employees who want to view the talent during training hours. Advise Power Plant staff of all office information. Prepare sign-in sheet for 10-12 Power Plant students. I file, order supplies, and I check the gym before departing each evening. People can come to me if with question concerning the Power Plant or appointments, workman's compensation questions, vendor questions due to non-payment, and all past and present try-out questions from 1994-July 1998. I am not responsible for admitting guests to the Power Plant. Or if employees leave their ID badge and mistakenly think I am supposed to use the entrance buzzer for admitting and departing. The WCW Ring Crew is not a part of the Power Plant and vendors constantly call for accounts payable.

Names: **Young, Danny** (3-1032)
       **Bruce, Dewayne "Sarge"** (3-2570)
       **Wenner, Mike** (3-1071)
Title: Trainer
Department: Power Plant

CONFIDENTIAL
X 000700

*Revised March 28, 2000*

## TALENT MANAGEMENT

Name: **Dillon, JJ**
Title: <u>Director of Talent Management</u>
Department: <u>Talent Management</u>
Extension: 3-3832
I am responsible for most talent management issues; which include some contract negotiations, overseeing the talent booking process, overseeing the talent travel process and being involved in the coordination of talent appearances. People can come to me for help with anything involving WCW talent.

Name: **Bartlett, Dee**
Title: <u>Administrative Assistant</u>
Department: <u>Talent Management</u>
Extension: 3-3835
I am responsible for secretarial duties for JJ, tracking all talent for all departments, and updating talent contact information. I fill out/track expense reports for all talent, and I track payroll/accounting issues for talent, department, vendors and other employees. I arrange delivery of correspondence/packages for talent, set-up yearly physicals for talent and track licensing status for the talent. I assist in the creation of our talent database, order office supplies for the department, and I am a liaison between staff on the road and those here. I troubleshoot office equipment for the department, assist with publishing booking sheets and updates/TV lists and updates/travel issues. I also assist in communications with Spanish speaking talent. I am not responsible for publishing the booking sheets and TV lists (Bowden).

Name: **Engle, Janie**
Title: <u>Talent Relations Manager</u>
Department: <u>Talent Relations/Wrestling Operations</u>
Extension: 3-3822
Talent Travel- I oversee the booking and booking agents travel, hotels, rental cars, limos, charter planes, etc. I work with the Talent Travel Department. Talent Database- I maintain all input of information for database including number of days worked at all events, PR appearances, absences, injuries, address/contact information, Farm System tracking, Productivity Reports, and travel information. Wardrobe management- I oversee travel schedule and supplies. I am also a contact for the new Japan Pro Wrestling- coordinating meetings and bookings, and dealing with travel requests regarding talent and management. People can come to for help with talent travel or database. It is often mistaken that I am responsible for booking information and the VP's schedule.

Name: **Bowden, David**
Title: <u>Talent Management Coordinator</u>
Department: <u>Talent Management</u>
Extension: 3-2540
I help coordinate the creation of the House show lineup including talent, referees and agents, and I manage distribution and upkeep of the House show booking sheets and information. I manage weekly Nitro, Thunder, Sat. Night and PPV talent list acting as a link between creative team and other departments within company. I provide the creative team with updated talent information and availability with regards to injury status, approved days off, etc. I also provide the creative team with ratings information. I provide an on site resource of Nitro, Thunder and PPV shows available to creative team and talent for a range of duties. I manage weekly tracking/accounting of talent with creation and implementation of sign in sheets with security to processing of information to accounting. I also manage tracking of talent. I coordinate a wide range of special projects and assignments with the talent management department. People can come to me for information regarding talent, in particular with bookings and accounting. It is often mistaken that I am working with the travel department and programming.

Name: **Taylor, Terry**
Title: <u>Director of Live Events</u>
Department: <u>Booking & Talent Relations</u>
Extension: 3-3630

CONFIDENTIAL
X 000701

*Revised March 28, 2000*

I am responsible for booking all house shows or live events; which is done six weeks ahead of time so Awesome Promotions and our publicity department can properly promote said events. The nature of our industry dictates constant monitoring because of changing story lines and unforeseen injuries. I am also an agent at Nitro and Thunder events, choreographing matches and ensuring the segments correspond with the writers' vision. Therefore, I need to make sure the talent understands and appreciates what is expected of them. I am also a member of the booking committee that writes all television shows and PPV's, developing story lines and characters. At a lesser degree I try to help find, groom and sign new talent. People can come to me for help with training, character issues or story line development. It is often mistaken that I am responsible for hiring/firing talent, the final say on booking decisions, or talent travel arrangements.

Names: **Russo, Vince** (3-2566)
          **Ferrara, Ed** (3-2567)
          **Banks, Bill** (3-1088)
Title: <u>Writer</u>
Department: <u>Talent Management</u>
BB-I am responsible for TV writing (on the road) under Vince Russo. I also head up the internet department supplying creative direction for wcw.com. People can come to me for help with creative direction/story lines for WCW, or anything to do with our internet site. It is often mistaken that I am responsible for ad sales for WCW.

Name: **Gary, Alto**
Title: <u>Nitro Girl Manager</u>
Department: <u>Talent Management</u>
Extension: 3-2565
I arrange travel for Nitro Girls to TV shows and performances. I choreograph and arrange dance routines, book Nitro Girls for WCW Promos, design and purchase costumes, and hire or fire Nitro Girls. I provide DJ and truck with music, and I edit the music. I also consult with celebrity placement services to book Nitro Girls for paid appearances. People can come to for help with locating or booking a Nitro Girl. It is often mistaken that I am responsible for all female talent.

CONFIDENTIAL
X 000703

*Revised March 28, 2000*

## TALENT TRAVEL

Name: **Bowen, Elena**
Title: Talent Travel Coordinator
Department: Talent Travel
Extension: 3-3824
I coordinate all the talent travel arrangements for TV shows, house shows, personal appearances and doctor appointments. I am responsible for all talent related travel emergencies after-hours and on weekends. I can help with arranging any travel for talent of finding out what talent is where at what time. I am not responsible for knowing what talent is supposed to be doing at the events and I do not always know the reason for travel.

Names: **Theys, Noreen** (3-3828)
　　　　**Gray, Pamela** (3-3121)
Title: WTP Travel Agent
Department: Talent Travel

CONFIDENTIAL
X 000702

*Revised March 28, 2000*

## PRODUCTION TRAVEL

Name: **Davis, Penny**
Title: Travel Coordinator
Department: Production and Office Travel
Extension: 3-1035
I book all travel for office personnel, oversee the Production Travel Department, book all hotels for televised events, and I am on-call for emergencies after-hours. I can help with travel needs, hotels and rental cars. It is often mistaken that I am responsible for talent travel.

Names: **Hill-Atkins, Julie** (3-3119)
   **Perry, Cynthia** (3-3128)
   **Cox, Randy** (3-3120)
Title: WTP Lead Agent
Department: Production Travel

Name: **Ndiaye, Falla**
Title: WTP Ticket Processor
Department: Production Travel
Extension: 3-3140

CONFIDENTIAL
X 000704

*Revised March 28, 2000*

## TECHNICAL SUPPORT

Name: **Upshaw, Doug**
Title: Technology Coordinator
Department: General Administration
Extension: 3-1011
My job responsibilities include network administrator/manager, desktop computer support manager, and computer specification and acquisition.  People can come to me if they need help with network and e-mail account management, desktop computer support, requests for computers and/or peripherals (with department head approval), computer related project support (new server or equipment specification and integration), office moves (computer and phone/fax only) and telephone moves or number changes.  It is often mistaken that I am responsible for malfunctioning copy machines, power outages, furniture moves, cable TV and VCR hookups.

Name: **Edwards, Jimmy**
Title: Technology Analyst
Department: General Administration
Extension: 3-1074
I am responsible for setting up new desktop computers, printers and phones.  I also am responsible for trouble shooting computer, printers and phones.  I can help with computer, printer and phone related issues.  I am not responsible for copiers and fax machines.

CONFIDENTIAL
X 000705



The purpose of this form is to assist New Hires in becoming acquainted with the mission of WCW and the distribution of work within the company. After each employee completes the forms they will be combined in a handbook that is to be given to each New Hire. This is necessary so those new employees are better informed of the various positions we have and what each department is responsible for at WCW. This is also a means to better inform existing employees of the work allocation and to identify where changes need to be made. Job descriptions and employee titles will undoubtedly change, so the handbook will be regularly updated. Please complete the form in detail and accuracy.

Name:  Suzanne Stem

Title:   Senior Promotions Manager

Department: Promotions

Reports to:   Director of Promotions, Tom Hunt

**Job Description**
Responsible for effectively executing WCW promotions that will reinforce the brand and key initiatives. Maximize communication with Ad Sales and Licensed Promotion Sales to help them drive incremental revenue to Turner and WCW.

• Work with Director of Promotions on the ideation of promotional concepts that reinforce WCW initiatives and can be strategically and creatively executed on-air.
• Fully concept and develop customized Fantasy Prize Promotions (with maximum lead time). Provide and customize these Fantasy Prize Promotions to Ad Sales and Licensed Promotion Sales to fit client's needs.
• Work with Legal Department to research promotional concepts and feasibility. Clear all concepts from any FCC violations before concept is presented externally.
• Work with Research Department to coordinate focus groups (when necessary) to test concepts, spots, prizes etc.
• Develop promotion presentations/documents/one-sheets to Sales. Work with Creative Services to develop presentation boards for client pitches
• Communicate and act as client liaison on all levels of promotion activity, including identifying and securing necessary client materials, production timeline, approvals, contracts etc.
• Oversee the production of all versions of promotional spots, including timeline, budget, client approvals, legal parameters, sponsor tags, etc.
• Work closely with Ad Sales, Sales Operations and Master Control on scheduling of all promotional spots in either commercial inventory or promo time
• Set up and manage entry mechanisms for on-air contests, i.e. 800#, PO Boxes, on-line and off channel entry
• Work with Director of PPV Marketing on any local extensions to WCW's national on-air promotions

CONFIDENTIAL
X 000706

• Develop customized prizes to award contest winners and/or secure prizes from client (when appropriate).   Manage the fulfillment and distribution of prizes.  Handle travel for winners when necessary.
• Maintain and manage budget that pertains to Promotion projects.  Intercompany bill Ad Sales for sales-driven promotion expenses.
• Provide recap packages of promotions/contests to internal divisions and client.
• Provide all necessary information pertaining to promotions to be included in sales collateral materials.

People can come to me if they need help with...

•    Anything that is advertising/promotions related.

It is often mistaken that I am responsible for...

•    Media buys to promote WCW shows.

CONFIDENTIAL
X 000707



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**



### BOBBY HARDWORK WALKER
BOBBY Walker
Professional Wrestler

59 Gleneagles Dr.
Fayetteville, GA.

Telephone 770-716-6830

TO:    **ERIC BISHOFF**
SUB.   **Racial Discrimination**
FROM:  **Bobby Walker**

**MARCH 01,1998**

**DEAR SIR:**

In the past Terry Taylor has made statements to me and others how he felt about blacks. Since he has had the top booking job, I have had nothing but problems. Ever since I talked to Terry in Orlando Fl., about my future in WCW, the problem has gotten worse. I feel like I lost my job because of Terry Taylor deep dislike for Blacks. I have alwas tried to talk to you about any problems. I want to know from you why I lost my job? Please contact me at 770-716-6830. I look forward to hearing from you soon. Thanks in advance for your assistance in this matter.

**Bobby Walker.**

**CC: ERIC BISHOFF**



PLAINTIFF'S EXHIBIT



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**



## BOBBY HARDWORK WALKER
BOBBY Walker
Professional Wrestler

59 Gleneagles Dr.
Fayetteville, GA.

Telephone 770-716-6830

TO:    DR. HAVEY SCHILLER
SUB.   Racial Discrimination
FROM:  Bobby Walker

MARCH 01,1998

DEAR SIR:

I know that you are a very busy man. Could you Please arrange a meeting with
me, to talk about this problem. In the past Terry Taylor has made statements to me
and others how he felt about blacks. Since he has had the top booking job, I have
had nothing but problems. Every since I talked to Terry in Orlando Fl., about my
future in WCW, the problem has gotten wrost. I feel like I lost my job because of
Terry Taylor deep dislike for Blacks. I want to know why I lost my job? Please
contact me at 770-716-6830. I look forward to hearing from you soon. Thanks in
advance for your assistance in this matter.

Bobby Walker.

CC: DR. HAVEY SCHILLER



PLAINTIFF'S
EXHIBIT
15

P00593



# EXHIBIT / ATTACHMENT

**(To be scanned in place of tab)**





WCW · WWF · ECW · Indies · Int'l
## Miller Time

Home

WrestleManiacs

ScoopThis

Bombshells

Toys

Rankings

Photos

Audio

Schedules

Columns

Almanac

Forums

Chat

Store

WOW Mag

Email Us

**Federations**

WCW

WWF

ECW

Indies

Int'l

# Exclusive interview with WWF's head writer Vince Russo

September 30, 1999

## By Ben Miller
### WrestleLine/WrestleManiacs

PLAINTIFF'S
EXHIBIT

#2

**BEN:** The people you closed the door on, I don't want to ask for names, have they ended up showing up on ECW or WCW, or do they end up staying on the fringe of the business for the same reason you didn't want them?

**RUSSO:** No, they wind up showing in ECW and WCW. I think that's why you have such chaos, especially in WCW's locker room. When there is a free agent out there, one of the first things we look at is that there is such peace and harmony and a family feeling in our locker room, if we bring this guy in, how is it going to affect that? If it's going to affect that in a negative way, we don't bring them in. These guys definitely get picked up in ECW and WCW. Like I said, I think that's part of the reason why you have so many problems in WCW.

**BEN:** Two guys that have been critical of you at various times are **Dave Meltzer** who obviously writes the *Wrestling Observer* and **Bruce**

**Mitchell**. Do you have any opinion on those guys?

**RUSSO:** Well yeah, it just really bothers me. First of all, you've got to understand something, I never in my life claimed to be a great journalist, because the way I write ... I don't try to write to impress people. I don't try to write in a style like look at me, I'm smarter than you. I try to write in a style that people ... the common guy - the wrestling fan will understand. That's how I try to write, and that's the most important thing to me - that I write in a way that our fan is going to understand. I am not above anybody, and another thing too, every one of my columns, even if it is pro-WWF, I write what I truly believe in my heart. Nobody tells me to write my column, if I write it positive, or negative, whatever the case may be, **Vince McMahon** lets it go, then I write about what I truly, truly feel. And I try to write the truth.

The thing that just bothers me, primarily about Dave Meltzer, I just feel he thinks he's better than everybody else. I think he tries to talk down on people like he knows everything, and the reality of the situation is that Dave Meltzer doesn't know shit. Because all Dave Meltzer's information is second hand information, and whoever is giving him that information is putting their little spin



Though there are some things Russo can't talk about, like the Owen Hart lawsuit, he believes in telling readers as much as possible. (WOW)

Case 1:00-cv-01717-CC  Document 108  Filed 01/30/03  Page 456 of 530

on it, and whereas you know - me - I'm there! I know what's going on. I'm behind the scenes. I talk to these guys on a daily basis. I know what's true. I know what's bullshit, and I tell the reader as much as I possible can.

Of course there are some things I can't talk about. I even mentioned to you like the Owen situation - anything involving a lawsuit, I can't talk about, you know. But it just really bothers me when you have a guy who feels that he's above it all, when the reality is he's getting the information second hand, and some of it right, and some of it is absolutely bullshit, and he doesn't have a clue as to what's right and what's bullshit. And that's what bothers me. They can be as critical as they want to be, but I would much rather have a job and be in a position where I know what I'm talking about rather than have to rely on gossip.

**BEN:** I see where you're coming from. Obviously those guys have to know someone in the company. If you ever found out that someone was a mole for one of these newsletters or something like that, would you get mad at them?

**RUSSO:** I don't necessarily know if they do know someone in the company, and the only reason I say that is because on so many occasions, the information is wrong. It's just flat wrong. I remember one time Dave Meltzer had something in there about me, a couple of years ago, it was rumored that one of the WCW wrestlers died in a car crash ... that black guy ... that Pit guy ---

**BEN:** Oh yeah. **Craig "Pitbull" Pittman**.

Case 1:00-cv-01717-CC   Document 108   Filed 01/30/03   Page 457 of 530

**RUSSO:** Yeah, the next thing I know I'm reading in Meltzer's newsletter that Russo was on the phone spreading this rumor. Just stuff like that. I can't fathom that they know somebody on the inside with credibility, because as I said, yeah half of their stuff is right on the money, and the other half is totally bullshit.

**BEN:** I see where you're coming from, but wrestling is a business obviously, where in the past, more than in the present, it's tough to get the truth. In my defense, because I'm someone who reads those newsletters, you don't know where the truth is coming from. It's hard to tell sometimes.

**RUSSO:** I don't necessarily agree with you on that, because why is it tough to get the truth? If Dave Meltzer ever called me, or a **Wade Keller** ever called me, or if any of those guys ever called me, I'm going to tell them the truth, and I'm going to tell them what I know. I have nothing to hide. If they ask me a question, I'm going to tell them the answer to the question. But the difference is, if they ask you a question, and you honestly don't know the answer to it, then you're a liar. Like you asked me about the IPO. I honestly don't know anything about that, and quite frankly, I really don't care. My plate is so full with writing television, I don't know about that. But to a Meltzer or a Keller, if they ask me that same question, and I answer it the same way, well I'm lying, and they're not getting the truth from me.

**BEN:** I understand, but to the average fan, it's not like you can get the entire truth like on the some of the uglier side of the business, like with deaths and stuff like that. It's not like you can

go to WWF.com and create a detailed itinerary of what was at **Brian Pillman**'s bedside. So sometimes you have to go to outside sources to find the truth.

**RUSSO:** Right.

**BEN:** This is something I've always wanted to see in American professional wrestling, have you guys, the TV writing team, ever thought of having the title like All Japan Pro Wrestling where there's no gimmick matches, no run-ins, no count outs, it's just two guys in a wrestling match. And not every match to be like that, because I know how it can get boring and monotonous, but just one title ---

**RUSSO:** I'm going to tell you something right now that you will absolutely not agree with, but I've been a wrestling fan my whole life and I will live and die by this - it is hard enough, believe me I write this shit, it is hard enough to get somebody over. You will never ever, ever, ever, ever see the Japanese wrestler or the Mexican wrestler over in American mainstream wrestling. And the simple reason for that is, even myself, I'm an American, and I don't want to sound like a big bigot or a racist or anything like that, but I'm an American ... if I'm watching wrestling here in America, I don't give a shit about a Japanese guy. I don't give a shit about a Mexican guy. I'm from America, and that's what I want to see. Now there are the smart fans that love that type of shit, like you.

**BEN:** Yeah, I really like All Japan.

**RUSSO:** Which is cool, but the reality of it is, that's a small minority of our audience.

**BEN:** But I'm not talking so much about the fact

Case 1:00-cv-01717-CC Document 108 Filed 01/30/03 Page 459 of 530

that you would have to use the guys from Japan, I'm just saying, two guys who I think are good wrestlers, maybe **D'Lo Brown** and **Jeff Jarrett**, who maybe don't have the interview skills or the charisma of a **Rock** or **Steve Austin**, but if you put them out there in longer matches where they could show their in ring talent ---

**RUSSO:** What do you call a longer match?

**BEN:** I don't know, maybe 12 minutes?

**RUSSO:** There is no way on television ---

**BEN:** Not on television. I mean more PPV, and on television it would 6-8 minutes. I don't think matches on television outside of the main event should go more than 8 minutes.

**RUSSO:** But the thing you don't understand is, and I can tell you first hand, the way television is, and how short the matches are on TV - what we've done now basically is we've basically trained the audience. It's crash TV. It's in and out. What's the finish? Let's get to the next thing.

**BEN:** Absolutely.

**RUSSO:** That's the way we've trained the fan, and I've got to tell you, I don't know how many PPVs you go to, but a couple of years ago when I wasn't writing the PPVs, and we just really started this trend with the way the business is now, we would have 15, 20, 25 minute matches, because it was the PPV, 5 minutes in, people were sitting on their hands.

**BEN:** That's true -

Case 1:00-cv-01717-CC Document 108 Filed 01/30/03 Page 460 of 530

**RUSSO:** The house was silent. The reason being, we've trained these people a certain way, and now that's why I'm writing the PPVs, because basically, the PPVs need to be written the same way as television, because that's what the fans expect.

**BEN:** That is true, but you have to recognize that WCW does a lot of short matches too, but when you go on their PPV and see a really good "wrestling match" where the workrate is high, with like ... I can remember **Raven** and **Saturn** v. **Malenko** and **Benoit** on PPV, and it went like 12 or 13 minutes and the crowd was hot the entire time. You don't think that type of thing would work in the WWF?

**RUSSO:** I think that's a rarity. I watch everything that I can. I've never watched Mexican or Japan, because I don't give a shit. I live here, that's all I care about. But one thing I got to tell you, I was watching ECW last week, **Van Dam** and who--?

**BEN:** I won't even go into that.

**RUSSO:** No, but who's the other guy?

**BEN: Jerry Lynn**.



Stone Cold Jersey!
· WWF Attitude Tee
· NWO Bucket Cap
· Sable Attitude Bear
· Hogan Flag
· Goldberg T-Shirt

**RUSSO:** Ok Jerry Lynn. Now I got to tell you something, seriously, I was sitting here really enjoying the hell out of the match, but it got to the point even with me where it was like, OK end this. The thing is, you've got to understand, in this day and age, there are so many things for people to do that their attention span is so

Case M:00-cv-01717-WC Document 108 Filed 01/08/08 Page 461 of 530

short. Why do you think when there is a commercial people change the channel? You know what I'm saying?

**BEN:** I agree, but are you saying that something that I thought was just as incredible, I don't know if you saw the last ECW PPV, but **Mike Awesome** versus **Masato Tanaka** and they went out there for a good 13-15 minutes and they had what people would call a \*\*\*\* or a \*\*\*\* ½ match, is that going to be obsolete in the WWF? In that match where they basically stayed around the ringside area, and there's a clean finish - even though I know they used table and chairs - but there is no in the crowd brawling, is kind of thing going to become obsolete in the WWF you think?

**RUSSO:** I don't want to say obsolete, but I don't see it going back in that direction. The only reason I tell you that, I'm at every show, I'm there, you put Rock and Mick in that ring with microphones, the people will sit there for a half an hour and be entertained. You put a wrestling in that ring for over ten minutes, they want to know, let's get to the finish, and let's go on to the next thing. And you gotta understand from a writing point of view, I am not dictating to these fans. I am basically in the arena every Monday and Tuesday night, I am in the arena, I am listening to the fans. All that I am trying to do from a television-writing standpoint is give the masses what they want. Now, I'm not saying give the smart wrestling fan what they want, I'm saying give the masses, and that's my job.

**BEN:** I see that, and I don't want to beleaguer it, but some would argue that it's true, that WWF fans mainly sit on their hands for matches that go more than 10 minutes, but some would

argue that it's because the quality of the in-ring wrestling isn't as good. Don't you think that if you put two good wrestlers in the ring, and I know we had talked about the Van Dam - Lynn thing, but I don't consider Van Dam to be that great of a wrestler, I look more to the Masato Tanaka - Mike Awesome example. Don't you think if you put two good wrestlers in there, who had a match which could stir the fans emotions, that that would ... look at what happened with **Sting** and Benoit? I know they still got killed by Raw when Raw opened, but they kept a much larger percentage than they had been by starting off their show with interviews. Do you think there's any validity to that?

**RUSSO:** No. I think they kept a much bigger number than they did, because that was really a well-booked match where you couldn't call the outcome. Benoit isn't going to beat Sting in the middle of the ring, and Sting isn't going to beat Benoit, so what are they gonna do? That was the appeal to the match.

**BEN:** OK.

**RUSSO:** Don't get me wrong, I love to see a good wrestling match, but my job is ... I get paid to give the people what they want, and whether I agree or disagree with them is not my job. I'm not writing television to please Vince Russo. I'm writing television to please the masses, and like I say, when I go out in a crowd, and I see the response from a Mick - Rock promo, and response to a wrestling match, I know what they want to see. And again, it's not Vince Russo writing TV for Vince Russo, I'm just trying to give the people what they want.

### Part 1 · Part 2 · Part 3

Case 1:00-sv-01717-CC Document 108 Filed 01/30/03 Page 463 of 530

**E-mail Ben Miller | Miller Time archive**

**WCW · WWF · ECW · Indies · Int'l**



Copyright © 1999 SportsLine USA, Inc. All rights reserved.

This website is not sponsored or endorsed by the WWF, WCW or ECW. This is not an official site.



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

To: ALL WCW TALENT

From: J.J. DILLON

Date: APRIL 30, 1999

Subject: TALENT SCHEDULES, INCLUDING PERSONAL APPEARANCES

CC: Eric Bischoff
Bill Busch
Diana Myers
Alan Sharp

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

We have had several recent situations where talent were needed on short notice for WCW business ("house show" substitution, personal appearance, etc.) only to be informed by the individual talent that they had made a previous commitment not approved by WCW (movie project, charity appearance, autograph session, etc.) that caused a conflict.     In order to avoid a reoccurrence of these situations from this point forward, please be advised that all requests for days "OFF" must be requested in advance and approved by J.J. Dillon.    If you are planning a vacation, wanting to attend the wedding of a friend or planning to attend a school reunion, etc., you must request the time off in advance. THIS INCLUDES ANY AND ALL PERSONAL APPEARANCES (INCLUDING AUTOGRAPH SESSIONS), WHETHER FOR CHARITY OR INVOLVING AN APPEARANCE FEE.

Talent Relations has been given approval on a trial basis to authorize personal appearances for talent that involve payment to talent of a fee payable from a source outside our company.      These personal appearances will only be considered "Authorized Appearances" if they are scheduled through WCW.      The talent involved and WCW will share any fee involved, with the majority of any appearance fee going to the talent that makes the appearance.      All of these non WCW related personal appearances will be voluntary (therefore not regarded as a workday if there are limitations in the WCW talent contract) and subject to the approval of the talent. Appearance fees are usually determined by the fair market value, and if approached, WCW will attempt to get a fair appearance fee, which is subject to the approval of the talent.     If you are approached concerning an appearance, please have the party contact J.J. Dillon to comply with our appearance approval process.      This usually involves a contract for the appearance, which assures the validity of the request.      All appearance fees are received in advance by WCW, which assures the talent will be paid in accordance with the agreement.      ALL APPEARANCES NOT CLEARED BY WCW WILL BE REGARDED AS "UNAUTHORIZED" AND YOUR PARTICIPATION IN AN "UNAUTHORIZED APPEARANCE" COULD BE INTERPRETED AS A BREACH OF YOUR CONTRACT.

This represents a great opportunity for an added revenue stream for WCW talent.    This should continue beyond a trial basis, if we all work within the system.     If you have any questions or comments, please call J.J. Dillon at (404) 603-3832.      Thank you.



PLAINTIFF'S EXHIBIT

49

WCW 010262
CONFIDENTIAL



# EXHIBIT / ATTACHMENT

# HH

**(To be scanned in place of tab)**

## DECLARATION OF BOBBY WALKER

STATE OF GEORGIA
COUNTY OF FULTON

Before the undersigned officer appeared Bobby Walker, who, after being placed under oath, says and deposes as follows:

1.

My name is Bobby Walker. I am over eighteen (18) years of age, and I am otherwise competent to make this affidavit.

2.

I trained at WCW's Power Plant intermittently from about 1993 until ~~1999~~. 2000 During this time, I had the opportunity to observe Willy Worthen train at the Power Plant. B.W.

3.

Willy worked very hard at his training. He was disciplined and committed to learning the skills necessary to become a wrestler and to succeed at WCW.

4.

To the best of my knowledge, Willy performed every task asked of him without complaint.

5.

Willy worked harder and showed more commitment to his training than many Caucasian trainees who received contracts from WCW.

6.

Many Caucasian trainees did not train at the Power Plant full time and still received a contract from WCW.

7.

I remember times when Caucasian trainees refused to attend the Power Plant, explaining that they needed to seek out employment to support themselves. WCW still offered some of these trainees contracts.

8.

I remember a Caucasian wrestler named Joey Maggs. He was provided with opportunities although he did not have very good wrestling skills. I occasionally saw him arrive at the Power Plant, but he never really trained for any significant period of times. Also, there were many times that he came by the Power Plant, but did not even train or wrestle.

9.

I also observed Rick Reeves wrestle. Rick Reeves had much better wrestling skills and abilities than Joey Maggs.

10.

In "squash" matches, a "jobber" or "enhancement talent" is scripted to lose the match and is used to make another wrestler look good. Squash matches do not provide a jobber with a meaningful opportunity to showcase his talents or progress.

11.

2

I declare under penalty of perjury that the foregoing is

true and correct.

_____
Bobby Walker

_____
Executed on (Date)

3



# EXHIBIT / ATTACHMENT

# II

**(To be scanned in place of tab)**

## DECLARATION OF SERGEANT STEVE HICKS

Sergeant Steve Hicks gives the following declaration under penalty of perjury and states as follows:

1.

I am a full time law enforcement officer with the Haleyville, Alabama Police Department.  I have been in law enforcement for approximately ten (10) years.

2.

I have followed wrestling my entire adult life and am the publisher of a wrestling industry publication entitled *DragonKing Update Report*, which has been in publication since 1999 and has a circulation base of approximately 5,000 readers, both domestically and internationally.

3.

Prior to publishing the *DragonKing Update Report*, I published a similar wrestling newsletter, the *Global Pro-wrestling News* from 1994-1996.

4.

I am also the publisher of *The Ultimate History of Pro Wrestling* (2000) and *The Ultimate Pro Wrestling Book of Lists*, *Vols. I and II.*

5.

I have maintained records that reflect the content and outcome of professional wrestling matches and events for the various professional wrestling organizations that date back to the early to mid-1990s.

6.

I have records that document who participated in, won and lost every WCW Pay-Per-View Event since WCW's inception.  I also have records of this data for every Nitro and Thunder event since 1997.

7.

I maintain a library of wrestling reference books, including every edition of the annual *Wrestling Almanac* (a Pro Wrestling Illustrated publication).

8.

Professional wrestling is a staged event.  The outcome of these events are predetermined by writers, who create various stories and storylines for wrestling programs and events.

9.

A wrestler's success in professional wrestling is largely determined by the amount of time and effort a wrestling entity, such as World Championship Wreslting, Inc. ("WCW"), expends to develop and "push" the wrestler's character.

10.

WCW "pushes" a wrestler by giving him or her the opportunity to wrestle on more popular television programs, such as Nitro, Thunder and Pay-Per-View events.  This gives wrestling fans the opportunity to become familiar with a wrestler's character, which is essential to establishing a fan-base.

11.

WCW also "pushes" a wrestler by having more-experienced bookers, agents and wrestlers work to develop a new wrestler's charisma, uniqueness of character, crowd appeal, stage presence, microphone skills and wrestling moves.

12.

I have had the opportunity to observe Bobby "Hardwork" Walker wrestle for WCW.

13.

Bobby Walker had as much excitement, charisma, uniqueness, crowd appeal and stage presence as many Caucasian wrestlers who received a significantly greater push from WCW.  Unlike Bobby Walker, WCW regularly utilized these wrestlers in its popular television programs.

14.

For example, Bobby Walker was equal in excitement, charisma, uniqueness, crowd appeal, stage presence and athleticism to Chris Kanyon, even though WCW spent greater time and energy developing Chris Kanyon's character and provided Chris Kanyon with more air-time on popular television programs.

15.

Similarly, Bobby Walker was equal in excitement, charisma, uniqueness, crowd appeal, stage presence and athleticism to Alex Wright and Prince Akeia even though WCW spent greater time and energy developing Alex Wright's and Prince Akeia's characters and provided each of them with more air-time on popular television programs.

16.

The times that I witnessed Bobby Walker perform his signature move "walking the ropes," he successfully completed the move.   I never witnessed Bobby Walker have any trouble completing this move.

17.

By way of contrast, on at least one occasion, I witnessed Billy Kidman miss his signature move, the "shooting star press," during a televised event.   From time-to-time, I witnessed Billy Kidman miss other wrestling moves during televised events.

18.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Sergeant Steve Hicks

_____
Executed on (Date)



# EXHIBIT / ATTACHMENT

## JJ

**(To be scanned in place of tab)**

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Davis v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1716-CC;
Saengsiphan v. World Championship Wrestling, Inc. and
Turner Sports, Inc., Civ. File No. 1-00-CV-1719-CC;
Speight v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1718-CC;
Worthen v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1717-CC;
Reeves v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1720-CC;
Easterling v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1715-CC
Onoo v. World Championship Wrestling, Inc., Turner Sports,
Inc., Civ. File No. 1:00-CV-0368-CC
Norris v. World Championship Wrestling, Inc., Turner
Sports, Inc., Civ. File No. 1:00-CV-0369-CC
Walker v. World Championship Wrestling, Inc., Turner
Sports, Inc., Civ. File No. 1:00-CV-0367-CC; Patterson v.
World Championship Wrestling, Inc., Turner Sports, Inc.,
Turner Entertainment Group, Inc. Civ. File No. Civ. File
No. 1:01-CV-1152-CC

**PLAINTIFFS' RULE 26(a)(2) DISCLOSURES OF
EXPERT TESTIMONY OF DR. DAVID W. RASMUSSEN**

Pursuant to Federal Rule of Civil Procedure 26(a)(2),

Plaintiffs hereby identify the expert testimony of their

statistician, Dr. David W. Rasmussen, who is the James H.

Gapinski Professor of Economics at Florida State University, as

follows:

**A.   Opinions, Basis and Reasons:**

Introduction

This report evaluates the contention that the World

Championship Wrestling (WCW) denied equal treatment to African-

American wrestlers in terms of employment, salary and other contract terms. The statistical evidence presented here sheds light on this question in two ways. First, evidence is presented that shows African-Americans are under-represented among WCW wrestler positions. These data are consistent with the contention that African-American wrestlers did not encounter an equal opportunity employer when dealing with WCW.    Second, the salary and other compensation of African-American wrestlers are explored. The fact that African-Americans are significantly underrepresented among wrestlers hinders formal statistical analysis of their salaries relative to other wrestlers, but the available evidence strongly indicates that African-Americans performers did not receive compensation that is commensurate with other wrestlers.

**Hiring**

*Methodology.* The following statistical analysis uses the methodology that is generally accepted in Title VII litigation. At issue is whether the WCW hired African-Americans in proportion to their representation in the qualified applicant pool. The crucial question to be answered is how far the proportion of African-Americans among total paid wrestlers stray from the expected proportion and still be regarded as "racially neutral." This is a straightforward statistical problem, and the prevailing legal doctrine is in accord with the standard

- 2 -

methods used in social science: discrimination is revealed when the employer's actual behavior results in the number of African-Americans hired to be more than two standard deviations below the number expected based on their availability in the workforce.[1]  Statistical analysis allows the analyst to make probability statements.  When actual number of African-Americans hired is two standard deviations below the expected number, it reveals that there is only one chance in twenty (five percent) that an equal opportunity employer by chance would have the racial distribution of retention decisions that is observed.

This statistical calculation is driven by three numbers: the actual number of African-Americans hired, the total number of persons hired, and the expected proportion of African-Americans among these hires.  Generally, the actual numbers of African-Americans and total hires are relatively free of controversy.  More contentious is the proportion of hires that are expected to be African-American, the "benchmark" by which actual hiring performance is evaluated.  This controversy is minimized when there is a good record of all persons who applied for employment together with identification of those who are African-American.  For obvious reasons, these data are not

---

[1] Statistical formula for calculating the number of standard deviations is the actual number of African-Americans hired minus the expected number divided by the standard deviation which is the square root of $np(1-p)$ where n is the total number of hires and p is the benchmark measuring the percent African-Americans that are available. It should be noted that social scientists recognize that important differences may occur even when customary significance levels are not realized.

generally available. However, even excellent applicant flow

data may be compromised if qualified African-Americans are

reluctant to apply because they believe that the employer will

discriminate against them.[2] Thus when good applicant flow data

that identifies African-Americans are not available, as in this

case, it is customary to use labor market statistics to

approximate the expected proportion of African-Americans among

qualified applicants.

*Wrestlers*

Data are available to examine the number of African-

American wrestlers under contract with WCW between 1996 and

2000.[3] The evidence available at this time suggests that there

are 228 wrestlers, 17 (7.5 percent) of whom were African-

American.[4] The crucial question is: by what benchmark are we to

evaluate this hiring performance?

One possible starting point is to get information about the

relative number of African-Americans who are interested in

becoming professional wrestlers. WCW has a school, the Power

Plant, to train wrestlers. The proportion of African-Americans

among qualified persons who desire to attend this school would

---

[2] This "chilling" effect that potentially lowers the percent African-American among applicants is analogous to the "discouraged worker" classification used by the U.S. Department of Labor. Discouraged workers are those that would look for work if they believed they could find a job somewhere in the economy. The chilling effect represents firm specific discouraged workers: individuals do not apply because they believe the employer is not an equal opportunity employer.

[3] Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3., Exhibit A.

provide an expression of interest in this line of work.

Unfortunately, Universal Wrestling Corporation has stated that

it does not have this information.[5]   There is, however,

testimony from five individuals who report their personal

impressions of the representation of African Americans among

school participants.

Five individuals have testified as to their impressions of

the representation of African-Americans among persons at the

Power Plant.[6]  These are recorded in Table 1.  As is clear in the

Table, three of these individuals provide an estimated range and

two provide a specific figure.  Estimates of the percent

African-American range from 10 to 40 percent.  Column 1 counts

each estimate as an independent observation, so Carr, Hamilton,

and Snakovsky, in effect, get two votes.  The mean of these

eight estimates is 23.5 percent African-American, the median

(the mid-point of the range of estimates) is 27.5 percent, and

the mode (the most frequent estimate) is 40 percent.

One could reasonably object to counting any individual's

estimate twice, so column two provides the mid-point of the

ranges provided by Carr, Hamilton, and Snakovsky.  The resulting

---

[4] I have been provided with a copy of Exhibit A that identifies persons who are African-American and persons whose presence on the list is disputed. These data have been supplemented by Plaintiff's counsel and a draft Affidavit by Bobby Walker.

[5] Defendant Universal Wrestling Corporation's Supplemental Responses and Objections to Plaintiffs' First Interrogatories to Defendants World Championship Wrestling, Inc. and Turner Sports, p. 4

mean is 26.4 percent African-American and the median is 32.5 percent.

TABLE 1

ESTIMATES OF AFRICAN-AMERICAN REPRESENTATION AT
POWER PLANT TRYOUTS

| SOURCE | PERCENT AFRICAN-AMERICAN | |
| | ESTIMATES | AVERAGE |
| --- | --- | --- |
| T.B. Carr | | 32.5 |
| Low | 25 | |
| High | 40 | |
| J.N. Hamilton | | 12.5 |
| Low | 10 | |
| High | 15 | |
| J.P. Snakovsky | | 35 |
| Low | 30 | |
| High | 40 | |
| B.F. Smith | 12 | 12 |
| M. Williams | 40 | 40 |
| | | |
| Mean | 23.5 | 26.4 |
| Median | 27.5 | 32.5 |
| Mode | 40 | n.a. |

Even if collectively these approximations of applicant flow give an accurate picture of African-American representation at the Power Plant, this estimate of interest  among qualified African-Americans could be biased downward if African-American applicants are discouraged from applying because they believe

---

[6] This information is given in depositions, the date of which is following the person's name: Tony Byron Carr (January 28, 2002); Joseph N. Hamilton (March 22, 2002); Brenda F. Smith (April 30, 2002); John Paul Snakovsky (May 30, 2002); and Moses Williams (May 28, 2002)

WCW is not an equal opportunity employer. This is the chilling effect described above.

Another source of information about the availability of African-Americans as wrestlers is a list by which the WCW has identified each individual who was a trainee at the Power Plant over the 1996-2000 period.[7] Of 82 persons on this list, 11 (13.4) have been identified as African-American. This is obviously a flawed benchmark since it can obviously be a product of discrimination if the Defendant has a bias against choosing African-Americans as trainees. Nevertheless, the 13.4 percent figure is useful as a lower bound estimate of African-American interest and availability in a wrestling career since WCW in fact achieved this level of representation at the Power Plant.

One way to approximate what an estimate applicant flow in the absence of a chilling effect is to consider the representation of African-Americans in activities that require attributes similar to those of professional wrestling: a list that would include excellent athletic ability, physical strength and size, and to be able follow a highly scripted sequence of events. These attributes are obviously found in professional football. African-Americans are much more highly represented in professional football than they are in the general population: blacks account for 67 percent of the players in the National

- 7 -

Football League.[8]   These data indicate African-American participation that is far in excess of any of the estimates provided in Table 1, which suggests these estimates may be downward biased estimates of a true measure of the availability of African-Americans who are interested in and qualified to be professional wrestlers.

Tables 2 and 3 report the results of the statistical analysis of African-American representation among wrestlers during the 1996-2000 period.  First consider Table 2. The first column shows the number of contract wrestlers listed in Exhibit A.[9] Column two shows a variety of benchmarks, the percent African-American expected among these wrestlers, which are drawn from Table 1.  Column three shows the number of African-American wrestlers expected given the benchmark (column 1 times column 2); column 4 shows the actual number of African-Americans identified in Exhibit A, and column five reports the difference actual and expected number of African-Americans.  The last column shows the number of standard deviations.  Recall that the prevailing standard is that a difference of two or more standard deviations is statistically significant.

Five benchmarks are used.  First, is the African-American representation among trainees at the Power Plant, 13.4 percent.

---

[7] *Supra*, note 3, Exhibit B.
[8] John Simons, U.S. News and World Report (March 24, 1997, pp. 46-48).  The same source indicates that blacks account for 80 percent of the players in the National Basketball Association.

WCW hired 228 persons during 1996-2000, and had they hired African-Americans at a rate of 13.4 percent the expected number of African-American hires would be 30.6. Instead, only 17 were hired; -2.63 standard deviations from the expected number. This is statistically significant. In probability terms this could happen by chance alone only one time in 100.

Subsequent benchmarks come from Table 1. The statistical analysis in row two uses the average (mean) availability from column one (23.5 percent); row three is the median estimate from column one (27.5 percent); row four is the median value of column 2 (32.5) and row five is the most frequently cited estimate in column one (40 percent).

The number of standard deviations range from -2.63 to -10.03, far beyond the standard of -2.00 standard that indicates that chance does not account for the under-representation of African-Americans at WCW. To put these statistics in perspective, there is only 1 chance in 1,000 that WCW is an equal opportunity employer when the number of actual African-American wrestlers is 3.00 standard deviations below the expected number. When the shortfall of African-American wrestlers is -6.00 standard deviations, as in row two of Table 2, this result is expected by chance in less than 1 chance out of 100,000.

---

[9] *Supra* note 3.

TABLE 2

## STANDARD DEVIATION ANALYSIS OF AFRICAN-AMERICAN
## REPRESENTATION AMONG WRESTLERS (1996-2000)

### A. EXCLUDING DISPUTED WRESTLERS

| NUMBER OF WRESTLERS | BENCHMARK | EXPECTED NO. OF AFRICAN-AMERICANS | ACTUAL NUMBER | DIFFERENCE | NO. OF STD DEVIATIONS |
|---|---|---|---|---|---|
| 228 | 13.4 | 30.6 | 17 | -13.6 | -2.63 |
| 228 | 23.5 | 53.4 | 17 | -36.4 | -7.71 |
| 228 | 27.5 | 62.7 | 17 | -45.7 | -6.78 |
| 228 | 32.5 | 74.1 | 17 | -57.1 | -8.07 |
| 228 | 40.0 | 91.2 | 17 | -74.2 | -10.03 |

### B. INCLUDING DISPUTED WRESTLERS

| NUMBER OF WRESTLERS | BENCHMARK | EXPECTED NO. OF AFRICAN-AMERICANS | ACTUAL NUMBER | DIFFERENCE | NO. OF STD DEVIATIONS |
|---|---|---|---|---|---|
| 232 | 13.4 | 31.1 | 20 | -11.1 | -2.14 |
| 232 | 23.5 | 54.5 | 20 | -34.5 | -5.35 |
| 232 | 27.5 | 63.8 | 20 | -43.8 | -6.44 |
| 232 | 32.5 | 75.4 | 20 | -55.4 | -7.77 |
| 232 | 40.0 | 92.8 | 20 | -72.8 | -9.76 |

Panel B of Table 2 is identical to Panel A except that the
four disputed wrestlers are included in the analysis. Three of
the disputed persons are African-American, so the total number
of wrestlers rises to 232 and the actual number of African-
Americans hired rises to 20. The results do not change: the
number of standard deviations range from -2.14 to -9.76, once
again indicating statistically significant under-representation
of African- Americans. The number of African-American wrestlers
will be 2.14 standard deviations below the expected number by
chance alone three times in 100. Recall that -6.00 standard

- 10 -

deviations will occur by chance in less than once in 100,000 cases.

The analysis is Table 2 is flawed in that it considers the number of persons in Exhibit A but does not account for the actual frequency of employment. As an illustration, suppose an employer hired two persons, a Caucasian and an African American, over a 10-year period. Using the method employed in Table 2, African-American representation would be 50 percent. But suppose that the Caucasian worked in each of the 10 years and the African-American worked in only one. By looking at African-American representation by salary years a very different picture emerges: instead of 50 percent, African-American representation is only 1 out of 11, or 9.1 percent.

Table 3 investigates African-American representation among WCW wrestlers using salary years as the unit of observations. In Exhibit A, there are 681 cells in which a person is reported to have received a salary. Of these cells, 51 (7.5 percent) represent salaries earned by African-Americans. The benchmarks that measure African-American availability are identical to those in Table 2. When the benchmark is 13.4 percent, the lowest in the Table, the shortfall of African-American wrestlers is -4.53 standard deviations from the expected number. As in Table 2, the number of standard deviations rises with the benchmark: when the benchmark is 40 percent, the shortfall is

- 11 -

-17.32 standard deviations.  There is less than one chance in a million that this result could happen by chance alone.

TABLE 3

STANDARD DEVIATION ANALYSIS OF AFRICAN-AMERICAN
AMONG WRESTLERS BY SALARY YEARS (1996-2000)

EXCLUDING DISPUTED WRESTLERS

| NUMBER OF SALARY YEARS | BENCHMARK | EXPECTED NO. OF AFRICAN-AMERICANS | ACTUAL NUMBER | DIFFERENCE | NO. OF STD DEVIATIONS |
|---|---|---|---|---|---|
| 681 | 13.4 | 91.3 | 51 | -40.3 | -4.53 |
| 681 | 23.5 | 160.0 | 51 | -109.0 | -9.85 |
| 681 | 27.5 | 187.3 | 51 | -136.3 | -11.70 |
| 681 | 32.5 | 221.3 | 51 | -170.3 | -13.94 |
| 681 | 40.0 | 272.4 | 51 | -221.4 | -17.32 |

This analysis strongly suggests that African-Americans are significantly under-represented among wrestlers at WCW.  Even when African American representation at the Power Plant is used as the benchmark, African Americans are significantly under-represented.  Even the highest benchmark in Tables 2 and 3 may under estimate the true availability of qualified African-Americans since it is possible that if WCW was a truly equal opportunity employer it would confront an applicant pool of interested and qualified persons that mirrored that of professional basketball or professional football.

Salary

Salaries of wrestlers within any year vary greatly.  For example, in 1999 annual compensation varies from under $10,000

- 12 -

to $4.65 million. The average wrestler's salary was $237,933 that year. Of the 160 wrestlers receiving compensation that year, 54 (33.1%) received under $50,000 and another 33 (20.6%) received a salary between $50,000 to $99,999. This concentration of salaries at the lower end of the overall salary range is reflected in the median (50 percent of the distribution lie on both sides of the median) income compared to the mean income: the median is $87,000 while the mean is about $238,000. At the other end of the spectrum, only 14 wrestlers received salaries in excess of $500,000 and only 9 earned more the $750,000 in 1999. This dispersion of salaries limits the possibilities to statistically evaluate the compensation of African-Americans relative to other wrestlers.

The structure of WCW wrestling salaries, then, appears to be one in which most wrestlers make a relatively modest salary and a few do very well. Therefore the statistical analysis focuses on the opportunities for African-Americans to enter the ranks of the most successful wrestlers or what we will call the salary elite. Discrimination, of course, can take many forms. Therefore we also investigate the possibility that African-Americans who are relatively successful at WCW in terms of compensation may have suffered from unequal employment practices because it took them longer to achieve high standing than comparable Caucasian wrestlers.

*Defining the Salary Elite*

Table 3 shows the salary distribution for wrestlers in 1999, which clearly reveals that there is a break in the distribution at $500,000. Only 8.7 percent of the wrestlers in that year earned over one-half million dollars and only 5.6 percent earned over $750,000. The $750,000 figure is the most appropriate definition of elite salary status for two reasons. First, most wrestlers who reached this salary figure eventually earned an annual salary in excess of $1 million. This is not the case for those whose top salary was in the $500,000 to $750,000 range. Second, licensing income as a percent of salary makes a sharp jump when salaries are in excess on $750,000. In 1999, licensing income as a percent of salary was 14.71 for the 9 wrestlers making over $750,000 but only 4.03 percent for the five wrestlers making between $500,000 and $749,999. In absolute figures the former group had an expected licensing income of $83,584 more than the lower income group. This is just slightly lower than the median wrestlers annual salary. Thus, it seems appropriate to define the salary elite to be the top five percent of the salary distribution, or those that make in excess of $750,000.

TABLE 4

SALARY DISTRIBUTION OF WRESTLERS, 1999

| SALARY | NUMBER | PERCENT |
|---|---|---|
| 0 - 49,999 | 53 | 33.1 |
| 50,000 - 99,999 | 33 | 20.6 |
| 100,000 - 199,999 | 38 | 23.8 |
| 200,000 - 499,999 | 22 | 13.8 |
| 500,000 - 749,999 | 5 | 3.1 |
| 750,000 - 999,990 | 1 | .6 |
| 1,000,000 - 2,000,000 | 5 | 3.1 |
| Over 2,000,000 | 3 | 1.9 |
| TOTAL | 160 | 100.0 |

*African American Wrestlers Among the Salary Elite*

During the 1996-2000 period, 10 wrestlers earned $750,000 or more.  Combined they account for 29 years earning an "elite" salary. These elite salary earners are shown in Table 5.  Since African-Americans account for 7.5 percent of all salary years during this time period, we expect that they should receive about that portion of these elite salary years.  The expected number of African-Americans is 2.18, but in fact there are none achieving elite status.  This shortfall in the expected number of African-Americans is -1.18 standard deviations from the actual number; this is not statistically significant at customary test levels.  However, it is worth noting that this

- 15 -

test statistic means that there is about .13 percent chance of observing this result due to chance.[10]  This means that there is less than 1 chance in 7 that there would be no African-Americans in the elite status due to chance.

TABLE 5

WRESTLERS WITH ELITE SALARIES AND YEARS IN SERVICE
BEFORE MAKING $600,000 OR MORE

| | NUMBER OF SALARY YEARS | | | TIME TO |
|---|---|---|---|---|
| NAME | $1M | $750-$1M | $600-$750 | $600+ |
| ABBOT | 0 | 0 | 1 | 1 |
| BOLLEA, T | 4 | 0 | 0 | na |
| BORDEN | 2 | 2 | 0 | 1 |
| EUDY | 0 | 1 | 1 | 0 |
| FALKENBERG | 2 | 0 | 0 | 1 |
| FLIEHR | 0 | 0 | 1 | 2 |
| GOLDBERG | 2 | 0 | 0 | 3 |
| HALL | 1 | 2 | 1 | 1 |
| HART | 3 | 0 | 0 | 1 |
| NASH | 3 | 1 | 0 | 1 |
| PFOHL | 2 | 1 | 1 | 1 |
| POFFO, R. | 3 | 0 | 1 | na |
| RECHSTEINER | 0 | 0 | 2 | 3 |
| TOOMBS | 0 | 0 | 3 | 1 |
| HUFFMAN, B[a] | 0 | 0 | 2 | 3 |
| HUFFMAN, L[a] | 0 | 0 | 1 | 3 |
| TOTAL | 22 | 7 | 14 | |

[a]African-American

*Putting in Your Time: Are African-American Wrestlers Treated Equally?*

---

[10] This is using a one-tail test that assumes that there is an *a priori* reason to expect that African-Americans will be under-represented among those with elite salary status.  Given the extreme under-representation of African-Americans in employment among wrestlers, this expectation is warranted.  If this assumption is rejected, there is less than one chance in three that no African-Americans would be among the salaried elite.

It is impossible to test whether African-Americans spend more time than Caucasians waiting to achieve elite status since none have reached this status when it is defined as an annual salary of $750,000. Time waiting in this context cannot be defined. To facilitate this analysis of waiting time, the definition of elite status is lowered to $600,000 so two African-Americans are included among the elite.[11]

Waiting time to elite status is defined as the number of years that a wrestler receives a salary before achieving elite salary status.[12] For example, S. Borden received $72,205 in 1996 and achieved elite status a year later with a salary of $913,304. His waiting time is therefore recorded as one year. Waiting time is defined for wrestlers who reached a salary exceeding $600,000 after 1996 in Exhibit A.[13] The sign test provides a way to investigate whether African-American wrestlers spent more time waiting to achieve their elite status. If African-Americans are treated equally it is expected that the number of times they spend more time waiting for elite salary status than Caucasians should be about equal to the number of times they reach this status faster. In a sign test ties, i.e.,

---

Americans in employment among wrestlers, this expectation is warranted. If this assumption is rejected, there is less than one chance in three that no African-Americans would be among the salaried elite.

[11] They are B. Huffman and L. Huffman.

[12] The salary data are found in Defendant's Exhibit A. Two wrestlers (T. Bollea and R. Poffo) have elite status in the first year recorded in Exhibit A and are not included in this analysis because waiting time is unknown.

[13] The status of seven wrestlers is disputed in this case and they are not included. In four of these seven cases, no salary statistics are shown in the Exhibit.

an equal number of years waiting, are excluded from the analysis.

Table 5 shows all the wrestlers who earned at least $600,000 after 1996, notes whether they are African-American, and gives the number of years they received a salary before reaching elite status.  The African-Americans, B. Huffman and L. Huffman, each waited three years before achieving $600,000 salary status.  Among the 14 Caucasians reaching this salary status, only Goldberg and Rechsteiner waited that long. Comparing each Huffman with every Caucasian (eliminating ties) shows that the Caucasians achieved this salary faster than the African-Americans: subtracting the years African-Americans waited from that of Caucasians yields 10 comparisons.  The sign is negative (i.e., African Americans waited longer) in each case.  This is statistically significant with less than one chance in 100 that this outcome could occur by chance alone.

B.    **Data Considered:**

The data I considered is outlined in the prior section of this report.  I have also considered racial identification data that was provided to me by Plaintiffs' counsel.

C.    **Exhibits to be Used:**

(1)    Defendant Universal Wrestling Corporation's
       Supplemental Responses and Objections to Plaintiffs'
       First Interrogatories to Defendants World Championship
       Wrestling, Inc. and Turner Sports, Inc.;

- 18 -

(2) Demonstrative exhibits created with the data and opinions referenced herein.

**D.  Qualifications:**

A copy of my resume was attached as Exhibit (B)(2)(a) to

Plaintiffs' Amended Supplemental Responses to Initial

Disclosures Providing Expert Disclosures Pursuant to Federal

Rule of Civil Procedure 26(a)(2).

**E.  Compensation:**

I will bill Plaintiffs $200.00 per hour for my time, and

$300.00 per hour for any time testifying at deposition or at

trial.

**F.  Other cases in which I have testified as an Expert at Trial or by Deposition within the Preceding Four (4) Years:**

Curtis Major et al. v. Eller Media Company
S.D. of Fla. (Miami Division)
Case No.: 00-3870-CIV-MORENO (pending)
(Report and deposition).

Lemuel Middleton et all., v. Publix Super Markets
U.S.D.C. M.D. of Fla. (Tampa Division)
Case No.: 97-760-CIV-T-25E
(Report and deposition).

Linden Adams et al., v. BellSouth Telecommunications, Inc.
U.S.D.C. S.D. of Fla.
Case No.: 96-2473-CIV-ZLOCH
(Report).

Zaidy Gantt, et al. v. The Martin Brower Company
U.S.D.C. S.D. of Fla.
Case No.: 97-6233-CIV-ZLOCH
(Testified).

Additional Cases:

Dixon v. Coca Cola Bottling Co., et al., N.D. of Fla.

- 19 -

Newton, et al. v. The Sherwin Williams Co., W.D. of Kentucky

Walker v. Smith, TCA 79-895, N.D. of Fla.

Forehand v. Florida State Hospital, TCA 83-7107-WS, N.D. of Fla.

Pollocks v. Sunland, TCA 87-40103, N.D. of Fla.

Worlds v. Sunland, TCA 77-0741, N.D. of Fla.

Winfield v. St. Joe Paper Co., MCA 76-28, N.D. of Fla.

Griffin v. Wainright, TCA 79-1016, N.D. of Fla.

Nickyson v. City of Tallahassee, TCA 76-118, N.D. of Fla.

Dr. David W. Rasmussen

Plaintiffs specifically reserve the right to supplement this disclosure in any manner permitted under the Federal Rules of Civil Procedure, the Local Rules of this Court or any other applicable law.

This 12th day of November, 2002.

Cary Ichter
Georgia Bar No. 382515
Charles J. Gernazian
Georgia Bar No. 291703
Michelle M. Rothenberg-Williams
Georgia Bar No. 615680

**MEADOWS, ICHTER & BOWERS, P.C.**
Eight Piedmont Center, Suite 300
3525 Piedmont Road

- 20 -

```
Atlanta, GA   30305
Telephone:    (404) 261-6020
Telecopy:     (404) 261-3656
```

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all parties in the foregoing matter with the foregoing **Plaintiffs' Third Amended Supplemental Responses to Initial Disclosures Providing Expert Disclosures Pursuant to Federal Rule of Civil Procedure 26 (a)(2)(B)** via hand delivery properly addressed as follows:

> John J. Dalton
> James Lamberth
> Evan Pontz
> Troutman Sanders LLP
> Suite 5200, Bank of America Plaza
> 600 Peachtree Street, N.E.
> Atlanta, Georgia  30308-22165

This ___12th___ day of November, 2002.

_____
Michelle M. Rothenberg-Williams



# EXHIBIT / ATTACHMENT

## KK

**(To be scanned in place of tab)**

## DECLARATION OF BRENDA SMITH

STATE OF GEORGIA
COUNTY OF_____

    Brenda Smith gives the following declaration under penalty of perjury and states as follows:

1.

    I was employed by WCW as the Power Plant Training Coordinator.  Although I worked primarily at the Power Plant, I had many job duties and responsibilities at WCW.

2.

    In the course of performing my duties, and in the course of interacting with my co-employees, I had personal knowledge of the racial identities of the WCW employees.  Specifically, I was aware of all of the African-American employees at WCW and their respective positions.

3.

    I have been asked to review the document entitled "Employee Job Profiles," in order to provide the racial identities of the WCW employees.

4.

    After reviewing the employee job profiles, I conclude that some of the individuals were not actually employed by WCW.  Also, I note that some of the employees listed may not have even been employed as of March 28, 2000 or may have not been a full time employee.  Nevertheless, I have been asked to include all individuals listed except for those who did not actually work for WCW, but World Travel Partners.

5.

    Excluding those individuals who did not work for WCW (Julie Hill-Atkins, Cynthia Perry, Randy Cox, and Fala Ndiaye), I count 158 total employees based on the list of employees in the Employee Job Profiles.

6.

Out of the 154 employees, I can confirm that 19 of the individuals listed in the employee profiles list were African-American.

7.

The following individuals listed on the Employee Job Profiles were African-American:

1. Reid, Octavia
2. McDade, Felicia
3. Wormsby, Greg
4. Cuthbert-Borders, Juliet
5. Richardson, Kinnette
6. Jennings, Monica
7. Smith, Pie
8. Avery-Neal, Catherine
9. Clifton, Robert
10. Nichols, William
11. Collins, Pamela
12. Hester, Frankesha
13. Haynes, Timothy
14. Williams, Jimmy
15. Green, Elliot
16. Miller, Darrell
17. Blackwell, Katrina
18. Smith, Brenda
19. Gary, Alto

8.

I can also confirm that WCW never had an African-American in senior management or in any executive position.

I declare under penalty of perjury that the foregoing is true and correct.

_Brenda Smith_
Brenda Smith

_09/24/02_
Executed on (Date)

## DECLARATION OF BRENDA SMITH

STATE OF GEORGIA
COUNTY OF_____

Brenda Smith gives the following declaration under penalty
of perjury and states as follows:

1.

I was employed by WCW as the Power Plant Training
Coordinator. Although I worked primarily at the Power Plant, I
had many job duties and responsibilities at WCW.

2.

In the course of performing my duties, and in the course of
interacting with my co-employees, I had personal knowledge of
the racial identities of the WCW employees. Specifically, I was
aware of all of the African-American employees at WCW and their
respective positions.

3.

I have been asked to review the document entitled "Employee
Job Profiles," in order to provide the racial identities of the
WCW employees.

4.

After reviewing the employee job profiles, I conclude that
some of the individuals were not actually employed by WCW.
Also, I note that some of the employees listed may not have even
been employed as of March 28, 2000 or may have not been a full
time employee. Nevertheless, I have been asked to include all
individuals listed except for those who did not actually work
for WCW, but World Travel Partners.

5.

Excluding those individuals who did not work for WCW (Julie
Hill-Atkins, Cynthia Perry, Randy Cox, and Fala Ndiaye), I count
158 total employees based on the list of employees in the
Employee Job Profiles.

6.

Out of the 154 employees, I can confirm that 19 of the individuals listed in the employee profiles list were African-American.

7.

The following individuals listed on the Employee Job Profiles were African-American:

1.  Reid, Octavia
2.  McDade, Felicia
3.  Wormsby, Greg
4.  Cuthbert-Borders, Juliet
5.  Richardson, Kinnette
6.  Jennings, Monica
7.  Smith, Pie
8.  Avery-Neal, Catherine
9.  Clifton, Robert
10. Nichols, William
11. Collins, Pamela
12. Hester, Frankesha
13. Haynes, Timothy
14. Williams, Jimmy
15. Green, Elliot
16. Miller, Darrell
17. Blackwell, Katrina
18. Smith, Brenda
19. Gary, Alto

8.

I can also confirm that WCW never had an African-American in senior management or in any executive position.

I declare under penalty of perjury that the foregoing is true and correct.

Brenda Smith

09/24/02

Executed on (Date)



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

## DECLARATION OF KATHERINE A. NEAL

STATE OF GEORGIA
COUNTY OF Fulton

Katherine A. Neal gives the following declaration under penalty of perjury and states as follows:

1.

I was hired by the World Championship Wrestling Organization ("WCW") in _____. I worked in the warehouse where WCW received, stored, and shipped out its merchandising items.

2.

At one time, my supervisor was Mr. Pie Smith. Mr. Smith was African-American, and was a very good manager. Mr. Smith wanted me to learn more about the merchandising process and sent me to Florida for training. Specifically, he sent me to Florida so that I could receive ICS MAX System computer training. Based on this computer training, I was able to learn how to track merchandise with the computer.

3.

In addition, Mr. Smith told me that he was impressed by my abilities, and wanted to train me to be his assistant and work in a supervisory capacity. I was very enthused about this opportunity to advance at WCW.

4.

Mr. Smith, however, left WCW. He was replaced by Ms. Leslie Cameron. Ms. Cameron was Caucasian.

5.

From the time that Ms. Cameron became the supervisor of the warehouse, myself and other African-Americans realized that she was treating us differently than the only Caucasian at the warehouse, Ralph Jensen

6.

As for myself, even though I had the specific computer training, and even though I had more experience than Ralph, Ms. Cameron assigned Ralph more meaningful work assignments. Although Ralph was able to receive better assignments, I was forced to perform menial tasks and do trivial things for Ms. Cameron. My skills were not being utilized. Also, my training was not being utilized. Lastly, although Mr. Smith had indicated that I would be an assistant supervisor, Ms. Cameron treated me as if I was not capable of performing any tasks other than basic tasks.

7.

Another example of Ms. Cameron's different treatment of African-Americans is that she asked the security personnel to check the personal belongings of myself, Mr. William Nichols, and Jason Brown all of whom were African-Americans. Although she had the security personnel check the African-American, she did not have the security personnel check Mr. Ralph. The purpose for her requesting the security to check our belongings, including any bags, was to make sure we were not stealing from the company. I found this not only insulting as it showed a lack of trust, but blatant discrimination because she only had the security personnel check the bags of African-American employees.

8.

Another example of Ms. Cameron's different treatment of the Caucasian employee was that Ralph was allowed to get as much over time as he wanted. Although myself and the two other African-American employees also wanted over time, we were not allowed to receive the over time to the extent that Ralph received it.

9.

Although Ralph was able to take lunch breaks, additional breaks, and come and go as he pleased, Ms. Cameron scrutinized the attendance of myself and the other African-American employees. At times, Ralph did not even use the Sign-In and Out sheet that was required of the other employees. Whenever an African-American employee did not use the Sign-In and Out sheet, Ms. Cameron would speak very harshly with us.

10.

Another example of the different treatment is that Ralph
was able to use the telephone during work hours. Although the
African-American employees were denied ample access to the
telephone; Ralph was able to use the phone whenever he needed.

*And I had children that might need*
*me at a point in time and I didn't get*

Because I believed that Ms. Cameron was blatantly *Message*
discriminating against myself and other African-Americans *from*
because of our race, I approached Mr. Tim Goodly, the Human
Resources person at WCW. At this time, Mr. Goodly told me that *Ralph*
he was in a transition out of his previous position and that I *that*
should speak to Ms. Paula _____ .

*they*
*called*

12.

At Mr. Goodly's direction, myself and Mr. Brown and Mr.
Nichols spoke with Ms. Paula, the Human Resources representative
for WCW. During this meeting, we explained to her each of the
above-mentioned ways in which Ms. Cameron was discriminating
against African-American people.

13.

Although Ms. Paula took notes, I was not convinced that she
was going to take a strong enough action.

14.

The only action that Ms. Paula took was that she set up a
meeting with Ms. Cameron. During this meeting Ms. Cameron
merely gave her side of the story. I felt that Paula believed
Ms. Cameron over the African-American employees who were being
discriminated against.

15.

I was completely unsatisfied with the way in which Paula
handled this case. Although we had very legitimate complaints
of discrimination, nothing was done to stop Ms. Cameron's
ongoing discrimination of us. Indeed, Ms. Cameron continued to
do the exact same things she did before.

16.

I do not believe that Paula disciplined or took any other steps to correct the discrimination that we endured. Thus, the discrimination continued until *Mr. Gur? Mysef & Mr. Nichol*

I declare under penalty of perjury that the foregoing is true and correct.

*Catherine Neal*
Catherine A. Neal

*5-27-02*
Executed on (Date)

*I have document showing proof of the behavior and statement, Notes*



# EXHIBIT / ATTACHMENT

# MM

**(To be scanned in place of tab)**

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Walker v. World Championship Wrestling, Inc., Turner Sports, Inc. and Turner Broadcasting System, Inc., Civ. File No. 1:00-CV-0367-CC

Onoo v. World Championship Wrestling, Inc., Turner Sports, Inc. and Turner Broadcasting System, Inc., Civ. File No. 1:00-CV-0368-CC

Norris v. World Championship Wrestling, Inc., Turner Sports, Inc. and Turner Broadcasting System, Inc., Civ. File No. 1:00-CV-0369-CC

Easterling v. World Championship Wrestling, Inc. and Turner Sports, Inc. and Turner Broadcasting System, Inc., Civ. File No. 1:00-CV-1715-CC

Davis v. World Championship Wrestling, Inc. and Turner Sports, Inc. and Turner Broadcasting System, Inc., Civ. File No. 1:00-CV-1716-CC

Worthen v. World Championship Wrestling, Inc. and Turner Sports, Inc. and Turner Broadcasting System, Inc., Civ. File No. 1:00-CV-1717-CC

Speight v. World Championship Wrestling, Inc. and Turner Sports, Inc. and Turner Broadcasting System, Inc., Civ. File No. 1:00-CV-1718-CC

Saengsiphan v. World Championship Wrestling, Inc. and Turner Sports, Inc. and Turner Broadcasting System, Inc., Civ. File No. 1:00-CV-1719-CC

Reeves v. World Championship Wrestling, Inc. and Turner Sports, Inc. and Turner Broadcasting System, Inc., Civ. File No. 1:00-CV-1720-CC

Patterson v. World Championship Wrestling, Inc., Turner Sports, Inc., Turner Entertainment Group, Inc. and Turner Broadcasting System, Inc., Civ. File No. 1:01-CV-1152-CC

**DEFENDANT UNIVERSAL WRESTLING CORPORATION'S
SUPPLEMENTAL RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FIRST INTERROGATORIES TO DEFENDANTS
WORLD CHAMPIONSHIP WRESTLING, INC. AND TURNER SPORTS, INC.**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure,

Defendant Universal Wrestling Corporation ("UWC") (formerly known

as World Championship Wrestling, Inc. ("WCW")) supplements its

objections and responses to Plaintiffs' Consolidated First

Interrogatories And First Request For Production Of Documents To

**DEFENDANT'S EXHIBIT**

#11

Defendants World Championship Wrestling, Inc. and Turner Sports, Inc. ("Plaintiffs' First Interrogatories") as follows:

## GENERAL TERMS AND CONDITIONS FOR RESPONSES

### 1.

The following supplemental responses are provided by UWC based upon documents and information currently available to UWC. UWC reserves the right to modify any of such responses at a later date if further factual development or analysis warrants such modifications.

### 2.

In responding to any of the interrogatories and document requests contained in Plaintiffs' First Interrogatories and Document Requests, UWC explicitly reserves the right to object to the admissibility at trial of any information produced in connection with such responses.

## SUPPLEMENTAL RESPONSES AND OBJECTIONS TO SPECIFIC INTERROGATORIES

**INTERROGATORY NO. 3.**     Please identify (following the requirements set forth in Instruction No. 8) the total number of wrestlers with whom Defendant WCW and/or Defendant Turner Sport [sic] have entered into wrestling contracts of any kind from January 1995 until the present.  For each such wrestler, please provide the following information:
    (a)  His or her legal and professional name;
    (b)  His or her racial background, (i.e. African or African-American, Hispanic/Latino or Hispanic/Latino American, Asian or Asian-American, Caucasian or Caucasian-American, or Other (please provide additional information regarding the racial background of any individual categorized as "Other"));
    (c)  The number of matches in which he or she performed on live television;
    (d)  The outcome (e.g. win, lose or other) of each WCW Monday Nitro, Thunder and/or Pay-Per View match in

which he or she performed from January 1995 through the present;

(e)   His or her annual compensation for each year from January 1995 until the present;

(f)   The merchandising revenues he or she received for each quarter from January 1995 until the present; and

(g)   Whether or not he or she was terminated and/or released during 1999.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3.**

UWC hereby adopts and incorporates by reference its general and specific objections to Interrogatory No. 3 as set forth in UWC's Objections and Responses to Plaintiff's First Interrogatories. Subject to and without waiving its objections, and in accordance with the Discovery and Scheduling Order entered in the above-referenced actions, UWC supplements its response to Interrogatory No. 3 as follows:

Attached hereto as Exhibit A is a chart identifying each male wrestler who entered into a wrestling contract with WCW for the period 1996 through 2000, and providing compensation information regarding salary, merchandising revenue and licensing revenue for each wrestler by year, as determined from documents and information currently available to UWC.

**INTERROGATORY NO. 7.**     Please identify (following the requirements set forth in Instruction No. 8) each and every individual who attended a "try out" at the Power Plant (or its predecessor) from January 1995 until the present. For each such individual, please provide the dates of his or her "try-out" and his or her racial background, (i.e., African or African-American, Hispanic/Latino or Hispanic/Latino-American, Asian or Asian-American, Caucasian or Caucasian-American or Other (please provide additional information regarding the racial background of any individual categorized as "Other")).

3

**RESPONSE TO INTERROGATORY NO. 7.**

UWC hereby adopts and incorporates by reference its general and specific objections to Interrogatory No. 7 as set forth in UWC's Objections and Responses to Plaintiff's First Interrogatories. Subject to and without waiving its objections, UWC supplements its response to Interrogatory No. 7 as follows:

After diligent investigation and review of information and documents reasonably available to UWC, UWC states that it does not have information or documents in its possession reflecting all of the individuals who attended a "try out" at the Power Plant from 1996 through 2000. Based upon review of documents currently available to UWC, UWC is aware of the following individuals who attended a "try out" at the Power Plant:

Matthew B. Baum, Cameron Beach, Nikola Bobic, Paulie Bykow, Joseph Bradley Cain, Tony Byron Carr, Rick Cornell, Twanta Maurice Craig, Jason Matthew Daniel, Marcial R. Davis, Joseph Fredrick Denson III, Rico Dixon, William C. Dreer, Phap Minh Duong, Darron Devon Easterling, Sean Charles Evans, Chris Ferrell, Allan Eric Funk, Edward Gatzky, Todd Griffith, Charles I. Groegler, Mark Guthrie, Bret Hamner, Theodore Harris, Jonathan Martin Hugger, Gregory John Hunke, Mark Jindrak, Trae Keller, Brian Klinge, Paul Lewis Knox, Charles M. Lee, Wondell Le Flore, J. Mark LeRoux, David Libich, Roberts S. Loewen, Michael W. Long, Jeremy Lopez, Ken Moore, Michael Brady Nimmons, Paul Neu, Stephen Oliviera, Charles R. Palumbo, Stan Patron, Craig Phillips, Cecil

Riley, Sam Roman, Bounthan Saengsiphan, Mike Sanders, Frank Sepe,

Sonny Siaki, Elix Skipper, Kenneth M. Stasiowski, Matthew T.

Sletvold, Mark Stevens, W. Chase Tatum, Courtright Thurber, James

Thurber, Mark Tipton, Michael Tolbert, Michael Jerry Tuite, Scott

Vick, Charles Franklin Walker, J. Bradley Walker, Sr., Chris

West, Curtis L. White, Wesley Wright, and Brett Yokley.

UWC further states that, upon information and belief, most

or all of the individuals who were "trainees" at the Power Plant

during the period 1996 through 2000 had also previously attended

a "try out." Attached hereto as Exhibit B is a chart identifying

each individual who was a "trainee" at the Power Plant for the

period 1996 through 2000, as determined from documents and

information currently available to UWC.

**INTERROGATORY NO. 8.**      Please identify (following the
requirements set forth in Instruction No. 8) each and every
individual who trained at the Power Plant (or its predecessor)
from January 1995 until the present. For each such individual,
please provide the dates he or she trained at the Power Plant,
his or her racial background, (i.e. African or African-American,
Hispanic/Latino or Hispanic/Latino-American, Asian or Asian-
American, Caucasian or Caucasian-American or Other (please
provide additional information regarding the racial background of
any individual categorized as "Other")), and whether Defendant
WCW and/or Defendant Turner Sports offered a wrestling contract
(whether classified as an "employment," "contractor," or
"independent contractor agreement") to him or her.

**RESPONSE TO INTERROGATORY NO. 8.**

UWC hereby adopts and incorporates by reference its general

and specific objections to Interrogatory No. 8 as set forth in

UWC's Objections and Responses to Plaintiff's First

5

Interrogatories. Subject to and without waiving its objections, UWC supplements its response to Interrogatory No. 8 as follows:

Attached hereto as Exhibit B is a chart identifying each individual who was a "trainee" at the Power Plant for the period 1996 through 2000, as determined from documents and information currently available to UWC.

This 10th day of October, 2002.

John J. Dalton
Georgia Bar No. 203700
James A. Lamberth
Georgia Bar No. 431851
Eric A. Richardson
Georgia Bar No. 233873
Evan H. Pontz
Georgia Bar No. 583577

Counsel for Defendant
Universal Wrestling Corporation
(formerly known as World
Championship Wrestling, Inc.)

TROUTMAN SANDERS LLP
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia 30308-2216
(404) 885-3000

EXHIBIT

CONFIDENTIAL

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Real Name | Ring Name | 1994 Payroll | 1996 March | 1996 Licensing | 1997 Payroll | 1997 March | 1997 Licensing | 1998 Payroll | 1998 March | 1998 Licensing | 1999 Payroll | 1999 March | 1999 Licensing | 2000 Payroll | 2000 March | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Todd Abbott | | | | $10,259.99 | $0.00 | | $0.00 | $0.00 | $80,134.99 | $0.00 | $0.00 | $524,258.51 | $0.00 | $10.00 |
| | Chris Adams | | | | | $0.00 | | $0.00 | $0.00 | $107,820.55 | $0.00 | $0.00 | $4,258.90 | $0.00 | $0.00 |
| | Kronik | | | | | $0.00 | | $19,786.55 | $0.00 | $160,535.51 | $0.00 | $13,166.51 | $226,014.83 | 315.95 | $3,185.95 |
| | Mike Avenson | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $378,551.45 | $27.21 | $0.00 |
| | Steve Sharpe | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $52,653.43 | $0.00 | $0.00 |
| | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| | Samuele Sivic Team | $51,133.37 | | | $116,482.54 | $0.00 | | $16,780.00 | $0.00 | $178,269.75 | $0.00 | $29,572.27 | $7,671.22 | $0.34 | $16.95 |
| | Snow Bud Scott Riggs | | | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 |
| | Ultimo Dragon | $92,757.10 | | | $110,011.77 | $0.00 | $10,674.18 | $21,818.66 | $0.00 | $104,100.42 | $0.00 | $31,487.01 | | $0.00 | $0.00 |
| | Kronos | | | | $335,791.14 | $0.00 | | $20,970.77 | $40.14 | $445,673.66 | $4,999.55 | $40,379.80 | $414,946.69 | $306.51 | $37,163.63 |
| | Buff Bagwell | $126,980.15 | | | $190,609.71 | $0.00 | | $20,278.00 | $40.14 | $119,811.70 | $1,379.22 | $23,995.07 | $281,645.57 | $3,074.01 | $41,648.93 |
| | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | | $500.00 | $0.00 | $0.00 |
| | Randy Barnes | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| | The Jobber | | | | $39,437.94 | $0.00 | | $367,344.30 | $0.00 | $34,480.35 | $0.00 | $0.00 | $67,170.39 | $0.00 | $0.00 |
| | Silver King | | | | | $0.00 | | $54,741.30 | $0.00 | $68,473.14 | $0.00 | $0.00 | | $0.00 | $0.00 |
| | Disorderly Conduct | | | | $9,400.00 | $0.00 | | $18,630.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| | | $106,966.00 | | | $109,412.39 | $23.94 | $10,678.41 | $197,248.42 | $43.46 | $24,460.15 | $49.51 | $55,698.04 | $1,328.76 | $16.77 | $29,512.2 |
| | 1st Japan | | | | | $0.00 | | $0.00 | $0.00 | $17,283.99 | $0.00 | $0.00 | | $0.00 | $0.00 |
| | | | | | | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |

EXHIBIT

PLINTIAL

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Real Name | Stage Name | 1996 Payroll | 1996 Licensing | 1996 March | 1997 Payroll | 1997 March | 1997 Licensing | 1998 Payroll | 1998 March | 1998 Licensing | 1999 Payroll | 1999 March | 1999 Licensing | 2000 Payroll | 2000 March | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ..w, Scott | Bam Bam Bigelow (Estate of the Late) | | | | | $0.00 | | $29,153.95 | $0.00 | $0.00 | $242,459.29 | $16.45 | $97.15 | $406,664.19 | $1.31 | $23,978.79 |
| | ..my Matthews | | | | | | | | | | | | | | | $0.00 |
| ..., Adam | ..chard, Tally | $550.00 | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $2,095.15 | $0.00 | $0.00 |
| ..ds, Marc | | $959.93 | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..d, Jr., Richard H | Ricky The Dragon Steamboat | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | | $0.00 |
| ..n, Wayne | ..rtiniel, Nick | | | | $13,341.08 | $0.00 | | $72,204.85 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..n, Michael | Horace | $54,367.61 | | | $124,657.79 | $0.00 | | $120,717.13 | $0.00 | $595.35 | $211,250.94 | $0.00 | $116,615.57 | $137,082.16 | $0.00 | $0.00 |
| ..ns, Terry | Hulk Hogan, Hollywood Hogan | $1,930,455.93 | $17,875.82 | $20,750.10 | $330,043.74 | $52,412.82 | $94,636.24 | $3,635,968.70 | $40,144.99 | $11,945.72 | $3,736,227.74 | $20,646.14 | $132,967.84 | $1,817,023.70 | $52,013 | $5,518.00 |
| ..rt, Steven | SID | $72,205.44 | $11,900.01 | $3,629.82 | $913,303.55 | $29,636.61 | $17,907.26 | $936,189.59 | $43,429.02 | $85,330.61 | $1,031,859.23 | $13,573.41 | $414,496.56 | $1,447,980.08 | $61,815.55 | $447,905.11 |
| ..rt, Todd | Todd Champion | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $16,381.47 | $504,737.49 |
| ..d, Thomas | Johnny Grunge | $2,100.00 | | | $26,707.16 | $0.00 | | $86,371.27 | $0.00 | $0.00 | $117,374.16 | $0.00 | $0.00 | $991,633.79 | $0.00 | $0.00 |
| ..orman, William | Jerry Flynn | $51,957.25 | | | $28,590.66 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..r, Chad | Buddy Lee Parker Surge | $34,031.53 | | | $65,719.63 | $0.00 | | $47,093.11 | $0.00 | $0.00 | $39,167.34 | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..n, Dewayne | Ironside Clown Posse | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..r, Joseph | Salvo | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..r, Terry | Lodi | | | | | $0.00 | | $59,993.70 | $0.00 | $16,150.00 | | $0.00 | $27,132.03 | $65,448.67 | $0.00 | $144.12 |
| ..ino, Chris | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..egory, Mark | Shanghai Pierce | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..tto, Michael | Mike Modest | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $3,000.00 | $0.00 | $0.00 |
| ..ey, Gary | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Real Name | Ring Name | 1996 Payroll | 1996 Merch | 1996 Licensing | 1997 Payroll | 1997 Merch | 1997 Licensing | 1998 Payroll | 1998 Merch | 1998 Licensing | 1999 Payroll | 1999 Merch | 1999 Licensing | 2000 Payroll | 2000 Merch | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| on, Lanny | Lanny Lane; Standards and Practices | | | | $15,332.10 | $0.00 | | $37,483.25 | $0.00 | $0.00 | $45,200.28 | $0.00 | $0.00 | $133,882.03 | $0.00 | $0.00 |
| allson, Dustin lo | Physician | $7,276.59 | | | $80,253.83 | $0.00 | | $107,292.54 | $0.00 | $16,330.00 | $149,351.07 | $0.00 | $37,696.47 | $76,044.71 | $9.39 | $2,213.97 |
| er, Soot | | | | | $16,538.37 | $0.00 | | $32,140.27 | $0.00 | $0.00 | $27,445.16 | $0.00 | $0.00 | | $0.00 | $0.00 |
| o, Mau | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| , E. Bryan | Kona/Wrath | $101,712.32 | | | $146,175.41 | $0.00 | | $171,253.40 | $27.41 | $6,697.18 | $214,387.52 | $30.34 | $12,441.24 | $320,605.34 | $14.89 | $34,489.65 |
| a, Rae J | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| , Kevin James | Kevin Cole The Cole Twins | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Kent Denud | Kent Cole The Cole Twins | | | | | $0.00 | | | $0.00 | $0.00 | $19,353.72 | $0.00 | $0.00 | $39,660.59 | $0.00 | $0.00 |
| d, Richard | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $44,472.58 | $0.00 | $0.00 |
| l, Dustin / Cmua/Ameo | Chris Daniels | $51,071.00 | | | $31,514.20 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| yola, John | Max Muerk | $17,367.10 | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| nucr, William | Bill Sullivan | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| er, Barry | Blacktop Billy | | | | $40,273.84 | $0.00 | | $154,245.92 | $0.00 | $0.00 | $153,194.04 | $0.00 | $0.00 | | $0.00 | $0.00 |
| , James | Esther Lancaster | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| l, Marcel | | | | | | $0.00 | | $253.55 | $0.00 | $0.00 | $17,448.39 | $0.00 | $0.00 | | $0.00 | $0.00 |
| , Rafael | Agetida | | | | | $0.00 | | $6,011.45 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| n, William C | General Revision; Hugh Morris | $100,210.93 | | | $163,564.15 | $0.00 | | $144,303.34 | $0.00 | $0.00 | $198,621.00 | $0.00 | $809.20 | $245,931.43 | $0.00 | $0.00 |
| Minenura, and | Villano V | | | | $14,411.40 | $0.00 | | $50,977.63 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.24 | $46.12 |
| Minenura, | Villano IV | $3,371.77 | | | $45,838.64 | $0.00 | | $44,454.47 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| a, | Roger The Wrecking Crew | | | | | $0.00 | | $2,400.00 | $0.00 | $0.00 | $19,930.60 | $0.00 | $0.00 | $14,465.00 | $0.00 | $0.00 |
| lo, Alfred | | | | | | | | | | | | | | | | |

EXHIBIT

CONFIDENTIAL

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

EXHIBIT

...DENTIAL

| Real Name | Ring Name | 1996 Payroll | 1996 Merch | 1996 Licensing | 1997 Payroll | 1997 Merch | 1997 Licensing | 1998 Payroll | 1998 Merch | 1998 Licensing | 1999 Payroll | 1999 Merch | 1999 Licensing | 2000 Payroll | 2000 Merch | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ...a, Joseph (Johnny Swinger) | Johnny Swinger | $1,625.00 | | | $22,093.86 | $0.00 | | $17,479.90 | $0.00 | $0.00 | $35,410.04 | $0.00 | $0.00 | | $0.00 | $0.05 |
| ...an, James | Hardcore Jim Dragon | $186,577.44 | $18.40 | | $310,301.39 | $0.00 | | $181,343.31 | $0.00 | $0.00 | $186,731.48 | $0.00 | $0.00 | | $0.00 | $19.20 |
| ...m, Bobby | Bobby Duncum Jr. | | | | | $0.00 | | $44,993.66 | $0.00 | $0.00 | $133,291.00 | $0.00 | $0.00 | | $0.00 | $2,518.00 |
| ...n, Michael | Public Enemy / Johnny Grunge | $81,110.85 | $23.99 | | $159,563.16 | $20.77 | | $171,515.16 | $13.41 | $607.49 | $54,909.32 | $0.04 | $7,901.04 | | ($1.06) | $0.00 |
| ..., Bobby | Beautiful Bobby | $88,709.17 | | | $76,679.24 | $0.00 | | $81,249.87 | $0.00 | $0.00 | $98,113.82 | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..., Troy | Mike | $77,724.27 | | | $80,567.00 | $0.00 | | $104,970.34 | $0.00 | $0.00 | $52,058.20 | $0.00 | $0.00 | | ($1.96) | $2,518.00 |
| Mike | Rough & Ready; Mike Rotu | | | | | $0.00 | | | $0.00 | $955.35 | $101,539.04 | $0.00 | $10,635.57 | | $0.00 | $0.00 |
| Sidney, R. | Sid Vicious | | | | | $0.00 | | | $0.00 | $0.00 | $493,331.36 | $0.00 | $0.00 | | $647.92 | $3,450.00 |
| ...Lance Timothy | Lance Storm | | | | | $0.00 | | | $0.00 | $0.00 | $101,439.04 | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...berg, Page (DDP) | Diamond Dallas Page (DDP) | $149,644.93 | | | $12,097.47 | $0.00 | | $300,515.48 | $0.00 | $49,024.05 | $1,074,554.83 | $1,131.87 | $247,700.97 | | $191.11 | $0.00 |
| ...Rashid Daniel | | | | | | $0.00 | | | $0.00 | $0.00 | $32,240.27 | $0.00 | $0.00 | | $419.25 | $264,771.22 |
| ...e, Ed | The Bleak | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...e, Jeff | NWO Sting | $34,249.78 | | | $81,098.65 | $0.00 | | $130,102.20 | $0.00 | $54,145.80 | $163,009.41 | $0.00 | $1,033.52 | | $0.00 | $0.00 |
| ...Sergio | Hugo | $133,290.09 | | | $164,308.21 | $0.10 | | $118,697.11 | $10.00 | $16,330.00 | $177,809.90 | $0.00 | $29,318.40 | | $0.00 | $0.00 |
| ...David | Fit Finlay | $17,050.00 | | | $31,600.00 | $0.00 | | $118,804.95 | $0.00 | $16,330.00 | $225,416.42 | $0.00 | $27,841.22 | | $0.00 | $44.12 |
| ...David | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Richard (Flair) | Ric Flair | $513,368.23 | | | $448,412.00 | $0.00 | | $742,024.97 | $413.39 | $17,611.00 | $44,109.59 | $14.31 | $120,350.29 | | $18.45 | $14,054.24 |
| ...Arturo (Michael) | Spyder | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...Michael | Christian Jack | $900.00 | | | $1,750.00 | $0.00 | | $17,276.00 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...Christopher (Joe Storm) | Crowbar | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.31 | $0.29 |
| ...an, Ryan | | | | | | $0.00 | | | $0.00 | $0.00 | $8,718.88 | $0.00 | $0.00 | | $0.00 | $0.00 |

106860_3.XLS - Active

EXHIBIT

CONFIDENTIAL

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Real Name | Ring Name | 1994 Payroll | 1994 Merch | 1996 Licensing | 1997 Payroll | 1997 Merch | 1997 Licensing | 1998 Payroll | 1998 Merch | 1998 Licensing | 1999 Payroll | 1999 Merch | 1999 Licensing | 2000 Payroll | 2000 Merch | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ...ny, Chad Guerrero, no | El Leo Fabuloso/el Diablo | | | | $34,000.00 $17,031.52 | $0.00 $0.00 | | $55,913.37 $50,232.15 | $0.00 $0.00 | $0.00 $0.00 | $79,040.34 $46,897.58 | $0.00 $0.00 | $0.00 $0.00 | $54,533.29 | $0.00 | $0.00 |
| ..., Rich | Rich Patler | | | | $22,307.14 | $0.00 | | $34,585.85 | $0.00 | $953.35 | $54,608.21 | $0.00 | $10,635.57 | $60,283.07 | $0.00 | $0.00 |
| ..., James | Hak or Hacker | | | | | $0.00 | | $47,383.38 | $0.00 | $0.00 | $233,403.43 | $0.00 | $0.00 | | $0.00 | $11,331.74 |
| ..., Alan, Eric | Kevin Wac | | | | | $0.00 | | | $0.00 | $0.00 | $16,312.35 | $0.00 | $0.00 | $44,202.51 | $0.00 | $0.00 |
| ..., Terry | Terry Funk | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $187,738.79 | $0.00 | $0.00 |
| ..., Jeff | The Guerrier | $32,399.00 | | | $31,200.00 | $0.00 | | $32,406.64 | $0.00 | $0.00 | $12,697.83 | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..., Alan | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $9,490.00 | $0.00 | $0.00 |
| ..., James | Jimmy Kimble | | | | | $0.00 | | | $0.00 | $0.00 | $19,536.19 | $0.00 | $0.00 | $42,041.73 | $0.00 | $0.00 |
| ..., Robert | Jaag Dragons | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..., Thomas | Reuben Cue | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...m, Glenn | Eddie Gilbert | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...ory, Bill | Boogie Knights - Disco Inferno | $14,641.35 | | | $42,395.96 | $0.00 | | $47,343.43 | $0.00 | $20,970.77 | $199,351.34 | $0.00 | $30,442.99 | $216,314.07 | ($0.96) | $8,051.10 |
| ...x, Jimmy | | $20,142.90 | | | $116,820.46 | $0.00 | | $442,086.77 | $16,377.77 | $32,783.27 | $54,650,001.77 | $10,002.94 | $351,205.65 | $13,376,247.46 | $15,593.48 | $640,375.66 |
| ...on | Bunkhouse Buck | $20,221.34 | | | $11,000.00 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...an Carrera | Damien | $180,617.05 $4,147.43 | | | $83,261.31 $46,014.63 | $0.00 $0.00 | | $63,702.36 | $0.00 $0.00 | $0.00 $0.00 | $1,900.00 | $0.00 $0.00 | $0.00 $0.00 | | $0.00 $0.00 | $0.00 $0.00 |
| ...nte, Hernandez, de Anibal | Juventud Guerrera | $4,330.82 | | | $61,444.09 | $0.00 | | $111,063.11 | $0.00 | $16,350.00 | $133,448.41 | $2.31 | $27,698.47 | $99,748.74 | $0.13 | $115,992.02 |
| ...lay, Jorge | El Gigante | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $144.36 |
| ..., Terry | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...n, Robert | Bobby Graham | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...George | One Man Gang | $10,000.00 | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $44,432.04 | $0.00 | $0.00 |
| ...Sam | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...olrey | | | | | $16,034.17 | $0.00 | | $132,129.27 | $0.00 | $0.00 | | $0.00 | $0.00 | | $10.00 | $0.00 |
| ..., Kevin | | $116,000.00 | | | $430,000.00 | $0.00 | | $520,000.00 | $0.00 | $0.00 | | $10.00 | $0.00 | | $0.00 | $0.00 |
| ...y, Peter | Billy Kidman | $19,883.18 | | | $38,740.98 | $0.00 | | $114,113.76 | $10.00 | $16,310.00 | $269,810.32 | $100.65 | $28,002.86 | $304,534.39 | $106.77 | $122,106.72 |
| ...rm, Eduardo | Eddie Guerrero | $131,422.59 | | | $246,419.43 | $1.11 | $10,635.10 | $217,195.77 | $28.11 | $35,694.51 | $473,614.71 | $0.31 | $15,934.34 | $331,349.66 | $38.62 | $54,331.73 |

1044404_3XLS - Andrea

EXHIBIT ●                                                                                          ● DENTAL

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Real Name | Ring Name | 1996 Payroll | 1996 March | 1996 Licensing | 1997 Payroll | 1997 March | 1997 Licensing | 1998 Payroll | 1998 March | 1998 Licensing | 1999 Payroll | 1999 March | 1999 Licensing | 2000 Payroll | 2000 March | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ...em, Salvador | Lieutenant Loco/ Chavo Guerrero Jr. | $48,073.06 | | | $44,766.96 | $0.00 | | $126,604.13 | $0.00 | $16,030.00 | $173,514.47 | $0.00 | $27,941.23 | $305,670.53 | | $2,144.12 |
| ...mes, Gene (aunta Inc.) | Ray Mysterio, Jr. | $37,043.11 | | | $134,455.71 | $243.05 | | $105,945.82 | $265.44 | $36,157.44 | $355,557.78 | $503.71 | $31,753.64 | $356,130.99 | ($1.06) | $7,150.78 |
| ...Jimmy ...nkscards, Inc.) | | | | | | $0.00 | | $2,500.00 | $0.00 | $0.00 | $532,778.86 | $0.00 | $0.00 | $67,304.23 | $1,312.63 | |
| ... Sean | Sean O'Hare | | | | $0.00 | $0.00 | | $0.00 | $0.00 | $0.00 | $3,244.22 | $0.00 | $0.00 | $74,984.59 | $0.00 | $0.00 |
| Scott (Boric Hall ...plons) | Boric Hall/ Last Call Pub/The Outsider | $379,293.49 | | | $664,047.71 | $3,511.13 | $1,027.51 | $1,173,734.77 | $4,690.76 | $44,766.04 | $771,757.34 | $19.39 | $78,349.91 | $613,334.43 | | $41,714.19 |
| ...tion, Troy | Ace | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $1,235.07 | $0.00 |
| ...art, Bret | | | | | | $0.00 | | $31,575.34 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...tion, Kit | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...art, Dale | | | | | | $0.00 | | | $0.00 | $0.00 | $108,493.16 | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..., Donald | Harris Boys Creative Control | | | | | $0.00 | | | $0.00 | $0.00 | $15,990.16 | $0.00 | $0.00 | $200,401.87 | | $0.00 |
| ..., Ronald | Harris Boys Creative Control | | | | | $0.00 | | | $0.00 | $0.00 | $15,990.56 | $0.00 | $0.00 | $200,716.87 | $3.70 | $0.00 |
| ..., Theodore | AKA | | | | | $0.00 | | | $0.00 | $0.00 | $50,410.94 | $0.00 | $0.00 | $13,993.00 | $5.70 | $0.00 |
| ... Bret | | | | | $47,945.20 | $0.00 | | $2,660,533.51 | $426.92 | $31,477.06 | $2,560,818.08 | $19.33 | $139,206.78 | $3,211,543.80 | $0.00 | $101,731.38 |
| ...ames, Glenn aka, Kazrabin | King Dragons KiR | | | | | $0.00 | | $540,017.79 | $0.00 | $955.23 | $591,494.21 | $0.00 | $11,444.77 | $100,198.98 | $0.00 | $0.00 |
| ...er, Michael | Prince Iaukea/ The Artist | $8,240.00 | | | $44,708.66 | $0.00 | | $533,231.30 | $0.00 | $0.00 | $905,553.00 | $0.00 | $7,099.62 | $85,560.04 | ($1.06) | $2,354.12 |
| ..., David ...trand, Michael | Road Warrior Hawk | $72,593.33 | | $59.19 | $7,200.00 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | ($1.06) | $52,511.00 |
| ..., Jim | Ultimate Warrior | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |

1544666_1.XLS - Active

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

EXHIBIT

| Real Name | Ring Name | 1994 Payroll | 1994 Merch. | 1996 Licensing | 1997 Payroll | 1997 Merch. | 1997 Licensing | 1998 Payroll | 1998 Merch. | 1998 Licensing | 1999 Payroll | 1999 Merch. | 1999 Licensing | 2000 Payroll | 2000 Merch. | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| n, Gregory Shane | r Crush Shane | | | | | $0.00 | | | $0.00 | | $31,109.44 | $0.00 | $0.00 | $57,728.94 | $3.31 | $0.00 |
| ys, Curt | Mr. Curt | | | | $203,897.03 | $0.00 | | $437,948.62 | $46.14 | $13,966.95 | $411,654.00 | $0.00 | $17,341.23 | $174,694.31 | ($1.03) | $3,154.02 |
| rrin, Mark (Van mer Int.) | Van Hammer | | | | $9,006.18 | $0.00 | | $121,224.02 | $0.00 | $0.00 | $119,552.64 | $0.00 | $27,132.00 | $90,842.99 | | |
| phnson, Richard | Vampiro | | | | | $0.00 | | $41,554.74 | $0.00 | $0.00 | $151,210.53 | $0.00 | $0.00 | $186,553.83 | $0.00 | $0.00 |
| w, Harold | H. J. Smooth Cat Phil | $73,316.52 | | | $93,408.97 | $0.00 | | $35,334.39 | $0.00 | $0.00 | $41,063.37 | $0.00 | $0.00 | $153,104.14 | $1,270.21 | $0.00 |
| rickg, Barry | | | | | $13,936.14 | $0.00 | | | $0.00 | $0.00 | $211,185.52 | $0.00 | $0.00 | $53,480.00 | $0.00 | $0.00 |
| hrea, Booker T ster T. (m.) | Harlem Heat Booker T | $151,623.90 | | $2,668.12 | $234,360.50 | $19.24 | $33.00 | $260,461.62 | $33.37 | $4,814.39 | $609,550.34 | $98.17 | $20,651.70 | $712,127.49 | $27.22 | $11,591.93 |
| rres, Lash | Harlem Heat Stevie Ray | $151,783.24 | | $2,668.22 | $234,180.43 | $63.42 | $33.00 | $260,222.67 | $33.59 | $2,973.19 | $609,550.34 | $98.16 | $33,015.77 | $304,506.60 | $17.94 | $4,217.78 |
| er, Jonathan (Bud) | Johnny "The Bull" | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ter, Jonathan | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $41,335.47 | $0.00 | $0.00 |
| wes, Curtis | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| n, Gregory | Big Cat | | | | | $0.00 | | $3,850.00 | $0.00 | $4,021.64 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| e, Chris | Chris Jericho | $50,589.62 | | | $164,493.10 | $0.00 | | $234,308.82 | $27.41 | $0.00 | $143,439.34 | $232.32 | $31,444.32 | | $59.93 | $30,394.53 |
| t, Robert Bind | Butch/JW Bind Armstrong | $54,548.75 | | | $85,107.48 | $0.00 | | $103,314.53 | $0.00 | $0.00 | $123,015.40 | $0.00 | $0.00 | $79,973.31 | | $0.00 |
| n, Scott | Scott Armstrong | $13,440.00 | | | $33,378.37 | $0.00 | | $35,790.37 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | |
| n, Steve | Steve Armstrong | $12,740.00 | | | $22,628.37 | $0.00 | | $33,632.37 | $0.00 | $0.00 | $43,523.19 | $0.00 | $0.00 | $55,119.02 | $0.00 | $0.00 |
| rphy, Frederick | Marty Jannetty | | | | $10,474.18 | $0.00 | | $117,932.34 | $0.00 | $0.00 | $19,944.67 | $0.00 | $0.00 | | $0.00 | $0.00 |
| o, Jeff (J.J. Inc.) | The Chosen One | $42,781.24 | | | $177,717.62 | $0.00 | $10,076.19 | | $0.00 | $0.00 | $174,453.05 | $0.00 | $0.00 | $335,671.17 | $4,350.66 | $0.00 |
| ski, Mark Robert | Mark Jindrak | | | | | $0.00 | | $120.00 | $0.00 | $0.00 | $28,250.09 | $0.00 | $0.00 | $77,203.83 | | $0.00 |
| son, Mark | | | | | | $0.00 | | $5,000.27 | $0.00 | $0.00 | $39,285.10 | $0.00 | $0.00 | $97,345.72 | $0.00 | $0.00 |
| , Albert | Al Styles | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $1,200.00 | $0.00 | $0.00 |
| y, Michael | Vincent | $37,010.36 | | | $109,463.71 | $0.00 | | $112,314.58 | $40.14 | $0.00 | $129,780.04 | $0.00 | $25,205.28 | $113,360.33 | $0.00 | $48.71 |

1844664_3.XLS - Active

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

EXHIBIT

CONFIDENTIAL

| Real Name | Ring Name | 1996 Payroll | 1996 Merch. | 1996 Licensing | 1997 Payroll | 1997 Merch. | 1997 Licensing | 1998 Payroll | 1998 Merch. | 1998 Licensing | 1999 Payroll | 1999 Merch. | 1999 Licensing | 2000 Payroll | 2000 Merch. | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ...k, Evan | J Crush | | | | $150.00 | $0.00 | | $33,327.12 | $0.00 | $0.00 | $71,845.21 | $0.00 | $0.00 | $78,117.42 | $1.53 | $0.00 |
| ...Steve | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...n, Rob | Moseley | | | | $26,232.17 | $0.00 | | $47,635.13 | $0.00 | $0.00 | $83,104.85 | $0.00 | $0.00 | $39,083.19 | $0.00 | $0.00 |
| ...ma, Chris | Kanyon/Morris | $43,381.72 | | | $104,735.00 | $0.00 | | $209,011.92 | $27.41 | $0.00 | $246,293.73 | $0.00 | $0.00 | $240,397.49 | $91.00 | $5,464.50 |
| ...k, Rob | Robby Rage/ High Voltage/Kaos | $17,115.30 | | | $77,080.00 | $0.00 | | $7,209.18 | $0.00 | $0.00 | $148,418.55 | $0.00 | $27,941.21 | $31,595.88 | | |
| ...Chris | | | | | | $0.00 | | | $0.00 | | | $0.00 | | | $0.00 | $0.00 |
| ...ing | Gossie Glaim | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...ie | Grey Valentine | $5,980.00 | | | $73,465.18 | $0.00 | | $20,542.37 | $0.00 | $0.00 | $51,407.95 | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...n, McA | Corporal Cajun/Lash Leroux | | | | | $0.00 | | $4,344.00 | | | | | | $84,634.71 | ($1.00) | $2,511.00 |
| ...Ry | Disciple/Sunny Maze Zodiac | $169,319.65 | | | $103,328.00 | | | | | | $196,629.05 | | $11,444.77 | | | $41.12 |
| ...ger, Fred | Terror Rysiie/Ivan Paul Lawrence | | | | | $0.00 | | | $0.00 | | | | | $0.00 | | $0.00 |
| ...Scott | Barers | | | | $130,341.60 | $0.00 | | $247,137.01 | $3,254.65 | $20,051.99 | $189,656.37 | $119.17 | $32,631.42 | | $13.00 | $16,413.43 |
| ...Raymond | Glacier Brett Sawn | $44,695.33 | | | $150,465.97 | $0.00 | | $104,438.41 | $27.41 | $7,269.92 | $160,344.57 | $0.00 | $27,255.41 | $22,479.44 | $0.00 | $413.30 |
| ...tte, Van | Big Vito | | | | | $0.00 | | | $0.00 | $0.00 | $31,863.02 | $0.00 | $0.00 | $243,461.78 | $0.00 | $0.00 |
| ...Jeremy David | Jeremy Lopez | | | | | $0.00 | | | $0.00 | $0.00 | $119,336.19 | $0.00 | $0.00 | $5,809.76 | | |
| ...les Carlos | Litemark, Jr. | | | | $34,504.47 | $0.00 | | $44,393.02 | $0.00 | $0.00 | $85,947.14 | $0.00 | $0.00 | $4,594.96 | $0.00 | |
| ...Martin | Ash Anderson | $200,399.94 | | | $211,493.92 | $0.00 | | $235,378.90 | $0.00 | $0.00 | $15,434.47 | $0.00 | $11,495.16 | | ($1.00) | $2,518.19 |
| ...on, Jerry | Jerry Musgi | $5,000.00 | | | $19,123.17 | $0.00 | | $17,200.00 | $0.00 | $0.00 | | $0.00 | | | $0.00 | $2,518.19 |
| ...ti, Karl | The Maidman | $16,337.72 | | | $20,000.00 | $0.00 | | $21,310.00 | $0.00 | $0.00 | $23,980.00 | $0.00 | | | $0.00 | $0.00 |
| ...r, James | | | | | $29,242.44 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...Michael | Steve Richards | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $339,483.51 | $0.00 | $0.00 |
| ...r, Troy | The Franchise Shane Douglas | | | | | $0.00 | | | $0.00 | $0.00 | $172,067.99 | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...gile, Jason | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $41.04 | $0.00 | $0.00 |
| ...ri, Darren | Sonn Regal | $149,529.69 | | | $216,228.47 | $0.00 | | $164,109.38 | $0.00 | $10,299.77 | $187,489.71 | $0.00 | $17,234.44 | $36,418.35 | $0.00 | $0.00 |
| ...el, Steve | | $207,417.92 | | | $270,408.32 | $0.00 | $10,676.18 | $259,285.48 | $27.41 | $2,551.38 | $109,496.00 | $0.00 | $14,361.44 | | ($1.00) | $4,464.50 |

0e16b7_3_5.3.3 - Active

EXHIBIT

DENTAL

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Last Name | Ring Name | 1996 Licensing | 1996 Merch | 1996 Payroll | 1997 Licensing | 1997 Merch | 1997 Payroll | 1997 Licensing | 1998 Payroll | 1998 Merch | 1998 Licensing | 1999 Payroll | 1999 Merch | 1999 Licensing | 2000 Payroll | 2000 Merch | 2000 Liability |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mark | Johny B. Badd | | | $46,829.14 | $316.62 | $344.59 | | | | | | | | | $1,500.00 | $0.00 | $1.00 |
| Emst | The Cat | | | $31,141.84 | | $147,819.43 | | $2,389.78 | $47,819.43 | | $27.41 | $308,231.66 | $0.00 | $10,061.40 | $341,445.54 | ($1.00) | $1,394.17 |
| Perry | Master P | | | | | | | | | | $0.00 | $291,000.00 | $0.00 | $0.00 | | $0.00 | $0.00 |
| L. Chip | | | | $33,290.00 | | $40,258.57 | | | $55,156.57 | | $0.00 | $559,231.10 | $0.00 | $0.00 | | $0.00 | $0.00 |
| Eli, James | James Vandenberg | | | | | $38,310.24 | | | $44,214.33 | | $0.00 | $40,546.43 | $0.00 | $0.00 | | $0.00 | $0.00 |
| John | Disorderly Conduct | | | | | $0.00 | | | $54,606.43 | | $0.00 | $46,280.11 | $0.00 | $45,514.39 | | $0.00 | $0.00 |
| Willa | | | | | | $99,700.00 | | | $114,300.00 | | $0.00 | $531,140.93 | $0.00 | $0.00 | $46,473.13 | $0.00 | $0.00 |
| s. Ricky | Linda Spindle | | | $10,480.00 | | | | | | | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| 30, Linda | Omni Man | | | | | $17,453.00 | | | $59,943.81 | | $0.00 | | $0.00 | $0.00 | $47,843.47 | $0.00 | $0.00 |
| Kyli | The Chamber (Big Saxy/ Vinas Vegas and Isc.) | | | $316,261.31 | | $3,310.75 | | | $14,473,128.17 | | $39,584.12 | $1,257,244.40 | $1,484.07 | $226,649.69 | $1,399,131.40 | $0.00 | $245,283.75 |
| ri. Jim | The Anvil | | | | | $0.00 | | | $317,933.46 | | $33,164.81 | $34,181.33 | $0.00 | $28,266.31 | $3,547.10 | $0.00 | $46.27 |
| John | | | | | | $40,273.85 | | | $122,208.38 | | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Jr. Harrison | Hardbody Harrison | | | $1,514.76 | | $12,475.00 | | | $55,635.00 | | $0.00 | $22,895.21 | $0.00 | $0.00 | $29,733.43 | $0.00 | $13,344.26 |
| st, Kevin | | | | | | $3,400.00 | | | $0.00 | | $0.00 | | $0.00 | $0.00 | $15,549.47 | ($1,055) | $13,344.26 |
| Scott | | | | $193,338.02 | | $233,747.14 | | | $301,143.33 | | $54,899.47 | $335,699.40 | $0.00 | $28,974.15 | $14,543.76 | $0.00 | $0.00 |
| fuer, Scott | | | | | | $0.00 | | | | | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| & Michael | | | | | | $0.00 | | | | | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Kamer (Super a) | Sonny | | | $99,310.58 | | $143,313.49 | | | $210,535.95 | | $32,107.94 | $188,849.24 | $0.00 | $16,788.69 | $13,150.09 | ($1.00) | $2,318.00 |
| Burn | | | | $3,735.42 | | $56,413.48 | | | | | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Cf. Paul | | | | $45,977.26 | | $91,933.00 | | | | | $0.00 | | $0.00 | $0.00 | $11,500.00 | $0.00 | $0.00 |
| sn, Charles | The Event Check | | | | | $0.00 | | | | | $0.00 | $126,150.09 | $0.00 | $0.00 | $311,603.34 | $0.00 | $0.00 |
| Thomas C | | | | | | $0.00 | | | $2,338.75 | | $0.00 | $531,159.41 | $0.00 | $0.00 | $10,544.40 | $0.00 | $0.00 |
| James Michael | Cyclope | | | | | $0.00 | | | $0.00 | | $0.00 | | $0.00 | $0.00 | | $0.00 | $335,990.00 |
| Adam J. | | | | | | $0.00 | | | $0.00 | | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |

1044606_SXLS - Active

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

**EXHIBIT**

CONFIDENTIAL

| Real Name | Rkg Name | 1996 Payroll | 1996 Merch | 1996 Licensing | 1997 Payroll | 1997 Merch | 1997 Licensing | 1998 Payroll | 1998 Merch | 1998 Licensing | 1999 Payroll | 1999 Merch | 1999 Licensing | 2000 Payroll | 2000 Merch | 2 X O Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Theodore J. | P(why) Know Itook/ Public Enemy | $81,454.98 | $23.98 | | $108,462.21 | $201.75 | | $174,359.16 | $13.42 | $967.49 | $39,318.59 | $0.04 | $7,901.04 | | $0.00 | $0.00 |
| Lawrence | The Total Package/Lex Luger | $443,997.79 | | | $701,772.33 | $3,111.58 | $11,301.44 | $791,298.29 | $375.48 | $59,999.82 | $1,521,704.74 | $12.49 | $50,181.77 | $1,326,056.87 | $44.84 | $54,037.16 |
| n. Brian | Pyfle Brian-Pillman California/Brian | $70,880.49 | $949.55 | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| n. Craig Alan | Sgt. Craig Pittman | $99,681.14 | $1.18 | | $70,411.06 | $19.54 | $17.92 | $1.30 | $0.95 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Larry | Larry Paffo | | | | | $0.00 | | $4,571.27 | $0.00 | $0.00 | | $0.00 | $0.00 | | ($0.12) | $0.00 |
| Randy | Randy Savage Macho King Macho Man | $723,613.19 | $10,879.17 | | $1,903,170.25 | $1,079.45 | $6,682.20 | $1,342,679.78 | $4,074.75 | $23,037.75 | $1,414,443.04 | $257.31 | $219,406.74 | $142,287.67 | $65.63 | $380,275.37 |
| ...sex, ...(Rick Steiner ...ing) | Rick Steiner (Varsity Club) | $154,212.94 | | | $115,774.11 | $1.60 | $10,676.18 | $333,379.59 | $17.91 | $12,616.86 | $144,202.46 | $0.04 | $33,733.62 | $597,310.21 | $0.00 | $0.00 |
| ...miner, Scott ...er Brothers) | Big Poppa Pump | $154,212.94 | | | $329,963.79 | $1.39 | $10,676.18 | $511,250.33 | $27.94 | $113,476.19 | $660,848.94 | $576.17 | $54,992.87 | $733,069.14 | $1,508.49 | $119,193.24 |
| Scott | | | | | | $0.00 | | $0.00 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Ron | Ron Shield | | $336,150.94 | | $87,636.09 | $0.00 | | $47,379.16 | $0.00 | $0.00 | | $0.00 | $16,325.00 | | $0.00 | $0.00 |
| John | Ralphus | | | | | $0.00 | | $1,750.00 | $0.00 | $0.00 | $4,490.00 | $0.00 | $0.00 | $36,259.94 | $0.00 | $0.00 |
| ...ek, Dennis | The Warm | | | | | $0.00 | | | $0.00 | $0.00 | $1,174,613.50 | $0.00 | $0.00 | | $0.00 | $0.00 |
| Dean | Shark Boy | | | | | $0.00 | | $100,000.00 | $0.00 | $0.00 | $58,143.03 | $0.00 | $0.00 | $457.89 | $0.00 | $0.00 |
| ...k, Sammy Lee | Kid Romeo | | | | | $0.00 | | | $0.00 | $0.00 | $22,620.31 | $0.00 | $0.00 | $34,851.50 | $0.00 | $0.00 |
| Richard | Rick Rude | | | | | $0.00 | | $296,477.28 | $0.00 | $0.00 | $13,150.46 | $0.00 | $511,209.19 | $247,238.92 | $0.00 | $44.17 |
| Jeremiah | Blitz Krieg | | | | | $0.00 | | $400.00 | $0.00 | $0.00 | $63,748.50 | $0.00 | $0.00 | $33,831.78 | $0.00 | $0.00 |
| ...dr. Michael | Michael Wallstreet | $119,382.14 | | | $149,548.99 | $0.00 | | $157,431.88 | $0.00 | $0.00 | $162,205.04 | $0.00 | $0.00 | $131,173.48 | $0.00 | $0.00 |
| ...ul Jason | | $44,007.30 | | | $92,537.33 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |

10

1046606_5.XLS : Active

EXHIBIT

DENTAL

## Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Last Name | Reg Name | 1994 Payroll | 1994 Merch | 1994 Licensing | 1997 Payroll | 1997 Merch | 1997 Licensing | 1998 Payroll | 1998 Merch | 1998 Licensing | 1999 Payroll | 1999 Merch | 1999 Licensing | 2000 Payroll | 2000 Merch | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| s, Dustin | Dustin Rhodes | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| s, Virgil | Dustin Rhodes | $134,602.42 | | $949.85 | $165,463.24 | $0.00 | | $108,179.50 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| rick, Jerry | Jerry Sags/Nasty Boys | $232,914.06 | $47.38 | $3,024.64 | $156,774.56 | $12.00 | $481.44 | | $0.39 | $0.00 | | $0.00 | $0.00 | | | $0.02 |
| m, Beau | | $4,000.00 | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| t, Rahl Davey | Super Calo | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| t, Michael E. | Above Average | | | | | $0.00 | | $3,596.00 | $0.00 | $0.00 | $25,998.55 | $0.00 | $0.00 | $90,841.00 | $0.00 | $0.00 |
| r, Robert | | | | | | $0.00 | | | $0.00 | $0.00 | $1,709.99 | $0.00 | $0.00 | $63,543.35 | $0.00 | $0.00 |
| Kressler | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Perry (S)lam ken) | Saturn | | | | $31,780.81 | $0.00 | | $163,313.62 | $0.00 | $1,014.97 | $275,249.21 | $149.44 | $29,386.22 | $29,108.54 | $44.01 | $4,833.27 |
| Charles | 2 Cold Scorpio | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Hector | | | | | $24,688.84 | $0.00 | | $66,993.31 | $0.00 | $0.00 | $42,848.26 | $0.00 | $4,833.27 | $4,833.27 | $0.00 | $0.00 |
| David | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| oony, Us; ke | Sunny Slati | | | | | $0.00 | | | $0.00 | $0.00 | $19,403.81 | $0.00 | $0.00 | $24,393.44 | $0.00 | $0.00 |
| Skelly Deun (Alexisla Inc.) | Dean Maleluko | $126,345.46 | | | $246,210.89 | $2.41 | $10,676.19 | $248,493.93 | $29.41 | $13,555.14 | $264,163.52 | $58.45 | $33,371.09 | $49,706.03 | | $7,013.56 |
| Elix, United | Primetime Els | $39,234.47 | | | | $0.00 | | $1,548.00 | $0.00 | $0.00 | $29,187.54 | $0.00 | $0.00 | $74,406.36 | $16.77 | $7,013.56 |
| United | Dink Boker | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| r, Robert | Bobby Blaze | | | | $17,452.06 | $0.00 | | $166,276.72 | $0.00 | $0.00 | $63,320.26 | $0.00 | $0.00 | $7,333.61 | ($1.00) | $0.00 |
| Norman | Norman/Black Maage | | | | | $0.00 | | | $0.00 | $0.00 | $100,549.42 | $0.00 | $0.00 | $172,621.69 | | $0.00 |
| vork | | | | | $31,299.84 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $44.36 | $2,118.00 |
| vork (Dubuen es) | Davie Boy Smith/British Bulldog | | | | | $0.00 | | $261,297.72 | $0.00 | $1,793.33 | $63,990.30 | $0.00 | $29,783.19 | | $0.00 | $0.00 |
| nams | Chandus Vork | | | | | $0.00 | | | $0.00 | $0.00 | $13,247.15 | $0.00 | $0.00 | $22,595.89 | $0.00 | $3,509.88 |
| lia/, Charles | C.J. Spencn | | | | | $0.00 | | | $0.00 | $0.00 | $19,334.19 | $0.00 | $0.00 | $12,784.37 | $0.00 | $0.00 |

1046060_3.XLS - Active

11

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

EXHIBIT

CONFIDENTIAL

| Rel Name | Reg Name | 1996 Payroll | 1996 March | 1996 Licensing | 1997 Payroll | 1997 March | 1997 Licensing | 1998 Payroll | 1998 March | 1998 Licensing | 1999 Payroll | 1999 March | 1999 Licensing | 2000 Payroll | 2000 March | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| , Dante E. | Dangerous Doublejohy | | | | | | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| wski, Kizmeth | High Voltage/Kenny Kess | $16,642.40 | | | $77,060.00 | | | $84,848.04 | $0.00 | $1,063.44 | $194,943.99 | $0.00 | $141.99 | $19,095.88 | $0.00 | $2,518.04 |
| e, Herman | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $33,500.00 | ($1.00) | $0.00 |
| , Shawn | Perfectionism | | | | | $0.00 | | | $0.00 | $0.00 | $54,117.36 | $0.00 | $0.00 | $111,344.74 | $0.00 | $0.00 |
| , Jacobus | Jakes | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $56,551.76 | $0.00 | $0.00 |
| r, One | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| r, Pat | El Gato | $45,136.90 | | | $41,378.07 | $0.00 | | | $0.00 | $0.00 | $111,879.73 | $0.00 | $0.00 | $500.00 | $0.00 | $0.00 |
| Butra, Adolfo | LaParka | $3,961.38 | | | $45,624.60 | $0.00 | | $67,449.39 | $0.00 | $0.00 | | $0.00 | $22,556.81 | $102,567.85 | ($1.00) | $2,518.70 |
| , William Chase | | | | | | $0.00 | | $3,900.00 | $0.00 | $0.00 | $26,598.05 | $0.00 | $0.00 | | $0.00 | $0.00 |
| , Dave | | $41,910.79 | | | $35,661.47 | $0.00 | | $36,635.16 | $0.00 | $0.00 | $116,134.33 | $0.00 | $0.00 | $11,201.17 | $0.00 | $0.00 |
| , Paul W. | Terry Taylor | $146,399.10 | | | $120,051.73 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| , John | Avalanche | $239,448.96 | | | $130,124.97 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| son, Wayne | Thunderbolt | | | | | $0.00 | | | $0.00 | $0.00 | $36,890.41 | $0.00 | $0.00 | | $0.00 | $0.00 |
| on, Roddy | Swej | | | | | $0.00 | | | $0.00 | $0.00 | $13,866.33 | $0.00 | $0.00 | | $0.00 | $0.00 |
| , Kevin | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| m, Roderick (Moolah, Inc.) | Rowdy Roddy Piper | $185,205.55 | | | $641,578.12 | $0.00 | | $448,078.90 | $0.00 | $1,733.35 | $446,571.18 | $0.00 | $31,624.54 | $435,894.12 | | $12,743.45 |
| r, Dale | The Dennis | | | | $11,645.06 | $0.00 | | $43,110.49 | $0.00 | $0.00 | $59,941.47 | $0.00 | $0.00 | $383,314.63 | $0.00 | $0.00 |
| r, Ray | Big Bubba Rogers | $150,956.33 | | | $206,398.16 | $30.28 | $10.76 | $324,042.61 | $1.07 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Michael Jerry | Sgt. A-Wall The Wall | | | | | $0.00 | | | $0.00 | $0.00 | $27,794.91 | $0.00 | $0.00 | $133,051.12 | $0.00 | $3.00 |
| , Joseph | Reazer Chews Prince | | | | | $0.00 | | | $0.00 | $0.00 | $37,231.19 | $0.00 | $0.00 | $34,490.68 | $0.00 | $0.00 |
| s, Brian | Barbarian | $71,544.47 | | | $149,548.93 | $0.15 | | $165,409.16 | $0.00 | $0.00 | $169,046.53 | $0.00 | $27,112.03 | | $0.00 | $0.00 |
| , Khosrow | Iron Sheik | | | | $0.00 | | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| dson, | Sick Boy | $54,602.05 | | | $0.00 | | | $117,427.10 | $0.00 | $0.00 | $113,497.11 | $0.00 | $27,941.21 | | $0.00 | $0.00 |
| , Manuel | Mr. Hughes | $161,318.60 | | | $161,318.60 | $0.00 | | $116,087.37 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| n, Kevin | Kevin Kelly | | | | | $0.00 | | $144,300.85 | $0.00 | $0.00 | $100,393.03 | $0.00 | $0.00 | | $0.00 | $0.00 |

EXHIBIT

**Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3**

| Real Name | Ring Name | 1996 Payroll | 1996 Merch. | 1996 Licensing | 1997 Payroll | 1997 Merch. | 1997 Licensing | 1998 Payroll | 1998 Merch. | 1998 Licensing | 1999 Payroll | 1999 Merch. | 1999 Licensing | 2000 Payroll | 2000 Merch. | 2000 Licensing tag |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ter, Bobby | Hardwork Bobby Walker | $70,012.33 | | | $94,671.49 | $0.00 | | $33,942.63 | $0.00 | $0.00 | $99,960.00 | $0.00 | $0.00 | $99,370.42 | | $0.00 |
| mk, Beau | Blau | $84,420.44 | | | $244,620.02 | $3,561.63 | $12,289.09 | $12,054.79 | $2,025.63 | $5,148.21 | | $0.00 | $3,476.17 | | $0.00 | $0.00 |
| on, John M. | Mikey Whipwreck | | | | | $0.00 | | $0.00 | $0.00 | $0.00 | $74,799.49 | $0.00 | $0.00 | | $1.00 | $0.00 |
| A, Bob Johnson | Bob Wass | | | | | $0.00 | | $44,310.04 | $0.00 | $0.00 | $84,047.50 | $0.00 | $0.00 | | $0.00 | $0.00 |
| n, Robert | Colonel Parker | $71,514.41 | | | $58,336.07 | $0.00 | | $900.00 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| mr, Michael | Michael Wisner | $57,466.20 | | | $23,377.64 | $0.00 | | $23,416.03 | $0.00 | $0.00 | $28,889.91 | $0.00 | $0.00 | | $0.00 | $0.00 |
| 9, Anthony | Tony Atlas | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| 6, Leon | Vader or Big Van Vader | | $563.15 | $10,183.58 | $4,701.55 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| 9, Reggie | | | | | $209,000.00 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| 6, Matthew | Horshu | | | | $54,752.01 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $5.00 |
| A, Paul (Blue Ox | Giant | $236,401.18 | | | $313,944.26 | $1,107.92 | $11,000.60 | $599,930.79 | $583.43 | $44,622.61 | $53,735.75 | $0.31 | $92,794.10 | | ($0.31) | $50,764.75 |
| irm, Steve | Steve Austin Stunning Renegade | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $29,000.00 | $0.00 | $3.00 |
| n, Rick | Luther | $1,700.00 | | | | $0.00 | | | $0.00 | $0.00 | $10,488.41 $23,794.55 | $0.00 | $0.00 | $10,109.60 | | $0.00 |
| rh, Stephen | | | | | | | | | | | | | | | | |
| Parm, Barry | Barry Windham | $940.31 | | | | $0.00 | | $44,394.12 | $0.00 | $0.00 | $154,004.51 | $0.00 | $0.00 | $319,315.07 | ($1.06) | $12,311.00 |
| Park, Kendall | | | | | $20,166.57 | $0.00 | | $71,155.48 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| kr, Ken | Booger Knight/Alan Wright | $134,381.51 | | | $169,650.36 | $41.99 | | $234,446.23 | $29.68 | $3,307.44 | $575,611.09 | ($0.07) | $12,595.24 | $391,211.09 | | $1,563.93 |
| r, Chad | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | ($0.17) | $0.00 |
| Horvitz, Brian (Jer.) | Brian Knobs | $230,317.21 | $47.34 | $11,900.93 | $159,622.75 | $13.06 | | | $0.31 | $0.00 | $187,492.25 | $0.00 | $0.00 | $183,776.84 | $0.00 | $0.00 |
| , Brett | | | | | | $0.00 | | | $0.00 | $0.00 | $54,377.04 | $0.00 | $0.00 | | $0.00 | $0.00 |
| James | Greg Dragon | | | | | $0.00 | | | $0.00 | $0.00 | $54,718.48 | $0.00 | $0.00 | $27,310.62 | $0.00 | $0.00 |
| Chuck | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |

13

104404_5XL3 - Active

## Exhibit B

# POWER PLANT TRAINEES

| REAL NAME | RING NAME |
|---|---|
| Allen, Steve | |
| Baum, Matthew B. | . |
| Beach, Cameron | |
| Bernick, Brian Michael | Jet Jaguar |
| Bobic, Nikola | |
| Cain, Joseph Bradley | |
| Carr, Tony Byron | Corporal Cruel |
| Cornell, Rick | Nino, Reno |
| Craig, Twanta Maurice | |
| Daniel, Jason Matthew | J-Sin, New-sensation Jason |
| Davis, Marcial R. | Mercenary |
| Denson, Joseph (Joey) Frederick III | |
| Dixon, Rico | |
| Dorgan, Joe | Johnny Swinger |
| Dreer, William C. (Billy) | |
| Duong, Phap Minh | |
| Easterling, Darron Devon | |
| Endres, Troy | |
| Evans, Sean Charles | Shocker |
| Faqir, Rachid Daniel (Danny) | |
| Fliehr, David | David Flair |
| Forrester, Ryan | The Hearthrob |
| Fortune, Chad | |
| Funk, Allan Eric | Vytor, Triple A |
| James Gibson | |
| Greco, Sam | |
| Greene, John | Johnny Attitude |
| Groegler, Charles I. | |
| Guthrie, Mark | |
| Haire, Sean | Sean O'Haire |
| Hamner, Bret | |
| Hildreth, Mark | |
| Hogue, Harold | Ice Train |
| Hugger, Jonathan Martin | Johnny Blaze or Johnny Blade |
| Hunke, Gregory John | J T Greed |
| Jindrak, Mark | Mark Millenium |
| Jones, Allen | |
| Karagias, Evan | |
| Kellum, Rob | Artiste |
| Knapik, Robert J. | |
| Knox, Paul Lewis | Pierce Kage |
| Lee, Charles M. | |

## Exhibit B

| | |
|---|---|
| Le Flore, Wondell | The Judge |
| LeRoux, J. Mark | Lash LeRoux |
| Loewen, Robert S. | |
| Mally (O'Malley), Craig | Irish Invasion |
| Maria, David | Apache |
| Massengale, Jason | |
| Moore, Ken | |
| Nimmons, Michael Brady | Mike Nova |
| Norris, Harrison, Jr. | Hardbody Harrison |
| Northcutt, Kevin | |
| Oliveira, Stephen | |
| Palumbo, Charles (Chuck) R. | |
| Reis, Ron | |
| Roll, Dean | Shark Boy |
| Roman, Sam | Rick Romeo, Kid Romeo |
| Saengsiphan, Bounthan | |
| Sanders, Mike | |
| Sapp, Bob | |
| Siaki, Sonny | Hawaiian GQ |
| Skipper, Elix | T-Lock, Venom |
| Speight, Lester | Mighty Rasta |
| Strauss, Jacobus | Jakes |
| Tatum, W. Chase | |
| Thurber, Courtright | |
| Thurber, James | |
| Tilton, Kevin | The Engima |
| Tipton, Mark | |
| Torborg, Dale | |
| Tuite, Michael Jerry | |
| Walker, Charles Franklin | |
| Walker, J. Bradley, Sr. | |
| Watkins, Joe | Vic Violent |
| White, Curtis L. | Toad |
| Wiese, Matthew | |
| Wilson, Luther | |
| Worthen, William | William Worthy |
| Wright, Chris | C.W. |
| Wright, Wesley "Shane" | |
| Yokley, Brett | |
| Yun, James | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Walker v. World Championship Wrestling, Inc., Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-0367-CC
Onoo v. World Championship Wrestling, Inc., Turner Sports, Inc.
    and Turner Broadcasting System, Inc., Civ. File No. 1:00-
    CV-0368-CC
Norris v. World Championship Wrestling, Inc., Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-0369-CC
Easterling v. World Championship Wrestling, Inc. and Turner
    Sports, Inc. and Turner Broadcasting System, Inc., Civ.
    File No. 1:00-CV-1715-CC
Davis v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1716-CC
Worthen v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1717-CC
Speight v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1718-CC
Saengsiphan v. World Championship Wrestling, Inc. and Turner
    Sports, Inc. and Turner Broadcasting System, Inc., Civ.
    File No. 1:00-CV-1719-CC
Reeves v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1720-CC
Patterson v. World Championship Wrestling, Inc., Turner Sports,
    Inc., Turner Entertainment Group, Inc. and Turner
    Broadcasting System, Inc., Civ. File No. 1:01-CV-1152-CC


CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of

*DEFENDANT UNIVERSAL WRESTLING CORPORATION'S SUPPLEMENTAL*

*RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST INTERROGATORIES TO*

*DEFENDANTS WORLD CHAMPIONSHIP WRESTLING, INC. AND TURNER SPORTS,*

*INC.* upon the interested parties by hand delivery, properly

addressed to:

1059482_1.DOC

Cary Ichter
Kelly Jean Beard
Charles Gernazian
Michelle M. Rothenberg-Williams
MEADOWS, ICHTER AND BOWERS, P.C.
Eight Piedmont Center, Suite 300
3525 Piedmont Road
Atlanta, GA 30305

This 10th day of October, 2002.

Eric A. Richardson