**ORIGINAL**

FILED IN CLERK'S OFFICE
U.S.D.C - Atlanta

JAN 3 0 2003

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

WILLIAM WORTHEN,                    )
                                    )
        Plaintiff,                  )
                                    )       Civil Action File No.:
v.                                  )       1-00-CV-1717 (CC)
                                    )
WORLD CHAMPIONSHIP                  )
WRESTLING, INC. and                 )       **JURY TRIAL DEMANDED**
TURNER SPORTS, INC.,                )
                                    )
        Defendants.                 )
_____)


**PLAINTIFF WORTHEN'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**


Cary Ichter
Charles J. Gernazian
Michelle M. Rothenberg-Williams
**MEADOWS, ICHTER & BOWERS, P.C.**
Fourteen Piedmont Center
Suite 1100
3535 Piedmont Road
Atlanta, GA  30305
(404) 261-6020



## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Worthen has established overwhelming evidence that Defendants discriminated against him, including the following:

- Defendants' principal decision-makers routinely used racial slurs, such as "nigger," and made many racially offensive remarks, revealing a racial bias against African-American wrestlers;
- WCW has been a historically racist enterprise, in which Caucasian decision-makers mistreated African-Americans without any guidelines or any human resource support to address systemic discrimination;
- WCW's principal decision-maker as to Worthen's wrestling career, Terry Taylor, routinely referred to African-Americans as "niggers," and stated that "black people wouldn't make it in the business as long as he had something to do with it," (Snakovsky[1] at 78);
- Compelling Statistical evidence that demonstrates that WCW's practices were racially discriminatory; and
- Additional evidence of race-based decision-making, racial stereotyping, and adverse treatment of African-American wrestlers.

Worthen has established direct, statistical, and circumstantial evidence that WCW engaged in a pattern and practice of discriminating against African-American wrestlers and that he was a victim of intentional racial discrimination, as well as illegal race-based decision-making. In addition, Worthen is entitled to a jury trial under the "McDonnell Douglas" method of proof and on his claim for a racially hostile work environment.

---

[1] Unless indicated otherwise, all references to a witness and corresponding page numbers will refer to the deposition on file or attached to Worthen's Exhibits.

He is also entitled to a jury trial on his claims under the Fair Labor Standards Act ("FLSA") because he had an employee-employer relationship with WCW.   Lastly, Worthen is entitled to a jury trial because Defendants' outrageous conduct inflicted severe harm upon him.

**STATEMENT OF FACTS**

I.   **WCW'S DECISION-MAKING PROCESS WAS RACIALLY BIASED**

   A.   **WCW's Exclusively Caucasian Management**

Throughout its entire history, WCW's executives and upper management were exclusively Caucasian. (Goodly at 32-33; Bischoff at 103.)   In addition to its top executives, Eric Bischoff and Vince Russo, WCW had a committee ("Booking Committee") of decision-makers ("Bookers") who selected wrestlers for WCW events and developed storylines.   (Schiavone at 13-14; Bischoff at 47-49; Smith at 13-14, 129; Disclosures of Expert Testimony of J. Steve Hicks ("Hicks Report") at 1, Tab U.)   When the Bookers selected a wrestler they wanted to promote, by providing opportunities to wrestle in main events, they provided the wrestler with a **"push."**   (Juster at 127-128; Bruce at 12-13; Hicks Report at 2-3, Tab U.)

The Booking Committee was exclusively Caucasian; WCW never had an African-American, Asian-American, or Hispanic work on the Booking Committee.   (Schiavone at 18-19; Williams at 116; Russo

at 67; Anderson at 189.)  WCW never posted an available "booking" position, and WCW employees joked that the Committee was a "good old boys network."  (Bayens at 25-26; see also Boulware at 119, Tab H (WCW officials "picked their buddies and their White counterparts and didn't hire anyone that was Black."))

Several qualified African-Americans, including Plaintiff Patterson, tried to become members of the Booking Committee, but WCW's Caucasian decision-makers denied them this opportunity. (Williams at 233-234; Anderson at 134-138; Morrison at 206-209; Smith at 95-97.)  Also, even though Pez Whatley, Kazuo Onoo, and Lash Huffman, who also have filed claims against WCW, each complained to Turner Human Resources Manager Timothy Goodly that WCW did not have any African-American Bookers, WCW never responded to their complaints.  (Whatley at 74, Tab Y; Onoo at 70-71; Goodly at 89.)  In addition to the Bookers, WCW's management was also comprised of "agents," who executed the mechanics of the match and reviewed the scripts with the wrestlers.  (Russo at 62, 67; Morrison at 24.)  WCW never had an African-American work as an agent.  (Boulware at 77, Tab H.)

## B.    Selection of Wrestlers From The Power Plant

Although many wrestlers trained at WCW's training facility, the Power Plant, WCW did not maintain any guidelines regarding

the manner in which wrestlers from the Power Plant would receive

contracts, television exposure, or wrestling opportunities:

> There was no formal process . . . could have been any
> number of ways that that might have happened . . . One way
> might have been that there was a student who caught the eye
> of booking people or the director of the power plant or
> whatever whom they thought was ready to take that next
> step.

(Juster at 126-127; see also Bruce at 82-83; Ferrara at 55.)

Brenda Smith, the administrative assistant to Power Plant

manager Jody Hamilton, testified that Hamilton distinguished

between Black and White wrestlers by using code words

"jiggerboggie" and "lackey" to designate African-American

wrestlers when he spoke to Bookers on the phone.  (Smith at 19-

22, 122.)  Smith testified that the Bookers "specifically

watched the Caucasians that Mr. Hamilton suggested."  (Smith at

132, 136.)

## II.   **WORTHEN'S RELATIONSHIP WITH DEFENDANTS**

### A.   **WCW Selects Worthen to Train at the Power Plant**

Worthen became interested in training to become a

professional wrestler and contacted the Power Plant to inquire

about the process.  (Worthen at 15, 62.)  WCW informed him that

he needed to pay $250 to "try out," but if he made it through

the tryout and "[WCW] thought he was good enough to be a WCW

superstar, [WCW] would invite him back for a fee of $3,000 and

[WCW] would train him for six months or for ever how (sic) long it took."  (Id.)

Pursuant to these instructions, Worthen attended a tryout at the Power Plant.  (Id. at 23.)  After his tryout, WCW trainers, Jody Hamilton, Dwayne Bruce (pka "Sergeant Buddy Lee Parker"), Pezean Whatley and Mike Wenners told Worthen that "they liked what they saw in the tryout and that they would like to have him back to train."  (Id.)  He was again told that the WCW training program would take about six months.  (Id. at 24.)

Because Worthen was excited about the prospect of becoming a "WCW superstar," he made a $1,000 down-payment to begin training at the Power Plant and paid the remaining fees in $400 monthly installments.  (Id. at 24-25; Worthen Aff. ¶ 5, Tab A.) To satisfy WCW's request that he train "full time," Worthen quit his job at the Department of Corrections and began attending the Power Plant on a full-time basis.  (Worthen at 26, 43, 114; Worthen Aff. ¶ 6, Tab A.)  For over two years, Worthen traveled 214 miles round-trip each day to attend the Power Plant. (Worthen at 38, 114.)

**B.    Worthen Performs Janitorial Tasks Without Compensation**

Although Worthen paid WCW $3,000 to train, WCW required him to spend much of his time at the Power Plant performing janitorial and other menial tasks, such as sweeping the floor,

- 5 -

tightening the ropes on the wrestling ring, sweeping mats, picking up trash, and loading/unloading delivery trucks. (Id. at 28, 30, 94, 99-100, 112-113; Bruce at 20-21.) Indeed, during the course of a "normal day" of "training", WCW required him to perform some or all of these tasks and, in some instances, spend entire days performing this work. (Worthen at 28; Bruce at 20-21.) WCW did not compensate Worthen for any of this work. (Worthen Aff. ¶¶ 8, 9, Tab A.) WCW simply used him for free labor. (Id.)

At the same time that it was utilizing Worthen for free labor, WCW continued to tell Worthen that he needed to be at the Power Plant "full time" to successfully "train" to become a professional wrestler. (Worthen at 43, 114.)

## C.   **Worthen is Exposed to WCW's Racially Biased Conduct**

Unlike Worthen and other African-American trainees, WCW's Caucasian trainees did not perform janitorial tasks and menial labor. (Worthen at 46-47.) Neither were they required to attend the Power Plant "full time." (Id. at 43.) Indeed many of the Caucasian trainees did not show up at the Power Plant at all. (Williams at 45 (testifying that certain Caucasian wrestlers, including David Flair, received a "push" from WCW even though "he wouldn't come to training. And he told them he wasn't coming, and didn't have to, but the black guys did");

Walker Aff. ¶ 7, Tab HH;  Worthen at 64-66; Worthen Aff. ¶ 11, Tab A.)

Despite the fact that WCW's Caucasian trainees refused to or were not required to train at the Power Plant, however, WCW "pushed" these wrestlers, by providing them with opportunities to participate in televised wrestling programs, playing introductory music to signal their entry into the ring during wrestling matches, scripting them to perform in longer wrestling matches, scripting them to win matches, providing them with the opportunity to "speak on the mic," and generally giving them the opportunity to get their characters "over" with the fans. (Worthen at 64, 86, 88.)

Also, WCW offered contracts to the following Caucasian wrestlers, all of whom began at the Power Plant at the same time as *or after* Worthen without having had any previous wrestling experience: "Horshoe," Joseph Bradley Kane pka "Lodi," Evan Karogias pka "Evan Courageous," "Spiderman", John Greene pka "Johnny Attitude," Dale Torberg pka "The Daemon," Scott Chasser pka "Lorenzo," Brett Hammer, Robert Vick pka "Sickboy," William Tatum pka "Chase Tatum," Sammy Roman pka "Kid Romeo," Mark LeRoux pka "Lash LaRue," Mike Sanders, "Kiwi," Chuck Palumbo, Luther "Big Sexy" Biggs, Mark Jindrek pka "Mark Millennium," Rick Cornell pka "Reno," Jacobus Strauss pka "Jake," Joan Hugger

- 7 -

pka "Johnny the Bull," Craig O'Malley pka "Irish Invasion," and Bill Goldberg.  (Worthen Aff. ¶ 12, Tab A)

At the same time as WCW offered contracts to Caucasian wrestlers with less training experience than Worthen, WCW trainer, Whatley, explicitly told him that because he was black, he would have to work "as hard or even harder" as Caucasians trainees to succeed at WCW.  (Worthen at 90-92.)

Worthen also learned of the negative racial attitudes exhibited by WCW's management.  During one match, a WCW announcer referred to Worthen as "Willie B," which was the name of the famous gorilla at the Atlanta zoo.  (Id. at 101.) Despite having the opportunity to edit this reference before the match aired on television, WCW chose to leave the reference unaltered.  (Id. at 101.)  When Worthen complained about this incident to the WCW trainers, they simply laughed.  (Id. at 102.)  Worthen also witnessed Marcus Bagwell's performance in "black face."  (Id. at 103).  He again complained about this incident to the WCW trainers, who again laughed.  (Id. at 104.) Worthen also learned that African American Rocky King had complained to WCW that a Caucasian employee, Doug Dillinger, had called King a "nigger" and that WCW had not responded to King's complaints in any way.  (Worthen at 104; Worthen Aff. ¶ 27, Tab A.)

### D.   **Worthen Successfully Learns to Wrestle**

Notwithstanding the fact that WCW required Worthen to spend "training" time performing menial tasks and to train in a racially hostile work environment, Worthen successfully learned to wrestle.  WCW trainer Bruce described Worthen as a "heck of a talent."  (Bruce at 67.)  He was impressed by Worthen's abilities, speaking capabilities and personality.  (Id. at 68.) After watching Worthen in a match against "Hacksaw" Duggan, Bruce told Worthen that he was "one of the best guys" at the Power Plant.  (Worthen at 33.)

When Worthen was forced to leave the school for a few weeks to seek employment, Bruce contacted Worthen and asked him to return to the school and again stated that he was "one of the best guys in the school."  (Id. at 36-37.)  Indeed, Bruce consistently told Worthen that he was the best trainee at the Power Plant.  (Id. at 92-93.)  Bruce testified that he would have used Worthen had he been the head Booker: "I would give Willie a shot no matter what show it was.  I would give Willie a shot."  (Bruce at 69.)  Bruce further testified that he would "definitely" use Worthen in the independent wrestling association that he is currently working to establish.  (Bruce at 109.)

Other individuals also noticed Worthen's talent.  Trainer
Mike Wenner told Worthen that he was working well at the Power
Plant and that "things would work out for him."  (Worthen at
93.)  Trainer Whatley told Worthen that he was good enough to
receive a contract but that WCW's failure offer him one was
"just the way things went down there."  (Id. at 90-92.)

WCW's talent evaluations of Worthen were consistently and
resoundingly positive.  (See Pls.' Ex. 11, Tab B (talent
evaluator describing Worthen: "Willie looks good.  Has a great
attitude.  Works very well in the ring . . . .")[2]; Pls.' Ex. 12,
Tab C (evaluation stating that Worthen has "been successfully
used on the WCW wrestling program," and describing his character
as "fast moving, charismatic, aggressive- comes to the ring to
look good as well as to win every match; Powerful and graceful
at the same time"); Pls.' Ex. 13, Tab D (evaluation describing
Worthen as a "good solid worker . . . looks like an athlete, his
'gimmick' is his solid convincing work in the ring."))

Similarly, after wrestling against Worthen, Caucasian
wrestler "Hugh Morris" commented to WCW trainers Whatley and
Bruce that Worthen was "one of the best guys he [had] wrestled
from the school."  (Worthen at 34-35.)  After this match, one of

---

[2]     Brenda Smith, the administrative assistant at the Power Plant,
testified that WCW trainer Mike Wenner completed the "comments" in the series
of talent evaluation that were created on the same form and in the same
fashion as Plaintiffs' Exhibit 11.  (Smith at 65-71.)

the Bookers, Jimmy Hart, also told Worthen that every time he saw Worthen wrestle, Worthen got "better and better." (Id. at 42.)   Famous Caucasian wrestler Bill Goldberg also commented that Worthen had potential. (Id. at 36, 109-111.)

Indeed, even Terry Taylor, who was notoriously racist and had openly expressed his dislike for African-American wrestlers, (see infra pp. 15-17), and Martin Lunde pka Arn Anderson, who was also racist, (see infra pp. 19), acknowledged that Worthen was athletic and a good wrestler. (Worthen at 34-36, 90-92, 109-111).  When asked about Worthen's positive talent evaluations, Taylor could not refute any of the comments made about Worthen. (Taylor at 120-124.)

Taylor refused to give Worthen a contract, however, and did nothing to "push" Worthen or to provide him with opportunities to succeed. (Worthen Aff. ¶ 16, Tab A.)  Taylor persisted in his refusal despite the repeated recommendations of the WCW trainers. (Worthen at 35 (testifying that Bruce and Whatley commented that they had tried to tell WCW management that Worthen was qualified but that management would not listen); Bruce at 69 (testifying that he went out of his way to recommend Worthen to Terry Taylor and other members of the Booking Committee.))

**E.   WCW Will No Longer Permit Worthen to "Train"**

Over the course of the two years in which he had been training at the Power Plant, WCW paid Worthen a total of $4,900 for his performances in wrestling matches. (Worthen at 74; Defs.' Ex. 6, Tab E.)  After two years of "training" at the Power Plant, Worthen had completely depleted his life savings and needed an income to support himself, his family and his efforts to continue his "training" at the Power Plant. (Worthen Aff. ¶ 17, Tab A.)  For this reason, Worthen sought out part-time employment.  He continued, however, to travel the 214 miles required for him to train at the Power Plant. (Id. ¶ 17, Tab A.)

Many Caucasian trainees who had trained at the Power Plant for less than two years refused to show up for training, explaining that they needed to find employment to support themselves. (Walker Aff. ¶ 11-12, Tab A.)  These wrestlers still received contracts from WCW. (Id.)

It was only after Worthen learned that WCW would not allow him to continue to train at the Power Plant that he discontinued his training altogether. (Worthen at 140-142; Worthen Aff. ¶ 18, Tab A.)  He remained, however, ready, willing and able to wrestle for WCW and would have signed a contract with WCW had WCW ever offered him one. (Worthen Aff. ¶ 19, Tab A.)

- 12 -

## ARGUMENT AND CITATION OF AUTHORITY

Summary judgment is improper "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact," Cornelius v. Town of Highland Lake, 880 F.2d 348, 351 (11th Cir. 1989), or if reasonable minds could differ on the inferences arising from undisputed facts, see Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992). In assessing the record, the Court may not weigh evidence or make credibility determinations. See Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 181 (11th Cir. 2001). In sum, Rule 56 merely requires Worthen to present "sufficient evidence" to require a fact-finder to resolve the "parties' different versions of the truth at trial." First Nat'l Bank v. City Serv. Co., 391 U.S. 253, 288-289 (1968).

## I.    PLAINTIFF IS ENTITLED TO A JURY TRIAL BECAUSE HE HAS PRODUCED OVERWHELMING EVIDENCE OF INTENTIONAL DISCRIMINATION.

Defendants erroneously imply that Worthen is restricted to proving discrimination under the methodology set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 798 (1973). Plaintiff is not, however, restricted to one method of proving discrimination. See U.S. Postal Service Bd. of Gov. v. Aikens, 460 U.S. 711, 715 (1983) (noting that the McDonnell Douglas

framework is "merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination"); see also, Costa v. Desert Place, Inc., 299 F.3d 838, 855 (9th Cir. 2002) ("nothing compels the parties to invoke McDonnell Douglas").

Rather, a plaintiff can rely on pattern and practice, direct, and/or McDonnell Douglas evidence to prove discrimination.  Worthen has established each of these types of evidence, and thus shows that he can easily persuade a trier of fact that Defendants discriminated against him, which is all he is required to do.  See Aikens, supra at 716 (stating that trial courts should not treat discrimination "differently from other ultimate questions of fact").

### A.    EVIDENCE OF A PATTERN AND PRACTICE OF DISCRIMINATION

Worthen can demonstrate a "pattern and practice" of discrimination.  As a result, "a rebuttable presumption that each plaintiff was a victim of discrimination obtains, and the burden shifts to the employer to prove that each individual employment decision was not made in furtherance of its illegal policy." Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208,

1227-28 (11th Cir. 2001).[3]

A plaintiff is allowed to a prove pattern and practice of discrimination through (1) direct evidence; (2) statistical evidence, and/or (3) anecdotal evidence that reveals the employer's "intent" to treat a protected class unequally.  See EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286-1287 (11th Cir. 2000).  Worthen has established compelling evidence in each category, as shown below.

### 1.   **Direct Evidence**

Worthen can establish a pattern and practice of discrimination through direct evidence because WCW's principal decision-makers, Terry Taylor, Eric Bischoff, and Vince Russo, as well as the Bookers, made numerous remarks and statements that constitute direct evidence of racial discrimination against all African-American wrestlers, including Worthen.

As to Taylor, arguably the most influential decision-maker as to Worthen,[4] the record is replete with his blatant

---

[3]     Although "pattern and practice cases" are ordinarily raised by the Equal Employment Opportunity Commission ("EEOC"), or by class action plaintiffs, the courts have also allowed plaintiffs in individual cases to prove discrimination through "pattern and practice evidence."  See Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1559 (11th Cir. 1986)(noting that although pattern and practice cases usually involve class actions, the individual plaintiffs showed a "pattern and practice" where sex discrimination was "the company's standard operating procedure"); see also Tye v. Houston County Bd. of Educ., 681 F. Supp. 740, 745 (M.D. Ala. 1987) (finding an that individual plaintiff was entitled to presumption of discrimination where she established a pattern and practice of sex discrimination).

discriminatory remarks, the intent of which "could be nothing

other than to discriminate on the basis of [race]." Bass v. Bd.

of County Comm., 256 F.3d 1095, 1105 (11th Cir. 2001).   Examples

of Taylor's offensive racial bias include the following:

- He told African-American wrestler Bobby Walker, "you're a nigger and you have no talent." (Snakovsky at 76.)
- When informed that Walker had complained that he was racially biased, he stated, "I don't know if I'm a racist but I know that . . .[h]e's a nigger with no talent." (Bayens at 19.)
- He stated that neither Walker nor African-American wrestler, "Hardbody" Norris would make it in the wrestling profession because they were "black." (Snakovsky Aff. ¶ 7, Tab J.)
- When Walker jumped off the ropes in a match, he stated, "that nigger, he's not good for jumping, so he should go play basketball too." (Snakovsky at 83-84.)
- He repeatedly told African-American wrestler Ernest Miller that even though he was a good athlete, "the only reason you got a job is because you're black" and that "this company don't market toward blacks; we only have white fans, and [they're only going to] look at you as a nigger." (Miller at 66, 101.)
- He gave his opinion that black wrestlers "weren't much of a draw." (Bayens at 19, 62-63.)
- He stated that black persons had great physiques because they were genetically inclined, but that he questioned their ability to wrestle. (Bayens at 21-22, 64-65.)
- He stated that Ernest Miller was "another nigger with no talent." (Bayens at 20.)
- He stated that black wrestlers "shouldn't be in our sport, they should be in basketball." (Snakovsky at 78.)
- He stated that "as long as he had something to do with it," "a lot of black people wouldn't make it in the business because they are black." (Snakovsky at 78.)
- When renowned wrestler Hulk Hogan was scheduled to begin at WCW, Taylor stated that he did not want any black wrestlers

---

[4] Taylor was known as the "top" or "head" Booker; the other Bookers were subordinate to him.  (Miller at 197-198.)

on the show to take away from Hogan's limelight.   (Williams
Aff. ¶ 40, Tab X; Williams at 54-57.)

- In reference to Norris, he stated, "that damn Hardbody is a no good nigger."  (Snakovsky at 108, 140; Snakovsky Aff. ¶ 18, Tab J.)

- Taylor used the "nigger" word quite a bit.  (Anderson at 107).

- When watching a match involving Ernest Miller and Sonny Onoo, he stated, "there's a nigger and a Jap.  Who's going to want to watch that?"  (Bayens at 67; Miller at 148-149.)

- He referred to African-American wrestlers as "that stupid nigger" and often used the word "nigger" when he was talking to other WCW officials.  (Anderson at 85, 172-173.)

- When a Caucasian was scheduled to replace an African-American, he stated, "don't worry about the niggers, I'll take care of that."  (Williams at 110.)

- He gave his opinion that wrestling fans are "white" and that blacks don't buy wrestling tickets."  (Williams at 111, 114-116; Williams Aff. ¶ 14, Tab X.)

- On a very cold winter day, he stated that "you better turn on the air conditioner because you know those niggers can't take the cold."  (Carr at 92-93,Tab I.)

- When African-American wrestler Tony Carr was going to participate in a WCW event in Montana, Taylor stated that "no one would believe there were niggers in Montana." (Carr at 139, Tab I.)

- Apparently referencing a demographic survey that was done by a Turner Defendant, Taylor informed African-American Rocky Boulware that "Turner told us we don't need to use you all niggers."  (Boulware at 71, 124-125, Tab H.)

WCW President Eric Bischoff also made many statements that

unequivocally reveal his intent to discriminate:

- He stated that wrestling was a "white man's sport" and that was why WCW did not have many black wrestlers.  (Williams Aff. ¶ 12, Tab X.)

- He stated that blacks were not paying to watch WCW events live and that they would rather watch it on TV. (Anderson at 177; Walker at 178.)

- When observing Plaintiff Norris, he stated that "that's too niggerish for my television." (Anderson at 90, 177-178.)

- When observing another African-American wrestler, he stated that "we need to get that crack nigger off the TV." (Anderson at 76-77, 202.)
- He used the word "nigger" in relation to wrestlers on more than one occasion. (Kearce at 42.)
- On one occasion, while removing African-American wrestlers from the schedule, he indicated that it was "white night." (Whatley at 132-134, Tab Y; Smith at 57; Walker at 177-178.)
- When Plaintiff Patterson tried to get a job at WCW, he told him that "we don't need no niggers." (Patterson at 76, 93.)
- He instructed Bookers not to worry about "pushing a black or a nigger." (Anderson at 177.)
- He asked why WCW was "pushing some of the blacks and some of the niggers on our television show?" (Anderson at 74-75.)

Similarly, <u>Vince Russo</u>, Bischoff's successor, made racist remarks, demonstrating his intent to discriminate:

- He agreed that African-American wrestlers were not as good workers as the white wrestlers. (Snakovsky at 82.)
- He often used racial slurs, including "nigger" when referring to wrestlers. (Sullivan at 55-56.)
- He called African-Americans "Moolions," referring to a tribe from Africa. (Sullivan at 56.)
- He indicated his racial bias by specifically referring to African Americans as "blacks" or "the brothers." (Williams at 94-96.)
- He stated that "whites rule wrestling." (Williams Aff. ¶ 12, Tab X.)
- He stated that "black folks don't buy wrestling tickets anyway, wrestling fans are white." (Williams at 94-96.)
- He indicated that WCW was going to have a "white champion" because that was the way he wanted it. (Williams Aff. ¶ 12, Tab X.)
- He used the word "nigger" on more than one occasion. (Kearce at 38.)

Thus, Taylor's, Bischoff's and Russo's statements are direct evidence of discrimination, as they reveal racial

discrimination against African-American wrestlers, without any inference or further inquiry. See Price Waterhouse v. Hopkins, 490 U.S. 220 (1989) (finding direct evidence of discrimination where a decision-maker believed that women were not capable of functioning as senior managers); Haynes v. WC Kaye and Co., 52 F.3d 928, 930-31 (11th Cir. 1995) (finding direct evidence where decision-maker stated that "women were simply not tough enough" and that it would "require a man to do the job"); Caban-Wheeler v. Elsea, 904 F.2d 1549, 1555 (11th Cir. 1990) (finding discrimination where decision-makers stated that the program "needed a black director").

Lastly, the Bookers' constant and frequent use of racial slurs, including "nigger," (see Sullivan at 13-14; Yother at 13-16; Smith at 131; Anderson at 83-84, 109-111, 174-175; Boulware at 49-50, Tab H; Juster at 116-117; Williams at 252; Schiavone at 16-24; Walker at 210-211; Kearce at 29, 31-33, 41), also constitutes direct evidence of discrimination. See Miles v. MNC Corp., 750 F. 2d 867, 873-76 (11th Cir. 1985) (characterizing evidence of racially derogatory remarks as direct evidence).

## 2.    Statistical Evidence

Through the expert testimony of Dr. David W. Rasmussen, Worthen has produced convincing statistical evidence that WCW discriminated against African-Americans.  Dr. Rasmussen

concluded that WCW's practices produced standard deviations that were "far beyond" the norm, indicating that chance did not account for the under-representation of African-Americans at WCW. [5]   (See Suppl. Rep. Pls.' Test. Dr. Rasmussen ("Rasmussen Supplement") at 5, Tab N.)

Indeed, even using the most conservative benchmark for the available applicant pool -- a document provided by WCW that ostensibly listed the individuals who trained at the Power Plant from 1996-2000[6] -- produced a standard deviation outside the norm.  This document showed that 17.1% of the trainees at the Power Plant were African Americans.[7]  (See Id. at 4.)    Given this percentage, Dr. Rasmussen compared the number of African-Americans that would be expected to be hired by WCW absent discrimination to the actual number of African-Americans hired. His analysis revealed a -5.26 standard deviation from the expected number.  (See Id.)  Importantly, anything greater than a 2.00 standard deviation is considered statistically significant.  (See Id.)  The standard deviation jumped to -6.65

---

[5]    Dr. Rasmussen also points out that all of the benchmarks used in his study could mask discrimination to some degree because African-Americans could have been discouraged from trying out at the Power Plant due to WCW's reputation for discriminating -- the "chilling effect."  (See Pls.' 26(a)(2) Discl. Rasmussen ("Rasmussen Report") at 4 fn. 2, 6-7, Tab JJ.)
[6]    WCW has taken the position that it cannot conclusively identify all of the trainees at the Power Plant.  Thus, the number of African-American might be higher than what is represented on the list.
[7]    Dr. Rasmussen notes that this might not accurately reflect the number African-Americans who applied to WCW because WCW could have discriminated against African-Americans in its selection of trainees at the Power Plant. (See Rasmussen Report at 7, Tab JJ.)

when the number of years a given wrestler actually received a
salary was used as the unit of analysis.  (Id. at 8.)  He
concluded that his analysis "strongly suggest that African-
Americans are significantly under represented among wrestlers at
WCW."  (Id.)

Worthen's statistical evidence, therefore, further
establishes a pattern and practice of discrimination.  See EEOC
v. Joe's Stone Crab, Inc., supra, at 1287.

### 3.   Anecdotal Evidence

In addition to direct and statistical evidence, Worthen has
also established ample anecdotal evidence of discrimination:

### a.   Racial Bias in WCW's Decision-Making Process

WCW allowed exclusively Caucasian decision-makers to use
informal methods of selecting its wrestlers, (see infra pp. 2-
4), which further demonstrates a pattern and practice of race
discrimination.  See Rowe v. General Motors Corp., 457 F.2d 348,
359 (5th Cir. 1972); see also, Robert's v. Gadsden Memorial
Hospital, No. 86-382b, 1988 U.S. App. LEXIS 19507 at *14-15 (11th
Cir. 1988) (stating that defendant's informal methods of
selection "necessarily and intentionally favored those who moved
within his social circles - i.e., white people").

In Rowe, the Court held that the defendant's exclusively
Caucasian, and completely subjective decision-making process,

was a "ready mechanism for discrimination against blacks, much
of which can be covertly concealed, and for that matter, not
really known to management." Rowe at 359.  The Court further
noted that "we and others have expressed a skepticism that black
persons dependent directly on the decisive recommendations from
whites can expect non-discriminatory actions." Id.  Similarly
here, WCW's exclusively Caucasian decision-makers were able to
readily perpetuate the dominance of Caucasian wrestlers.

    Significantly, although the Turner Defendants provided
Human Resource managers to assist WCW, these managers did not
even have "any official duties as related to [wrestling]
talent." (Goodly at 63.)  Loretta Walker, a Turner Human
Resource manager assigned to WCW, testified that she was not
responsible for preventing discrimination against wrestlers.
(L. Walker at 12-13.)  Indeed, no Turner or WCW employee/officer
took any responsibility for ensuring that African-American
wrestlers were being treated fairly, which constitutes evidence
of discrimination. [8]  See Rowe at 359 (finding that Defendants'
decision-making process violated Title VII, in part, because

---

[8]     The witnesses are completely inconsistent as to who, if anybody, was
responsible for ensuring that the wrestlers were not victims of
discrimination.  Compare Goodly at 65-67 (testifying Bischoff and possibly
Myers and Busch were responsible) with Loretta Walker at 21 (testifying that
although she was Human Resource Manager for employees, she did not know who
was responsible for protecting wrestlers from discrimination).

"there are no safeguards in the procedure designed to avert discriminatory practices").

### b.   Scripting and Staging of Wrestling Events.

WCW's pattern and practice of discrimination is also illustrated in the manner in which it scripted its matches. Perhaps most illustrative is when WCW directed a Caucasian manager, Colonel Parker, to dress like a "southern gentleman" and lead his African-American wrestling tag team, "Harlem Heat" into the arena shackled in chains.   (See Kearce at 34-36 (noting that the wrestlers were "dressed like slaves," and Colonel Parker was dressed like a "slave owner."))

Also, during a "main event," WCW instructed a Caucasian wrestler, Buff Bagwell, to appear in the ring with his face painted black to mock African-American Ernest Miller.   Taylor commented to Miller: "he [looks] like you.  He look[s] like a nigger."  (Miller at 149.)   Some WCW officials also wanted African-American wrestlers to dress like "pimps" based upon the racial stereotype that black men are pimps.   (Miller at 194-195; Norris at 180.)

### c.   Racial Bias at WCW's Power Plant

Although Caucasian "rookies" may have performed limited manual labor at the Power Plant, the evidence establishes racial disparities regarding the comparatively greater amount of

physical labor performed by African-American wrestlers.  (Smith
at 27-28; Davis at 77; Worthen at 46-47; Worthen Aff. ¶ 11, Tab
A.)   If an African American trainee did not perform the labor
requested or faltered in any way, the managers believed that he
had a "bad attitude," but white wrestlers often left early
without doing physical work and were given second chances to
correct mistakes.  (Walker at 102-103; Whatley at 101, Tab Y.)

> **d.    WCW Deflects Allegations of Discrimination.**

Throughout its entire history, the only two times that WCW
made an African-American its "heavyweight champion," were in
response to a charge of or suit for racial discrimination.  In
January 1992, WCW received notice of an EEOC charge filed by
African-American wrestler Ranger Ross.  (Ross EEOC Charge, Tab
G.)  In response, WCW made another African-American, Ron
Simmons, its first African-American heavyweight champion.  (List
of Champions, Tab F.)  WCW official Olie Anderson admitted that
WCW promoted African-Americans at that time to respond to racial
complaints.  (See Anderson Interview, Tab Z (explaining that a
WCW official stated, "we've taken a black team and we've made
them champion so that they wouldn't have any bitch from a racial
point of view."))

Similarly, after Walker and Norris filed complaints of race
discrimination, WCW once again responded by making an African-

American, Booker T, the heavyweight world champion.

Significantly, Taylor told Russo that he wanted to "take the heat off" the racial allegations. (Snakovsky Aff. ¶ 20, Tab J; Snakovsky at 99-100.) Indeed, virtually every witness agrees that the circumstances under which Booker T became the champion were very unusual. (Williams at 151-160, 165; Schiavone at 22-26.)[9]

Thus, a reasonable jury could conclude that WCW's conduct in belatedly and reluctantly promoting African-Americans to deflect allegations or race discrimination further shows that it discriminated against African-Americans.

### e.   WCW Personnel Admit to Discrimination

Turner's Human Resource manager, Goodly, admitted to Plaintiff Walker that he was aware of discrimination at WCW, but apparently was unable to prevent it because he "had a job too."

---

[9]   WCW's actions after Booker T became the champion are also revealing. For example, Schiavone recalls conducting an initial interview with Russo about Booker T's championship, but WCW did not air this interview. (Schiavone at 29-33.) Instead, it directed Schiavone to tape a second interview. (Id.) As to the initial interview, Assistant Producer Michelle Bayens stated:

> I knew that when the tape came back and they put it up and I asked about why all the secrecy, and they said because there was a lot of discriminating things, or that could be construed as discriminatory within the interview, so they - the powers that be had to take a look at it to see whether it could air or not. And a second interview was shot just in case.

(Bayens at 99.) Bayens further recalls, "I know they talked about him [Booker T] being Black and if that was an issue. I don't remember the answers." (Bayens at 104.) She also states, "yes, it was a great concern." (Bayens at 100-106.)

(Walker at 254.)  Goodly also noticed a lack of diversity in the
upper talent at WCW, (Goodly at 69-73), and suggested to
Bischoff that WCW should get a "fresh set of eyes," such as
Konan (Hispanic) or Booker T (African-American) on the Booking
Committee, (Goodly at 89-91).  Goodly acknowledged that WCW's
practice of not using African-Americans as world champions might
be a "red flag of discrimination." (Goodly at 95-97; see also
Goodly at 176 ("I just didn't think we had strategies in place
to market diverse talent, to market all talent as well as the
competition."))

     In addition, other WCW employees knew about the obvious
discrimination and racism at WCW.  (See Bayens at 94 ("When you
take a step back . . . [minority wrestlers] were treated less
favorably or weren't promoted because of the color of their
skin"); Kearce at 27-28 (testifying about "bigotry" and "racism"
at WCW); Collins Aff. at ¶¶ 3-5, Tab AA (observing that
"Caucasians dominated WCW."))

### f.   Discrimination in Merchandising

     Worthen has established evidence that WCW disparately
merchandised its wrestling products, such as T-shirts and other
props, based on race.  (Miller at 117-119; see also, Williams at
69-72 (testifying that although many of the younger fans

requested more merchandise for the African-American wrestlers,
WCW did not adequately merchandise for minority wrestlers.))

Moreover, WCW officials Taylor and Arn Anderson admitted
that WCW did not merchandise items for African-Americans because
black people "don't buy anything when they come to the show" and
"white people ain't [going] buy merchandise T-shirts with black
faces on it."  (Miller at 120.)

### g.   Discrimination Against Other Employees

In considering WCW's pattern and practice of racial
discrimination, evidence that WCW discriminated against African-
American non-wrestling employees is also revealing.  WCW only
employed about 12% African-Americans.  Of these, only two were
mid-level managers, and none were senior managers.  (See Smith
Aff. ¶ 8, Tab KK; Collins Aff. ¶ 4, Tab AA.)  Indeed, even
Goodly acknowledged that minority representation at WCW was not
"consistent with what [he] knew to be good HR practice."
(Goodly at 49.)

In addition:

- WCW routinely favored Caucasian personnel who had less
  experience than more qualified African-Americans.  (Smith
  at 39-42, 44-45, 151-152, 180-181, 189; Williams at 217-
  222.)
- WCW's Security manager, Doug Dillinger, expressly refused
  to hire a "black" security person.  (Williams at 134-135;
  Carr at 111, Tab I.)
- A Caucasian supervisor requested security personnel to
  check the bags and belongings of African-Americans, but did

not similarly request that the security personnel check the belongings of the Caucasians.  (See Neal Aff. ¶ 7, Tab LL.)

Accordingly, only a jury can decide whether all of the above-described anecdotal evidence, when considered collectively, demonstrates a pattern and practice of racial discrimination. See Hipp v. Liberty National Life Ins. Co., 252 F.3d 1208, 1227-28 (11th Cir. 2001) (the proper method of adjudicating pattern and practice cases is to submit a verdict form to the jury).

### B.   **WORTHEN IS ENTITLED TO A JURY TRIAL BECAUSE HE HAS ESTABLISHED DIRECT EVIDENCE OF RACE DISCRIMINATION**.

Even if the Court does not find evidence of a "pattern and practice of discrimination," the above-referenced evidence, (see supra at pp. 13-28), nevertheless constitutes direct evidence of discrimination against Worthen, making summary judgment inappropriate.  See Taylor v. Runyon, 175 F.3d 861, 866 (11th Cir. 1999) (stating that judgment as a matter of law is not appropriate where non-movant presents direct evidence).

As noted above, WCW's principal decision-makers, Taylor, (who was the principal decision-maker as to Worthen), Bischoff, and Russo each made blatantly discriminatory remarks that establish "the existence of discriminatory intent behind their adverse decisions" regarding Worthen "without any inference or presumption."  Standard v. ABEL Serv., Inc., 161 F.3d 1318, 1330

(11th Cir. 1998).  Moreover, Russo's, Bischoff's and Taylor's
remarks demonstrate a fundamental belief that African-Americans,
as a class, were not as suited for the wrestling business as
were Caucasians.  Thus, Worthen has established direct evidence
that WCW discriminated against him and summary judgment is
inappropriate.  See Burrell v. Bd. of Trustees, 125 F.3d 1390,
1394 n.7 (11th Cir. 1997) ("such statements because of their
breadth -- may obviate the need for inferences about the
speaker's motivation for a wide category of employment
decisions"); see also EEOC v. Alton Packaging Corp., 901 F.2d
920, 924 n.6 (11th Cir. 1990) (decision-makers comments
constituted direct evidence where the statements indicated "a
decidedly negative attitude toward black people").

### C.   WORTHEN IS ENTITLED TO A JURY TRIAL UNDER THE MCDONNELL DOUGLAS METHOD OF PROOF.

#### 1.   Worthen Can Establish a Prima Facie Case of Discrimination.

Erroneously characterizing Worthen's claims as "failure to
promote" or "failure to hire" claims, Defendants argue that
Worthen cannot establish a prima-facie case of discrimination
because he is purportedly not qualified for the "position"
sought and cannot establish that he was more qualified than any
similarly situated Caucasian who was so hired.  (See DB at 13-
17.)  Defendant's argument fails.

- 29 -

First, Worthen was qualified.  Even though WCW refused to push him, Worthen can still show that he was more qualified than Caucasian wrestlers who received a push.  Numerous individuals within WCW's own organization commented that Worthen was athletic, entertaining, a good wrestler, and "one of the best" trainees at the Power Plant.  (Worthen at 33-37, 90-93, 109, 111.)  WCW trainer Bruce called Worthen a "heck of a talent" and stated that he would have "given Willie a shot no matter what show it was" had he been the head Booker.  (Bruce at 68.) Indeed, because he was so impressed with Worthen's physical and speaking capabilities and personality, Bruce went out of his way to recommend Worthen to Terry Taylor and the Booking Committee. (Bruce at 67.)

Moreover, WCW's talent evaluations of Worthen were consistently and resoundingly positive.  (See Pls.' Ex. 11, Tab B (talent evaluator describing Worthen: "Willie looks good.  Has a great attitude.  Works very well in the ring . . . ."); Pls.' Ex. 12, Tab C (evaluation stating that Worthen has "been successfully used on the WCW wrestling program" and describing his character as "fast moving, charismatic, aggressive- comes to the ring to look good as well as to win every match; Powerful and graceful at the same time"); Pls.' Ex. 13, Tab D (Hamilton's evaluation describes Worthen as a "good solid worker . . . looks

like an athlete, his 'gimmick' is his solid convincing work in the ring."))

Thus, contrary to Defendants' assertions, Worthen is not relying on "nothing more than his own subjective opinion," (DB at 16), to show that he was qualified. Moreover, given that its own trainer has testified that Worthen was "one of the best" trainees at the Power Plant, and the undisputed fact that other trainees at the Power Plant received contracts from WCW, (see Worthen Aff. ¶ 12, Tab A; Suppl. Resp. Pls.' First Interr. No. 3, Exs. A and B, Tab MM), WCW cannot credibly argue that Worthen has not established that he was qualified to wrestle for WCW.

Second, a wrestler's success was limited only by the creative imaginations and intentions of the Caucasian Bookers. (See Sullivan at 35 (testifying to the fallibility of process because matches were "not real"); see also Hicks Aff. ¶¶ 9-11, Tab II.)  Indeed, WCW made an actor, David Arquette, its world heavyweight wrestling champion even though Arquette had no demonstrable "wrestling" experience.  As noted by a WCW producer, WCW could have made Worthen a superstar because WCW can "make anybody they want to a superstar."  (Kearce at 82.)  Thus, the determination that a particular wrestler was "qualified" had more to do with WCW decision to "push" that wrestler than anything else.

Third, with respect to comparator evidence, this Court should not compare Worthen's qualifications with Caucasians after they received the very opportunities that WCW denied Worthen.  Rather, the Court must allow a jury to decide whether Worthen was as qualified as Caucasian wrestlers before WCW gave them the "push."  Indeed, all of the Power Plant wrestlers were relatively inexperienced at wrestling before live or televised audiences and needed regular television exposure to succeed. (Ferrara at 51.)  For example, WCW provided significant microphone training and instruction to its biggest Power Plant success, Bill Goldberg.  (Bruce at 44; Walker at 105).

Finally, contrary to Defendants' assertions, Worthen is not alleging that he was denied promotion to one particular position, but that WCW discriminated against him regarding the terms and conditions of his employment, the training provided to him under the Training Contract and by failing to offer him a contract to wrestle or the training, exposure, and "push" that was provided to Caucasians.

Moreover, the cases upon which Defendants rely to support the argument that Worthen must be "obviously more qualified" than a particular caucasian relate to situations where a plaintiff's sole evidence of discrimination is the comparison of his/her qualifications to the person that received a particular

position.  See e.g., Dennis v. Columbia Colleton Medical Center,
290 F.3d 639, 648 (4th Cir. 2002) (evidentiary standard that a
plaintiff's superior qualifications must "slap one in the face"
only applies where a plaintiff's "sole evidence of pretext is
the superior qualifications of the plaintiff") (emphasis
provided).  Because comparison evidence is not Worthen's sole
evidence of discrimination, see infra pp. 13-32, these cases are
inapposite to Worthen's claims.

Thus, Worthen has established a prima facie case of
discrimination, especially in light of his statistical evidence
and Defendants' subjective decision-making process. See Crawford
v. Western Electric Co., 614 F.2d 1300, 1315-1320 (Former 5th
Cir. 1980) (plaintiffs established prima facie case where
subjective criteria was used and plaintiffs' evidence showed
Caucasians were generally advanced more readily).

### 2.  Defendants' "Non-Discriminatory Reasons" Should Be Rejected.

Defendants assert the following alleged non-discriminatory
reasons for their adverse treatment of Worthen:

(1) Worthen "lacked the training and skills necessary to be
a successful wrestler," ("lack of skills"),(DB at 18);
(2) WCW purportedly was experiencing a "business downturn"
in "1999" and had "less need for mediocre talent," ("business
downturn"), (DB at 18); and
(3) Worthen was "unable to commit to the training schedule
necessary for him to become a successful professional wrestler,"
("lack of commitment"), (DB at 18).

A reasonable jury could conclude that each reason is a pretext for discrimination, as discussed below.

### a. Lack of Skills

Although Defendants' burden of production at this stage is light, a defendant is nevertheless required to identify its non-discriminatory reasons and support them with a "clear and reasonably specific" factual basis, as Worthen is entitled to a "full and fair opportunity" to demonstrate pretext. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 258 (1981). The Supreme Court's requirement of a "clear and reasonably specific" non-discriminatory reason is critical because a court needs "objective factors that can be tested against other testimony and evidence." Chapman v. A.I. Transport, 229 F.3d 1012, 1034 n. 25 (11th Cir. 2000). Thus, an employer cannot obtain summary judgment by merely stating it did not hire the plaintiff because "I did not like his appearance," with no further explanation. See Id.

Similar to the justification provided in Chapman, Defendants' "lack of skills" reason for failing to advance Worthen is subjective and virtually impossible to test by any objective means.[10] Because Defendants have failed to provide factual support for their contention that Worthen lacked skills,

---

[10] WCW did not maintain any guidelines as to which wrestlers would receive contracts, television exposure, or wrestling opportunities. (See Juster at 128-129; Bruce at 80-82.)

- 34 -

neither Worthen nor the Court can reasonably evaluate the
truthfulness of these assertions.  Thus, unlike cases in which
an employer's subjective reason is justified by a reasonably
clear and specific explanation, Defendants' subjective
explanation is too vague and amorphous to rebut.  Compare Morris
v. Wallace Community College, 125 F. Supp. 2d 1315, 1330 (S.D.
Ala. 2001) (questioning whether employer provided a reasonably
specific factual basis for its vague and subjective reasons to
deny plaintiff a promotion) with Miller v. Bed, Bath & Beyond,
185 F. Supp. 2d 1253 (N.D. Ala. 2002) (employer provided a
factual basis for its subjective decision-making where
plaintiff, inter alia, left store unattended).

        Moreover, as to "lack of skills," the Court should note
that these Defendants have consistently proffered virtually the
same alleged non-discriminatory reason regarding other African-
Americans whom Defendants denied meaningful opportunities.
Incredibly, Defendants are simultaneously seeking summary
judgment in Plaintiff Norris' and Plaintiff Walker's case,
asserting that they too "lacked the basic skills necessary to be
a highly successful wrestler." (See DB Norris at 18, Tab T; DB
Walker at 20, Tab BB.)  In a similar race case brought by
African-American wrestler Tony Carr, Defendants argued that Mr.
Carr "lacked unique wrestling skills, physique, demeanor, and

other characteristics of WCW's better performers." (See DB Carr at 13, Tab L.)   Indeed, when WCW denied allegations raised by African-American wrestler Robert Ross in 1993, he too purportedly "lacked the charisma and ability to generate widespread interest in his matches."  (DB Ross at 9-10, Tab M.)

Accordingly, the Court should reject Defendants' purported reason that Worthen "lacked skills" because Defendants have failed to provide a factual basis.  See Burdine at 258.

In addition, the Court should reject "lack of skills" because Defendants' only supporting evidence is the testimony of witnesses who were not the decision makers as to Worthen's career at WCW and who have demonstrated racial bias. Strategically avoiding reference to Taylor, Defendants instead rely WCW Power Plant managers Orndorff and Hamilton for their broad assertions regarding Worthen.  Orndorff, however, denies that he had any authority to "push" a wrestler on the main events while he was manager at the Power Plant.  (Orndorff at 29.)  Similarly, Hamilton states that although he provided Taylor and other Bookers with his "opinions" about the wrestlers, he did not think that his recommendations influenced the decision-making process. (Hamilton at 29-31.)  Thus, the Court should disregard their testimony.  See IMPACT, supra at 1194 (rejecting Defendants' purported non-discriminatory reason

because defendants did not even offer proof of reasons by "any person who made the employment decision").

Moreover, **each of these individuals has demonstrated their racial bias against African-Americans**. Defendants take the anomalous position that Worthen was not qualified to wrestle on WCW's main events, even though the persons who belatedly deem him "unqualified" have demonstrated racial bias against African-Americans. Jody Hamilton made numerous racially derogatory statements while he was the manager at WCW's Power Plant, including using the word "nigger." (Smith at 19-21, 34, 122; Patterson at 30, 95-97, 117; Whatley at 95-97, Tab Y; Reeves at 59; Carr at 55, 97, Tab I; Boulware at 59-61, 73, 150, Tab H.) Paul Orndorff also made numerous racial comments and racial slurs, even concluding that "niggers" were what was wrong with America. (Anderson at 106-107; 170; Hart at 117; Onoo at 254-255; see also Boulware at 23-33, 72-73, Tab H.)

Finally, Worthen has established a genuine issue of material fact as to whether he possessed the requisite skills to become a successful wrestler because numerous witnesses stated that he was sufficiently talented to wrestle for WCW, he received resoundingly positive talent evaluations, and WCW consistently told him that he was "one of the best" trainees at the Power Plant. (See infra pp. 9-11.)

### b.   "Business Downturn"

Like its "lack of skills" justification, WCW's "business downturn" reason lacks sufficient factual specificity to be entitled to any credence and should be rejected by this Court. (See supra pp. 34-35.)

In any event, Defendants' suggestion that WCW cut its payroll because of the downturn in its business in 1999 is demonstrably untrue.  According to John E. Kampfe, the Senior Vice President and Chief Accounting Officer for TBS, WCW lost millions of dollars on an annual basis "from the day Ted Turner bought it . . . up until roughly 1997, 1998 time frame." (Kampfe at 14-15.)  WCW was profitable for a very short period of time sometime between 1997 and 1999 and then began to lose money again.  (Id. at 15, 72-3.)  WCW did not have to worry about the cost of talent because TBS funded its losses, including covering that cost, **and TBS never told WCW to cut its cost of talent.**  (Id. at 61, 72-73, 113-114.)

Moreover, far from cutting costs in 1999, WCW went on a talent-buying binge. [11]  Indeed, in the same month that WCW refused to offer Worthen a contract, WCW added 13 new talents,

---

[11]    On March 31, 1999 -- two months before WCW refused to offer Worthen a contract in connection with the Power Plant move -- Diana Myers reported to Dr. Harvey Schiller, the President of Turner Sports, that WCW had just entered into new contracts with two new wrestlers (costing $895,000) and had given two wrestlers raises (costing $115,000), for a net talent cost increase of $1,010,000.  (Pl. Ex. 75, Tab P.)  Following those increases in costs, WCW was "$1,858,000 **under budget** for 1999."  (Id.)

gave two wrestlers raises, and terminated two contracts for a net increase in talent cost of $58,714 and was still "$100,000 **under budget** for 1999." (See Pl. Ex. 76, Tab Q.)

Thus, the evidence gathered by Worthen strongly suggests that WCW increased its payroll costs in every month of 1999, except October. It borders on ludicrous to suggest that WCW could not offer Worthen a contract in any amount because of a downturn in business in the middle of this spending spree.

### c. "Lack of Commitment"

WCW's contention that Worthen lacked the commitment necessary to become a professional wrestler is belied by the facts.[12] As WCW admits, at its behest, Worthen left his full-time employment with the Department of Corrections to train full-time at the Power Plant. (See Worthen at 26, 43, 114;

---

For further evidence of WCW's spending spree in 1999, see Pl Ex. 64, Tab R (listing thirty (30) new performers with WCW for the first six months of the year, representing an increase in payroll to new personnel of $2,709,514); Pl Ex. 44 at 019255, Tab S (showing that in August 1999, WCW added six white wrestlers, gave raises to two white wrestlers, and terminated six contracts, for a net payroll increase of $303,714); Pl. Ex. 44 at 019226, Tab S (showing that in October 1999, WCW added three white wrestlers and gave raises to three white wrestlers, adding another $966,714 to its payroll, while eliminating $1,943,000 in payroll costs by terminating 12 contracts -- over 35 percent of the reduction coming from terminating the contract of one of the two highest paid blacks in the WCW, Lash Huffman); Pls.' Ex. 44, Tab S (showing that in November 1999, WCW added a white wrestler, Vito Lograsso ($120,000 per year and a $12,000 signing bonus), and a white female "valet," Stacy Keibler ($15,000 per year plus per event payments) and gave raises to two other wrestlers, one white and one of unknown racial identification).
[12]   To the extent that WCW's "lack of commitment" justification means that he failed to attend the Power Plant frequently enough to receive a contract, it is sufficiently specific to be tested by objective means. To the extent that WCW offers this justification to say that although Worthen attended with sufficient frequency, he did not appear sufficiently committed, it suffers from the same lack of specificity as the "lack of skills" and "business downturn" justifications and should be rejected. See Burdine at 258.

Worthen Aff. ¶ 6, Tab A; DB at 5.)   Worthen paid $3,000 and

traveled between 214 miles per day for over two years to "train"

full-time at the Power Plant, despite the fact he spent much of

his "training" time performing janitorial tasks for WCW, such as

cleaning, sweeping, picking up trash and loading/unloading

trucks, without receiving any compensation.   (Worthen at 24-25,

28, 30, 94, 99-100, 112-113; Worthen Aff. ¶¶ 7-8, Tab A; Bruce

at 20-21.)   During this time, Worthen depleted his entire

savings.   (Worthen Aff. ¶ 17, Tab A.)

In essence, **Worthen paid WCW** to use him as free labor for

over two years.   That Defendants now contend that Worthen was

not sufficiently "committed" to his training because he did not

continue to attend the Power Plaint "full time" is palpably

absurd.   If "full time" training was so essential to Worthen's

success, WCW should have actually trained Worthen full-time

while he attended the Power Plant.   They failed to do so,

however, and should now not be heard to argue that Worthen

needed additional training to succeed at WCW.   This argument is

disingenuous, at best.

Moreover, while training at the Power Plant, Worthen

performed every task that WCW asked of him.   (Worthen at 85.)

Indeed, Worthen was a hard worker who was very disciplined and

committed to his training.   (See Hamilton Evaluation, Pls.'s Ex.

13, Tab D (describing Worthen as a "good solid worker"); Smith
at 160 ("[Worthen] was really putting forth the effort because
he really wanted to be a wrestler"); Walker Aff. ¶¶ 3-5, Tab HH
(describing Worthen as disciplined and committed.))  As a
result, WCW trainer Bruce described Worthen as a "heck of a
talent" and repeatedly told him that he was "one of the best
guys" at the Power Plant.  (Bruce at 67-68, Worthen at 33-37,
92-93.)  Despite this, WCW provided greater opportunities,
including contracts, to many Caucasian wrestlers who spent far
less time training than Worthen.  (Williams at 45 (testifying
that certain Caucasian wrestlers, including David Flair,
received a "push" from WCW even though "he wouldn't come to
training.  And he told them he wasn't coming, and didn't have
to, but the black guys did"); Worthen at 54, 64-66, 71-72;
Worthen Aff. ¶¶ 11-12, Tab A.)

Furthermore, Defendants' belated explanations as to why WCW
did not promote and push Worthen is internally inconsistent,
thus demonstrating that its reasons are pretextual.  See
Sheridan v. E.I. Dupont de Nemours, 100 F.3d. 1061, 1072 (11th
Cir. 1997) (noting that "weaknesses, and implausibilities,
inconsistencies, incoherencies, or contradictions" in
defendants' reasons could lead a reasonable fact-finder to find
them "unworthy of credence").

Although WCW now contends that Worthen "lacked commitment,"
Power Plant Manager Hamilton earlier described Worthen as a
"good solid worker." (See Pls.' Ex. 13, Tab D.)  When Worthen
asked Hamilton why WCW did not offer him a contract, however,
Hamilton told him it was because of his size.  (Worthen at 82.)
This reasoning did not make sense, however, because WCW offered
contracts to other wrestlers who were smaller than Worthen.
(Worthen at 95-96.)  Apparently recognizing this inconsistency,
WCW now offers the "lack of commitment" reasoning, which, of
course, also lacks  merit.

Thus, a reasonable jury could certainly conclude that
Defendants' inconsistencies as to Worthen's actual abilities and
commitment reveal that their proffered reasons merely mask WCW's
racial discrimination.  See Sheridan at 1072.  For all of these
reasons, Defendants cannot credibly argue that it did not
provide a contract to Worthen because he lacked commitment.

### d.   Statistical Evidence.

In addition to establishing pattern and practice evidence,
Worthen's statistical evidence further demonstrates pretext.
See Teamsters v. United States, 431 U.S. 324 (1977); see also
Washington v. Brown & Williamson Tobacco Corp., 756 F. Supp.
1547, 1554 n.5 (N.D. Ga. 1991), aff'd. 959 F.2d 1566 (11th Cir.
1992) (statistical disparities, "which are insufficient to

demonstrate a pattern and practice of discrimination, might still be relevant to making out a prima facie case or proving pretext"). Accordingly, a reasonable jury could certainly conclude that WCW's contentions regarding Worthen are a pretext to mask discrimination.

### e.   Circumstantial Evidence.

Even if the Court somehow does not find that WCW's constant racial slurs and racist comments constitute direct evidence of discrimination, the Court must consider all such slurs and remarks as circumstantial evidence of pretext. See Damon v. Fleming Supermarkets of Florida, Inc. 196 F.3d 1354, 1361 (11th Cir. 1999) (holding that although statements regarding a discriminatory animus toward older managers did not constitute direct evidence, the evidence did constitute "probative circumstantial evidence of age discrimination"); Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1290 (11th Cir. 1998). As noted supra, Worthen has established significant anecdotal evidence of discrimination. (See supra at 17-24).

Accordingly, even if this Court applies McDonnell Douglas, Defendants are not entitled to summary judgment because Worthen has established an abundance of evidence from which a reasonable jury could conclude that WCW discriminated against him. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 255

- 43 -

(1981) (plaintiff is entitled to "directly persuade" the Court that a "discriminatory reason more likely motivated" adverse treatment).

## II.  **WORTHEN IS ENTITLED TO A JURY TRIAL BECAUSE HE HAS ESTABLISHED EVIDENCE OF ILLEGAL RACE-BASED DECISIONS**

In addition to establishing blatant racist discrimination, Worthen demonstrates evidence of race-based decision-making, which is illegal, regardless of the specific intent or racial animus of the decision-makers.  See EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1284 (11th Cir. 2000); Miller v. Bed, Bath & Beyond, Inc., 185 F. Supp. 2d 1253, 1254-65 (N.D. Ala. 2002) ("[I]t is well established that making work assignments along the lines of race or color is forbidden . . . .").

Eric Bischoff essentially instructed Bookers not to use African-American wrestlers because "blacks wouldn't buy a ticket to an event but would instead stay at home and watch it on TV." (Anderson at 74-75, 177.)  Moreover, Taylor and Arn Anderson each admitted that Turner had conducted a survey, and that because black people were not coming to the matches they were not going to "use all the blacks."  (Boulware at 96, 124-125, Tab H; see also Smith at 58 (acknowledging the belief/perception that African-Americans would not pay to see a live event, or pay

- 44 -

for pay-per-views); accord Anderson at 184-185; Walker at 96-97.)

WCW also retained the services of independent marketing companies to ascertain, among other things, the racial demographics of WCW's viewing audiences. (See Grace Aff. ¶ 6, Tab K; Pls.' Ex. 72, Tab V; Ferrara at 59 (stating that he attended a presentation from a marketing research firm that reported that more black persons were watching WCW on television than were actually paying for tickets to see live events); see also Sullivan at 23 (testifying that the audience was predominantly white.))  Importantly, the evidence demonstrates that WCW frequently used, or did not use, black wrestlers based on such marketing data.  (Walker at 80; Boulware at 150, Tab H; Randal Anderson at 74-74, 144-145; Whatley at 132-134, Tab. Y; Miller at 66, 101.)[13]

Accordingly, Worthen has established ample evidence that Defendants engaged in illegal race-based decision-making.  See Ferrill v. The Parker Group, Inc., 168 F.3d 468, 472-475 (11th Cir. 1999).

---

[13] At times, WCW even maintained lists of wrestlers, designating the various categories of wrestlers, including the "Mexicans" and "the blacks." (Anderson at 95-97.)

- 45 -

## III. **WORTHEN IS ENTITLED TO A JURY TRIAL AS TO HIS HOSTILE WORK ENVIRONMENT CLAIM**.

The Court should not grant summary judgment as to Worthen's hostile work environment claim because his work environment was permeated with racial insult and racial humiliation. From the beginning of his relationship through the end, Worthen was constantly mistreated insulted, and humiliated because of his race; he was subjected to a racist culture in which every facet of his relationship was tainted by the color of his skin. Thus, he is entitled to recover under a hostile work environment claim, especially where, as here, many of the racist comments and slurs were regular, routine, and made in public. See Edwards v. Wallace Community College, 49 F.3d 1517, 1521 (11th Cir. 1995); see also, Busby v. City of Orlando, 931 F.2d 764, 785 (11th Cir. 1991) ("the fact that many of the epithets were not directed at [the plaintiff] is not determinative" of whether work atmosphere was hostile).

Moreover, because Worthen was subjected to a hostile work environment, Defendants are either strictly liable for the conduct of the supervisors, or vicariously liable because they can make no showing that they took any actions whatsoever to "prevent and correct promptly" the racially harassing harm

inflicted on Worthen.[14]   See Faragher v. City of Boca Raton, 524
U.S. 775, 808 (1998).[15]

**IV.   WORTHEN IS ENTITLED TO A JURY TRIAL AS TO HIS FLSA CLAIM**

In connection with Worthen's FSLA claim, Defendants argue
only that Worthen was not an employee.  It is well-recognized
that pursuant to social welfare legislation, such as the FLSA,
the statutory definition regarding who is an employee is given a
broad and comprehensive meaning to accomplish the remedial
purposes of the FLSA. See United States v. Rosenwasser, 323 U.S.
360, 362-363 (1945).  Whether the parties intended to create an
employment relationship is irrelevant to the analysis. See
Brennan v. Partida, 492 F.2d 707, 709 (5th Cir. 1974).
Similarly, an employer cannot escape the reaches of the FLSA by
merely labeling an employee an independent contractor. See
Rutherford Food Corp. v. McComb, 331 U.S. 722, 729 (1947).

In Harrell v. Diamond A Entertainment, Inc., 992 F. Supp.
1343 (M.D. Fla. 1997), the court determined that the defendant
"employed" an exotic dancer, despite the nightclub's claims that

---

[14] Indeed, the only effort WCW made to address the hostile work environment
was to conduct a diversity workshop at Goodly's suggestion.  The wrestlers
mocked this workshop by fictitiously signing the names of racially
controversial people.  (Pls.' Ex. 18, Tab W.)
[15]    Defendants also argue that Worthen cannot establish a claim for a
hostile work environment because he maintains that he was still able to
become a qualified wrestler.  (See DB at 23.)  In this regard, Defendants
essentially argue that an individual cannot make out a claim for hostile work
environment unless the conditions are so offensive as to require the
individual to leave the job, i.e., constructive discharge.  This is not the
law, as courts routinely recognize actionable adverse actions that fall short
of "constructive discharge."  See e.g., Wideman v. Wal-Mart, Inc., 141 F.3d
1453 (11th Cir. 1998).

she was an independent contractor because she provided her own costume, hairstyle and music. Id. at 1349. The court found it critical that the employer controlled the "meaningful" parts of the business: atmosphere and surroundings, and the flow of customers into the club. Id. at 1349.

Similarly, Defendants argue that Worthen was not dependent on them because he "developed his own wrestling persona, decided which costumes he was going to wear and was responsible for finding and purchasing the costumes." (See DB at 25.) Like the nightclub in Harrell, however, WCW controlled all "meaningful" aspects of events, indicating that there was an employment relationship. See Harrell at 1352. [16] [17] [18]

It is undisputed that Worthen worked thirty-five hours a

---

[16]    The extent to which the task performed by a putative employee was integral to the business of the employer is also a factor indicating dependence. See Rutherford Food Corp., 331 U.S. at 730. The Court in Harrell explained, "[e]xotic dancers are obviously essential to the success of a topless nightclub." Id. at 1352. Certainly, the same can be said of the relationship between WCW and its wrestlers.

[17]    WCW also maintains that Worthen was not an employee because, for part of the time that he worked at the Power Plant, he worked at other places as well. (See DB at 25.) This is not conclusive of the inquiry. If it were, employers could avoid the strictures of the FLSA with respect to all part-time employees that held other employment by simply claiming that they were not "employees." Nothing in the FLSA permits such a result. See 29 U.S.C. § 206.

[18]    Defendants have argued that any FLSA violation that occurred prior to July 10, 1998, is time-barred by the Act's two-year statute of limitations. Actually, the statute of limitations under the FLSA is three years where, as here, there has been a willful violation of the Act. 29 U.S.C. § 255(a). "Willful violation" is defined as a violation where the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the Act. See McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988).

week for WCW without compensation.[19]   (Worthen Aff. ¶ 9, Tab A).
Thus, such factual disputes preclude this Court from denying
Worthen relief under the FLSA, as a matter of law.   See
generally Duncan v. Brockway Std., Inc., 1992 U.S. LEXIS 21165
*14 (11th Cir. 1992).

## V.    WORTHEN IS ENTITLED TO A JURY TRIAL AS TO HIS CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

To recover for intentional infliction of emotional
distress, Worthen must show that intentional conduct that is
extreme and outrageous has caused him severe emotion distress.
See Hendrix v. Phillips, 207 Ga. App. 394, 428 S.E.2d 91 (1993).
In an employment relationship, where one party enjoys control
over another, the courts are more apt to find the existence of
outrageous conduct.   See Bridges v. Winn-Dixie Atlanta, 176 Ga.
App. 227, 335 S.E.2d 445 (1985).

---

[19]    Under the FLSA, employers are required to keep certain minimum records
on each employee. 29 U.S.C. § 211(c).    These records must accurately
reflect, inter alia, the time of day and day of the week when the work weeks
begins, the regular hourly rate of pay, hours worked, and wages paid.    29
C.F.R. §516.   When inadequate or no employment records exist, an employee's
testimony recollecting hours he worked may be used to establish a prima facie
case.   Leonard v. Carmichael Properties & Mgmt. Co., Inc., 614 F. Supp. 1182,
1186 (S.D. Fla. 1985).
    Once the employee has made out his prima facie case, the burden shifts
to the "employer to come forward with evidence of the precise amount of work
performed or with evidence to negative the reasonableness of the inference to
be drawn from the employee's evidence."   See Anderson v. Mt. Clemens Pottery
Co., 328 U.S. 680, 687-88 (1946).   If the employer fails to do so or relies
on unsubstantiated estimates, the court may then award damages to the
employee, despite only approximate results.   See Anderson, 328 U.S. at 688;
see also Caro-Galvan v. Richardson, Inc., 992 F.2d 1500, 1514 (11th Cir.
1993).

Worthen is entitled to a jury trial because genuine issues exist as to the outrageousness of WCW's Bookers and trainers' conduct. Worthen submits that the racial discrimination and racially hostile environment, as well as Defendants' intentional misrepresentations and abuse of their decision-making power go well "beyond the bounds of common decency." See Coleman v. Housing Authority of Americus, 191 Ga. App. 166, 169, 381 S.E.2d 303 (1989) ("workplace is not a free zone" for causing emotional distress). Accordingly, a jury should consider Worthen's claim.

## CONCLUSION

For the foregoing reasons, Worthen submits that Defendants' Motion for Summary Judgment should be denied.

Respectfully submitted this 30th day of January, 2003.

Cary Ichter
Georgia Bar No. 382515
Charles J. Gernazian
Georgia Bar No.: 291703
Michelle M. Rothenberg-Williams
Georgia Bar No. 615680

**MEADOWS, ICHTER & BOWERS, P.C.**
Fourteen Piedmont Center, Suite 1100
3535 Piedmont Road
Atlanta, GA  30305
(404) 261-6020

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

This is to certify that I have this date served opposing counsel to this action with the foregoing **PLAINTIFF'S BRIEF IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** by hand delivering a copy of the same, addressed as follows:

> Eric Richardson, Esq.
> Evan Pontz, Esq.
> Troutman Sanders LLP
> Suite 5200, Bank of America Plaza
> 600 Peachtree Street, N.E.
> Atlanta, Georgia  30308-22165

This ___30___ day of January, 2003.

Michelle M. Rothenberg-Williams
Georgia Bar No. 615680

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

WILLIAM WORTHEN,              )
                              )
        Plaintiff,            )
                              )      Civil Action File No.:
v.                            )      1-00-CV-1717 (CC)
                              )
WORLD CHAMPIONSHIP            )
WRESTLING, INC. and           )      **JURY TRIAL DEMANDED**
TURNER SPORTS, INC.,          )
                              )
        Defendants.           )
_____)



## **PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Comes now Willy Worthen and respectfully submits his response to Defendants Statement of Undisputed Material Facts In Support of their Motion for Summary Judgment, showing the Court as follows:

1.    Worthen does not dispute SMF No. 1.

2.    Worthen does not dispute SMF No. 2.

3.    Worthen disputes SMF No. 3.  Although Defendant WCW designated wrestlers and other performers to be independent contractors, as a matter of law these workers were employees of WCW.  Under the terms of the standard Independent Contractor Agreements ("ICA") into which WCW entered with virtually all of its contract talent, performers were not allowed to compete with WCW either during or after the term of their contracts.

Additionally, WCW's standard ICA forbid performers from doing **any kind of work** without the express permission of WCW.  This rule was reinforced by JJ Dillon on April 30, 1999, when he sent a memo to "All WCW Talent" regarding schedules "including personal appearances."  (Pls.' Ex. 49, Tab GG[1]; Morrison at 172.) In his memo, Mr. Dillon advised all wrestlers that "all requests for days 'off' must be requested in advance and approved by JJ Dillon."  Mr. Dillon also told the wrestlers that during time "off," wrestlers could not make personal appearances unless those appearances were first approved by WCW.  Under the policy announced by Mr. Dillon, if a wrestler was approached about a personal appearance, he would be required to refer the request to Mr. Dillon.  Mr. Dillon would decide whether to approve the appearance.  WCW would then collect the appearance fee, and the wrestler would be required to share the fee with WCW.   WCW exercises complete control over wrestlers' performances --- deciding every detail of every performance --- from the specific dates and times to the consequences for being late or missing a scheduled performance.  Any failure to comply with this policy would be considered a breach of contract.

    4.    Worthen does not dispute SMF No. 4.

---

[1] All references to "Tabs" refer to documents attached in the Appendix filed with Plaintiff's Response to Defendants' Motion for Summary Judgment.

5.   Worthen disputes SMF No. 5.  During its entire
existence, WCW only made money during a brief period of time.
According to John E. Kampfe, the Senior Vice President and Chief
Accounting Officer for TBS, WCW lost millions of dollars on an
annual basis "from the day Ted Turner bought it . . . up until
roughly 1997, 1998 time frame." (Kampfe at 14-15.)  WCW never
lost any of its own money because all of it losses were financed
by its parent corporation Defendant Turner Broadcasting System,
Inc. ("TBS").  As of June 30, 1997, TBS funded $76,607,338 of
losses and asset acquisitions by WCW.  (Kampfe at 113-14.)  WCW
was profitable for a very short period of time sometime between
1997 and 1999 and then began to lose money again.  (Id. at 15,
72-73.)  During that period, TBS financed WCW's losses because
having access to WCW programming allowed TBS's subsidiaries to
"boast about its ratings" because the WCW program "was the
highest rated cable show on television." (Id. at 42.)  TBS
financed WCW's losses for access to WCW programming.  (Id. at
73-74.)  WCW did not have to worry about the cost of talent
because TBS covered that cost, **and TBS never told WCW to cut its
cost of talent.**  (Id. at 61.)

WCW was involved in significant hiring during 1999.  On
March 31, 1999, Diana Myers reported to Dr. Harvey Schiller, the
President of Turner Sports that WCW had just entered into new
contracts with two new wrestlers (costing $895,000) and had

- 3 -

given two wrestlers raises (costing $115,000), for a net talent
cost increase of $1,010,000.  (Pl. Ex. 75, Tab P.)  Following
those increases in costs, WCW was "$1,858,000 **under budget** for
1999."  (Id.)  During May 1999, WCW added 13 new talents, gave
two wrestlers raises, and terminated two contracts for a net
increase in talent cost of $58,714.  (Pl. Ex. 76, Tab Q.)  In
her May report, Myers reported to Schiller that "we are
currently $100,000 **under budget** for 1999."  (Id.)

     A memo from Myers to Bischoff and Bill Busch dated June 9,
1999, reported on New ICAs (Independent Contractor Agreements)
and Trainees, listing thirty (30) new performers with WCW for
the first six months of the year, representing an increase in
payroll to new personnel of $2,709,514.  (Pl. Ex. 64, Tab R.)

     6.   Worthen disputes that WCW experienced a "business
downturn" for the reasons set forth in Response to SMF No. 5
hereof, which is incorporated by reference herein.  Worthen also
disputes that WCW "restructured" the Power Plant for financial
reasons.  WCW's legal counsel, Diana Myers, testified that WCW
moved the Power Plant because it "wanted it to be more
professional, more like a part of the company and we would keep
track of what's going on there for liability purposes . . . ."
(Myers at 118.)  Consistent with this testimony, on March 15,
1999, Randy Melcher sent a memo to Brenda Smith, the
administrative assistant at the Power Plant, in which he

- 4 -

indicated that Diana Myers had informed him that once the Power
Plant moved, only those trainees that were under contract would
be allowed to train and that "[i]t was agreed that going-
forward, all WCW Power Plant trainees should be covered under
the WCW worker's compensation program." (See Pls.' Ex. 26A, Tab
O.)

Power Plant Manager Jody Hamilton testified that WCW moved
the Power Plant "to have everything under one umbrella, one roof
. . . so that merchandising and accounting and – and all
departments of WCW would be under the same roof." (Hamilton at
85.)

7.   Worthen disputes that WCW experienced a "business
downturn" for the reasons set forth in Response to SMF No. 5
hereof, which is incorporated by reference herein.  Worthen does
not dispute that WCW sold certain of its assets and completely
ceased its operations in March of 2001.

8.   Worthen does not dispute SMF No. 8.

9.   Worthen does not dispute SMF No. 9.

10.   Worthen does not dispute SMF No. 10.

11.   Worthen does not dispute SMF No. 11.

12.   Worthen does not dispute that based upon his tryout,
WCW trainers believed that Worthen had potential and WCW invited
him to train full-time at the Power Plant.  Worthen disputes
that WCW ran a "full-time professional wrestling program"

- 5 -

because many Caucasian trainees at the Power Plant did not attend full-time.  (Williams at 45; Walker Aff. ¶ 7, Tab HH, Worthen at 43, 64-66; Worthen Aff. ¶ 11, Tab A.)

13.  Worthen disputes SMF No. 13.  Although it appeared that the purpose behind the Power Plant "training" program was to physically train Worthen, WCW required him to spend part of each day and, in some instances, entire days performing janitorial work and other menial tasks, such as sweeping, cleaning bathrooms, hauling garbage, loading/unloading trucks and moving the wrestling rings for upcoming events.  (Worthen at 28, 30, 94, 99-100, 112-113; Bruce at 20-21.)

14.  Worthen does not dispute SMF No. 14.

15.  Worthen does not dispute that WCW trainers told him that he needed to train full time.  Worthen disputes that full-time training was an actual prerequisite to success at the Power Plant or WCW because many Caucasian wrestlers did not train full-time at the Power Plant and received contracts from WCW nonetheless.  (Williams at 45; Walker Aff. ¶ 7, Tab HH, Worthen at 43; Worthen Aff. ¶ 12, Tab A.)

16.  Worthen does not dispute that he trained full-time at the Power Plant for two years.

17.  Worthen disputes SMF No. 17.  Although Worthen wrestled in a few wrestling matches, Worthen's experience consisted of wrestling as a "jobber" or "enhancement talent,"

someone who is used to enhance the career of another wrestler, typically a Caucasian, which do not allow for the exposure necessary to become a successful wrestler. (Walker Aff. ¶ 10, Tab HH, Worthen Aff. ¶ 23, Tab A.) In addition, WCW scripted Worthen to lose all but one of his matches and never permitted him to win a televised match. (Worthen Aff. ¶ 22, Tab A.)

18. Worthen does not dispute SMF No. 18.

19. Worthen disputes SMF No. 19. There were many Caucasian wrestlers from the Power Plant with equal or less experience than Worthen who WCW were scripted to win multiple matches. (Worthen Aff. ¶ 21, Tab A.) For example, the following wrestlers with similar experience as Worthen won multiple wrestling matches: "Horeshoe, Dale Torberg pka "The Daemon," Scott Chasser pka "Lorenzo," Robert Vick pka "Sickboy," Mark LeRoux pka "Lash LaRue," Rick Cornell pka "Reno," Bill Goldberg and Evan Koragias pka "Evan Courageous." (Id.)

20. Worthen disputes SMF No. 20. A wrestler's success was limited only by the creative imaginations and intentions of the Caucasian Bookers. (See Sullivan at 35 (testifying to the fallibility of process because matches were "not real"); see also Hicks Aff. ¶¶ 9-11, Tab II.) Indeed, WCW made an actor, David Arquette, its world heavyweight wrestling champion even though Arquette had no demonstrable "wrestling" experience. As noted by a WCW producer, WCW could have made Worthen a superstar

because WCW can "make anybody they want to a superstar."
(Kearce at 82.)

21.   Worthen disputes that he "was not a polished wrestler
and lacked the distinct personality and charisma of WCW's better
wrestling talent."   WCW trainer Bruce described Worthen as a
"heck of a talent."   (Bruce at 67.)   He was impressed by
Worthen's abilities, speaking capabilities and personality.
(Id. at 68.)   After watching Worthen in a match against
"Hacksaw" Duggan, Bruce told Worthen that he was "one of the
best guys" at the Power Plant.   (Worthen at 33.)

When Worthen was forced to leave the school for a few weeks
to seek employment, Bruce contacted Worthen and asked him to
return to the school and again stated that he was "one of the
best guys in the school."   (Id. at 36-37.)   Indeed, Bruce
consistently told Worthen that he was the best trainee at the
Power Plant.   (Id. at 92-93.)   Bruce testified that he would
have used Worthen had he been the head Booker: "I would give
Willie a shot no matter what show it was.   I would give Willie a
shot."   (Bruce at 69.)   Bruce further testified that he would
"definitely" use Worthen in the independent wrestling
association that he is currently working to establish.   (Bruce
at 109.)

Other individuals also noticed Worthen's talent.   Trainer
Mike Wenner told Worthen that he was working well at the Power

Plant and that "things would work out for him."  (Worthen at
93.)  Trainer Whatley also told Worthen that he was good enough
to receive a contract but that WCW's failure to do so was "just
the way things went down there."  (Id. at 90-92.)  WCW's talent
evaluations of Worthen were consistently and resoundingly
positive.  (See Pls.' Ex. 11, Tab B (talent evaluator describing
Worthen: "Willie looks good.  Has a great attitude.  Works very
well in the ring . . . ."); Pls.' Ex. 12, Tab C (evaluation
stating that Worthen has "been successfully used on the WCW
wrestling program" and describing his character as "fast moving,
charismatic, aggressive- comes to the ring to look good as well
as to win every match; Powerful and graceful at the same time");
Pls.' Ex. 13, Tab D (Hamilton's evaluation describes Worthen as
a "good solid worker . . . looks like an athlete, his 'gimmick'
is his solid convincing work in the ring."))

       Similarly, after wrestling against Worthen, Caucasian
wrestler William C. Demott pka "General Rection" or "Hugh
Morris" commented to WCW trainers Whatley and Bruce that Worthen
was "one of the best guys he [had] wrestled from the school."
(Worthen at 34-35.)  After this match, one of the Bookers, Jimmy
Hart, also told Worthen that every time he saw Worthen wrestle,
Worthen got "better and better."  (Id. at 42.)   Famous
Caucasian wrestler Bill Goldberg also commented that Worthen had
potential.  (Id. at 36, 109-111.)

Indeed, even Terry Taylor, who was notoriously racist and had openly expressed his dislike for African-Americans, (see Snakovsky at 40, 76, 78, 83-84, 108; Snakovsky Aff. ¶ 7, 18, Tab J; Miller at 66, 101, 148-149; Williams at 54-57, 110-111, 114-116; Williams Aff. ¶ 14, 40, Tab X; Anderson at 85, 107, 172-173; Carr at 92-93, 139, Tab I; Boulware at 71, 124-125, Tab H), and Martin Lunde pka "Arn Anderson," who was also racist, (R. Anderson at 83-84, 87, 109-111, 174; Walker at 211, Williams at 252), commented that Worthen was athletic and a good wrestler. (Worthen at 34-35, 90-92, 109-111).

Taylor refused to give Worthen a contract, however, and did nothing to "push" Worthen or to provide him with opportunities to succeed.   (Worthen Aff. ¶ 16, Tab A.)   Taylor persisted in his refusal despite the repeated recommendations of the WCW trainers.   (Worthen at 35 (testifying that Bruce and Whatley commented that they had tried tell WCW management that Worthen was qualified but that management would not listen); Bruce at 69 (testifying that he went out of his way to recommend Worthen to Terry Taylor and other members of the Booking Committee.))

Worthen does not dispute that WCW generally used him as "enhancement talent."

22.   Worthen disputes SMF 22.   WCW utilized enhancement talents as "jobbers."   A jobber is a wrestler that is scripted to lose a match and make another wrestler look good.   Enhancment

matches do not provide an opportunity for the jobber to showcase his talents or progress. (Williams at 110; Walker Aff. ¶ 10, Tab HH.)

23. Worthen disputes SMF 23 for the reasons set forth in Response to SMF 21 hereof, which is incorporated by reference herein. Additionally, Worthen disputes that he was "inexperienced" because WCW utilized, pushed and offered contracts to many Caucasian wrestlers that had less or similar experience as Worthen. (Worthen Aff. ¶¶ 12, 21, Tab A.)

24. Worthen disputes SMF No. 24 as stated. Worthen took a three/four week break from his training in 1998 to secure employment to support himself and to enable himself to continue to train. He was forced to take a temporary break because he had been attending the Power Plant and laboring for WCW free of charge for two years. (Worthen at 38.)

25. Worthen does not dispute SMF No. 25.

26. Worthen disputes SMF No. 26 as stated. Worthen did not ask the WCW trainers if he could train part-time. He told them that, after two years, he was "broke," unable to support himself and could not continue to train "full time" without payment. (Worthen at 45.)

27. Worthen does not dispute SMF No. 27.

28. Worthen does not dispute that he continued to attend the Power Plant part-time. Worthen disputes that he spent this

- 11 -

time "training" because he was still required to spend some time every day, and in some instances, his entire "training" session performing janitorial tasks for WCW.  (Worthen Aff. ¶ 17, Tab A.)

29.   Worthen disputes SMF No. 29.  When he left his security job after ten months, he began working part-time for FedEx.  He was guaranteed only 17-20 hours per week.  (Worthen at 40.)

30.   Worthen disputes SMF No. 30 to the extent it implies that Worthen trained once a week because he was working full-time at FedEx.  Worthen was working part-time for FedEx and attended the Power Plant once a week because the WCW was in the process of moving the Power Plant and he learned that once WCW completed the move, only wrestlers who were under contract would be permitted to train at the Power Plant.  (Worthen at 40-41; Worthen Aff. ¶ 18, Tab A.)

31.   Worthen disputes that there was a "restructuring" at WCW for the reasons set forth in Responses to SMF Nos. 5 and 6 hereof, which are incorporated by reference herein.  Worthen does not dispute that WCW moved the Power Plant facility from its previous location to a new location on Log Cabin Drive at the end of 1998 and into 1999.

32.   Worthen does not dispute SMF No. 32.

33.   Worthen does not dispute SMF No. 33.

- 12 -

34. Worthen disputes SMF No. 34 to the extent that it implies that the trainers evaluated Worthen's "skills and talents" to decide whether or not to offer him a contract. According to WCW trainer Bruce and numerous other individuals, Worthen was one of the best trainees at the Power Plant, yet he did not receive a contract at the end of the evaluations. (Bruce at 67-69, 109; Pls.' Exs. 11-13, Tabs B-D; Worthen at 33-37, 42, 92-93, 109-111.) Worthen does not dispute that WCW training officials attended the Power Plant for six to eight weeks and watched the trainees.

35. Worthen does not dispute SMF No. 35.

36. Worthen does not dispute SMF No. 36.

37. Worthen disputes that WCW made decisions regarding which Power Plant trainees would be offered contracts on the basis of the tryouts for the reasons set forth in Response to SMF No. 34 hereof, which is incorporated by reference herein. Worthen does not dispute that he was working for Federal Express and training part-time at the time WCW conducted the "tryouts."

38. Worthen disputes SMF No. 38 for the reasons set forth in Response to SMF No. 34 hereof, which is incorporated by reference herein.

39. Worthen disputes SMF No. 39 for the reasons set forth in Response to SMF No. 34 hereof, which is incorporated by reference herein. Worthen also disputes that WCW concluded that

- 13 -

he was not committed to becoming a professional wrestler, as it offered contracts to many Caucasian wrestlers that trained less often and for a lesser number of years than had Worthen. (Walker Aff. ¶ 7, Tab HH, Smith at 160; Williams at 45; Worthen Aff. ¶ 12, Tab A.)

40. Worthen disputes SMF No. 40 for the reasons set forth in Responses to SMF Nos. 20, 34, and 39 hereof, which are incorporated by reference herein. Worthen does not dispute that WCW did not offer him a contract to wrestle with WCW or to train at the new facility.

Respectfully submitted this 30th day of January, 2003.

Cary Ichter
Georgia Bar No. 382515
Charles J. Gernazian
Georgia Bar No. 291703
Michelle M. Rothenberg-Williams
Georgia Bar No. 615680

**MEADOWS, ICHTER & BOWERS, P.C.**
Fourteen Piedmont Center, Suite 1100
3535 Piedmont Road
Atlanta, GA 30305
Telephone:  (404) 261-6020
Telecopy:   (404) 261-3656

- 14 -